**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>**Achaogen, Inc.**,<br><br>　　　　　　Debtor.[1] | Chapter 11<br><br>Case No. 19-10844 (BLS) |

**DECLARATION OF BRIAN L. CUMBERLAND IN SUPPORT OF DEBTOR'S
MOTION FOR ORDER APPROVING THE IMPLEMENTATION OF THE
<u>KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN</u>**

　　　　I, Brian L. Cumberland, hereby declare and state as follows:

　　　　1.　　I am a Managing Director at Alvarez & Marsal ("<u>A&M</u>"). In March 2019, the above-captioned debtor and debtor in possession (the "<u>Debtor</u>") engaged A&M to provide compensation consulting services in relation to the Debtor's restructuring activities, including for a potential chapter 11 filing. I am familiar with the pre- and post-petition structure of the Debtor's compensation plans as well as the structure of the Debtor's proposed 2019 employment compensation programs—the Key Employee Incentive Plan (the "<u>KEIP</u>") and the Key Employee Retention Plan (the "<u>KERP</u>", and collectively, the "<u>Employee Compensation Plans</u>")—as they are set forth in the Debtor's Motion Pursuant to 11 U.S.C. §§ 105, 363(b), and 503(c)(3) for entry of an Order [2] Approving Debtor's Employee Compensation Plans (the "<u>Motion</u>").

　　　　2.　　I respectfully submit this declaration (the "<u>Declaration</u>") on behalf of A&M in support of the Debtor's Motion for an Order Approving the Implementation of the

---

[1] The last four digits of the Debtor's federal tax identification number are 3693. The Debtor's mailing address for purposes of this Chapter 11 Case is 1 Tower Place, Suite 400, South San Francisco, CA 94080.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

Employee Compensation Plans, filed contemporaneously herewith. The Debtor has duly authorized me to do so.

3. Except as otherwise indicated, I have personal knowledge of all facts in this Declaration, based on my review of the Debtor's operations and finances, my research into compensation practices for companies that have filed for chapter 11 protection, and information supplied to me by members of the Debtor's management team and the Debtor's other advisors. For the reasons described below, it is my opinion that the Debtor's Employee Compensation Plans are reasonable and consistent with market practice for companies in chapter 11. If called upon to testify, I could and would testify competently to the facts and opinions set forth herein.

**A.     Employment and Background**

4. I received my Bachelor's degree in Business Administration from the University of Texas. Thereafter, I received a Juris Doctorate from the St. Mary's School of Law and Latin Legum Magister in Taxation from the University of Denver. Prior to joining A&M, I worked in KPMG's National Tax Practice in addition to leading KPMG's Compensation and Benefits Group for the Southwest. Since my time at KPMG, I have been employed by A&M for over thirteen years.

5. A&M is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. A&M designs and delivers solutions that manage risk, optimize benefits, cultivate and value talent, and expand the power of capital to protect and strengthen institutions and individuals. A&M focuses on five key business segments: corporate performance improvement, private equity services, restructuring and turnaround, valuation, and regulatory and risk advisory.

6. My responsibilities at A&M have primarily involved consulting with large companies, specifically with regard to executive compensation and the development of compensation strategies. I have worked with numerous Fortune 1000 companies, and have participated in the development and design of hundreds of management and employee incentive/retention plans for companies inside and outside of bankruptcy.

7. I am frequently retained by large companies to advise them on their employee compensation strategies, programs, and pay levels. I am also retained by companies performing specific searches for management personnel, for which I provide guidelines on general market practice and the level and form of current market compensation for those positions.

8. I am highly experienced in executive, management, and employee compensation matters with nearly 30 years of experience in the field. During this time, I have been the lead or supporting employee compensation expert in more than 50 bankruptcy cases, and have frequently testified as to the reasonableness of a variety of postpetition compensation arrangements. Specifically, I have been involved in the review and design of key employee incentive plans, management incentive plans, key employee retention plans, severance plan design, and other similar-type plans in the chapter 11 cases of, among others, Abengoa Bioenergy, Aeropostale, AF Global, Alpha Natural Resources, American Gilsonite Company, Answers Corporation, API Heat Transfer, Aralez Pharmaceuticals, Inc., Arcapita Bank B.S.C.(c), Azure Midstream Partners, LP, Bonanza Creek, Breitburn Energy Partners LP, , The Brock Group, Inc., Bruno's Supermarkets, LLC, Cal-Dive, Castex Energy, Inc., Cenveo, Inc., Coldwater Creek, Inc., Ciber, Inc., Eastman Kodak Company, Eddie Bauer, Energy Corporation of America, Fairway Midstream; GNC Holdings, Hercules Offshore Inc., iHeart Media, Lehman

Brothers Holdings, Inc., Nine West, Nortel, Pacific Drilling, Payless Shoes, Rockport Shoes, Seadrill Ltd., Sun Edison, Truck Pro, Toys R US, Ultra-Petroleum Corp, Vanguard Natural Resources, Washington Mutual, and YRC Worldwide.

