**EXHIBIT 1 TO ORDER: Engagement Letter**

DocuSign Envelope ID: 5E6AEBB9-3550-4C22-AB93-1530BA115802



## Cassel Salpeter & Co.
### INVESTMENT BANKING

*Strictly Confidential*

April 2, 2019

Blake Wise
Chief Executive Officer
Achaogen, Inc.
1 Tower Place, Suite 300
South San Francisco, CA

**INVESTMENT BANKING AGREEMENT**

Dear Blake:

We are pleased to confirm our mutual understanding regarding the retention of Cassel Salpeter & Co., LLC ("CS") by Achaogen, Inc., its subsidiaries, affiliates, beneficiaries, successors and assigns (collectively, and with any entity formed or used for the purposes set forth herein, the "Company"), subject to the terms and conditions of this agreement, inclusive of Exhibit A annexed hereto and incorporated herein by reference (the "Agreement"). The Company is considering filing Chapter 11 bankruptcy proceedings (the "Bankruptcy") in the U.S. Bankruptcy Court for the District of Delaware, (the "Bankruptcy Court").

1. **Purpose of Engagement.** The Company hereby retains CS as its exclusive financial advisor and to assist the Company in connection with any Sale Transaction(s) (as defined herein) in connection with a potential Bankruptcy. For purposes of this Agreement, a "Sale Transaction" shall mean, any transaction or series of transactions that close following the date of commencement of any bankruptcy proceeding of the Company (regardless of whether such bankruptcy proceeding is subsequently dismissed or converted to a case under any other chapter of Title 11 of the United States Code) involving (a) an acquisition, merger, consolidation, or other business combination pursuant to which all or substantially all of the business assets, subsidiaries, divisions, business segments, operations, securities, or equity interests of the Company are, directly or indirectly, combined with or otherwise acquired by another company; (b) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding economic interests in the Company or possessing a majority of the then outstanding voting power of the Company; (c)

any other purchase or acquisition, directly or indirectly, by a buyer or buyers of any assets, securities or other interests of the Company; or (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of a controlling interest in the Company to a third party. Any such Sale Transaction may be consummated through any means, including, without limitation, through a Section 363 sale or process under the United States Bankruptcy Code (the "Bankruptcy Code"), or through a confirmed plan of reorganization or plan of liquidation, or otherwise.

2. **Term and Termination.** The term of the Agreement shall be for a period commencing on the date hereof and expiring twelve (12) months from the date hereof and shall automatically renew for additional one (1) month upon the same terms and conditions until terminated as hereinafter provided (the "Term"). On or after six (6) months, the Company may terminate this Agreement upon thirty (30) days prior written notice to CS. The Company may terminate this Agreement at any time for Cause. "Cause" shall include the Company's good faith determination (subject to CS's right to contest any such determination, and subject to any related final judicial determination by a court of competent jurisdiction (not subject to appeal)) that (a) CS has materially breached this Agreement (provided that CS shall be provided reasonable notice and opportunity to cure such breach) or (b) CS has engaged in willful misconduct, gross negligence or bad faith. Notwithstanding any termination or expiration of this Agreement, the provisions of this Paragraph 2 and Paragraphs 5, 7, 8, 9, and 10 and Exhibit A, which is attached hereto and incorporated herein, shall survive any such termination or expiration.

3. **Services.** CS will act as the Company's financial advisor with respect to the matters listed below and may perform other services as it recommends as reasonably necessary and are agreed by the Company. During the term of this engagement, CS will not be engaged to provide investment banking financial advisory services to any potential buyer of the Company in connection with a Sale Transaction between such potential buyer and the Company. For the avoidance of doubt, CS may provide investment banking financial advisory services to any such potential buyer or any other party so long as such services are unrelated to the Company or a Sale Transaction involving the Company. Each of CS and the Company agrees to act in compliance with all applicable laws, rules and regulations in connection with the engagement hereunder.

   a) **General Advisory Services**

      (i) Reviewing and analyzing the Company's business, operations and financial projections;

      (ii) Attending meetings of the Board of Directors of the Company (whether in person or telephonically) with respect to matters on which we have been engaged to advise hereunder; and

      (iii) Providing testimony, as necessary, with respect to matters on which we have been engaged to advise hereunder in any proceeding before the Bankruptcy Court.