**B.     Overview of Opinion**

9.      I have familiarized myself with the Debtor's operations and unique challenges, provided assistance in developing and reviewing the Employee Compensation Plans, gathered relevant market compensation data, and analyzed whether the Employee Compensation Plans are consistent with market practice.

10.     Based on my analysis, the KEIP and KERP are reasonably designed and consistent with market practices for the Debtor's employees. My conclusion is based on several factors:

(a)     The KEIP awards certain of the Debtor's executives with incentive payments (the "KEIP Payments") if the Debtor closes a section 363 sale transaction that amounts to proceeds to the Company (i.e., after bid protections (break-up fee and expense reimbursements) amounts, as applicable, have been deducted) greater than $25 million ("Asset Sale Proceeds"). For Asset Sale Proceeds between $25 million to $30 million, the KEIP Participants will receive a one-time KEIP Payment equal to 1% to 10% of their base salaries to be interpolated linearly from $25 million to $30 million. For every $5 million realized over $30 million, the KEIP Participants will each receive an additional 10% of their base salaries; provided, however, KEIP Payments will be capped at 300% of the KEIP Participants' individual base salaries;

(b)     The estimated level of potential compensation provided under the KEIP, when considered within the context of total compensation, is reasonable in comparison to market-based compensation of other similarly-situated companies; even taking into account the additional compensation provided by the Employee Compensation Plans and the Debtor as outlined in the Motion, Participants' (as defined below) total compensation is below market;

(c)     The KERP awards key non-insider personnel with payments equal to 20% to 42% of their base salary not to exceed $1,427,255 in the aggregate ("Collective Funds"); and

4

  (d)  The KEIP and KERP designs are consistent with other restructuring programs.

11. In addition to my conclusions above, the Debtor's board of directors approved the KEIP and KERP on April 12, 2019.

**C.** **The Debtor's KEIP**

12. The Debtor has recognized a need to address the concerns of its employees and its creditors and to align the interests of these respective constituencies. In order to effectively and efficiently accomplish an orderly sale process (the "Sale") that maximizes value for all stakeholders, the Debtor has determined that formulating the KEIP was in the best interest of its estate and all parties in interest. The KEIP will help ensure that key employees who are essential to the Chapter 11 Case and sale processes are properly motivated to maximize value for the Debtor, its estate, its creditors and other parties in interest. With these objectives in mind, the Debtor, after extensive consultation with, and benchmarking analysis by, A&M, developed the KEIP to properly incentivize certain key insider employees identified by the Debtor.

13. The KEIP is designed to provide incentives to four (4) eligible employees (the "KEIP Participants") to achieve a successful sale process for the benefit of all of the Debtor's stakeholders. The KEIP Participants are all insiders and consist of the Chief Executive Officer, the General Counsel, the Chief Commercial Officer, and the Chief Business Officer.

14. It is my understanding that each of the KEIP Participants is playing a central role in the chapter 11 process and, in particular, the Debtor's ongoing marketing and sale efforts. Incentivizing the KEIP Participants is critical in order to ensure that these key employees remain focused on their efforts to successfully guide the Debtor through the bankruptcy process and maximize value for the benefit of all of the Debtor's stakeholders.

15. As the Debtor continues its marketing efforts to solicit the highest and best offer from interested market participants, it is imperative that the Debtor's key personnel is appropriately incentivized to maximize the sale price to ensure optimum recovery for all stakeholders. Not only have the KEIP Participants continued to fulfill the normal tasks and projects required by the ordinary demands of their employment, but I understand they have been, and will continue to be, required to expend substantial additional time and resources on tasks relating to the implementation of the proposed restructuring, the day-to-day reporting and operational requirements of this Chapter 11 Case, and the ongoing marketing and sales process.