   b) **Sale Transaction Services**

      (i) Assisting in the preparation of materials, describing the Company's industry, business strategy, business and management, and incorporating current financial and other

appropriate information furnished by the Company (which may be amended and/or supplemented from time to time);

(ii) Assisting the Company with market testing the debtor-in-possession financing currently anticipated from Silicon Valley Bank, or, if such financing is not obtained from Silicon Valley Bank, identifying and evaluating alternative candidates for potential debtor-in-possession financing;

(iii) Assisting in creating a teaser and confidential information memorandum to be distributed to potential bidders;

(iv) Assisting the Company in identifying and evaluating candidates for any potential Sale Transaction;

(v) Advising the Company in connection with negotiations, and aiding in the consummation of any such Sale Transaction;

(vi) Advising with regards to possible affiliations with strategic partners;

(vii) Advising with regards to divestitures of non-strategic assets;

(viii) Assisting or cooperating in the drafting and/or review of any materials for submission to the Bankruptcy Court, creditors, or other parties in interest related to any Sale Transaction or the process therefor; and

(ix) Providing testimony, as necessary, with respect to matters on which we have been engaged to advise hereunder in any proceeding before the Bankruptcy Court.

4. **Nature of Engagement.** In order to facilitate CS's efforts under this Agreement, during the Term, the Company shall not authorize any other party to act on the Company's behalf with respect to the services agreed to in this Agreement (other than counsel) and the Company will promptly inform CS of any discussions, negotiations, or inquiries regarding any potential Sale Transaction(s), including any such discussions or inquiries that have occurred during the one (1) year period prior to the date hereof.

5. **Fees.** In consideration for our services described above, CS shall be entitled to receive and the Company agrees to pay CS, the following compensation:

a) **Advisory Fee.** A non-refundable, $200,000 fee which shall be due and earned in full on the date of execution of this Agreement, provided, however, that such Advisory Fee shall be payable by check or wire transfer in immediately available U.S. funds, as follows: $100,000 on the date hereof; $50,000 on the first monthly anniversary hereafter; and $50,000 on the second monthly anniversary hereafter; and provided further, however, that in the event of expiration or termination of this Agreement (whether for Cause or not for Cause) prior to the payment in full of this $200,000 Advisory Fee, then any remaining unpaid portion of such Advisory Fee owing hereunder shall be payable upon such expiration or termination of this Agreement.

DocuSign Envelope ID: 5E6AEBB9-3550-4C22-AB93-1530BA115802

b) **Sale Transaction Fee.** If the Company consummates a Sale Transaction, the Company shall pay to CS a sale transaction fee (the "Sale Transaction Fee"), payable by check or wire transfer in immediately available U.S. funds at the closing of the Sale Transaction, equal to the greater of (x) $500,000 or (y) the sum of (i) 3.0% of the Sale Consideration (as defined in Exhibit A) up to $30 million; and (ii) 4.5% of the Sale Consideration in excess of $30 million. Notwithstanding the foregoing, in the event any Sale Transaction(s) includes deferred and/or contingent payment(s), the Company shall pay to CS the portion of any Sale Transaction Fee relating thereto, payable in cash by check or wire transfer in immediately available U.S. funds, if and when such deferred and/or contingent payment(s) is actually paid.

c) **Multiple Closings.** If more than one Sale Transaction is consummated, CS shall be compensated based on the aggregate Consideration of all Sale Transactions, calculated in the manner set forth above.

d) **Fee Obligation.** CS shall be entitled to the fees set forth in this Paragraph 5 with respect to any Sale Transaction consummated during the Term, or within six (6) months after the date of any termination or expiration of this Agreement, provided, however, that in the event of any proper termination of this Agreement by the Company for Cause prior to the expiration hereof, CS shall not be entitled to any Sale Transaction Fee pursuant to Paragraph 5(b) for any Sale Transaction that is consummated within six (6) months after the date of any such proper termination of this Agreement for Cause.

e) **Reasonableness.** The parties acknowledge that this engagement will require a substantial professional commitment of time and effort by CS. Moreover, the amount of time and effort may vary substantially during different periods of this engagement. As a result, in order to ensure the availability of all necessary professional resources, whenever required, CS may be foreclosed from pursuing other alternative engagement opportunities. In light of the foregoing, the parties agree that the fee arrangement provided for herein is reasonable and fairly compensates CS.