16. Awards under the KEIP will be paid out in accordance with the KEIP term sheet (the "<u>KEIP Term Sheet</u>") attached as **Exhibit A** to the Motion. All of the KEIP Participants will be entitled to incentive payments (the "<u>KEIP Payments</u>"); provided, however, the KEIP Payments will only be distributed if the Debtor consummates a section 363 sale transaction with proceeds to the Debtor (i.e., after bid protections (break-up fee and expense reimbursements) amounts, as applicable, have been deducted) greater than $25 million ("<u>Asset Sale Proceeds</u>").

17. Upon Asset Sale Proceeds amounting to more than $25 million, the amount of each individual's KEIP Payment will be based on (i) the amount of Asset Sale Proceeds above $25 million and (ii) the KEIP Participants' base salaries. Each KEIP Participant will receive a one-time KEIP Payment equal to a percentage of their base salaries for Asset Sale Proceeds amounting to more than $25 million. For Asset Sale Proceeds between $25 million and $30 million, the KEIP Participants will receive a KEIP Payment equal to 1% to 10% of their base salaries to be interpolated linearly from $25 million to $30 million. For every $5 million realized over $30 million for a Sale of the Debtor's assets, the KEIP Participants will receive an

additional 10% of their base salaries; provided, however, KEIP Payments will be capped at 300% of the KEIP Participants' individual base salaries.  For example, the payments to the KEIP Participants upon hypothetical Asset Sale Proceeds of $40 million would total in the aggregate $512,580.

18.    The KEIP Payments will be distributed upon the consummation of a sale of the Purchased Assets.  Even if the Debtor's assets are sold on a piecemeal basis rather than in a single transaction, KEIP Payments will still be determined and distributed based on the total aggregate value of the Purchased Assets.

19.    It is important to note that the KEIP is not a "pay to stay" retention plan. Instead, the KEIP incentivizes KEIP Participants by tying payments directly to operating disbursements or the proceeds received from the Debtor's sale process. Accordingly, the KEIP is a true incentive plan that successfully aligns the interests of the Debtor, its employees, and its stakeholders, in that it motivates the KEIP Participants to strictly adhere to the established budget or achieve the highest sale price, which in turn will improve recoveries for the Debtor's creditors.

**D.    A&M's Independent Review of the Reasonableness of the KEIP**

20.    Since A&M was retained by the Debtor in March 2019, I have familiarized myself with the Debtor's operations and unique business and restructuring challenges.  At the start of our engagement, A&M discussed with the Debtor and its advisors the Debtor's operational history, financial performance, restructuring process, and various issues regarding the Debtor's workforce and employee programs.  A&M reviewed the structure of the Debtor's primary incentive programs and executives' existing base salaries, paying specific

attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

21.     In assessing the design of the KEIP, my primary goal in the course of these interactions with the Debtor was to ensure that the resulting compensation levels for KEIP Participants would be appropriate based on market comparisons as well as ensure that the KEIP design is in line with typical chapter 11 practice. To guide the design of the KEIP and assess the design relative to market practice, my team and I conducted a comprehensive review of incentive-based programs implemented in other chapter 11 cases. We examined a population of 20 companies (the "All Companies Set") that filed for bankruptcy protection, underwent a sale of their assets, implemented key employee incentive plans linked to the results of the sale process while in bankruptcy, and were approved by bankruptcy courts in 2013 or later. The target aggregate cost associated with proposed KEIPs in the All Companies Set were compared to the aggregate cost at target payout levels.

E.    **Analysis of KEIP Participants Total Direct Compensation**

22.     In assessing the reasonableness of the KEIP, I worked with my team to analyze competitive target total direct compensation ("TDC")—an industry-standard benchmark that includes the sum of base salary and target annual bonus awards—for all KEIP Participants. A critical initial step in this analysis was to define the relevant market for talent. A&M analyzed 18 public similarly-situated company proxy statements for the purpose of obtaining benchmark compensation levels for executive positions. We matched the KEIP Participants to competitive benchmark position matches and compiled market TDC for use in our analysis. I believe these benchmarks are reasonable for compensation benchmarking purposes.

23. In evaluating the Debtor's executives' TDC opportunity, A&M compared the KEIP Participant's target TDC with and without the proposed KEIP (which, for TDC purposes, included retention payments made to the KEIP Participants as discussed in the Motion) to the competitive benchmark TDC (including retention payments) for each position. We then calculated the KEIP Participant's aggregate variance from the 25th and 50th percentiles of the market. Compared to the market, the KEIP Participant's aggregate annual target TDC (including retention payments) were well below the market 25th percentile for each KEIP Participant.