All fees due to CS as set forth in this Paragraph 5 shall not be subject to offsets, are non-refundable and non-cancelable. No fee payable to any third party, by the Company or any other person or entity, shall reduce or otherwise affect any fee payable hereunder to CS.

6. **CS Retention in Bankruptcy Proceedings.** The Company agrees that it will use its best efforts to obtain prompt authorization from the Bankruptcy Court to retain CS on the terms and conditions set forth in this Agreement under the provisions and standards of review of Section 328(a) of the Bankruptcy Code. Subject to being so retained CS agrees that during the pendency of any such proceedings, it shall continue to perform its obligations pursuant to this Agreement and that it shall file interim and final applications for allowance of the fees and expenses payable to CS under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure, and any applicable local rules and order of the Bankruptcy Court. The Company shall supply CS with a draft of the retention application and proposed retention order authorizing CS's retention sufficiently in advance of the filing of such application and proposed order to enable CS and its counsel to review and comment thereon. The order authorizing the employment of CS as a professional must be acceptable to CS in its sole discretion. CS shall be under no obligation to provide any services under this Agreement unless CS's retention under the terms of this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the

Bankruptcy Court, which order is acceptable to CS in its sole discretion. The retention application shall note that in agreeing to seek CS's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that CS's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Sale Transaction, that the value to the Company of CS's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of CS's proposed fees, including the Sale Transaction Fee, is reasonable regardless of the number of hours to be expanded by CS professionals in the performance of the services to be provided hereunder, and therefore CS professionals shall not be required to maintain time records, that the proposed fees shall not be considered to be "bonuses" or fee enhancements under applicable law and that all fees and expenses due and payable to CS shall be paid directly out of any gross cash proceeds of any Sale Transaction, or if such gross cash proceeds are not sufficiently available, out of other funds of the Company regardless of the existence of any other unpaid administrative claims. Notwithstanding anything to the contrary in this Agreement, the Company is not and shall not be obligated to file any Bankruptcy proceedings or to consummate any Sale Transaction.

7.     **Lenders.** In consideration for CS's agreement to render services to the Company under the terms of this Agreement, the Company's lenders (included on the signature page below) agree to the following: (a) CS's fees and expenses may be paid to CS free and clear of any lien, claim or interest that the lenders may have in the Company's assets or the proceeds thereof; and (b) in the event that CS becomes entitled to any fees under Paragraph 5 above, the lenders agree to fully subordinate their right to payment of their debt (whether principal, interest or other costs or charges) or any other recovery on its claims to the payment of all fees and expenses due to CS under this Agreement.

8.     **Additional Agreements.** In the event that the Company requests CS to provide services exceeding the scope contemplated by this Agreement, the parties will discuss and agree in good faith to the additional fees associated with such services.

9.     **Reimbursement of Expenses.** In addition to the fees described in Paragraph 5 above, the Company shall promptly reimburse CS, upon CS's prompt request (which shall be made no less than monthly), for all reasonable and documented out-of-pocket expenses incurred by CS in connection with this Agreement or the performance thereof, whether or not any Sale Transaction, or other type of transaction is consummated, including, but not limited to, travel and lodging, databases, fees and disbursements of CS's counsel, and any other consultants and advisors retained by CS after consultation with and agreement by the Company. All fees and reimbursable expenses due to CS hereunder shall have no offsets, are non-refundable and non-cancelable. CS shall not incur unpaid expenses pursuant to this Paragraph 9 in excess of $20,000 without having obtained the Company's prior written consent to incur such expenses.

10.    **Other.** In performing services pursuant to the Agreement, CS is not assuming any responsibility for the decisions of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Sale Transaction or other transaction. CS shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements; nor shall CS be

responsible for providing or deemed to have providing any tax, accounting, actuarial, legal or other specialist advice.

We look forward to formalizing our business relationship.  If the foregoing and the attached Exhibit A correctly set forth our agreement, please execute the enclosed copy of this Agreement in the space provided and return it to us.