24. Given the above observations, I believe that the Debtor's KEIP is reasonable and in line with the relevant standard for similarly-situated companies.

F.  **Analysis of Aggregate KEIP Payments**

25. In addition, A&M calculated the percentage of Asset Sale Proceeds designated for the KEIP Participants (assuming a sale of $40 million for the Purchased Assets) and compared it to the percentage of sale proceeds set aside for incentive plans of similarly-situated companies in bankruptcy at the 25th, 50th, and 75th percentile of the market. The KEIP Payments, at a total cost of $512,580, were found to be 1.28% of the Asset Sale Proceeds, which was lower than the 75th percentile (1.37%) of the market target percentage. Based on the Debtor's KEIP Payments falling below the 75th percentile of the market reference companies, the Debtor's KEIP aggregate costs were found to be reasonable in comparison.

G.  **The Debtor's KERP**

26. The Debtor seeks to implement the KERP for key non-management personnel who are not KEIP Participants, in order to ensure that the Debtor does not suffer significant and costly turnover of essential employees during the chapter 11 process. To develop the KERP, the Debtor's management analyzed its workforce and given the significant recent

reductions in employees determined that the entirety of its remaining workforce was absolutely essential to a successful restructuring and sale process.

27. The Debtor's management team has identified twenty-eight (28) employees to likely participate in the KERP (the "KERP Participants" and, together with the KEIP Participants, the "Participants"), based on their status as critical, hard to replace employees. None of the KERP Participants are insiders, as that term is defined in section 101(a)(31) of the Bankruptcy Code. It is my understanding from the Debtor's management that many of the KERP Participants have developed valuable institutional knowledge regarding the Debtor's ongoing business operations, and keeping such employees in their current roles over the near term will be key to the successful completion of the Debtor's sale process as well as the efficient administration of this Chapter 11 Case and the Debtor's estate.

28. Awards under the KERP will be paid out in accordance with the KERP term sheet (the "KERP Term Sheet") attached hereto as **Exhibit B**. The Collective Funds reserved for the KERP Participants will not exceed $1,427,255 in the aggregate. Of the Collective Funds, each KERP Participant's respective allocation (the "KERP Payment") will be solely based on a percentage of the KERP Participants' base salaries and their continued employment with the Debtor through the consummation of the Sale of the Debtor's assets. No other performance metrics will be included to determine the amount of the KERP Payments. Upon the consummation of the sale of the Debtor's assets, each KERP Participant remaining employed with the Debtor will receive a retention payment ranging from 20 to 42% of their base salary.

29. If a KERP Participant voluntarily terminates their employment prior to the consummation of the sale of the Debtor's assets, the KERP Participant will forfeit any rights to a KERP Payment.

### H. The KERP Design is Consistent with the Bankruptcy Market

30. The KERP covers twenty-eight (28) non-insiders with award amounts equal to 15-42% of each KERP Participant's base salary. The total cost of the KERP is $1,427,255 in the aggregate. To evaluate the KERP, A&M compared such compensation to that of 40 similarly-situated companies to assess the Debtor's cost and structure of the KERP. A&M compared the proposed KERP payments taken in the aggregate to other retention plans (i) approved by bankruptcy courts in 2013 or later and (ii) containing no more than one hundred (100) participants.

31. A&M calculated the aggregate cost of the KERP in isolation and compared it to the aggregate costs of KERP Payments at the 25th, 50th, and 75th percentile of the market for KERPs with less than one hundred (100) participants that were approved by bankruptcy courts in 2013 or later. In comparing the KERP against other similarly-situated bankruptcy companies, the KERP Payments fell within the 66th percentile of the market. Given that (i) restructuring KERP programs for non-insiders are common, (ii) there are no other compensation arrangements in place for the KERP participants other than base salary (aside from the Prepetition KERP Participants (as defined in the Motion)), and (iii) the KERP Payments fell below the 75th percentile of the market reference companies, the KERP design is reasonable.

### I. The Debtor's KEIP and KERP Are Reasonable and Justified By Market Practices

32. Based on my education, experience and the work I have done on this matter, it is my opinion that the KEIP and the KERP are designed to be consistent with market

practice, are reasonable given the facts and circumstances and provides anticipated value that is appropriate to competitively motivate talented staff.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: April 15, 2019

/s/ *Brian L. Cumberland*
Brian L. Cumberland