Very truly yours,

**CASSEL SALPETER & CO., LLC**

By:_____
James S. Cassel
Chairman


Confirmed and agreed to this _7th_ day of April, 2019


**ACHAOGEN, INC.**

By:_____
Name: Blake Wise
Title:     CEO

**WITH RESPECT TO LENDER ACKNOWLEDGEMENTS AND PAYMENT OBLIGATION UNDER PARAGRAPH 7 HEREIN**


**SILICON VALLEY BANK**


By:_____
Name:
Title:

responsible for providing or deemed to have providing any tax, accounting, actuarial, legal or other specialist advice.

We look forward to formalizing our business relationship. If the foregoing and the attached Exhibit A correctly set forth our agreement, please execute the enclosed copy of this Agreement in the space provided and return it to us.

Very truly yours,

**CASSEL SALPETER & CO., LLC**

By:_____
     James S. Cassel
     Chairman

Confirmed and agreed to this _7th_ day of April, 2019

**ACHAOGEN, INC.**

By:_____
Name:
Title:

**WITH RESPECT TO LENDER ACKNOWLEDGEMENTS AND PAYMENT OBLIGATION UNDER PARAGRAPH 7 HEREIN**

**SILICON VALLEY BANK**

By:_____
Name: Sheila Colson
Title: Managing Director

DocuSign Envelope ID: 5E6AEBB9-3550-4C22-AB93-1530BA115802

## EXHIBIT A

(A)  **Sale Consideration.** For purposes of this Agreement, the term "Sale Consideration" means (x) the total amount of cash and the fair market value (on the date of payment) of all the property paid and payable (including amounts paid into escrow) in connection with any Sale Transaction (or related transaction), including amounts paid and payable in respect of convertible securities, preferred equity securities, minority interest obligations, earn out provisions, non-competition agreements, warrants, stock appreciation rights, option or similar rights, whether vested or not, plus (y) the principal amount of all indebtedness for borrowed money or other liabilities of the Company or relevant Company entity, as applicable, as set forth on the most recent balance sheet or, in the case of the sale of assets, equity or other securities, all indebtedness for borrowed money or other liabilities assumed, cancelled, exchanged, credit bid, or forgiven by any third party. Sale Consideration shall also include the aggregate amount of any dividends or other distributions declared by the Company or relevant Company entity, as applicable, after the date hereof other than normal quarterly cash dividends, and, in the case of the sale of assets, equity or other securities, the net value of any current assets not sold by the Company or relevant Company entity, as applicable. For purposes of calculating Sale Consideration, (i) all shares will be deemed transferred where a Sale Transaction is effected by the transfer of shares, (a) constituting 50% of the then outstanding equity securities of or equity interests in the Company or relevant Company entity having more than 50% of the economic interest in the Company or relevant Company entity, as applicable, or (b) possessing more than 50% of the then outstanding voting power of the outstanding equity securities of, or an equity interests in, the Company or relevant Company entity, as applicable, and (ii) the value of securities (whether equity or debt) that are freely tradable in an established public market will be determined on the basis of the average closing price in such market for the 10 trading days prior to the closing of the Sale Transaction (the "Valuation Date"); and the value of securities that have no established public market or other property will be the fair market value of such securities or other property on the Valuation Date and any restricted stock (i.e., stock in a public company not freely tradable) received shall be valued at 85% of the public market price of such stock. The aggregate fair market value of all such securities that have not established public markets and other property shall be determined by CS and the Company, or by an independent appraiser jointly selected by CS and the Company, the cost of which shall be borne entirely by the Company. Sale Consideration shall also be deemed to include pension liabilities and guarantees of monies borrowed, assumed, cancelled, exchanged, credit bid or forgiven directly or indirectly by a third party.

(B)  **Representations and Covenants.** The Company shall make available to CS, and will use its best efforts to cause other parties to make available to CS, such party's officers, directors, and advisors, and such information as CS may reasonably request for the purpose of carrying out its engagement hereunder. The Company represents and warrants that all information provided to CS by or on behalf of the Company in connection with this Agreement and the services to be performed hereunder by CS, shall be to the best of the Company's knowledge, true, complete, and correct as of the date of such delivery and shall not fail to state a material fact necessary to make any of such information not misleading. The Company acknowledges that the ability of CS to adequately provide services as described herein is dependent upon the prompt receipt of accurate, correct, and complete information by CS. The Company further represents and warrants that this Agreement has been duly and validly authorized by all requisite corporate action; that the Company has the full right, power, and capacity to execute, deliver, and perform its obligations hereunder; and that this Agreement, upon execution and delivery of the same by the Company, will represent the valid and binding obligation of the Company enforceable in accordance with its terms.

(C)  **Indemnification.** The Company hereby agrees to indemnify and hold CS, its affiliates, and its and their officers, directors, principals, employees, shareholders, members, representatives, and agents, each person, if any, who controls CS (or any affiliate) within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended, and their respective successors and assigns (collectively, the "Indemnified Persons"), harmless from and against any and all losses, claims, damages, liabilities, deficiencies, actions, suits, proceedings, costs, or expense whatsoever (including, but not limited to, reasonable legal fees and other expenses, and reasonable

DocuSign Envelope ID: 5E6AEBB9-3550-4C22-AB93-1530BA115802

disbursements incurred in connection with investigating, preparing to defend, or defending any action, suit, or proceeding, including any inquiry or investigation, commenced or threatened, or any claim whatsoever, or in appearing or preparing for appearance as witness in any proceeding, including any pretrial proceeding such as a deposition) (collectively the "Losses") (A) (i) arising out of, based upon, or in any way related or attributed to the Company's actions or failures to act (including statements or omissions made or information provided by the Company or its agents) or breach of this Agreement or (ii) actions or failures to act by the Company or an Indemnified Person with the Company's consent or in reliance on the Company's actions or failures to act or (B) otherwise related to or arising out of the engagement, CS's performance thereof, any other matter contemplated by this Agreement, or any other services CS is asked to provide to the Company (in each case, including related activities prior to the date hereof), except that this clause (B) shall not apply to any Losses to the extent that they are finally determined by a court of competent jurisdiction to have resulted from the willful misconduct, gross negligence, or bad faith of CS in performing the services hereunder. The Company will not settle, compromise, or consent to an entry of judgment in, or participate, facilitate or permit any settlement, compromise or entry of judgment on behalf of its directors or officers in, any pending or threatened action, suit or proceeding for which indemnification or contribution may be sought hereunder (whether or not an Indemnified Person is party thereto), unless such settlement, compromise, or consent includes a release of the Indemnified Persons reasonably satisfactory to CS in its sole discretion.

If CS or any Indemnified Person becomes involved in any capacity in any direct or third party action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person, including, without limitation, stockholders of the Company, in connection with or as a result of the engagement, CS's performance thereof, any other matter contemplated by this Agreement, any other services CS is asked to provide to the Company, or any actions taken or omitted to be taken by an Indemnified Person or the Company in connection with this Agreement (in each case, including related activities prior to the date hereof), the Company also agrees to promptly reimburse CS and such Indemnified Persons for their reasonable and documented expenses (including without limitation, reasonable fees and expenses of their counsel incurred in connection with investigating, preparing for, and responding to third party subpoenas or enforcing this Agreement ) as such expenses are incurred.

If CS receives written notice of the commencement of any claim, action, proceeding or investigation with respect to which the Company is or may be obligated to provide indemnification pursuant to this Section (D), CS shall, within thirty (30) days of the receipt of such written notice, give the Company written notice thereof (a "Claim Notice"). Failure to give such Claim Notice within such thirty (30) day period shall not constitute a waiver by CS or the Indemnified Persons of their right to indemnity hereunder with respect to such claim, action, proceeding or investigation, except to the extent such failure prejudices the Company's rights or its ability to defend against such claim, action, proceeding or investigation.

If for any reason the foregoing indemnification is unavailable or is insufficient to hold CS and the Indemnified Persons harmless, the Company agrees to contribute to such amount paid or payable by CS and the Indemnified Persons in such proportion as to reflect the relative benefits received by the Company, as the case may be, on the one hand, and CS and the Indemnified Persons, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by CS and any Indemnified Person in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company and its officers, directors, principals, employees, shareholders, members, representatives, and agents, on the one hand, and CS and the Indemnified Persons, on the other hand, in connection therewith, as well as any relevant equitable considerations. In no event shall CS and the Indemnified Persons be required to contribute, or otherwise be liable in connection with the matters contemplated by this Agreement for, an aggregate amount in excess of the fees actually received by CS pursuant to the terms of this Agreement. Relative benefits to the Company, on the one hand, and CS and the Indemnified Persons, on the other hand, with respect to the matters contemplated by this Agreement shall be deemed to be in the same proportion as (i) the total value paid

DocuSign Envelope ID: 5E6AEBB9-3550-4C22-AB93-1530BA115802

or proposed to be paid or received or proposed to be received by the Company and its security holders, as the case may be, pursuant to any Sale Transaction, whether or not consummated, contemplated by this Agreement, bears to (ii) all fees actually received by CS pursuant to this Agreement.

The Company further agrees that neither CS nor any other Indemnified Person shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in right of the Company related to or arising out of the Agreement, CS's engagement under this Agreement, any Sale Transaction, or any actions taken or omitted to be taken by an Indemnified Person or the Company in connection with this Agreement, except for losses, claims, damages or liabilities incurred by the Company which are finally judicially determined by a court of competent jurisdiction (not subject to appeal) to have resulted from the willful misconduct, gross negligence, or bad faith of such Indemnified Person. Without limiting the generality of the foregoing, in no event shall CS or any Indemnified Person have any liability to the Company or any of its affiliates, or the Company or its affiliates' stockholders or other security holders or creditors, or any other person, for the consequential, special, exemplary, or punitive damages arising out of the engagement or their performance thereof.

Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange, or other business combination or proposed sale, exchange, dividend, or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement and this Exhibit A, the Company will notify CS in writing thereof (if not previously so notified) and, if requested by CS, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement and this Exhibit A, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions satisfactory to CS in its sole discretion. The Company agrees that CS would be injured by any breach of this Agreement (including, without limitation, the agreement set forth in the immediately preceding sentence), that money damages alone may not be an adequate remedy for any such breach and that, in the event of any such breach, CS shall be entitled, in addition to any other remedies provided by law or equity, to pursue injunctive relief and specific performance.

(D) **Confidentiality.** CS acknowledges that, in connection with the services to be provided pursuant to this Agreement, certain confidential, non-public and proprietary information concerning the Company ("Confidential Information") has been or may be disclosed by the Company to CS or its employees, affiliates, attorneys, subcontractors, and advisors (collectively, the "Representatives"). CS agrees that, without the Company's prior written consent, no Confidential Information will be disclosed, in whole or in part, to any other person other than: (i) to those Representatives who need access to any Confidential Information for purposes of performing the services to be provided hereunder; (ii) to the Company and its attorneys and other advisors; (iii) as may be required by law or regulatory authority; or (iv) to third parties who have signed a confidentiality agreement, on terms substantially similar to those applicable to CS hereunder, in order to receive information concerning the Company in connection with potential Sale Transaction. The term "Confidential Information" does not include any information: (a) that was already in the possession of CS or any of its Representatives, or that was available to CS or any of its Representatives on a non-confidential basis, prior to the time of disclosure to CS or such Representatives; (b) obtained by CS or any of its Representatives from a third person which, insofar as is known to CS or such Representatives, is not subject to any prohibition against disclosure; (c) which was or is independently developed by CS or any of its Representatives without violating any confidentiality obligations under this Agreement; or (d) which was or becomes generally available to the public through no fault of CS or its Representatives. If CS becomes required by legal process or requested by regulatory authority to disclose any Confidential Information, prompt notice thereof (to the extent permitted by law, rule, or regulation) shall be given to the Company, and CS may disclose only that Confidential Information which its counsel advises it is compelled to disclose.

The obligations of CS and its Representatives set forth in this paragraph shall remain in effect for a period of one (1) year after the date of this Agreement or one (1) year from the last day of any agreed extensions hereto.

(E) **Independent Contractor.** It is expressly understood and agreed that CS has been retained to act solely as an exclusive financial advisor to the Company and, in such capacity, shall, at all times, act as an independent contractor with respect to the Company and not as an employee or agent of the Company, and nothing contained in this Agreement shall be construed to create a joint venture, partnership, association, or other affiliation, or like relationship, between the parties. It is specifically agreed that the relationship is and shall remain that of independent parties to a contractual relationship and that CS shall have no right to bind the Company in any manner. In no event shall either party be liable for the debts, liabilities, or other obligations of the other except as otherwise specifically provided in this Agreement.

(F) **Amendment.** No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is evidenced by written instrument, executed by the party against which such modification, waiver, amendment, discharge, or change is sought.

(G) **Notices.** All notices, demands, consents, approvals, or other communications given hereunder shall be in writing and shall be deemed to have been duly given when delivered in person or transmitted by facsimile transmission or on the third calendar day after being mailed by United States registered or certified mail, return receipt requested, postage prepaid, to the addresses herein above first mentioned or to such other address as any party hereto shall designate to the other for such purpose in the manner hereinafter set forth.

(H) **Entire Agreement.** This Agreement, including this Exhibit A, contains all of the understandings and agreements of the parties with respect to the subject matter discussed herein. All prior agreements, whether written or oral, are merged herein and shall be of no force or effect. This Agreement, including this Exhibit A, has been reviewed by the signatories hereto and their counsel. There shall be no construction of any provision against a party based on authorship, and the parties waive any statute or rule of law to such effect. The headings are inserted for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement including this Exhibit A.

(I) **Severability.** The invalidity, illegality, or unenforceability of any provision or provisions of this Agreement will not affect any other provision of this Agreement, which will remain in full force and effect, nor will the invalidity, illegality, or unenforceability of a portion of any provision of this Agreement affect the balance of such provision. In the event that any one or more of the provisions contained in this Agreement or any portion thereof shall for any reason be held to be invalid, illegal, or unenforceable in any respect, this Agreement shall be reformed, construed, and enforced as if such invalid, illegal, or unenforceable provision had never been contained herein.

(J) **Construction; Venue.** This Agreement and all aspects of the relationship created by this Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed therein. The Company agrees that the sole and exclusive venue for any claims, disputes, or other matters arising hereunder (whether based upon contract, tort, or otherwise) shall be the courts of the State of Delaware, the United States District Court for the District of Delaware, in each case located in the State of Delaware or, after a bankruptcy filing, the United States Bankruptcy Court for the District of Delaware, and agrees to waive any objections to such venue. THE COMPANY AND CS EACH HEREBY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING, SUIT, OR CLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT.

(K) **Binding Nature.** The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors and assigns. Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified

Persons (as defined in this Exhibit A) and each of their respective successors, heirs and assigns, any rights or remedies (directly or indirectly as a third party beneficiary or otherwise) under or by reason of this Agreement or as a result of the services to be rendered by CS hereunder.

(L) **Counterparts.** This Agreement may be executed in any number of counterparts, including PDF or facsimile signatures, which shall be deemed as original signatures. All executed counterparts shall constitute one Agreement, notwithstanding that all signatories are not signatories to the original or the same counterpart.

(M) **Attorneys' Fees and Court Costs.** If any party to this Agreement brings an action, directly or indirectly, based upon this Agreement or the matters contemplated hereby against the other party, the prevailing party shall be entitled to recover, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and expenses and court costs.

(N) **Computer Virus.** During the course of this engagement, CS may exchange electronic versions of documents and emails with the Company using commercially available software. Unfortunately, the technology community is occasionally victimized by the creation and dissemination of so-called viruses, or similar destructive electronic programs. CS has invested in document and email scanning software designed to identify and reject files containing known viruses, and therefore CS's system may occasionally reject a communication sent to it. CS cannot guarantee that its communications and documents will always be virus free. Occasionally, a virus will escape and go undetected as it is passed from system to system. Although CS believes its virus protection measures are excellent, it can make no warranty that its documents will be virus free at all times. Please inform CS immediately in the event a virus enters the Company's system via any electronic means originating from CS. Through cooperative efforts, disruption to communications can be minimized.

(O) **Legal Services.** While certain principals and employees of CS are attorneys, CS is not, in any manner, providing legal services or legal advice to the Company. Furthermore, the Company agrees and acknowledges that CS is not an advisor as to tax, accounting, or regulatory matters in any jurisdiction.

(P) **No Fiduciary Duties.** The Company represents that it is a sophisticated business enterprise that has retained CS for the limited purposes set forth in this Agreement, and the parties acknowledge and agree that their respective rights and obligations are contractual in nature. Each party disclaims any intention to impose fiduciary obligations on the other by virtue of the engagement as contemplated by this Agreement.

(Q) **Regulatory Requirements.** If necessary, the Company agrees to provide CS with information and supporting documentation to enable CS to comply with the requirements under the USA Patriot Act, the Financial Crimes Enforcement Network, and other regulations.

(R) **Marketing.** CS shall have the ability to publicize (i.e., use of the Company logo in its marketing materials) its role in providing the services as provided herein.