**EXHIBIT A**

ASSET PURCHASE AGREEMENT

by and between

ACHAOGEN, INC.,

SELLER

and

CIPLA USA INC.,

PURCHASER

DATED AS OF JUNE 20, 2019

# TABLE OF CONTENTS

Page

**ARTICLE 1** DEFINITIONS AND CONSTRUCTION ..................................................2
  **Section 1.1** Definitions.  For the purposes of this Agreement: ............................2
  **Section 1.2** Construction ...................................................................................16

**ARTICLE 2** THE TRANSACTION .........................................................................17
  **Section 2.1** Sale and Purchase of Purchased Assets .........................................17
  **Section 2.2** Excluded Assets ..............................................................................19
  **Section 2.3** Assumed Liabilities .........................................................................21
  **Section 2.4** Excluded Liabilities .........................................................................21
  **Section 2.5** Consideration. .................................................................................23
  **Section 2.6** Deposit ............................................................................................25
  **Section 2.7** Allocation of Purchase Price. ..........................................................26
  **Section 2.8** Closing ............................................................................................26
  **Section 2.9** Closing Deliveries. ..........................................................................26
  **Section 2.10** Payment of Cure Amounts .............................................................28
  **Section 2.11** Consents ........................................................................................28

**ARTICLE 3** REPRESENTATIONS AND WARRANTIES OF THE SELLER ........29
  **Section 3.1** Organization .....................................................................................29
  **Section 3.2** Authority and Enforceability ............................................................29
  **Section 3.3** No Conflict .......................................................................................29
  **Section 3.4** Title to Assets; Liens .......................................................................30
  **Section 3.5** Claims, Litigation and Disputes .......................................................30
  **Section 3.6** Compliance With Laws; Governmental Authorizations ...................30
  **Section 3.7** Environmental Matters .....................................................................30
  **Section 3.8** Contracts ..........................................................................................31
  **Section 3.9** Intellectual Property .........................................................................31
  **Section 3.10** Taxes ..............................................................................................34
  **Section 3.11** Real Property ..................................................................................34

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...35
  **Section 4.1** Organization and Good Standing ......................................................35
  **Section 4.2** Authority and Enforceability ............................................................35
  **Section 4.3** No Conflict .......................................................................................35
  **Section 4.4** Legal Proceedings ............................................................................35
  **Section 4.5** Availability of Funds .......................................................................35
  **Section 4.6** No Knowledge of Breach or Inaccuracy ..........................................35
  **Section 4.7** Independent Investigation ................................................................36

**ARTICLE 5** COVENANTS .....................................................................................36

i

| | | |
|---|---|---|
| **Section 5.1** | Access and Investigation | 36 |
| **Section 5.2** | Operation of the Plazomicin Business. | 36 |
| **Section 5.3** | Employee Matters | 38 |
| **Section 5.4** | Consents and Filings; Commercially Reasonable Efforts. | 38 |
| **Section 5.5** | Supplements to Disclosure Schedules | 39 |
| **Section 5.6** | Confidentiality | 40 |
| **Section 5.7** | Public Announcements | 40 |
| **Section 5.8** | Bulk Transfer Laws | 40 |
| **Section 5.9** | Bankruptcy Court Matters | 40 |
| **Section 5.10** | Bankruptcy Court Approval | 41 |
| **Section 5.11** | Assumption & Rejection of Executory Contracts | 42 |
| **Section 5.12** | Back-Up Bidder | 44 |
| **Section 5.13** | Post-Auction Supplement | 44 |
| **Section 5.14** | Payments Received. | 45 |
| **Section 5.15** | Cessation of Use of Acquired Intellectual Property. | 45 |
| **Section 5.16** | Transfer of Governmental Authorizations and IP Registrations | 45 |
| **Section 5.17** | Further Actions | 46 |
| **Section 5.18** | Use of Seller Corporate Names | 47 |

**ARTICLE 6** CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE ...... 47

| | | |
|---|---|---|
| **Section 6.1** | Conditions to the Obligation of the Purchaser | 47 |
| **Section 6.2** | Conditions to the Obligations of the Seller | 48 |

**ARTICLE 7** TERMINATION ...... 48

| | | |
|---|---|---|
| **Section 7.1** | Termination Events. | 48 |
| **Section 7.2** | Effect of Termination | 49 |

**ARTICLE 8** NO SURVIVAL ...... 50

| | | |
|---|---|---|
| **Section 8.1** | No Survival of Representations and Warranties and Certain Covenants | 50 |

**ARTICLE 9** TAX MATTERS ...... 51

| | | |
|---|---|---|
| **Section 9.1** | Transfer Taxes | 51 |
| **Section 9.2** | Proration items | 51 |

**ARTICLE 10** GENERAL PROVISIONS ...... 52

| | | |
|---|---|---|
| **Section 10.1** | Notices | 52 |
| **Section 10.2** | Amendment | 53 |
| **Section 10.3** | Waiver and Remedies | 53 |
| **Section 10.4** | Entire Agreement | 54 |
| **Section 10.5** | Assignment, Successors and No Third Party Rights | 54 |
| **Section 10.6** | Severability | 54 |
| **Section 10.7** | Exhibits and Schedules | 55 |
| **Section 10.8** | Interpretation | 55 |
| **Section 10.9** | Expenses | 55 |
| **Section 10.10** | Limitation on Liability | 55 |

**Section 10.11**   Specific Performance ......................................................................56
**Section 10.12**   Governing Law; Jurisdiction; Waiver of Jury Trial.........................56
**Section 10.13**   No Joint Venture..............................................................................56
**Section 10.14**   Counterparts; Signatures .................................................................57
**Section 10.15**   Preservation of Records; Post-Closing Access and Cooperation. ...................57

## Exhibits

Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement
Exhibit C – Form of Intellectual Property Assignment

## Schedules

Schedule 2.1(c) – Company Owned Intellectual Property
Schedule 2.1(i) – Chapter 5 Actions and Claims
Schedule 5.11(a) – Contract & Cure Schedule

## Seller Disclosure Schedules

Schedule 3.4 – Title to Assets, Liens
Schedule 3.5 – Claims, Litigation and Disputes
Schedule 3.6 – Governmental Authorizations
Schedule 3.8 – Contracts
Schedule 3.9(a) – Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements
Schedules 3.9(c) – Intellectual Property Claims Brought Against the Seller
Schedule 3.10 – Taxes
Schedule 3.11 – Leased Real Property
Schedule 5.2 – Operation of the Plazomicin Business

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of June 20, 2019, by and between Achaogen, Inc., a Delaware corporation (the "Seller"), and Cipla USA Inc., a Delaware corporation (the "Purchaser").

## RECITALS

WHEREAS, the Seller is a biopharmaceutical company focused on the development and commercialization of innovative antibacterial agents for multi-drug resistant gram-negative infections (the "Business");

WHEREAS, on April 15, 2019, the Seller filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (Case No. 19-10844-BLS), and is operating and managing its businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, subject to and upon the terms and conditions herein, the Seller desires to sell, assign, transfer, convey and deliver and cause its Subsidiaries to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, all of the Purchased Assets, subject to the terms and conditions described in this Agreement;

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order approving such sale free and clear of all Liens and Claims, all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order; and

WHEREAS, the Seller and the Purchaser have negotiated in good faith and at arm's length for the purchase and sale of the Purchased Assets, the assumption of certain Liabilities associated therewith, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements, representations and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

**Section 1.1**    <u>Definitions</u>.  For the purposes of this Agreement:

"<u>Acquired Intellectual Property</u>" has the meaning set forth in <u>Section 2.1(c)</u>.

"<u>Affiliate</u>" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  Notwithstanding the foregoing, under no circumstance will the Purchaser and the Seller be deemed Affiliates of one another notwithstanding the possession by the Purchaser (whether or not exercised) of any rights with respect to the Seller or otherwise as a result of the transactions contemplated in this Agreement.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation</u>" has the meaning set forth in <u>Section 2.7(a)</u>.

"<u>Allocation Statement</u>" has the meaning set forth in <u>Section 2.7(a)</u>.

"<u>AMP Assets</u>" means all of the assets of the Seller, wherever located, relating to the AMP Development Program, including Intellectual Property, Contracts and Governmental Authorizations.

"<u>AMP Development Program</u>" means the AMP development program of the Seller relating to novel beta-lactam agents.

"<u>Applicable Rate</u>" has the meaning set forth in <u>Section 2.5(d)</u>.

"<u>Approved Product</u>" means the Product as currently approved by the FDA under New Drug Application 210303.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.9(a)(ii)</u>.

"<u>Assumed Contracts</u>" has the meaning set forth in <u>Section 2.1(d)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Assumption Effective Date</u>" has the meaning set forth in <u>Section 5.11(b)</u>.

"Assumption Procedures" means the procedures for the assumption and assignment of Executory Contracts as contemplated in this Agreement, the Bidding Procedures and the Bidding Procedures Order.

"Auction" means the bankruptcy auction of the Seller's assets, conducted by the Seller pursuant to the Bidding Procedures Order.

"Back-Up Bidder" has the meaning set forth in Section 5.12.

"Back-Up Period" has the meaning set forth in Section 5.12.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"BARDA Bid" has the meaning set forth in Section 2.5(b)(i).

"Bidding Procedures" means the procedure governing the solicitation of bids and the conduct of the Auction for the Purchased Assets under the supervision of the Bankruptcy Court which are attached as Exhibit 1 to the Bidding Procedures Order.

"Bidding Procedures Order" means the order entered by the Bankruptcy Court on May 1, 2019, approving the Bidding Procedures (Dkt. No. 123).

"Bill of Sale" has the meaning set forth in Section 2.9(a)(i).

"Budget" has the meaning set forth in the DIP Loan Agreement.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in Delaware are closed either under applicable Law or action of any Governmental Authority.

"Business Payments" has the meaning set forth in Section 5.14.

"Chapter 5 Actions and Claims" means, with respect to any Person, all avoidance actions, claims or causes of action that constitute property of such Person's bankruptcy estate under section 541 of the Bankruptcy Code, including claims and causes of action under chapter 5 of the Bankruptcy Code or any other applicable law, and all proceeds therefrom.

"Chapter 11 Case" means the case commenced by the Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (Case No. 19-10844-BLS).

"China License Agreement" means the License Agreement to be entered into between the Seller and the China Licensee for the China Territory, on terms reasonably acceptable to the Purchaser, to be assigned by the Seller and assumed by the Purchaser in accordance with the terms of the Auction.

"China Licensee" means Qilu Antibiotics Pharmaceutical Co., Ltd. (or the "Back-Up Bidder" for the China Territory as contemplated in connection with the Auction, or such other licensee if neither Qilu Antibiotics Pharmaceutical Co., Ltd. nor the "Back-Up Bidder" consummates the transactions as contemplated in connection with the Auction).

"China License Rights" means (i) the right of the Seller to grant a license for the Product for the China Territory pursuant to the China License Agreement, and upon the consummation of the transactions contemplated under such China License Agreement, the rights and interests of the China Licensee under the China License Agreement, subject to any amendment or termination thereof, and (ii) the right of the Seller to receive the up-front license fee to be paid by the licensee under the China License Agreement.

"China Territory" means the People's Republic of China, Hong Kong, Macau and Taiwan.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"Closing Payment" has the meaning set forth in Section 2.5(a).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the regulations promulgated thereunder.

"Collective Bargaining Agreement" means any written or oral agreement, memorandum of understanding or other contractual obligation between the Seller and any labor organization or other authorized employee representative representing Service Providers.

"Commercially Available IP" has the meaning set forth in Section 3.9(e).

"Company IP Registrations" means all of the Seller's Intellectual Property that is subject to any issuance registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered Trademarks, domain names and Copyrights, issued and reissued Patents and pending applications or filings for any of the foregoing, but not including the Seller Corporate Names.

"Company Owned Intellectual Property" means all Intellectual Property owned or purported to be owned, in whole or in part by the Seller or any of its Subsidiaries, and required for and used or held for use in connection with the Plazomicin Business, including the

4

Intellectual Property as set forth on <u>Schedule 2.1(c)</u>, but not including the Seller Corporate Names.

"<u>Company Used Intellectual Property</u>" means the Seller's rights and interest in all Intellectual Property owned or controlled by a Third Party and licensed or otherwise made available to the Seller or any Subsidiary or used or held for use by the Seller or any Subsidiary, in whole or in part, that is required for and used or held for used in connection with the Plazomicin Business, in each case, other than Commercially Available IP.

"<u>Confidential Information</u>" means any information that is not generally known to the public and that is or has been used, developed or obtained by the Seller and its Affiliates to the extent it relates to the Purchased Assets, including: (i) products or services; (ii) fees, costs and pricing structures; (iii) designs and specifications; (iv) analyses; (v) drawings, photographs and reports; (vi) computer software, including electronic mail, operating systems, applications and program listings; (vii) flow charts, transaction summaries and models, manuals and documentation; (viii) databases; (ix) financial reports, investment summaries, and accounting and business methods; (x) ideas, formulas, compositions, inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice; (xi) supplier, customers and clients and supplier, customer, contact or client lists and other marketing data or plans; (xii) know-how; (xiii) manufacturing and production processes and techniques; (xiv) research and development information; (xv) files and records; and (xvi) all similar and related information in whatever form, except that Confidential Information will not include any information that (1) has been published in a form generally available to the public or becomes part of public domain, other than as a result of a disclosure by the parties hereto or their respective representatives; (2) was known or was otherwise in possession of the receiving party prior to the time of disclosure of such information by the disclosing party or (3) is developed by the receiving party independent of and without reference to any Confidential Information disclosed by the disclosing party under this Agreement.

"<u>Contract</u>" means any contract, agreement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation that is legally binding.

"<u>Contract & Cure Schedule</u>" has the meaning set forth in <u>Section 5.11(a)</u>.

"<u>Copyrights</u>" means all copyrights, including copyrights in software and in the content contained on any Web site, artwork (including editable jpeg images), packaging material, patient information leaflets, promotional material, advertising material, and those which are registered, applied for registration or used, whether registrable or not, by the Seller, and rights to sue for past infringement thereof.

"<u>Cure Amount</u>" means, for any Executory Contract, the amount required to be paid under section 365 of the Bankruptcy Code to effectuate the assumption and assignment of such Executory Contract by the Seller to the Purchaser (giving effect to any mutual agreement with the contract counterparty to such Executory Contract).

"<u>C-Scape Assets</u>" means all of the assets of the Seller, wherever located, relating to the C-Scape Development Program, including Intellectual Property, Contracts and Governmental Authorizations.

"<u>C-Scape Development Program</u>" means the C-Scape development program of the Seller which consists of a potential therapeutic including clavulanic acid and ceftibuten.

"<u>Deductions</u>" means, without duplication, any:

        (a)     discounts of any type or nature, including retroactive price reductions, cash discounts, volume discounts, promotional discounts, chargebacks, allowances, rebates, returns and credits;

        (b)     rejections, returns, credits, returned goods allowances and retroactive corrections, and other similar costs;

        (c)     price adjustments, billing adjustments, shelf stock adjustments, promotional payments, and other similar allowances;

        (d)     any credits or allowances granted to any wholesalers, retailers, distributors or other customers upon prompt payment;

        (e)     administrative fee arrangements, reimbursements, and other payments of similar nature to wholesalers, distributors, buying groups, health care insurance carriers, pharmacy benefit management companies, health maintenance organizations, health care institutions or organizations, or any other customers;

        (f)     redistribution center fees, information service agreement fees, and other fees of similar nature that are passed from any wholesalers, retailers, distributors or other customers;

        (g)     freight, shipping and insurance costs charged to a customer on an invoice;

        (h)     costs of recalls, seizures or destruction of goods and other similar costs, whether voluntarily or pursuant to a request or order by a Governmental Authority;

        (i)     failure-to-supply penalties (except to the extent actually covered by insurance or otherwise subject to reimbursement);

        (j)     compulsory payments and cash rebates related to sales of the Product paid to any Governmental Authority or pursuant to any legal requirement in connection with any health insurance program, compensation program, or similar program;

        (k)     excise taxes, use taxes, sales taxes, value added taxes, goods and services taxes, custom duties, and any other Taxes or charges imposed by any Governmental Authority; or

(l)     any other deduction from gross sales to arrive at net sales as permissible under GAAP that has not been listed above.

"<u>Deposit</u>" has the meaning set forth in <u>Section 2.6</u>.

"<u>DIP Loan Agreement</u>" means the Senior Secured Superpriority Debtor-in-Possession Loan and Security Agreement, dated as of April 15, 2019, by and among the Seller, and Silicon Valley Bank, as lender.

"<u>Election Period</u>" means the period ending on the date forty-five (45) days following the Closing Date or on such earlier date that Purchaser shall determine by notice to the Seller.

"<u>Employee Plan</u>" means any written: (i) "employee benefit plan" as defined in Section 3(3) of ERISA; (ii) compensation, employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, agreement, arrangement, program or policy; or (iii) other plan, agreement, arrangement, program or policy providing for compensation, bonuses, profit-sharing, equity or equity-based compensation or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangement), medical, dental, vision, prescription or fringe benefits, life insurance, relocation or expatriate benefits, perquisites, disability or sick leave benefits, employee assistance program, workers' compensation, supplemental unemployment benefits or post-employment or retirement benefits (including compensation, pension, health, medical or insurance benefits), in each case (A) that is sponsored, maintained, administered, contributed to or entered into by the Seller for the current or future benefit of any current or former Service Provider or (B) for which the Seller has any direct or indirect liability.

"<u>Environmental Law</u>" means any Law concerning: (i) the treatment, disposal, emission, discharge, Release or threatened Release of Hazardous Material; or (ii) the protection of the environment (including natural resources, air and surface or subsurface land or waters).

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and any rules or regulations promulgated thereunder.

"<u>Excluded Assets</u>" has the meaning set forth in <u>Section 2.2</u>.

"<u>Excluded Contract</u>" has the meaning set forth in <u>Section 2.2(b)</u>.

"<u>Excluded Liabilities</u>" has the meaning set forth in <u>Section 2.4</u>.

"<u>Executory Contract</u>" means a Contract to which the Seller is a party that is an "executory contract" or "unexpired lease", as such terms are used in section 365 of the Bankruptcy Code.

"<u>Exploitation</u>", and related terms such as "<u>Exploit</u>", shall mean, with respect to the Product or any other product, the research, development, manufacture, having manufactured, testing, storage, import, export, distribution, sale, licensing, use, having used, offering for sale,

having sold, disposition, registering, holding or keeping (whether for disposal or otherwise), commercializing, advertising, marketing and promotion of the Product or such other product, as applicable, and applying for and receiving regulatory approvals, including from the FDA (on compliance with all requirements including clinical trials) related to the Product or such other product, and including the outsourcing of any of the foregoing activities.

"FDA" means the United States Food and Drug Administration.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of: (A) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing; and (B) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed.

"Governmental Authority" means any: (i) nation, region, state, county, city, town, village, district or other jurisdiction; (ii) federal, state, local, municipal, foreign or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal); (iv) multinational organization exercising judicial, legislative or regulatory power; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government.

"Governmental Authorization" means any approval, consent, ratification, waiver, license, permit, registration or other authorization issued or granted by any Governmental Authority.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Hovione" means Hovione Limited, a company with its principal place of business at Loughbeg, Ringaskiddy, Cork, County Cork, Ireland.

"Hovione Agreement" means the Validation and Manufacturing Agreement, dated March 6, 2017, between the Seller and Hovione, and all Work Plans (as defined therein), and all other agreements, instruments, or documents entered into or delivered in connection with the Hovione Agreement or any such Work Plans, as any of the foregoing may have been amended, modified, or supplemented.

"Hovione Release" means the written, unconditional release by Hovione, its Affiliates and Subsidiaries, and all of their respective current and former officers, directors, principals, employees, members, managers, advisors, attorneys, financial advisors, investment bankers, or agents, of all of their Claims, including all Claims arising from or in connection with the Hovione Agreement, the rejection by the Seller of the Hovione Agreement, and the Business, against the Seller, its estate, Affiliates and Subsidiaries, and all of their respective current and former officers, directors, principals, employees, members, managers, advisors, attorneys, financial advisors, investment bankers, or agents, in form and substance satisfactory to the Seller.

"Intellectual Property" means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (i) all Patents and applications for Patents and all related reissues, reexaminations, divisions, renewals, extensions, provisionals, continuations and continuations-in-part, including any future applications or filings of the foregoing; (ii) all Copyrights, Copyright registrations and Copyright applications, copyrightable works and all other corresponding rights; (iii) all mask works, mask work registrations and mask work applications and all other corresponding rights; (iv) all advertising material, trade dress and trade names, logos, Internet addresses and domain names, Trademarks and service marks and related registrations and applications, including any intent to use applications, supplemental registrations and any renewals or extensions, all other indicia of commercial source or origin and all goodwill associated with any of the foregoing; (v) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, clinical trial data and information, safety data and pharmacovigilance data, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (vi) all computer software (including source and object code), firmware, development tools, algorithms, files, records, technical drawings and related documentation, data and manuals; (vii) all databases and data collections; (viii) all licenses and permits to the extent transferable; (ix) all rights pertaining to the foregoing, including those arising under international treaties and convention rights, (x) all rights and powers to assert, defend and recover title to any of the foregoing, (xi) all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any of the foregoing, (xii) all proceeds, income, royalties, damages and payments now and/or hereafter

due and payable under and/or in respect of all of the foregoing (including with respect to past, present or future infringement or violation thereof), (xiii) all administrative rights arising from the foregoing, including the right to prosecute applications and oppose, interfere with or challenge the applications of others, the rights to obtain renewals, continuations, divisions, and extensions of legal protection pertaining to any of the foregoing, and (xiv) all other intellectual property rights irrespective of not being registered or applied for registration.

"Intellectual Property Assignment" has the meaning set forth in Section 2.9(a)(iv).

"Ionis License Agreement" means the license agreement dated January 25, 2006 between the Seller and Ionis Pharmaceuticals, Inc. (formerly known as Isis Pharmaceuticals, Inc.).

"IP Agreements" means all agreements (including outstanding decrees, orders, judgments, settlement agreements, or stipulations) to which the Seller or any of its Subsidiaries is a party which contain provisions: (i) granting to any Person rights in Company Owned Intellectual Property or Company Used Intellectual Property; (ii) granting to the Seller or any Subsidiary thereof any rights in Company Used Intellectual Property; (iii) consenting to another Person's use of Company Owned Intellectual Property or Company Used Intellectual Property, or covenanting not to sue any Person for infringement of any such Intellectual Property; (iv) restricting the Seller's or any of its Affiliates' use of Company Owned Intellectual Property or any Company Used Intellectual Property; or (v) otherwise relate to Intellectual Property covering the Product.

"Judgment" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Knowledge of the Seller" or "the Seller's Knowledge" means the actual knowledge of any executive officer of the Seller after due inquiry into the facts or circumstances supporting any representation, warranty or statement qualified by such terms.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code.

"Leased Real Property" has the meaning set forth in Section 3.11.

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Lien" means any possessory or non-possessory lien, license (other than with respect to any Company Used Intellectual Property), encumbrance, claim or charge against or other interest in any property or assets, whether voluntary or involuntary and whether statutory or contractual, including any mortgage, deed of trust, deed to secure debt, pledge, assignment, hypothecation, security interest, attachment, judgment, levy, conditional sale agreement, right of first refusal, right of first offer, option, restriction of any kind, including any restriction on use, transfer,

receipt of income or exercise of any other attribute of ownership or other arrangement, and including any agreement to give any of the foregoing.

"MAA" means a Marketing Authorization Application with the European Medicines Agency.

"Material Adverse Effect" means any event, change, circumstance, effect or other matter that has a material adverse effect on: (i) the financial condition or results of operations of the Plazomicin Business, taken as a whole; (ii) the condition or value of any material portion of the Purchased Assets; or (iii) the ability of the Seller to consummate timely the transactions contemplated by this Agreement; provided, however, that none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect: any event, change, circumstance, effect or other matter resulting from or related to: (A) any Excluded Assets or Excluded Liabilities; (B) any outbreak or escalation of war or major hostilities or any act of terrorism; (C) changes in Laws, United States generally accepted accounting principles or enforcement or interpretation thereof; (D) changes that generally affect the industries and markets in which the Seller operates which does not disproportionately affect Seller; (E) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions; (F) any failure, in and of itself, of the Seller to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics; (G) any action taken or failed to be taken pursuant to or in accordance with this Agreement or at the request of, or consented to by, the Purchaser; (H) the filing or continuation of the Chapter 11 Case or any action approved by the Bankruptcy Court (or any other Governmental Authority in connection with any such Proceeding); (I) the execution or delivery of this Agreement, the consummation of the transactions contemplated by this Agreement or the public announcement or other publicity with respect to any of the foregoing; or (J) any change in or termination of the relationship of the Seller with its Service Providers, customers or suppliers.

"Materials of Environmental Concern" means all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or defined as such by, or regulated as such under, any Environmental Law.

"Milestone Period" means the period beginning on the Closing Date and ending at such time that any Person (other than the Purchaser or its Affiliates) has received final FDA approval for an Abbreviated New Drug Application or an FDA AP-rated 505(b)(2) NDA using the Product.

"Net Sales" means total gross revenue actually received by the Purchaser (including its successors and assigns), any of their respective Affiliates, or any sublicensee(s) of any of the foregoing, from sales of the Approved Product to Third Parties generated anywhere in the world (other than the China Territory), less any Deductions to the extent exclusively related to the Approved Product, and taken, paid, accrued, allowed, included or allocated, based on the

Purchaser's good faith estimates in calculating gross revenue with respect to the Approved Product, in each case, determined according to U.S. Generally Accepted Account Principles applied by the Purchaser in good faith, it being agreed that Net Sales shall exclude any Approved Product transferred or disposed of for promotional or educational purposes, or to any Affiliate of the Purchaser. Notwithstanding the foregoing, Net Sales shall not include any Stockpiling Awards.

"Net Sales Royalty" has the meaning set forth in Section 2.5(b)(ii).

"New Hovione Agreement" has the meaning set forth in Section 5.17(a).

"Non-Proration Items" has the meaning set forth in Section 9.2.

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Other Seller Taxes" has the meaning set forth in Section 9.2.

"Outside Date" has the meaning set forth in Section 5.9(b)(ii).

"Patent" means all patents and industrial designs, including any continuations, divisionals, continuations-in-part, renewals, reissues and applications for any of the foregoing, and rights to pursue future applications and filings for any of the foregoing and to rights to sue for past infringement thereof.

"Person" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"Petition" has the meaning set forth in the Recitals.

"Petition Date" means April 15, 2019, the date the Petition was filed with the Bankruptcy Court.

"Plazomicin Business" means Seller's Business related to the Product anywhere in the world, including the Exploitation of the Product, as presently conducted and as was conducted immediately prior to the Petition Date.

"Post-Closing Access and Cooperation Period" has the meaning set forth in Section 10.15(a).

"Previously Omitted Contract" has the meaning set forth in Section 5.11(f).

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal

or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Product" means plazomicin, including ZEMDRI™ (plazomicin) approved by FDA in the United States for the Treatment of Adults with Complicated Urinary Tract Infections (cUTI), or any other strength, dosage, indication or platform thereof. For clarity, "Product" includes any form of plazomicin, including salts, esters, hydrates, solvates and polymorphs of plazomicin.

"Product Trademarks" means the Trademarks used or held for use by the Seller or its Affiliates for the Product in the Plazomicin Business and any registrations thereof or any pending applications relating thereto, including any unregistered Trademark rights related to the Product as may exist through use before, on or after the Closing Date (for clarity, excluding any Seller Corporate Names).

"Proration Items" has the meaning set forth in Section 9.2.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchaser" has the meaning set forth in the Preamble.

"Qualified Accounting Firm" means any of Deloitte & Touche, Ernst & Young, KPMG, PricewaterhouseCoopers, Grant Thornton, or any other nationally or internationally recognized accounting firm agreed by the Purchaser and, subject to Section 2.5(f), the Seller; provided, that the Purchaser may not have engaged such accounting firm other than for the purposes contemplated in this Agreement for the preceding twelve (12) months.

"Qualified Bid" means competing bids that are submitted in accordance with the Bidding Procedures and Bidding Procedures Order.

"Receivables" has the meaning set forth in Section 2.2(q).

"Regulatory Approval" shall mean (a) any approval by the FDA of any "new drug application" or "premarket approval application" (as such terms are used under the United States Federal Food, Drug, and Cosmetic Act) with respect to a product and (b) any other approval, decision, license, registration, designation or authorization by a Governmental Authority necessary to lawfully Exploit a product, in each case of clauses (a) and (b), together with any approval of any subsequent submissions, supplements or amendments thereto or any applications therefor.

"Regulatory Documentation" shall mean original documents in any format in the possession or control of the Seller and/or its Subsidiaries as of the Closing, of all Regulatory Approvals, dossiers, quality specifications for the manufacture, import, release and testing of the Product and its components and all correspondence with, or reports or other materials submitted to, any Governmental Authority related to the Exploitation of the Product, including all U.S. and

non-U.S. regulatory applications, filings, submissions and approvals (including all Investigational New Drug Applications and New Drug Applications with the FDA, and foreign counterparts thereof, all Regulatory Approvals and all complaint files, periodic safety reports and adverse drug experience reports) for the Product, the Exploitation of the Product or use of any Purchased Asset or related to the Plazomicin Business, and all technical and other information contained therein, and all correspondence with the FDA and other Governmental Authorities relating to any of the foregoing, including correspondence related to any serious adverse events associated with the Product.

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Royalty Payment" has the meaning set forth in Section 2.5(b).

"Sale Hearing" means the hearing to be conducted by the Bankruptcy Court to approve this Agreement and seeking entry of the Sale Order.

"Sale Order" means, collectively, one or more orders of the Bankruptcy Court in form and substance acceptable to the Purchaser and the Seller: (i) approving the sale of the Purchased Assets (and the assumption and assignment of the Executory Contracts on the Contract & Cure Schedule) to the Purchaser (or such other bidder chosen as the winning bidder at the Auction) free and clear of all Claims and Liens pursuant to section 363(f) of the Bankruptcy Code, on the terms and conditions set forth in this Agreement; (ii) approving the Back-Up Bidder chosen at the Auction and the asset purchase agreement submitted by such Back-Up Bidder; (iii) authorizing consummation of the transactions contemplated hereby; (iv) containing a finding that the transactions contemplated by this Agreement are undertaken by the Seller and the Purchaser (solely in its capacity as such) at arm's length, without collusion and in good faith by the Purchaser within the meaning of section 363(m) of the Bankruptcy Code; (v) assuring that the Purchaser shall not assume any of the Sellers' liabilities and will not be subject to successor liability for any claims or causes of action of any kind or character against the Seller, whether known or unknown, unless expressly assumed as an Assumed Liability pursuant to this Agreement; (vi) providing that the Bankruptcy Court shall retain jurisdiction to hear any disputes arising in connection with the transactions contemplated by this Agreement; (vii) rejecting the Hovione Agreement to the extent the Hovione Release (a) has been granted, (b) will be granted contemporaneously with the entry of the Sale Order, or (c) will be granted pursuant to the Sale Order, and (viii) permitting the Purchaser to waive, in its sole discretion, the 14-day stay period under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

"Schedule" means a schedule included in the Seller Disclosure Schedule and the other schedules attached hereto.

"SEC" means the Securities and Exchange Commission.

"Section 365 Order" means with respect to any Executory Contract not assumed and assigned to the Purchaser pursuant to the Sale Order, an Order of the Bankruptcy Court in form and substance acceptable to the Purchaser and the Seller authorizing such assumption and assignment to the Purchaser.

"Seller" has the meaning set forth in the Preamble.

"Seller Corporate Names" means those Trademarks, names and logos of Seller or any of its Affiliates other than the Product Trademarks, including any Trademarks that consist of or include any corporate name or corporate logo of Seller or any of its Affiliates.

"Seller Disclosure Schedule" has the meaning set forth in ARTICLE 3.

"Seller SEC Documents" means all forms, statements, documents and reports filed or furnished by the Seller with the SEC since January 1, 2015, as amended through the date hereof.

"Service Provider" means any director, officer, employee or individual independent contractor of the Seller.

"Specified Contracts" means the Executory Contracts set forth on Part B of the Contract & Cure Schedule as of the date of this Agreement.

"Stockpiling Awards" has the meaning set forth in Section 2.5(b)(i).

"Stockpiling Royalty" has the meaning set forth in Section 2.5(b)(i).

"Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

"Subsidiary" means, with respect to a specified Person, any corporation or other Person of which equity securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held directly or indirectly by the specified Person. When used in this Agreement without reference to a particular Person, "Subsidiary" means a Subsidiary of the Seller. Notwithstanding the foregoing, under no circumstance will the Seller be deemed a Subsidiary of the Purchaser notwithstanding the possession by the Purchaser (whether or not exercised) of any rights of control with respect to the Seller.

"Successful Bidder" means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction in accordance with the Bidding Procedures and Bidding Procedures Order.

"Supplement" has the meaning set forth in Section 5.13.

"Target Executory Contracts" means all of the Executory Contracts listed on the Contract & Cure Schedule (including both Part A and Part B) on the date of this Agreement.

"Tax" means: (i) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including Taxes under section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority; (ii) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute; and (iii) any Liability for the Taxes of another Person.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" means any Person and/or group of Persons (including any Governmental Authority) other than the Seller, the Purchaser or any of their respective Affiliates.

"Trademarks" means trademarks, trade names, service marks, designs, logos, brand names, emblems, signs or insignia, slogans, Internet addresses and domain names, other similar designations of source or origin and general intangibles of like nature, together with the registrations and applications for registrations pertaining to any of the foregoing, any derivations of any of the foregoing, all goodwill associated therewith, and rights to sue for past infringement thereof.

"Transfer Taxes" has the meaning set forth in Section 9.1.

**Section 1.2**    Construction.  Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise.  The table of contents and the headings of Articles and Sections and Schedules are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  All words used in this Agreement are to be construed to be of such gender or number as the circumstances require.  The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance.  Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement.  Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time.  Any

reference to a Contract or other document as of a given date means the Contract or other document as amended, supplemented and modified from time to time through such date. Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires. The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if." References to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or."

# ARTICLE 2
# THE TRANSACTION

**Section 2.1**    Sale and Purchase of Purchased Assets.  In accordance with the provisions of this Agreement and the Sale Order, and except as set forth in Section 2.2, at and effective as of the Closing, the Seller will, and/or will cause its Subsidiaries to the extent transferable under applicable Law, sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Seller's right, title and interest in and to all of the properties and assets of the Seller relating to the Plazomicin Business as of the Closing Date, free and clear of all Liens and Claims other than the Assumed Liabilities and the China License Rights, including the following (all of the assets to be sold, conveyed, assigned, transferred or delivered to the Purchaser are referred to as the "Purchased Assets"):

(a)    Inventory.  All right, title and interests in and to (i) any raw materials (including work in process, buffer stock held by vendors, dies and active pharmaceutical ingredients inventory), finished goods and other inventory of the Product in the possession or control of, or otherwise held by or on behalf of, or owned by the Seller, with a remaining shelf life of at least six (6) months, and (ii) all good and marketable unbroken lots of packaged finished goods inventory of any Product in the possession or control of, or otherwise held by or on behalf of, the Seller as of Closing which (1) with respect to any commercial lots of any Product, has a remaining shelf life of at least six (6) months, and (2) with respect to samples of any Product, has a remaining shelf life of at least six (6) months, that has already been paid for by the Seller regardless of where located, and all rights to receive refunds, rebates or credits in connection therewith (for the avoidance of doubt, the Purchased Assets also include all manufactured product, packaging material, compounds and any other similar assets relating to the Product which have already been paid for by the Seller, and any assets that are under manufacture);

(b)    [Intentionally Omitted.]

(c)    Intellectual Property. All Company Owned Intellectual Property and all Company Used Intellectual Property including: (i) any related Patents, Copyrights, and Trademarks therein, (ii) all of the Seller's and Subsidiaries' worldwide Intellectual Property rights in connection with the Product (except for Commercially Available IP and the Seller Corporate Names), (iii) the Company Owned Intellectual Property set forth on Schedule 2.1(c); and (iv) any other Company Used Intellectual Property set forth on Schedule 3.9(a) of the Seller Disclosure Schedule (collectively, the "Acquired Intellectual Property"); provided, that the

Purchaser may, in its sole discretion, remove any Intellectual Property from the Acquired Intellectual Property at any time prior to Closing by giving written notice thereof to Seller, and such removed Intellectual Property shall not be deemed to be Acquired Intellectual Property or Purchased Assets hereunder; provided, further, that any such removal of Intellectual Property shall not, in and of itself, reduce the Purchase Price or any other consideration or obligation owed by Purchaser hereunder, or cause Seller to be in breach of its representations, warranties or covenants under this Agreement;

(d)     Contracts.  All Executory Contracts assumed by and assigned to the Purchaser in accordance with Section 5.11 and pursuant to the Sale Order or a Section 365 Order, as applicable (collectively, the "Assumed Contracts"); provided, however, that if any Assumed Contract is recharacterized by a Final Order to not be an Executory Contract, then all of the Seller's rights, including with respect to Intellectual Property and other property, under such Assumed Contract shall be a Purchased Asset;

(e)     Authorizations.  All worldwide Governmental Authorizations held by the Seller, to the extent transferable, relating to any Purchased Asset, Assumed Liability or the Plazomicin Business, including any MAA of the Seller or any Subsidiary, and all Regulatory Approvals, to the extent transferable, held by the Seller or any Subsidiary with respect to the Exploitation of the Product, and all rights under, interests in and deposits under the foregoing, and pending applications for any thereof, including the Governmental Authorizations and Regulatory Approvals listed on Schedule 3.6 of the Seller Disclosure Schedule.

(f)     Correspondence.  All correspondence with or to any Governmental Authority (including letters, minutes and official contact reports relating to any communications with any Governmental Authority) relating to any Purchased Assets, Assumed Liability or the Plazomicin Business that are within the Seller's control or accessible to the Seller, including any Regulatory Documentation;

(g)     Advertising Materials.  All advertising, marketing, market research, sale and promotional files and materials (including any television, radio and print content and materials), pricing lists, consulting deliverables and other related literature, catalogs, point of sale materials and Web site content, including all Company Owned Intellectual Property therein, relating to any Purchased Asset or Assumed Liability or the Plazomicin Business that are within the Seller's control or accessible to the Seller;

(h)     Books and Records.  All information, books, records, files and papers, client and customer lists, supplier and vendor lists, purchase orders and quotes, sales and purchase invoices, production reports, customer and supplier lists, distribution lists, inventory cost records, mailing lists, forms, quality control records and procedures, standard operating procedures, information and records, financial and accounting records, correspondence, memoranda, documentation relating to sales Taxes, relating to any Purchased Asset, Assumed Liability, the Product, or the Plazomicin Business that are within the Seller's control or accessible to the Seller, including any original documentation relating to the Acquired Intellectual Property, all records of disclosure under the Physician Payments Sunshine Act (42

18

U.S.C. §1320a-7h) and any other applicable Laws, any documents or agreements entered into or furnished to the China Licensee in connection with the China License Agreement, and any other documents or records required by the Purchaser to fulfill its obligations under the China License Agreement upon assumption thereof or any Assumed Contract, in each case in any format;

(i)    Claims.  All of the Seller's claims, warranties (express and/or implied), rights, guarantees, indemnities and similar rights, credits, causes of action, defenses and rights of recovery or set-off, rights of subrogation and all other rights of any kind against Third Parties relating to or arising from any of the Purchased Assets or Assumed Liabilities, including any commercial tort claims and unliquidated rights under manufacturers' and vendors' warranties related to the Purchased Assets and all Chapter 5 Actions and Claims of any nature, whether related to the Purchased Assets or otherwise, including any Chapter 5 Actions and Claims against the Persons described in Schedule 2.1(i); provided, notwithstanding anything to the contrary contained herein, the Purchased Assets shall not include any Chapter 5 Actions and Claims against any of the Releasees (as defined in the applicable order of the Bankruptcy Court authorizing the Seller to incur post-petition debtor-in-possession financing);

(j)    Prepaid Expenses.  All prepaid charges and expenses of the Seller to the extent related to the Purchased Assets; and

(k)    Insurance.  All insurance policies relating to the Purchased Assets and the Plazomicin Business, which insurance policies shall be endorsed in the name of the Purchaser and all rights of any nature with respect thereto including to receive insurance proceeds thereunder and rights to assert claims with respect to any such insurance recoveries, including any pending insurance claims thereunder.

Section 2.2    Excluded Assets.  Notwithstanding the terms of Section 2.1, the Seller will retain and will not sell, convey, assign, transfer or deliver to the Purchaser, and the Purchaser will not purchase or acquire, and the Purchased Assets do not include, any of the following assets described below (the "Excluded Assets"):

(a)    Equity Interests.  All equity interests in the Seller and its Subsidiaries;

(b)    Contracts.  All Contracts that are not assigned to the Purchaser pursuant to Section 5.11 (each, an "Excluded Contract");

(c)    Employee Plans.  All rights and interests related to the Employee Plans.

(d)    Books and Records.  All minute books and records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain or which relate primarily to an Excluded Asset or Excluded Liability; provided, however, that the Seller shall provide the Purchaser with reasonable access to and copies of any such materials;

(e)     Insurance.     All insurance providing coverage for current or former directors and officers, and all claims and proceeds to the extent related to the Excluded Assets and Excluded Liabilities;

(f)     Claims.     All rights, claims or causes of action that the Seller may have against any Person with respect to any Excluded Assets or Excluded Liability;

(g)     Chapter 5 Actions and Claims.     All Chapter 5 Actions and Claims not constituting Purchased Assets pursuant to Section 2.1(i);

(h)     Estate Claims.     All estate claims of the Seller (except to the extent constituting Purchased Assets pursuant to Section 2.1(i));

(i)     Accounts and Deposits.     All: (i) cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items; and (ii) deposits, pre-payments, refunds, rebates, credits and similar items, including rent and utility deposits, prepaid rent and all other prepaid charges and expenses, in each case attributable to any period of time (or portion thereof) ending on or prior to the Closing Date;

(j)     Prepaid Expenses.     All prepaid charges and expenses of the Seller to the extent related to the Excluded Assets;

(k)     Real Property.     All rights in respect to any real property leased by the Seller.

(l)     Tax Refunds.     All rights to refunds, rebates, credits or similar benefits relating to Taxes and other governmental charges of whatever nature attributable to any period of time (or portion thereof) ending on or prior to the Closing Date;

(m)     Equipment.     All furniture, fixtures, equipment, and other similar personal property owned by the Seller, including all trade fixtures, supplies, computer equipment, applications, systems and motor vehicles owned by the Seller, including any substitutions or replacements thereof, which may occur within the ordinary course of business, made between the date of this Agreement and the Closing Date, regardless of where located;

(n)     C-Scape Assets and AMP Assets.     All of the C-Scape Assets and all of the AMP Assets;

(o)     [Intentionally Omitted.]

(p)     Non-Plazomicin Assets.     All of the Seller's assets and properties not related to the Plazomicin Business (including the Seller Corporate Names and related domain names and internet addresses, and all assets relating to the Seller's Tie2 program), subject to Section 5.18;

(q)     Receivables.  All accounts receivable and other receivables (together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto) arising from or relating to the Purchased Assets or the Plazomicin Business prior to the Closing, and all causes of action pertaining to the collection of the foregoing ("Receivables"); and

(r)     This Agreement.  All of the Seller's rights under this Agreement and all agreements ancillary to this Agreement (including payments comprising part of the Purchase Price).

**Section 2.3**     Assumed Liabilities.  In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due the following Liabilities of the Seller, in each case other than the Excluded Liabilities (the "Assumed Liabilities"):

(a)     Contractual Liabilities.  All Liabilities arising after the Closing under the Assumed Contracts and the Governmental Authorizations included in the Purchased Assets to the extent that such Liabilities are related to and are required to be performed during the periods after Closing;

(b)     Cure Amounts.  To the extent set forth next to any Assumed Contract on the Contract & Cure Schedule, any Cure Amount with respect to such Assumed Contract, subject to any renegotiation or other mutual agreement with the contract counterparty to such Assumed Contracts which shall supersede the amounts set forth in the Contract & Cure Schedule; and

(c)     Transfer Taxes.  All Liabilities for Transfer Taxes borne by the Purchaser pursuant to Section 9.1.

**Section 2.4**     Excluded Liabilities.   Notwithstanding any other provision of this Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and except for the Assumed Liabilities, it is not assuming, nor shall it agree to pay, perform, be responsible for or discharge, any other Liability of the Seller or any Affiliate of the Seller or the Business including the Plazomicin Business, of whatever nature, whether presently in existence or arising hereafter, and whether absolute, contingent, accrued, known or unknown (the "Excluded Liabilities").  Without limiting the generality of the prior sentence, Excluded Liabilities include the following:

(a)     Operating Liabilities.  All Liabilities which are not Assumed Liabilities to the extent relating to claims, events or conditions arising out of or relating in any way to the operation of the Business or the ownership of the Purchased Assets prior to the Closing, including as a result of the manufacture, design, use, operation, storage, acquisition, development or construction of a Purchased Asset during the period prior to the Closing, and any Liabilities for warranty claims and product liability claims or similar claims, whether occurring prior to or post-Closing, and all Liabilities to customers relating to any Product sold by or on behalf of the Seller or any of its Subsidiary prior to the Closing;

(b)     <u>Taxes</u>.  Any Liability for Taxes of the Seller or attributable to the Plazomicin Business or the Purchased Assets for any period of time (or portion thereof) ending on or prior to the Closing Date (other than the Taxes expressly assumed by the Purchaser pursuant to Section 9.1), and any Liability for Taxes attributable to the Excluded Assets at any time;

(c)     <u>Employee Liabilities</u>.  All Liabilities and obligations arising out of, relating to or in connection with any Person employed by, or acting as an independent contractor on the property of or on behalf of, the Seller or its Affiliates at any time, including those related to payment, claims or benefits under workers' compensation Laws or any other Law;

(d)     <u>Employee Plans</u>.  All Liabilities related to the Employee Plans or the Service Providers.

(e)     <u>Costs</u>.  All Liabilities of the Seller for costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby;

(f)     <u>Recalls</u>.  All Liabilities arising out of or relating to the voluntary or mandatory recall or market withdrawal of any Product or post-sale warning in respect of any Product sold by or on behalf of any of the Seller or its Affiliates prior to the Closing;

(g)     <u>Pre-Closing Liabilities Under Assumed Contracts</u>.  All Liabilities under any Assumed Contracts arising or relating to a period prior to the Closing, other than the applicable Cure Amount (subject to any renegotiation or adjustment thereof);

(h)     <u>Contract Liabilities</u>.  Liabilities arising under or related to the Excluded Contracts or any other Contracts which are not validly and effectively assigned to Purchaser pursuant to this Agreement, or Liabilities arising from or related to Assumed Contracts which arise out of any defaults or breaches by the Seller or any of the Subsidiaries, relating to a period prior to the Closing whether it occurs prior to or post-Closing;

(i)     <u>Breach of Law</u>.  Liabilities arising out of or based on any violation, on or prior to the Closing Date, of any statute, law, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Authority to which Seller, its Affiliates, or the Business is subject, including any criminal acts by Seller or its Affiliates;

(j)     <u>Litigation Claims</u>.  Any litigation claims against the Seller, including any tort claims, breach of contract claims, employment claims and discrimination claims;

(k)     <u>Chargebacks</u>.  Liabilities arising from chargebacks or related charges by Seller or its Affiliates prior to Closing, and all Liabilities arising out of or relating to the return of any Product, or for any credits, rebates, refunds or other amounts payable in respect of any Product, sold by or on behalf of any of the Seller or its Affiliates or prior to the Closing

(l)     <u>Trade Accounts Payable</u>. Any Liability for trade accounts payable;

(m)    <u>Environmental</u>.  Any Liabilities arising under any Environmental Law;

(n)    <u>Real Property</u>.  Any Liabilities arising from or relating to any lease agreement or real property interest of Seller or its Affiliates, or any other real estate that was otherwise used in connection with the Business;

(o)    <u>Transaction Expenses</u>.  Any Liabilities of Seller or its Affiliates arising under or relating to this Agreement, including any brokers, finder, agent or other fees or commissions in connection with the transactions contemplated hereunder;

(p)    <u>Indebtedness</u>. Any Liability in respect of any indebtedness for borrowed money of the Seller, including any Liability in respect of the Senior Secured Superpriority Debtor-in-Possession Loan and Security Agreement, dated as of April 15, 2019, by and among the Seller, and Silicon Valley Bank, as lender;

(q)    <u>BARDA Liabilities</u>.  To the extent permitted by Law, any Liability arising out of or relating to any Contracts with or grants made by the U.S. Biomedical Advanced Research and Development Authority, including any clawback of funds granted to the Seller;

(r)    <u>Excluded Assets</u>.  Any Liability arising out of or related to any Excluded Asset; and

(s)    <u>Other</u>.  Any Liabilities that are not Assumed Liabilities.

For the avoidance of doubt, all Liabilities arising out of, relating to or incurred in connection with the Purchased Assets arising out of and related to period after the Closing shall be Liabilities of the Purchaser.

**Section 2.5**    <u>Consideration</u>.

(a)    The consideration for the Purchased Assets (the "<u>Purchase Price</u>") consists of: (a) cash in the amount of $4,650,000, subject to adjustment set forth in <u>Section 2.5(e)</u>, at Closing (the "<u>Closing Payment</u>"); (b) the Royalty Payments; and (c) the assumption of the Assumed Liabilities.

(b)    Purchaser shall make the following post-Closing payments to Seller (the "<u>Royalty Payments</u>"):

(i)    If the Purchaser (or any of its Affiliates, successors or assigns) is awarded a contract from HHS/OS/ASPR/AMCG under the Solicitation 19-100-SOL-00011 (the "<u>BARDA Bid</u>"), then the Purchaser shall pay to the Seller a royalty equal to twelve and a half percent (12.5%) of the total amounts actually received by the Purchaser (or any of its Affiliates, successors or assigns) in cash in 2019, 2020 and 2021 under the Stockpiling Awards (the "<u>Stockpiling Royalty</u>").  "<u>Stockpiling Awards</u>" shall include any Contract Line Item Number (CLIN) that is awarded in 2019, 2020, and 2021 pursuant to the BARDA Bid, that relates to the stockpiling of plazomicin, including CLIN0002,

CLIN0008, CLIN0009, and CLIN0010. The Purchaser shall pay the Stockpiling Royalty to the Seller no later than thirty (30) days following receipt of payment from HHS/OS/ASPR/AMCG. For clarity, no Stockpiling Royalty shall be paid on any cash received by the Purchaser or its Affiliates, successors or assigns after 2021, regardless of when the Stockpiling Awards are granted.

   (ii) For each calendar year (or portion thereof) during the Milestone Period, ten percent (10%) of the amount that the Net Sales of the Product exceed $40,000,000 (pro-rated for any partial calendar year) in such calendar year (or portion thereof) (the "Net Sales Royalty"); provided, however, that the minimum amount of the Net Sales Royalty payable by the Purchaser under this Section 2.5(b)(ii): (A) for 2020 shall be at least $150,000, (B) for 2021 shall be at least $200,000, (C) for 2022 shall be at least $250,000 and (D) for each of 2023 through (and including) 2029 shall be at least $300,000. Such Royalty Payment, if payable for a calendar year (or portion thereof), shall be paid to the Seller within sixty (60) days following the end of such calendar year (or end of the Milestone Period, if applicable). Except for the minimum payments set forth in the proviso above for the years 2020 through (and including) 2029, if the aggregate Net Sales for the Approved Product are less than $40,000,000 (pro-rated for any partial calendar year) in any calendar year (or portion thereof) during the Milestone Period, then no Royalty Payments shall be due under this Section 2.5(b)(ii) for such calendar year.

   (c) The Purchaser shall maintain adequate books and records of accounting that enable the calculation of all Royalties Payments hereunder to be verified by a Qualified Accounting Firm in accordance with this Section 2.5(c). The Purchaser shall retain the books and records for at least five (5) years following each calendar year in which such Royalty Payments are earned. After the end of each calendar year during the Milestone Period and the end of the Milestone Period, unless waived by the Seller, the Purchaser shall cause a Qualified Accounting Firm to review its books and records and furnish a report to the Seller that certifies the amount of Royalty Payments that were due and payable for such preceding calendar year (or portion thereof) (the "Royalties Report"). The determination of such Qualified Accounting Firm in the Royalties Report shall be final and binding on the Seller and the Purchaser for all purposes under this Agreement. If the Royalties Report identifies any underpayment or overpayment of Royalty Payments by the Purchaser during the preceding year, then the Purchaser shall pay the Seller the amount of such underpayment, or the Seller shall pay the Purchaser the amount of such overpayment, as applicable, within thirty (30) days after such Royalties Report is delivered to both parties. Any amount not paid within such thirty (30) day period shall incur interest at the Applicable Rate; provided, that the Purchaser may also, at its option, set off any payments owed by the Seller against future Royalty Payments payable to the Seller, at which time the payments shall stop accruing interest. The fees and expenses of the Qualified Accounting Firm in connection with the Royalties Report shall be paid by the Purchaser, but it may deduct one-half of such fees and expenses from future Royalty Payments payable to the Seller (if any).

(d)     The Purchaser shall pay all amounts due pursuant to clauses (b) and (c) of this Section 2.5 in United States Dollars, in each case, by wire transfer of immediately available funds to the bank account(s) the Seller designates in writing from time to time. Any payment under Section 2.5(b) that is more sixty (60) days past due shall thereafter, to the extent permitted by applicable Law, be subject to interest at an annual percentage rate of the lesser of (i) five percent (5%), or (ii) the maximum rate permitted by Law, calculated on a three hundred and sixty (360) day basis (the "Applicable Rate").

(e)     Notwithstanding anything to the contrary contained herein, if the aggregate Cure Amount for the Target Executory Contracts (after giving effect to any adjustments determined by the Bankruptcy Court or by mutual agreement with the contract counterparty to such Assumed Contracts) is greater than $1,300,000 (as adjusted in accordance with clauses (i) and (ii) of this Section 2.5(e), the "Target Cure Amount"), then the Closing Payment shall be reduced, on a dollar-for-dollar basis, to the extent such Cure Amount exceeds the Target Cure Amount. The Target Cure Amount shall be adjusted as follows:

(i) if any Contract that was on the Contract & Cure Schedule as of the date of this Agreement ceases to be an Assumed Contract as of Closing for any reason (a "Removed Contract"), then the Target Cure Amount shall be reduced by the applicable Cure Amount with respect to such Removed Contract; and

(ii) to the extent that any portion of a Cure Amount of any Specified Contract (after giving effect to any adjustments determined by the Bankruptcy Court or by mutual agreement with the contract counterparty to such Assumed Contracts) represents a prepayment of any amount due after the Petition Date or a payment in respect of goods or services to be provided under such Specified Contract after the Petition Date that inures to the benefit of the Purchaser, as reasonably documented by such contract counterparty, then the Target Cure Amount shall be increased by the amount such payment or value of such goods or services.

(f)     All references to "Seller" in this Section 2.5 shall be deemed to include any trustee, administrator, receiver, receiver-manager, interim receiver or monitor or similar officer or entity appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any Person appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan or otherwise.

**Section 2.6**     Deposit. The parties acknowledge that the Purchaser previously delivered a good faith cash deposit to the Seller (the "Deposit"), in advance of the Auction, equal to $700,000 by wire transfer to US Bank, National Association as master escrow agent. The parties also acknowledge that the Purchaser delivered an additional $350,000 in advance of the Auction which is subject to the Purchaser's obligations with respect to the Bidding Procedures in connection with the China License Agreement, as back-up bidder thereunder.

**Section 2.7** <u>Allocation of Purchase Price</u>.

(a) Within sixty (60) days after the Closing Date, the Purchaser shall deliver to the Seller, or any trustee appointed under the terms set forth in any bankruptcy plan confirmed by the Seller (as applicable), an allocation statement (the "<u>Allocation Statement</u>"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities, as adjusted for payments made pursuant to <u>ARTICLE 9</u>, among the Purchased Assets, in accordance with and solely for the purposes of section 1060 of the Code and any comparable provisions of state or local Law (the "<u>Allocation</u>"). The Seller will review the Allocation Statement and the Allocation, and, to the extent the Seller disagrees with the content of the Allocation Statement, the Seller will inform the Purchaser of such disagreement within thirty (30) days after receipt of the Allocation Statement. The Seller and the Purchaser will attempt in good faith to resolve any such disagreement. If the Seller and the Purchaser are unable to reach a good faith agreement on the content of the Allocation Statement within ninety (90) days of the Closing Date, the Seller and the Purchaser will each use its own allocation statement. For purposes of this <u>Section 2.7</u>, all actions of the Seller may be the obligations or rights of a liquidating trustee of the Seller's estate.

(b) If the Purchaser and the Seller agree on the Allocation Statement, the Purchaser and the Seller will report the Allocation of the Purchase Price in a manner consistent with the Allocation Statement and will act in accordance with the Allocation Statement in the preparation and filing of all Tax Returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise, except as required by applicable Law.

(c) The Purchaser and the Seller will promptly inform one another of any challenge by any Governmental Authority to the Allocation made pursuant to this <u>Section 2.7</u> and agree to consult with and keep each other informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

**Section 2.8** <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") will take place at the offices of Hogan Lovells US LLP, 4085 Campbell Avenue, Suite 100, Menlo Park, California 94025, subject to the satisfaction or waiver of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> hereto, no later than June 28, 2019 (or such other date set forth in the Bidding Procedures Order), starting at 10:00 a.m., prevailing Pacific time, if not conducted electronically at the option of the parties hereto. The date and time on and at which the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>." All actions to be taken and all documents to be executed and delivered by the parties hereto at the Closing shall be deemed to have been taken and executed simultaneously, and no action shall be deemed taken nor any document executed and delivered until all have been taken, executed and delivered.

**Section 2.9** <u>Closing Deliveries</u>.

(a) At the Closing, the **<u>Seller</u>** will deliver or cause to be delivered to the Purchaser:

(i)     a bill of sale in the form of Exhibit A (the "Bill of Sale") executed by the Seller;

(ii)     an assignment and assumption agreement in the form of Exhibit B (the "Assignment and Assumption Agreement") executed by the Seller;

(iii)     a certificate, dated as of the Closing Date, executed by the Seller confirming the satisfaction of the conditions specified in Sections 6.1(a) and 6.1(b);

(iv)     an Intellectual Property assignment agreement in the form of Exhibit C (the "Intellectual Property Assignment") executed by the Seller; and

(v)     such other instruments of sale, transfer, conveyance and assignment as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement (which shall not prejudice the rights of the Seller or subject the Seller to any additional Liabilities).

(b)     At the Closing, the Purchaser will deliver or cause to be delivered to the Seller or for the Seller's benefit:

(i)     the Closing Payment by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing, less the amount of the Deposit and any interest thereon at the rate specified, if any, in the master escrow agreement with US Bank, National Association (the "Escrow Agreement");

(ii)     the Assignment and Assumption Agreement executed by the Purchaser;

(iii)     evidence of the ability to satisfy the Assumed Liabilities (other than those to be satisfied in cash on the Closing Date) to the extent necessary to satisfy the Bankruptcy Code, or as required by order of the Bankruptcy Court;

(iv)     the Bill of Sale executed by the Purchaser;

(v)     a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b); and

(vi)     the Intellectual Property Assignment executed by the Purchaser; and

(vii)     such other instruments of assumption as the Seller reasonably requests for the purpose of consummating the transactions contemplated by this Agreement (which shall not prejudice the rights of the Purchaser or subject the Purchaser to any Liabilities beyond the Assumed Liabilities).

**Section 2.10** <u>Payment of Cure Amounts</u>.  Without limiting the Purchase Price adjustment set forth in <u>Section 2.5(e)</u>, the Purchaser shall pay any and all Cure Amounts with respect to the Assumed Contracts, in cash on the Assumption Effective Date in the amount specified on the Contract & Cure Schedule as of the Closing Date (or as otherwise determined by the Bankruptcy Court or by mutual agreement with the contract counterparty to such Assumed Contracts) or in such other manner as agreed by the Purchaser and the counterparty to an Assumed Contract.

**Section 2.11** <u>Consents</u>.  Notwithstanding any other provision of this Agreement, this Agreement does not effect an assignment of any Assumed Contract to the extent that such Assumed Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable, as of the Closing.  As to any Purchased Asset, including any Assumed Contract and Governmental Authorization, the Seller will use commercially reasonable efforts to obtain as promptly as practicable prior to the Closing (and, prior to the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing the Chapter 11 Case, and subject to the availability of funds for such purpose, use commercially reasonable efforts to continue seeking after the Closing, if consent is not obtained prior to the Closing), the consent of the other parties to transfer such Purchased Asset to the Purchaser or, if required, novation thereof to the Purchaser or, alternatively, written confirmation from such parties reasonably satisfactory to the Seller and the Purchaser that such consent is not required.  In no event, however, will the Seller be obligated to pay any money to any Person or to offer or grant financial or other accommodations to any Person in connection with obtaining any consent, waiver, confirmation, novation or approval with respect to any such Assumed Contract.  If any required consent, waiver, confirmation, novation or approval is not obtained with respect to any such Purchased Asset prior to the Closing, then to the extent permitted by applicable Law, the Seller and the Purchaser will cooperate to establish an agency type or other similar arrangement reasonably satisfactory to the Seller and the Purchaser under which the Purchaser would obtain (including by means of subcontracting, sublicensing or subleasing arrangement), to the extent practicable, all rights, and assume the corresponding Assumed Liabilities thereunder for the period of time that the Purchaser shall receive such rights, or under which the Seller would enforce, for the benefit of the Purchaser, with the Purchaser assuming and agreeing to pay the Seller's Liabilities and expenses (other than Excluded Liabilities) for the period of time that the Purchaser shall receive such benefits, any and all rights of the Seller against a Third Party to any such Purchased Asset.  In such event: (a) the Seller will promptly pay to the Purchaser when received all moneys relating to the period on or after the Closing Date received by it under any Purchased Asset not transferred pursuant to this <u>Section 2.11</u>; and (b) for the period of time set forth in clause (a) the Purchaser will promptly pay, perform or discharge when due any Assumed Liabilities arising thereunder after the Closing Date but not transferred to the Purchaser pursuant to this <u>Section 2.11</u>.  The failure by the Purchaser or the Seller to obtain any required consent, waiver, confirmation, novation or approval with respect to any Assumed Contract will not relieve any party from its obligation to consummate at the Closing the transactions contemplated by this Agreement.  Without limiting the Purchase Price adjustment set forth in <u>Section 2.5(e)</u>, the Purchaser acknowledges that no adjustment to the Purchase Price will be made for any

Purchased Assets that are not assigned and that the Purchaser will have no claim against the Seller after the Closing in respect of any such unassigned Purchased Assets.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as follows, except as (i) disclosed in the Seller SEC Documents available prior to the date hereof or (ii) set forth on the disclosure schedule delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule"):

**Section 3.1**    Organization.  The Seller is a corporation duly organized and validly existing and in good standing under the Laws of the State of Delaware.  Except as a result of the filing of the Petition, the Seller has all requisite power and authority to conduct the Plazomicin Business as presently conducted. The Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not reasonably be expected to have, a Material Adverse Effect.  The Seller has heretofore delivered to the Purchaser true and complete copies of the certificate of incorporation, bylaws or other material governing documents of the Seller and its Subsidiaries as currently in effect.  The Seller does not have any Subsidiaries other than Achaogen UK Ltd. and Achaogen Ireland Limited.

**Section 3.2**    Authority and Enforceability.  Subject only to the entry of the Bidding Procedures Order and the Sale Order, the Seller has all requisite corporate power, authority and capacity to execute and deliver this Agreement and the other agreements contemplated hereunder and to perform its obligations under this Agreement and such other agreements.  Subject only to the entry of the Bidding Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the other agreements contemplated hereunder and the consummation of the transactions contemplated by this Agreement and such other agreements by the Seller have been duly authorized by all necessary action on the part of the Seller.  The Seller has duly and validly executed and delivered this Agreement.  Assuming the due authorization, execution and delivery of this Agreement by the Purchaser and subject to the entry of the Sale Order, this Agreement constitutes the valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**Section 3.3**    No Conflict.  Subject only to the entry of the Bidding Procedures Order and the Sale Order, neither the execution, delivery and performance of this Agreement by the Seller, nor the consummation by the Seller of the transactions contemplated by this Agreement, will: (a) conflict with or violate the organizational documents of Seller or any of its Subsidiaries; (b) result in a breach or default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent, approval, or waiver under, any material Contract to which the Seller or its Subsidiaries are a party or to which the Purchased Assets are bound in any case with or without notice or lapse of time or both (other than needed consents for transfer of licenses to Company Used Intellectual Property); (c) violate any Law or Judgment applicable to the Seller or its Subsidiaries, the Plazomicin Business or the Purchased Assets; (d)

result in the imposition of any Lien or other encumbrance on any of the assets of the Seller; or (e) require the Seller to obtain any Governmental Authorization or otherwise require any consent, approval or notice to any Governmental Authority.

Section 3.4    Title to Assets; Liens.  Except as set forth on Schedule 3.4 of the Seller Disclosure Schedule, as of the date of this Agreement, the Seller has good and marketable title to the Purchased Assets, and subject to the entry of the Sale Order, at Closing, the Purchaser will be vested with good and marketable title to all of the Purchased Assets, which Purchased Assets shall be conveyed free and clear of any Liens or Claims (other than the China License Rights) by order of the Bankruptcy Court.   Other than certain MAAs made by the Subsidiaries, no Subsidiary of the Seller owns or has any interest in the Purchased Assets.

Section 3.5    Claims, Litigation and Disputes.  Except as set forth on Schedule 3.5 of the Seller Disclosure Schedule, there are currently no pending or, to the Knowledge of the Seller, threatened in writing, lawsuits, administrative or regulatory proceedings, actions, orders, arbitration or reviews, or formal complaints or investigations or inquiries, including grand jury subpoenas by any Person, concerning or against the Seller or any of its Subsidiaries, or to which the Plazomicin Business or any of the Purchased Assets may be subject.

Section 3.6    Compliance With Laws; Governmental Authorizations.  Each of the Seller and its Subsidiaries are in compliance with all Laws, Orders, ordinances, decrees, rules or regulations of any Governmental Authority applicable to the Plazomicin Business or the Purchased Assets, except such noncompliance which has not had, and would not reasonably be expected to have, a Material Adverse Effect.  Schedule 3.6 of the Seller Disclosure Schedule sets forth all material Governmental Authorizations held by the Seller.  The Seller has in effect the Governmental Authorizations necessary to conduct the Plazomicin Business in all material respects as it is currently being conducted in accordance with the Laws of any Governmental Authority having jurisdiction over its properties or activities, except for any such failure to obtain a Governmental Authorization that has not had, and would not reasonably be expected to have, a Material Adverse Effect (it being understood that it shall be the sole and exclusive obligation of the Purchaser to obtain any Governmental Authorizations necessary for future operations, provided that the Seller shall provide reasonable assistance regarding the transfer of any Governmental Authorizations held by the Seller in accordance with Section 5.16).   The Seller has not received any written notice from a Governmental Authority of any proceeding, inquiry, investigation, violation or alleged violation of any Laws or Orders related to the Plazomicin Business or the Purchased Assets or of any pending or threatened withdrawal, suspension or termination of a Governmental Authorization.  All material fees and charges due and payable with respect to the Governmental Authorizations held by the Seller have been made in full.

Section 3.7    Environmental Matters.  To the Seller's Knowledge, the operation of the Business by the Seller is being conducted in material compliance with all applicable Environmental Laws and under all environmental, health and safety Governmental Authorizations and other authorizations required under all applicable Environmental Laws to operate the Business as it is currently being operated.  All such Governmental Authorizations or

other authorizations are in full force and effect. No material penalty has been assessed and no investigation or review is pending or, to the Knowledge of the Seller, threatened in writing by any Governmental Authority with respect to any alleged failure by the Seller to comply with any applicable Environmental Law or to have any material environmental, health or safety Governmental Authorization or other authorization required under any applicable Environmental Law in connection with the operation of the Business. To the Seller's Knowledge, there are no past or present facts, circumstances or conditions, including the Release of any Materials of Environmental Concern that could reasonably be expected to result in a material claim under applicable Environmental Laws against the Seller.

**Section 3.8** <u>Contracts</u>. The Seller has made available to the Purchaser, true and complete copies of, and <u>Schedule 3.8</u> of the Seller Disclosure Schedule sets forth a true and complete list of, all Contracts material to the operation of the Plazomicin Business. The Seller has not, and, to the Seller's Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any material default or violation under any Assumed Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amount. Assuming payment of the Cure Amounts, to the Seller's Knowledge, each Assumed Contract is, or will be upon the Closing, valid, binding on all parties thereto and in full force and effect in accordance with its terms. To the Seller's Knowledge, there are no material disputes between the Seller and any other party to or otherwise in connection with any Assumed Contract, other than in connection with the payment of the Cure Amount. To the Seller's Knowledge, the Seller has not received any written notice that any other party to an Assumed Contract intends to cancel or terminate such Contract or has committed or failed to perform any act which, with or without notice, lapse of time or both would constitute, in any material respect, a breach of or default under any of the Assumed Contracts. The Subsidiaries are not parties to the Assumed Contracts.

**Section 3.9** <u>Intellectual Property</u>.

(a) <u>Schedule 3.9(a)</u> of the Seller Disclosure Schedule sets forth a true and complete list of all of the Company Owned Intellectual Property, Company Used Intellectual Property and IP Agreements, including a true and complete list of all United States, foreign, international and state: (i) Patents and Patent applications, including serial numbers for each filed application and Patent numbers for each issued Patent, included in the foregoing; (ii) Trademark registrations, applications and material unregistered Trademarks, included in the foregoing; (iii) domain names, included in the foregoing; and (iv) Copyright registrations, applications and material unregistered Copyrights, included in the foregoing. The Seller has provided to the Purchaser true and complete copies of all IP Agreements that are included in the Acquired Intellectual Property, together with all amendments and material written notices relating to the foregoing. Each IP Agreement included in the Company Owned Intellectual Property, Company Used Intellectual Property and Acquired Intellectual Property is valid and binding on the Seller and, to Seller's Knowledge, the other parties thereto in accordance with its terms and is in full force and effect. Neither the Seller nor, to Seller's Knowledge, any other party thereto is in

breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of breach or default of or any intention to terminate, any IP Agreement included in the Acquired Intellectual Property. Other than certain MAAs made by the Subsidiaries, no Subsidiary of the Seller owns or has any interest in the Acquired Intellectual Property or any other Intellectual Property relating to the Plazomicin Business. The granting of the China License Rights under the China License Agreement, as contemplated under the terms of the Auction, will not require the Purchaser to make any payments, including any milestone, royalty or sublicense revenue payments, on or after Closing, under the Ionis License Agreement.

(b) Except for United Stated federal research grants and customary funding arrangements with Governmental Authorities, no funding, facility or personnel of any Governmental Authority were used, directly or indirectly, to develop or create, in whole or in part, the Product or any Company Owned Intellectual Property or Company Used Intellectual Property.

(c) Except as set forth in Schedule 3.9(c) in the Seller Disclosure Schedule, the Seller solely and exclusively owns all Company Owned Intellectual Property and is properly licensed under or has the valid and enforceable right to use all Company Used Intellectual Property, free and clear of all Liens and Claims, and none of such rights will be affected by the consummation of the transactions contemplated by this Agreement (subject to any necessary consents for the transfer of any Company Used Intellectual Property). The Seller is neither party to or bound by any Contract that impairs its ability to use, sell, transfer, assign, license or convey any of the Company Owned Intellectual Property. There are no inquiries, investigations, Claims, opposition, interference, or cancellation proceedings challenging or contesting any of the Company Owned Intellectual Property, or to the Seller's Knowledge, the Company Used Intellectual Property, and the Seller has not received written notice from any Third Party: (i) alleging infringement by the Seller of Intellectual Property rights of any Person; or (ii) challenging or threatening to challenge the Seller's right, title, or interest with respect to its ownership, use of, or continued use or right to preclude others from using any Acquired Intellectual Property as currently used, or the validity, enforceability or registrability of any such Intellectual Property. To the Seller's Knowledge, the Seller has not infringed, misappropriated or otherwise violated any Intellectual Property of any Person, and neither the conduct of the Plazomicin Business nor the Acquired Intellectual Property (or any use thereof) infringes, misappropriates or otherwise violates the rights of any Person including any Intellectual Property owned or purported to be owned by any Third Party.

(d) To Seller's Knowledge, no Third Party is purporting to or infringing, misappropriating, diluting, or otherwise violating any Acquired Intellectual Property. The Seller has not brought or threatened in writing a Claim against any Person: (i) alleging infringement, misappropriation or other violation of Acquired Intellectual Property; or (ii) challenging any Person's ownership or use of, or the validity, enforceability or registrability of any Acquired Intellectual Property. The Seller has not licensed or transferred ownership of, or, except in the ordinary course of business and as would not adversely affect such Intellectual Property, granted or authorized the retention of any license or right under or with respect to, or authorized the

retention of any right with respect to ownership of, any Acquired Intellectual Property. No Third Party has brought or threatened in writing a Claim against the Seller: (i) challenging any Person's ownership or use of, or the validity, enforceability or registrability of any Acquired Intellectual Property; or (ii) alleging infringement of any Third Party's Intellectual Property relating to Exploitation of the Product and/or the Plazomicin Business by the Seller. The Seller is not aware of any Third Party Intellectual Property that would be infringed by operation of the Plazomicin Business, including Exploitation of the Product.

(e)  Except for commercially available Intellectual Property, including commercially available software and other Intellectual Property licensed to the Seller under so-called "shrink-wrap" licenses (collectively, "Commercially Available IP"), the Company Owned Intellectual Property and the Company Used Intellectual Property is the only Intellectual Property used by Seller in or necessary for the operation of the Plazomicin Business by the Seller, including all licenses relating to aminoglycocide necessary for the Exploitation of the Product. The Company Owned Intellectual Property and, to the Seller's Knowledge, the Company Used Intellectual Property: (i) has been duly maintained, including the payment of all required fees, and all necessary documents, recordations and certificates have been filed with the relevant governmental entity for the purposes of prosecuting, perfecting and maintaining and such Intellectual Property; (ii) to the Knowledge of the Seller, is subsisting, in full force and effect and there are no orders, materials, information, facts or circumstances that would render any such Intellectual Property invalid, cancelled, abandoned or unenforceable or that would materially affect any pending application or renewal for any such Intellectual Property; (iii) has not been cancelled, expired or abandoned or adjudged invalid or unenforceable; and (iv) to the Knowledge of the Seller, is valid and enforceable (except for pending Patent applications in various jurisdictions, which by their nature as applications are not yet enforceable). To the Seller's Knowledge and based on reasonable search and inquiry, no Intellectual Property owned or Controlled by a Third Party prevents the Seller from operation of the Plazomicin Business, including the Exploitation of the Product.

(f)  The Seller has taken commercially reasonable measures to protect its rights, title and interests in and to all Company Owned Intellectual Property and Company Used Intellectual Property, and to maintain, protect, and preserve the security, confidentiality, value and ownership of all material non-public Company Owned Intellectual Property and Company Used Intellectual Property relating to the Plazomicin Business, including by implementing commercially reasonable security measures and requiring any Person to whom the Seller provides access to such non-public Company Owned Intellectual Property to execute and deliver to the Seller a valid and enforceable (except as enforceability may be limited by: (i) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (ii) Laws governing specific performance, injunctive relief and other equitable remedies) confidentiality agreement in customary form.

(g)  All current and, to Seller's Knowledge, former directors, officers, and employees of Seller who are or were involved in, or who have participated in or contributed to, the conception, development, creation, reduction to practice, improvement to or modification of

the Product or Acquired Intellectual Property or any other Intellectual Property used by Seller or held for use in the Plazomicin Business have executed and delivered to the Seller a written agreement that (i) includes customary confidentiality terms and (ii) assigns to the Seller any Intellectual Property rights conceived, developed, created, or reduced to practice by such director, officer or employee in the course of services performed for the Seller by such director, officer or employee. No current or, to Seller's Knowledge, former director, officer or employee of Seller retains any Intellectual Property rights to the Acquired Intellectual Property.

(h)     The consummation of the transactions contemplated hereunder will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, Purchaser's right to own, use or hold for use any Acquired Intellectual Property as owned, used or held for use in the conduct of the Plazomicin Business as currently conducted.

**Section 3.10**   <u>Taxes</u>.   Except as set forth in <u>Schedule 3.10</u> in the Seller Disclosure Schedule, (a) the Seller has filed or has caused to be filed on a timely basis all Tax Returns that are or were required to be filed with respect to the Purchased Assets; (b) all such Tax Returns accurately reflect all Taxes and other Liabilities required to be reflected thereon; (c) all Taxes due and payable by the Seller with respect to the Purchased Assets, whether or not shown on a Tax Return, have been paid in full, other than those Taxes which have been stayed by the filing of the Petition; (d) the Seller has not requested or consented to extend to a date later than the Closing Date the time in which any Tax may be assessed or collected by any Governmental Authority with respect to the Purchased Assets; (e) no deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of Tax has been proposed, asserted or assessed by any Governmental Authority against the Seller with respect to the Purchased Assets and there is no action, suit, taxing authority proceeding or audit now in progress, pending or, to the Knowledge of the Seller, threatened in writing against or relating to the Seller with respect thereto; (f) there are no pending audits by any taxing authority in connection with the Purchased Assets; (g) the Seller is not a party to, or bound by, any Tax indemnity, Tax-sharing, or Tax allocation agreement that relates to the Purchased Assets (other than as set forth in this Agreement); and (h) there are no Liens for Taxes (other than for current Taxes not yet due and payable or Liens for Taxes filed as a result of the Chapter 11 Case) upon the Purchased Assets.

**Section 3.11**   <u>Real Property</u>.   <u>Schedule 3.11</u> of the Seller Disclosure Schedule sets forth a true and complete list of all material leased real property of the Seller (the "<u>Leased Real Property</u>"), and the Seller has provided to the Purchaser true and complete copies of the leases related thereto.  The Seller has a valid leasehold interest in the Leased Real Property, and the leases granting such interests are in full force and effect in all material respects. Except as set forth on <u>Schedule 3.11</u> of the Seller Disclosure Schedule, none of the Leased Real Property is subject to any sublease or grant to any Third Party of any right to the use, occupancy or enjoyment of the Leased Real Property that would materially impair the use of the Leased Real Property in the operation of the Business. The Seller has not received written notice of any pending or threatened condemnations relating to the Leased Real Property.  The Seller does not own any real property.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as follows:

**Section 4.1** <u>Organization and Good Standing</u>.  The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to conduct its business as it is presently conducted.

**Section 4.2** <u>Authority and Enforceability</u>.  The Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser.  The Purchaser has duly and validly executed and delivered this Agreement.  Assuming the due authorization, execution and delivery of this Agreement by the Seller and subject to the entry of the Sale Order, this Agreement constitutes the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to: (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

**Section 4.3** <u>No Conflict</u>.  Neither the Purchaser's execution, delivery and performance of this Agreement, nor the consummation by the Purchaser of the transactions contemplated by this Agreement, will: (a) conflict with or violate the Purchaser's organizational documents; (b) result in a breach or default under or create in any Person the right terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any material Contract to which the Purchaser is a party or by which the Purchaser is bound, in any case with or without due notice or lapse of time or both; (c) result in the imposition of any Lien or other encumbrance on any of the assets of the Purchaser; (d) violate any Law or Judgment applicable to the Purchaser; or (e) require the Purchaser to obtain any Governmental Authorization or make any filing with any Governmental Authority, subject only to the entry of the Sale Order.

**Section 4.4** <u>Legal Proceedings</u>.  There is no Proceeding pending or, to the Purchaser's knowledge, threatened against the Purchaser that questions or challenges the validity of this Agreement or that may prevent, delay, make illegal or otherwise interfere with the ability of the Purchaser to consummate any of the transactions contemplated by this Agreement.

**Section 4.5** <u>Availability of Funds</u>.  The Purchaser has immediately available cash in an amount sufficient to allow the Purchaser to perform all of its obligations under this Agreement.

**Section 4.6** <u>No Knowledge of Breach or Inaccuracy</u>.  To the Purchaser's knowledge, as of the date of this Agreement, there is no breach of, or inaccuracy in, or any fact, event, breach, condition or occurrence that may constitute a breach of, or inaccuracy in, any representation or warranty made by the Seller in this Agreement.

**Section 4.7** <u>Independent Investigation</u>.    The Purchaser has conducted its own independent investigation, review and analysis of the Plazomicin Business and the Purchased Assets as it has deemed appropriate, which investigation, review and analysis was done by the Purchaser and its representatives.  In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of the Seller or its representatives (except the representations and warranties set forth in ARTICLE 3, including the related portions of the Disclosure Letter).    The Purchaser acknowledges and agrees that: (a) other than the representations and warranties set forth in <u>ARTICLE 3</u>, none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the Business, the Plazomicin Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement, and the Purchaser is purchasing the Purchased Assets from the Seller "as is" and "where is"; and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have or will be subject to any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business, the Plazomicin Business, or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing.

## ARTICLE 5
## COVENANTS

**Section 5.1** <u>Access and Investigation</u>.    Until the Closing, subject to existing confidentiality agreements and upon reasonable advance notice from the Purchaser, the Seller will allow the Purchaser and its representatives reasonable access during normal business hours and without unreasonable interference with the operation of the Plazomicin Business to: (a) such materials and information about the Plazomicin Business as the Purchaser may reasonably request; (b) specified members of management of the Plazomicin Business as the Purchaser may reasonably request, and (c) any premises used by the Seller in connection with the Plazomicin Business.

**Section 5.2** <u>Operation of the Plazomicin Business</u>.

(a)      Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case (it being understood that no provision of this <u>Section 5.2</u> will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as expressly set forth in this Agreement or <u>Section 5.2</u> of the Seller Disclosure Schedule; or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will operate, and will conduct the Plazomicin Business in the ordinary course of business in all material respects and use its commercially reasonable efforts to

(1) preserve intact the Plazomicin Business's relationships with its suppliers, customers and others doing business with it, subject to the limitation that any payments necessary for the forgoing shall be provided for and within the amounts in the Budget approved from time to time; (2) shall continue to maintain all advertising material, all documentation that would constitute acquired Regulatory Documentation and all books and records on a basis consistent with past practice; and shall (3) continue to make all necessary or appropriate filings and payments with and to Governmental Authorities in connection with the Plazomicin Business in a timely manner, and maintain in effect all existing Regulatory Approvals and Authorizations required for the ongoing operation of the Plazomicin Business as presently conducted.

(b)        Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case (it being understood that no provision of this <u>Section 5.2</u> will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as expressly set forth in this Agreement or Schedule 5.2 of the Seller Disclosure Schedule; (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed); or (iv) pursuant to any orders approving debtor in possession financing and/or use of cash collateral, or any KEIP/KERP orders or other orders affecting employees, entered by the Bankruptcy Court in the Chapter 11 Case, the Seller will not:

(i)        amend or terminate any Assumed Contract or any other material Contract;

(ii)        amend the certificate of incorporation, by-laws or other governing documents of the Seller or any Subsidiary;

(iii)        waive or release any material right or claim with respect to the Purchased Assets;

(iv)        sell, lease, transfer, license or otherwise dispose of, or permit any Lien on any portion of, the Purchased Assets, other than in respect of inventory in the ordinary course of business;

(v)        incur or suffer to exist any indebtedness for borrowed money except any such indebtedness that is an Excluded Liability;

(vi)        acquire, by merger or consolidation with, or by purchase of all or a substantial portion of the assets or stock of, or by any other manner, any business or entity, make any investment in any Person or enter into any joint venture, partnership or other similar arrangement for the conduct of the Plazomicin Business;

(vii)        except as required by applicable Law or an Employee Plan: (A) grant any severance, retention or termination pay to, or enter into or amend any severance, retention, termination, employment, consulting, bonus, change in control or severance agreement with, any employee; (B) increase the compensation or benefits

provided to any employee; (C) grant any incentive awards to, or discretionarily accelerate the vesting or payment of any such awards held by, any employee; (D) establish, adopt, enter into or amend any Employee Plan or Collective Bargaining Agreement; or (E) terminate the employment of any employee other than for cause;

(viii)   transfer or dispose of, abandon, lapse, allow to lapse, sell, assign, subject to any Lien, grant any right or license to, any Acquired Intellectual Property, or disclose (except as necessary in the conduct of the Plazomicin Business consistent with past practice) to any Person, other than Purchaser or its representatives, any trade secret, formula, process or know-how that is not a matter of public knowledge prior to such disclosure;

(ix)   grant any refunds, credits, rebates or other allowances to any supplier, vendor, customer or distributor related to the Plazomicin Business except in the ordinary course of business;

(x)   settle, or offer or propose to settle, any material claim or Action arising out or relating to the Plazomicin Business or relating to the transactions contemplated by this Agreement;

(xi)   fail to pay any Tax on or before the date when it becomes due and payable; or

(xii)   agree in writing to take any of the foregoing actions.

**Section 5.3**   <u>Employee Matters</u>.   The Purchaser shall have the right, but not the obligation, to offer employment on an at-will basis or otherwise engage any of the Service Providers, at any time on or after the Closing Date, on such terms and conditions established by the Purchaser in its sole discretion. In no event shall the Purchaser be obligated to hire any engage any Service Providers for any period following the Closing. The Purchaser shall have no obligation to continue or assume any Employee Plan of the Seller or to offer any Employee Plan to Service Providers.

**Section 5.4**   <u>Consents and Filings; Commercially Reasonable Efforts</u>.

(a)   Subject to the terms and conditions of this Agreement, each of the parties will use their respective commercially reasonable efforts: (i) to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement; and (ii) as promptly as practicable after the date of this Agreement, to obtain all Governmental Authorizations from, and make all filings with, all Governmental Authorities, and to obtain all other consents, waiver approvals or authorizations of, declarations, filings or registrations with, or notices to all other Third Parties, that are necessary or advisable in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, including the transfer and/or assignment of the

38

Purchased Assets to Purchaser as contemplated herein, in either case, in form and substance reasonably satisfactory to Purchaser.

(b)    Each of the Seller and the Purchaser will promptly notify the other of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement, and will permit the other party to review in advance any proposed communication by such party to any Governmental Authority.  Neither the Seller nor the Purchaser will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the transactions contemplated by this Agreement unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate at such meeting.  Each of the Seller and the Purchaser will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing.  Each of the Seller and the Purchaser will provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

**Section 5.5**    Supplements to Disclosure Schedules.  The Seller may, from time to time up to seven (7) Business Days prior to the Closing (unless a shorter period is approved by the Purchaser), by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) in order to disclose any matter which, if occurring prior to the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement; provided, that any such supplement shall give Purchaser an unconditional right to terminate this Agreement under Section 7.1(a)(ii) within seven (7) Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedules.  Subject to this Section 5.5, none of such supplements to the Seller Disclosure Schedule will be deemed to cure the representations and warranties to which such matters relate with respect to the satisfaction of the conditions set forth in Section 6.1(a) or otherwise affect any other term or condition contained in this Agreement; provided, however, that, unless the Purchaser delivers a notice of termination with respect to such matter as contemplated by Section 7.1(a)(ii) within seven (7) Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedule pursuant to this Section 5.5, the Purchaser will be deemed to have waived any and all rights to terminate this Agreement pursuant to Section 7.1(a)(ii) or otherwise arising out of or relating to the contents of such supplement and the resulting breach or breaches of the representations and warranties and the Purchaser will be deemed to have accepted the contents of such supplement for all purposes of this Agreement; and provided, further, that from and after the date the Sale Order has been entered, the Seller will have no Liability pursuant to this Agreement for any matters arising out of or relating to any of the matters disclosed on the Seller Disclosure Schedule, as supplemented or amended by the Seller prior to the date the Sale Order has been entered.

**Section 5.6**    Confidentiality.    Effective upon the Closing Date, all confidentiality agreements between the Seller and the Purchaser concerning the Seller, the Business (including the Plazomicin Business) or the transactions contemplated hereby shall terminate except as set forth in this Section 5.6 (other than with respect to the Excluded Assets and Excluded Liabilities).    Following the Closing, the Seller will, and will instruct its directors, officers, Service Providers and advisors to, hold in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all Confidential Information, except to the extent that such Confidential Information: (a) must be disclosed in connection with the obligations of the Seller pursuant to this Agreement; (b) can be shown to have been in the public domain through no fault of the Seller; (c) becomes a matter of public record as a result of the Chapter 11 Case and filings made with the Bankruptcy Court with respect thereto; or (d) was later lawfully acquired by the Seller from sources other than those related to its prior ownership of the Business.    Notwithstanding the foregoing, in no event will this Section 5.6 limit or otherwise restrict the right of the Seller to disclose such Confidential Information: (i) to its and its Affiliates' respective directors, officers, Service Providers, agents and advisors to the extent reasonably required to facilitate any delivery or performance of this Agreement; (ii) to any Governmental Authority or arbitrator to the extent reasonably required in connection with any Proceeding relating to the enforcement of this Agreement; or (iii) as otherwise required by applicable Law.

**Section 5.7**    Public Announcements.    Prior to the Closing, neither the Purchaser nor the Seller will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party (which approval will not be unreasonably withheld, conditioned or delayed), unless required by applicable Law or by any listing agreement with any national securities exchange. Prior to issuing any such press release or making any such other public announcement as required by applicable Law or by any listing agreement with any national securities exchange and without the other party's prior written approval, the disclosing party will give the other party a copy of the proposed press release or other public announcement and reasonable opportunity to comment on the same.

**Section 5.8**    Bulk Transfer Laws.    The Seller shall ensure that the Sale Order shall provide either that: (a) the Seller has complied with any applicable bulk sale or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement; or (b) compliance with such Laws described in the foregoing clause (a) is not necessary or appropriate under the circumstances.

**Section 5.9**    Bankruptcy Court Matters.

(a)    The Purchaser and the Seller will use their respective good faith and commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as practicable after its entry.

(b)    The Seller shall:

(i)     cause the Bankruptcy Court to enter the Sale Order by no later than 11:59 p.m. prevailing Eastern time on June 24, 2019; and

(ii)     consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event later than 11:59 p.m. prevailing Pacific time on or before June 28, 2019 (the "Outside Date").

(c)     The Seller will promptly take such actions as are reasonably requested by the Purchaser to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Purchaser of its obligations under this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that the Purchaser is a good faith buyer under section 363(m) of the Bankruptcy Code.

(d)     If an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from either the Bidding Procedures Order or the Sale Order, the Seller will promptly notify the Purchaser of such appeal, petition, motion or stay request and the Seller, with input from the Purchaser, will take all reasonable steps to defend against such appeal, petition, motion or stay request.  Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and the Purchaser, in its sole discretion, waives in writing the condition set forth in Section 6.1(d) that the Sale Order be a Final Order.

(e)     The Seller and the Purchaser shall comply with all of their respective obligations under the Bidding Procedures Order and Sale Order (after the entry of such order by the Bankruptcy Court).

(f)     The Seller shall comply (or obtain an order waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement.  The Seller shall serve on all required Persons, including: (i) all Persons who are known to possess or assert a Claim or Lien against or interest in the Purchased Assets; (ii) all applicable Governmental Authorities; (iii) all other Persons required by any order of the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules; and (iv) using commercially reasonable efforts to serve any other Persons that the Purchaser reasonably may request, any notice of the motions, hearings, or orders necessary to comply with its obligations under this Section 5.9 and to consummate the transactions contemplated hereby.

**Section 5.10**   Bankruptcy Court Approval.  The Purchaser and the Seller acknowledge that, under the Bankruptcy Code, the sale of Purchased Assets is subject to approval of the Bankruptcy Court. The Purchaser and the Seller acknowledge that to obtain such approval, the Seller must demonstrate that it has taken reasonable steps to obtain the highest or best value

possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Purchased Assets to prospective bidders, entertaining higher or better offers from qualified bidders and, if necessary, conducting an Auction and selling the Purchased Assets to another qualified bidder. The Purchaser acknowledges and agrees that it is not entitled to receive a break-up fee, reimbursement of its expenses or any other "bid protections" of any kind in the event it is not the Successful Bidder.

**Section 5.11**    Assumption & Rejection of Executory Contracts.

(a)    Schedule 5.11(a) (the "Contract & Cure Schedule") sets forth a list of all Executory Contracts that the Purchaser has advised the Seller it wants the Seller to assume and assign to the Purchaser under section 365 of the Bankruptcy Code and in accordance with Section 5.11(b) below.   The Cure Amounts in respect of each Executory Contract are also set forth in the Contract & Cure Schedule.   Subject to the *Notice of Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases* (as amended or supplemented, the "Assignment Notice"), at any time prior to the Closing, the Purchaser, in its sole and absolute discretion, may amend the Contract & Cure Schedule to add or remove any Executory Contract in accordance with the conditions concerning notice and service to contract counterparties set forth in the Bidding Procedures and Bidding Procedures Order; provided that in the event that the Cure Amount for any Executory Contract on the Contract & Cure Schedule has not been determined as of the Closing Date, the Purchaser at any time following the Closing Date may in its sole and absolute discretion remove such Executory Contract from the Contract & Cure Schedule.   Notwithstanding the foregoing, any removal of the Ionis License Agreement from the Contract & Cure Schedule must be made by written notice from the Purchaser to the Seller no later than 4:00 p.m. (prevailing Eastern time) on June 27, 2019.

(b)    Unless the Bankruptcy Court otherwise orders, each Executory Contract included on the Contract & Cure Schedule as of the Closing Date will be deemed to have been assigned to the Purchaser and become an Assumed Contract on the date (the "Assumption Effective Date") that is the later of: (i) the Closing Date, or (ii) contemporaneously with the resolution of any objections to the assumption and assignment of such Executory Contract or, subject to Section 5.11(a), to a proposed Cure Amount, and the entry of a Section 365 Order with respect to any such Executory Contract by the Bankruptcy Court.

(c)    Except as otherwise specified by the Seller or as set forth in Section 5.11(h), each Executory Contract that is not listed on the Contract & Cure Schedule as of the Closing Date will be rejected by the Seller, subject to approval by the Bankruptcy Court.   Except as set forth in Section 5.11(h), each Executory Contract that is not listed on the Contract & Cure Schedule as of the Closing Date, or which is removed from the Contract & Cure Schedule by the Purchaser as set forth in Section 5.11(a), will be deemed to be an Excluded Contract under this Agreement.

(d)    The Seller and the Purchaser will comply with the procedures set forth in the Assumption Procedures and the Bidding Procedures Order with respect to the assumption

and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this Section 5.11.

(e)     Except as provided in Section 2.5(e), no designation of any Executory Contract for assumption and assignment or rejection in accordance with this Section 5.11, the Bidding Procedures, the Bidding Procedures Order or the Sale Order will give rise to any adjustment to the Purchase Price.

(f)     If at any time, prior to the earlier of confirmation of a plan in the Chapter 11 Case or entry or an order dismissing the Chapter 11 Case, it is discovered that a Contract material to the operation of the Plazomicin Business should have been listed on Schedule 3.8 of the Seller Disclosure Schedule, but was not so listed (any such Contract, a "Previously Omitted Contract"), the Seller shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify the Purchaser in writing of such Previously Omitted Contract and provide the Purchaser with a copy of such Previously Omitted Contract and the Cure Amount (if any) in respect thereof. The Purchaser shall thereafter deliver written notice to the Seller, no later than five (5) Business Days following such notice of such Previously Omitted Contract from the Seller, if the Purchaser elects to so include such Previously Omitted Contract on the Contract & Cure Schedule.

(g)     If the Purchaser includes a Previously Omitted Contract on the Contract & Cure Schedule in accordance with Section 5.11(f), the Seller shall file and serve a notice on the contract counterparties to such Previously Omitted Contract notifying such counterparties of the Seller's intention to assume and assign to the Purchaser such Previously Omitted Contract, including the proposed Cure Amount (if any). Such notice shall provide such contract counterparties with ten (10) Business Days to object, in writing, to the Seller and the Purchaser to the assumption of its Contract. If such counterparties, the Seller and the Purchaser are unable to reach a consensual resolution with respect to the objection, the Seller will seek an expedited hearing before the Bankruptcy Court to seek approval of the assumption and assignment of such Previously Omitted Contract. If no objection is timely served on the Seller and the Purchaser, then such Previously Omitted Contract shall be deemed assumed by the Seller and assigned to the Purchaser pursuant to the Sale Order. Each of the Seller and the Purchaser shall execute, acknowledge and deliver such other instruments and take commercially reasonable efforts as are reasonably practicable for the Purchaser to assume the rights and obligations under such Previously Omitted Contract.

(h)     Notwithstanding anything contained in this Section 5.11, during the Election Period, the Purchaser will have the right to require that the Seller use its commercially reasonable efforts to assume and assign to the Purchaser or its designee(s) (i) any additional Executory Contracts that it determines, in its reasonable discretion, is material to the operation of the Plazomicin Business but which was not otherwise included on Schedule 3.8 of the Seller Disclosure Schedule or (ii) any Specified Contract that was removed from the Contract & Cure Schedule prior to the Closing ("Additional Contracts") for no additional consideration; provided, that the Purchaser or its designee(s) will pay to the Seller the full Cure Amount for each Additional Contract that it assumes, and during the Election Period the Purchaser shall pay to the

Seller on a current basis any post-petition administrative expense arising under all Additional Contracts, pending the determination whether such Additional Contracts will be assumed and assigned or rejected. Within three (3) Business Days of receipt of written notice from the Purchaser directing the Seller to seek the assumption and assignment of any Additional Contract, the Seller shall promptly file with the Bankruptcy Court a notice of proposed assignment (the "Additional Contracts Notice") which Assignment Notice shall include a Section 365 Order. The Additional Contracts Notice and Section 365 Order shall be in form and substance reasonably acceptable to the Purchaser. The Seller shall file the Additional Contracts Notice and serve it on all Persons entitled to notice thereof, all in accordance with the applicable provisions of the Bankruptcy Code and applicable order(s) of the Bankruptcy Court, including the Bidding Procedures Order and the Sale Order. Upon entry of the Section 365 Order (unless such Section 365 Order shall have been stayed, modified, reversed or amended), such Additional Contracts shall be deemed to be Assumed Contracts for all purposes under this Agreement. The Purchaser shall promptly reimburse the Seller for all reasonable costs and expenses of the Seller incurred in complying with the terms of this Section 5.11. Nothing in this Section 5.11 shall be deemed to require the Seller to remain a debtor in the Chapter 11 Case or maintain its corporate existence for any period of time beyond forty-five (45) days after the Closing Date.

Section 5.12   Back-Up Bidder.   If an Auction is conducted, and the Seller does not choose the Purchaser as the Successful Bidder, but instead chooses the Purchaser as the bidder as having submitted the next highest or otherwise best bid at the conclusion of such Auction (the "Back-Up Bidder"), the Purchaser shall be the Back-Up Bidder and its bid shall be the last highest bid of the Purchaser made at the Auction. If the Purchaser is chosen as the Back-Up Bidder, the Purchaser shall be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction) open and irrevocable until the earlier of: (i) the date of closing on the sale of the Purchased Assets to the Successful Bidder; and (ii) twenty-five (25) Business Days following the date the order approving the sale of the Purchased Assets to the Successful Bidder shall have become a Final Order (such date, the "Back-Up Period"); provided, however, that if the Successful Bidder shall fail to close on its purchase of the Purchased Assets within the period set forth above, the Back-Up Bidder shall be deemed to be the Successful Bidder and the Seller will be authorized, without further order of the Bankruptcy Court, to, and the Back-Up Bidder shall, consummate the transactions contemplated by this Agreement within ten (10) Business Days of becoming the Successful Bidder on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Purchaser prior to or at the Auction).

Section 5.13   Post-Auction Supplement.   Following the conclusion of the Auction, the Seller will promptly file with the Bankruptcy Court a supplement (the "Supplement") that will inform the Bankruptcy Court of the results of the Auction. The Supplement will identify, among other things: (i) the Successful Bidder as the proposed purchaser of the Purchased Assets; (ii) the amount and form of consideration to be paid by the Successful Bidder for the Purchased Assets; (iii) the Assumed Liabilities to be assumed by the Successful Bidder; (iv) the Executory Contracts to be assumed by the Seller and assigned to the Successful Bidder, or the Seller's

rights and interests therein to be sold and transferred to the Successful Bidder, as the case may be; and (v) the Executory Contracts designated to be rejected by the Seller (subject to Purchaser's rights under <u>Section 5.11</u> of this Agreement and the Assignment Notice). The Supplement will also include similar information relating to the Back-Up Bidder and its bid. In addition, the Seller will attach to the Supplement: (a) the proposed or revised proposed Sale Order, with any revisions necessary to reflect the results of the Auction, approving the sale to the Successful Bidder; (b) a copy of this Agreement, with any amendments necessary to reflect the results of the Auction, or a copy of the purchase agreement entered into by the Seller and such other Successful Bidder, following the Auction; and (c) any additional information or documentation relevant to the Successful Bidder. The Seller will file the Supplement on the docket for the Chapter 11 Case as promptly as is reasonably practicable prior to the Sale Hearing, but will not be required to serve the same on any parties-in-interest in the Chapter 11 Case.

**Section 5.14** <u>Payments Received</u>. The Seller, on the one hand, and the Purchaser, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts. Without limiting the generality of the foregoing, the Seller (prior to the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing the Chapter 11 Case) agrees to cooperate with the Purchaser, at the sole cost of the Purchaser, to inform parties owing payments to the Plazomicin Business after the Closing that constitute Purchased Assets (the "<u>Business Payments</u>") of the accounts of the Purchaser that should receive such Business Payments following the Closing and otherwise reasonably assist the Purchaser to ensure that such Business Payments are made to such accounts. The Seller, on the one hand, and the Purchaser, on the other hand, hereby agrees that any payments mistakenly received by it or its respective Affiliates shall be promptly transferred and delivered back to the other party or its Affiliate, as applicable.

**Section 5.15** <u>Cessation of Use of Acquired Intellectual Property</u>. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary: (a) the Seller acknowledges and agrees that, from and after the Closing, the Seller shall not have any right, title or interest in or to any Acquired Intellectual Property; and (b) from and after the Closing, the Seller shall cease and discontinue any and all use or other Exploitation of any and all Acquired Intellectual Property.

**Section 5.16** <u>Transfer of Governmental Authorizations and IP Registrations</u>. From and after the date hereof, the Seller, on the one hand (subject to the availability of funds for such purpose), and the Purchaser, on the other hand, shall, and shall cause their respective Affiliates to, reasonably cooperate to transfer to the Purchaser as of the Closing (or as soon as reasonably practicable thereafter) all Company IP Registrations and Governmental Authorizations included in the Purchased Assets, including any that is necessary for the import, manufacture, distribution, marketing and sale by the Purchaser of the products of the Plazomicin Business under applicable

Law (including the related MAAs made by the Seller or the Subsidiaries), in each case, to the extent such Company IP Registrations and Governmental Authorizations are transferable, and to enable the continued maintenance of any Company IP Registrations; provided that: (a) any reasonable, documented out-of-pocket costs associated with such cooperation by the Seller after the Closing (including the *pro rata* portion of the costs of any Service Provider directly providing such cooperation after the Closing, as determined by the amount of time dedicated by such Service Provider to such cooperation as a proportion of all time dedicated by such Service Provider to the Seller) shall be borne by the Purchaser; and (b) nothing in this Section 5.16 shall be deemed to require the Seller to remain a debtor in the Chapter 11 Case or maintain its corporate existence for any period of time beyond forty-five (45) days after the Closing Date; provided that the foregoing shall not be deemed to require the Seller to take any action in violation of the DIP Loan Agreement.

**Section 5.17** Further Actions.

(a) The Purchaser shall use its commercially reasonable efforts to enter into a new supply agreement with Hovione substantially upon the terms read into the record by Hovione at the Auction (the "New Hovione Agreement").

(b) Within three (3) Business Days of request by the Seller, the Purchaser shall execute and deliver to the Seller and the China Licensee, an assignment and assumption agreement, in form and substance reasonably satisfactory to the Seller and the Purchaser, pursuant to which the Seller will assign, and the Purchaser will assume, all rights and obligations of the Seller under the China License Agreement.

(c) The Seller shall cooperate with the Purchaser in connection with its submission of the BARDA Bid, including providing any consent, authorization, or documentation reasonably requested by the Purchaser in connection with such submission.

(d) To the extent that any inventory included in the Purchased Assets is held by or in the control of a Third Party, the Seller will use commercially reasonable efforts to deliver, at the cost and direction of the Purchaser, possession or control of such inventory to the Purchaser at or as promptly as is practicable following the Closing (including the delivery of appropriate notices and instructions to such Third Parties, and requests to such Third Parties to provide the Seller and the Purchaser with acknowledgements as to the inventory in such form and substance as the Purchaser may reasonably request).

(e) The Purchaser will negotiate in good faith and use commercially reasonable efforts to finalize the China License Agreement on terms reasonably acceptable to Purchaser as soon as reasonably practicable following the date hereof.

(f) The Seller will cooperate with the Purchaser and use reasonable best efforts to facilitate a call or meeting with Ionis Pharmaceuticals, Inc. as soon as practicable after the date of this Agreement for the purpose of allowing the Purchaser the ability to renegotiate and amend the Ionis License Agreement.

(g)     Subject to the other express provisions of this Agreement, upon the request of either party to this Agreement, the other party will execute and deliver such other documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement.

**Section 5.18**     Use of Seller Corporate Names.  Notwithstanding anything to the contrary in this Agreement, the Purchaser and any successor or permitted assignee under Section 10.5 shall have a non-exclusive, non-transferable, royalty free, fully paid-up license to use the Seller Corporate Names.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

**Section 6.1**     Conditions to the Obligation of the Purchaser.  The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction or thereafter as a result of the Successful Bidder failing to close) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part, in its sole and absolute discretion):

(a)     Accuracy of Representations and Warranties.  The representations and warranties of the Seller in ARTICLE 3 must be true and correct in all respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (disregarding all materiality qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a Material Adverse Effect;

(b)     Performance of Covenants.  All of the covenants and obligations that the Seller is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)     No Action.  There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

(d)     Sale Order.  The Sale Order must be a Final Order and must be in form and content satisfactory to the Purchaser;

(e)     No Material Adverse Effect.  There shall not have occurred any event or occurrence (regardless of whether such event or occurrence constitutes a breach of any representation, warranty, or covenant of the Seller under this Agreement) after the date of this Agreement which has had, or would reasonably be expected to have, a Material Adverse Effect; and

47

(f)     Transaction Documents.  The Seller must have delivered or caused to be delivered each document under Section 2.9(a).

**Section 6.2**     Conditions to the Obligations of the Seller.  The obligation of the Seller to perform any obligations hereunder, including to consummate the transactions contemplated by this Agreement, is subject to the Purchaser becoming the Successful Bidder (whether following the conclusion of the Auction or thereafter as a result of the Successful Bidder failing to close) and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a)     Accuracy of Representations and Warranties.  The representations and warranties of the Purchaser in ARTICLE 4 must be true and correct in all respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (disregarding all materiality qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a material adverse effect on the Purchaser's ability to timely complete the transactions contemplated by this Agreement;

(b)     Performance of Covenants.  All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)     No Action.  There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement;

(d)     Sale Order.  The Sale Order must be a Final Order and must be in form and content satisfactory to the Seller;

(e)     Transaction Documents.  The Purchaser must have delivered or caused to be delivered to the Seller each document that Section 2.9(b) requires it to deliver; and

(f)     Hovione Release.  Hovione must have granted the Hovione Release.

## ARTICLE 7
## TERMINATION

**Section 7.1**     Termination Events.

(a)     This Agreement may, by written notice given before the Closing (other than in the case of clause (vi) upon which termination shall be automatic), be terminated (other than in the case of clause (vi) upon which termination of this Agreement shall be automatic):

(i)     by mutual consent of the Purchaser and the Seller;

(ii)    **by the Purchaser** (so long as the Purchaser is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if (A) there has been a breach of any of the Seller's representations, warranties or covenants contained in this Agreement which would result in the failure of the conditions set forth in <u>Section 6.1(a)</u> or <u>Section 6.1(b)</u>, as applicable, to be satisfied, and which breach has not been cured within ten (10) days after written notice of such breach has been delivered to the Seller from the Purchaser or cannot be cured by the Outside Date; (B) in accordance with <u>Section 5.5</u>; or (C) any other condition set forth in <u>Section 6.1</u> remains unsatisfied by the Outside Date;

(iii)   **by the Seller** (so long as the Seller is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if (A) there has been a breach of any of the Purchaser's representations, warranties or covenants contained in this Agreement which would result in the failure of a condition set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u>, as applicable, to be satisfied, and which breach has not been cured within ten (10) days after written notice of such breach has been delivered to the Purchaser from the Seller or cannot be cured by the Outside Date; or (B) any other condition set forth in <u>Section 6.2</u> remains unsatisfied by the Outside Date;

(iv)    **by either the Purchaser or the Seller**, if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 7.1(a)(iv)</u> will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this <u>Section 7.1(a)(iv)</u> occurring;

(v)     **by the Purchaser** if: (A) the Chapter 11 Case is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code; or (B) an examiner with expanded powers or trustee is appointed in the Chapter 11 Case; or

(vi)    automatically if the Purchaser amends the Contract & Cure Schedule to remove the Ionis License Agreement.

(b)    This Agreement shall terminate automatically in the event that: (i) the Purchaser is not chosen at the Auction to be the Successful Bidder or Back-Up Bidder; or (ii) the Purchaser is chosen at the Auction to be the Back-Up Bidder upon the expiration of the Back-Up Period.

**Section 7.2**    <u>Effect of Termination</u>.

(a)    If this Agreement is terminated pursuant to <u>Section 7.1</u>, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any other party or its Affiliates, except that <u>Section 5.7</u> (*Public Announcements*), <u>Section 5.12</u> (*Back-Up Bidder*), <u>ARTICLE 10</u> (*General Provisions*) (except for <u>Section 10.11</u> (*Specific Performance*)) and this <u>Section 7.2</u> shall remain in full force and survive

any termination of this Agreement. Notwithstanding the foregoing, but except as contemplated in Section 7.2(b) below (in which case the forfeiture of the Deposit as liquidated damages shall be the sole and exclusive remedy), in the event this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.

(b)  Following entry by the Bankruptcy Court of an order authorizing the sale to the Purchaser either as the Successful Bidder or Back-Up Bidder, the Deposit shall be forfeited to the Seller as liquidated damages if either (i) the Purchaser fails to consummate the sale as the result of a breach by the Purchaser of any of its obligations under this Agreement or (ii) this Agreement is terminated pursuant to Section 7.1(a)(vi); provided, that the Seller is not in material breach of its obligations under Section 5.17(f).

(c)  Subject to clause ((b)) above, the Seller shall return the Deposit (with interest thereon at the rate specified, if any, in the Escrow Agreement) to the Purchaser within five (5) Business Days (i) following entry by the Bankruptcy Court of an order authorizing the sale of the Purchased Assets to a Person other than the Purchaser who submitted a Qualified Bid, unless the Purchaser shall have been designated as the Back-Up Bidder, in which case clause ((d)) below shall apply, (ii) following termination by Purchaser under Section 7.1, or (iii) following termination by the Seller under Section 7.1(a)(iii) solely as a result of a failure of the condition set forth in Section 6.2(f) to be satisfied, provided that the Purchaser has complied with its obligations under Section 5.17(a).

(d)  Subject to clause ((b)) above, in the event the Purchaser shall have been chosen as the Back-Up Bidder, the Purchaser's Deposit shall be returned to the Back-Up Bidder (with interest thereon at the rate specified, if any, in the Escrow Agreement) within five (5) Business Days following the date its bid is no longer required to be open and irrevocable as set forth in Section 5.13. If the Back-Up Bidder is subsequently designated by the Seller as the Successful Bidder as a result of the failure of the Successful Bidder to close on the sale within the time period set forth in Section 5.13, the Back-Up Bidder shall be deemed to be the Successful Bidder and the Seller and the Back-Up Bidder shall close the sale of the Purchased Assets within ten (10) Business Days of the Back-Up Bidder becoming the Successful Bidder. Subject to clause ((b)) above, the Deposit of the Back-Up Bidder shall be held in escrow until such closing and applied (with interest thereon at the rate specified, if any, in the Escrow Agreement) to its obligations at the closing of the sale in accordance with Section 2.6 and Section 2.9(b)(i).

## ARTICLE 8
## NO SURVIVAL

**Section 8.1**  No Survival of Representations and Warranties and Certain Covenants. Each of the representations, warranties and covenants (other than covenants that, by their terms,

survive the Closing or termination of this Agreement) in this Agreement or any agreement or certificate to be executed or delivered in connection with the transactions contemplated by this Agreement shall terminate at the Closing or upon termination of this Agreement pursuant to Section 7.1 and, following the Closing or the termination of this Agreement, as the case may be, no party shall make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Section 7.2.  Nothing in this Section 8.1 shall limit the ability of Purchaser to seek or obtain a return of the Deposit in accordance with this Agreement or the Escrow Agreement.

## ARTICLE 9
## TAX MATTERS

**Section 9.1**    Transfer Taxes.  The Purchaser will pay in a timely manner all applicable sales**,** use, ad valorem, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"), arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement, including expenses and fees relating to registering Acquired Intellectual Property in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the Purchased Assets or the Seller.  Any Tax Returns that must be filed in connection with any Transfer Taxes will be prepared by the party that customarily has primary responsibility for filing such Tax Returns pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the preparing party will deliver such Tax Returns for the other party's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten (10) Business Days prior to the applicable due date.  The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes, or otherwise to comply with its obligations with respect to Transfer Taxes.

**Section 9.2**    Proration items.  Personal property Taxes, real property Taxes and other similar Taxes (the "Proration Items") with respect to the Purchased Assets for any taxable period beginning before the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between the Purchaser and the Seller as of the Closing Date.  The amount of the Proration Items attributable to the Seller shall be equal to the amount of Tax for the period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the period through and including the Closing Date and the denominator of which shall be the entire number of days in the period.  For purposes of allocating all other Taxes ("Non-Proration Items") with respect to the Purchased Assets for any Straddle Period, such Taxes shall be allocated between the pre-Closing portion of such Straddle Period and the post-Closing portion of such Straddle Period based on an interim closing of the books at the end of the day on the Closing Date.  The Seller shall bear any Non-Proration Items allocable to the pre-Closing portion of any Straddle Period and any other unpaid Taxes with respect to the Purchased Assets for Tax periods ending on or prior to the Closing Date (such Non-Proration Items and other pre-Closing Date Taxes, "Other Seller Taxes").  The amount of all such Proration Items attributable to the

Seller and the amount of any Other Seller Taxes shall be estimated as of the Closing Date and deducted from the Purchase Price at the Closing; provided, however that final payments with respect to the Proration Items or Other Seller Taxes that are not able to be calculated as of the Closing Date shall be calculated and the Seller (or any successor thereof or any estate) shall pay over any additional amount as soon as practicable after the Closing Date, but no later than five (5) Business Days after determination of such additional amounts.

## ARTICLE 10
## GENERAL PROVISIONS

**Section 10.1** <u>Notices</u>. All notices and other communications under this Agreement must be in writing and are deemed duly delivered when: (a) delivered, if delivered personally or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or by email with confirmation of receipt (or, the first Business Day following such transmission if the date of transmission is not a Business Day); or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number or individual as a party may designate by notice to the other party):

If to the **Seller**:

    Achaogen, Inc.
    One Tower Place, Suite 400
    South San Francisco, California 94080
    Attn:   Blake Wise, Chief Executive Officer
    Email: bwise@achaogen.com

    Meru, LLC
    1372 Peachtree Street, NW, Suite 2121
    Atlanta, GA 30309
    Attn:   Nick Campbell, Managing Partner
    Email: nick@wearemeru.com

with a copy (which will not constitute notice) to:

    Hogan Lovells US LLP
    1999 Avenue of the Stars, Suite 1400
    Los Angeles, California 90067
    Attn:   Richard Wynne, Esquire
           Erin Brady, Esquire
    Email: rick.wynne@hoganlovells.com
           erin.brady@hoganlovells.com

following the Closing, with a copy (which will not constitute notice) to:

        Akin Gump Strauss Hauer & Feld LLP
        One Bryant Park
        New York, NY 10036
        Attn:   Arik Preis, Esq.
        Email: apreis@akingump.com

If to the **Purchaser**:

        Cipla USA Inc.
        c/o Cipla Ltd.
        Cipla House, Peninsula Business Park
        Ganapatrao Kadam Marg, Lower Parel West
        Mumbai, Maharashtra 400013, India
        Attn: A.S. Kumar, Esq., Global General Counsel
        Email: as.kumar@cipla.com
               cosecretary@cipla.com

with a copy (which will not constitute notice) to:

        Kelley Drye & Warren LLP
        101 Park Avenue, 27th Floor
        New York, New York 10178
        Attn:   Deepak Nambiar, Esq.
        Email: DNambiar@KelleyDrye.com

    **Section 10.2**   <u>Amendment</u>.   Except as otherwise expressly contemplated by this Agreement, this Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each party hereto and that identifies itself as an amendment to this Agreement.  Notwithstanding anything to the contrary herein, any deadline set forth in this Agreement that: (a) does not fall on a Business Day shall automatically be extended to the next Business Day; or (b) requires the Bankruptcy Court to either (i) hold a hearing by a specified date, or (ii) enter an order by a specified date, shall be subject to the Bankruptcy Court's availability, calendar or discretion and such deadline shall automatically be extended to such date as the Bankruptcy Court is available or its calendar shall permit it to hold such hearing or enter such order, as applicable.  All deadlines set forth herein may be modified by the parties in accordance with this <u>Section 10.2</u>.

    **Section 10.3**   <u>Waiver and Remedies</u>.  The parties may, but are not required to: (a) extend the time for performance of any of the obligations or other acts of the other party to this Agreement; (b) waive any inaccuracies in the representations and warranties of the other party to this Agreement contained in this Agreement; or (c) waive compliance with any of the covenants or conditions for the benefit of such party contained in this Agreement.  Subject to <u>Section 5.5</u>: (i) any such extension or waiver by a party to this Agreement will be valid only if set forth in a

written document signed on behalf of the party granting such waiver or extension; (ii) no extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant or condition, as the case may be, other than that which is specified in the written extension or waiver; and (iii) no failure or delay by a party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy. Notwithstanding anything to the contrary herein, any deadline set forth in this Agreement that does not fall on a Business Day shall automatically be extended to the next Business Day.

Section 10.4    Entire Agreement.  This Agreement (including the Schedules and Exhibits hereto and the documents and instruments referred to in this Agreement that are to be delivered at or prior to the Closing) constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement.

Section 10.5    Assignment, Successors and No Third Party Rights.  This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any Person appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan).  No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations (other than the obligation to pay the Purchase Price) to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation.  The Purchaser may designate one or more Affiliates, including any special purpose entities that may be organized by the Purchaser for such purpose, to take title to the Purchased Assets or any portion thereof and operate the business going forward, and upon written notice to the Seller of any such designation by the Purchaser, the Seller agrees to execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, the Purchaser's designees. No designation shall affect, in any way, any guaranty of payment and performance provided to the Seller by the Purchaser, and such guaranty shall continue to obligate the guarantor. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement (which includes any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any Person appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan), any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this Section 10.5.

Section 10.6    Severability.  In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and

the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.

**Section 10.7** <u>Exhibits and Schedules</u>.  The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement.  The Seller Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of ARTICLE 3.  The disclosure in any section or paragraph of the Seller Disclosure Schedule, and those in any amendment or supplement thereto, shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered or lettered section or paragraph of ARTICLE 3, except to the extent that (a) such information is cross-referenced in another part of the Seller Disclosure Schedule; or (b) it is reasonably apparent on the face of the disclosure (without reference to any document referred to therein or any independent knowledge on the part of the reader regarding the matter disclosed) that such information qualifies another representation or warranty of the Seller in ARTICLE 3. The information contained in the Seller Disclosure Schedule is intended only to qualify the representations and warranties of the Seller contained in this Agreement and shall not be deemed to expand in any way the scope or effect of any such representations or warranties. Certain of the information contained in the Seller Disclosure Schedule may not be required to be disclosed pursuant to this Agreement and be included solely for informational purposes.  The inclusion of any information in the Seller Disclosure Schedule shall not be construed as an admission or acknowledgement, in and of itself, that such information is material to the Business or the Seller or any of its Subsidiaries.  No information contained in the Seller Disclosure Schedule shall be deemed to be an admission of any liability or obligation by the Seller to any third party of any matter whatsoever, including of any violation of Law or breach of any agreement.

**Section 10.8** <u>Interpretation</u>.  In the negotiation of this Agreement, each party has received advice from its own attorney.  The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against either party because that party or its attorney drafted the provision.

**Section 10.9** <u>Expenses</u>.  Except as otherwise provided herein, each party will pay its own direct and indirect expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.

**Section 10.10** <u>Limitation on Liability</u>.  Notwithstanding any other provision of this Agreement to the contrary, in no event will any party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of the conduct of such party pursuant to this Agreement, regardless of whether the nonperforming party was advised of the possibility of such damages or not.

**Section 10.11** <u>Specific Performance</u>.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by either party in accordance with such party's specific terms or were otherwise breached by such party.  The parties accordingly agree that, prior to the termination of this Agreement pursuant to <u>Section 7.1</u>, in addition to any other remedy to which a non-breaching party is entitled at law or in equity, the non-breaching party is entitled to injunctive relief to prevent breaches of this Agreement by the breaching party and otherwise to enforce specifically the provisions of this Agreement against the breaching party; <u>provided</u> that, the non-breaching party shall only be entitled to injunctive relief if such non-breaching party is not otherwise in breach of this Agreement or if the breaching party is not otherwise entitled to terminate this Agreement.  Each party expressly waives any requirement that the other party obtains any bond or provides any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.  Notwithstanding anything contained in this <u>Section 10.11</u>, the liquidated damages set forth in <u>Section 7.2(b)</u> shall be the sole and exclusive remedy of the Seller if the Purchaser fails to consummate the transactions contemplated under this Agreement as the result of a breach by the Purchaser of any of its obligations hereunder.

**Section 10.12** <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS OF COMPETENT JURISDICTION LOCATED IN THE STATE OF DELAWARE OR IN THE BANKRUPTCY COURT (FOR SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION) AND EACH OF THE PARTIES HERETO IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, GENERALLY AND UNCONDITIONALLY, AND WAIVES ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT HEREBY.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

**Section 10.13** <u>No Joint Venture</u>.  Nothing in this Agreement creates a joint venture or partnership between the parties.  This Agreement does not authorize any party hereto (a) to bind or commit, or to act as an agent, employee or legal representative of, any other party, except as

may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of any other party. Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 10.13.

**Section 10.14** Counterparts; Signatures. The parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Agreement is effective upon delivery of one executed counterpart from each party to the other party. The signatures of all parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

**Section 10.15** Preservation of Records; Post-Closing Access and Cooperation.

(a)     For a period equal to the lesser of: (i) eighteen (18) months after the Closing Date; and (ii) the closing of the Chapter 11 Case by the Bankruptcy Court (the "Post-Closing Access and Cooperation Period"), the Purchaser shall preserve and retain all books and records in its possession that are Purchased Assets (including any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations) relating to the Purchased Assets prior to the Closing Date.

(b)     During the Post-Closing Access and Cooperation Period, subject to existing confidentiality agreements and upon reasonable advance notice from the Seller (or its designee or successor), the Purchaser shall provide reasonable cooperation to the Seller and its representatives (or its designee or successors, which may include the trustee of a liquidating trust) for the purpose of winding-up its affairs and finalizing the administration of the Chapter 11 Case, including its books and records with respect to the Purchased Assets prior to the Closing Date, at the sole cost of the Seller. During the Post-Closing Access and Cooperation Period, the Purchaser shall cooperate with, and shall permit and use its reasonable commercial efforts to cause, its personnel to cooperate with the Seller (or, its designee or successors) after the Closing and upon receipt of prior written notice, in furnishing information, testimony and other assistance with respect to the Purchased Assets for periods prior to the Closing Date as reasonably required in connection with any action or proceeding relating to the Chapter 11 Case; provided, that such access does not unreasonably interfere with the Purchaser's business or operations.

[SIGNATURES APPEAR ON THE FOLLOWING PAGES]

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

**SELLER:**

ACHAOGEN, INC.

By: _____

Name:  Blake Wise
Title:   Chief Executive Officer

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

**PURCHASER:**

CIPLA USA, INC.

By: _____

Name: Nikhil Lalwani

Title: CEO – Cipla North America

[Signature Page to APA]

## FORM OF BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is made as of the ___ day of _____, 2019, by and between Achaogen, Inc. ("Seller"), to and in favor of _____ ("Purchaser").  Seller and Purchaser are each a "Party" hereto and are collectively referred to herein as the "Parties".  All capitalized terms that are not otherwise defined herein shall have the meanings given to such terms in the Agreement (as defined below).

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement dated _____, 2019 (the "Agreement"), pursuant to which the Seller agreed to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agreed to purchase from Seller, all of Seller's right, title and interest in and to the Purchased Assets, including, but not limited to, the Assumed Contracts, free and clear of all liens, pledges, mortgages, hypothecations and other encumbrances other than the Assumed Liabilities and the China License Rights (the "Sale");

WHEREAS, the Bankruptcy Court entered the Sale Order on _____, 2019, approving the Sale of the Purchased Assets to Purchaser on the terms set forth in the Agreement and in the Sale Order; and

WHEREAS, pursuant to the Agreement, Seller has agreed to execute and deliver this Bill of Sale to effectuate the sale, transfer, assignment, conveyance and delivery of the Purchased Assets to Purchaser and its successors and assigns.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1.      For and in consideration of payment by Purchaser to Seller of the Purchase Price, all upon the terms and subject to the conditions set forth in the Agreement, the receipt, sufficiency and adequacy of which are hereby acknowledged and accepted by Seller, Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, its successors and assigns, all of Seller's entire right, title and interest in, to and under the Purchased Assets, free and clear of all liens, pledges, mortgages, hypothecations and other encumbrances other than the Assumed Liabilities and the China License Rights, the same to be held and enjoyed by Purchaser for its use and enjoyment, and for the use and enjoyment of its successors, assigns and other legal representatives, as the same would have been held and enjoyed by Seller had this sale, transfer, assignment, conveyance and delivery not been made.

2.      Seller and Purchaser hereby agree to execute and deliver any and all additional documents that Seller or Purchaser may reasonably request in order to more fully effect the agreements set forth in this Bill of Sale.

3.      This Bill of Sale shall be subject to the terms and conditions set forth in the Agreement and the Sale Order.  Seller and Purchaser hereby acknowledge and agree that the

provisions of this Bill of Sale shall not modify or limit the full force and effect of the terms and provisions of the Agreement or the Sale Order, and that in the event of a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the Agreement, the terms and provisions of the Agreement, as approved by the Sale Order, shall prevail, govern and control in all respects without limitation.

4. Section 10.12 of the Agreement is hereby incorporated by reference into this Bill of Sale and shall apply as if fully set forth herein *mutatis mutandis*.

5. The Parties may execute this Bill of Sale in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Bill of Sale is effective upon delivery of one executed counterpart from one Party to the other Party. The signatures of all Parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

6. The undertakings, covenants and agreements set forth herein shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties have executed this Bill of Sale as of the date first above written.

**SELLER:**

**ACHAOGEN, INC.**

By: _____
Name:
Title:

**PURCHASER:**

**CIPLA USA, INC.**

By: _____
Name:
Title:

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT**, dated as of _____, 2019 (the "Agreement"), among Achaogen, Inc., as assignor (the "Assignor"), a Delaware corporation, and _____, a _____, in its capacity as assignee (the "Purchaser"), of the Assumed Liabilities. Assignor and Assignee are each a "Party" hereto and are collectively referred to herein as the "Parties". Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Assignor and Purchaser are parties to the Agreement for Sale of Assets, dated as of [_____], 2019 (the "Purchase Agreement"), pursuant to which the Assignor has agreed to sell, assign, transfer, convey and deliver to the Purchaser all of the Seller's right, title and interest in and to the Purchased Assets and assign to the Purchaser the Assumed Liabilities and the Purchaser has agreed to purchase, acquire and accept all of the Assignor's right, title and interest in the Purchased Assets and assume the Assumed Liabilities from and after the Closing Date; and

WHEREAS, this Agreement is being provided to evidence the Assignor's assignment to the Purchaser, and the Purchaser's assumption, of the Assumed Liabilities, pursuant to the terms and conditions of the Purchase Agreement from and after the Closing Date.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows.

1. <u>Assignment and Assumption of Liabilities</u>. The Assignor hereby assigns, transfers and sets over unto the Purchaser all of the Assumed Liabilities and the Purchaser hereby assumes the Assumed Liabilities pursuant to the terms and conditions of the Purchase Agreement and Sale Order, including, without limitation, liability for the due performance of all the terms, covenants and conditions of the Assignor pursuant to, arising under or related to the Assumed Liabilities from and after the Closing on the Closing Date. Notwithstanding anything herein to the contrary, this Agreement shall not be deemed to be an assignment by the Assignor to the Purchaser or an assumption by the Purchaser of any of the Excluded Liabilities or Excluded Assets.

2. <u>Headings</u>. The section headings used herein are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

3. <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. Section 10.12 of the Purchase Agreement is hereby incorporated by reference into this Agreement and shall apply as if fully set forth herein <u>mutatis mutandis</u>.

4.     Severability; Conflicts. In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.  In the event of any conflict between the terms and provisions of this Agreement and the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

5.     Successors and Assigns. This Agreement shall bind the Parties, their legal representatives, and their permitted successors and assigns.

6.     Entire Agreement. This Agreement and the Purchase Agreement constitute the entire agreement between the Parties.  No amendment or modification of this Agreement shall be binding or valid unless set forth in writing and executed by the Parties.

7.     Counterparts. The Parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement.   This Agreement is effective upon delivery of one executed counterpart from one Party to the other Party.  The signatures of all Parties need not appear on the same counterpart.  The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties have caused this agreement to be executed on the date first above written.

**ASSIGNOR:**

**ACHAOGEN, INC.**

By: _____
Name:
Title:

**PURCHASER:**

**CIPLA USA, INC.**

By: _____
Name:
Title:

<u>**EXHIBIT C**</u>

**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT**

      **THIS INTELLECTUAL PROPERTY ASSIGNMENT A G R E E M E N T** (this "<u>Assignment</u>"), effective as of _____, 2019 (the "<u>Effective Date</u>"), is by and between _____, a _____ ("<u>Assignee</u>") and Achaogen, Inc., a Delaware corporation ("<u>Assignor</u>").

**W I T N E S S E T H :**

      WHEREAS, pursuant to the terms and subject to the conditions of the Asset Purchase Agreement, dated [•], 2019 (the "<u>Asset Purchase Agreement</u>"), between Assignee and Assignor, Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, among other things, the Purchased Assets; and

      WHEREAS, pursuant to the Asset Purchase Agreement, Assignor desires to sell, assign, convey, deliver and transfer the entire right, title and interest in, to and under all of the Intellectual Property included in the Purchased Assets, including the Intellectual Property set forth on Exhibit A hereto (the "<u>Assigned IP</u>"), to Assignee and Assignee desires to acquire the entire right, title and interest in, to and under such Assigned IP.

      NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Asset Purchase Agreement and subject to the terms and conditions therein, the parties hereto, intending to be legally bound, hereby agree as follows:

      1.     Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

      2.     Assignor hereby irrevocably sells, assigns, conveys, delivers and transfers to Assignee the entire right, title and interest in, to and under (i) the Assigned IP, together with all goodwill associated therewith, in each case to be held and enjoyed by Assignee for its own use and enjoyment as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, including the right to claim priority under the International Convention for the Protection of Industrial Property and under any other international arrangement to which the United States of America is or hereafter becomes a signatory (but not, for the avoidance of doubt, any Excluded Liability), (ii) all rights to sue, claim and recover for past, present and future infringement, misappropriation, dilution or other violation of any Assigned IP, and (iii) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing.

      3.     Concurrent with the execution of this Assignment, Assignor shall transfer any and all domain names and social media accounts included in the Assigned IP from Assignor's account to Assignee's account (such that Assignee will be listed as the registrant and/or owner

of such domain names and social media accounts in the applicable registrar) and shall deliver to Assignee all necessary Auth-Info codes and all other required passwords necessary to unlock and control such domain names and social media accounts.

4.      Upon the reasonable request by Assignee, Assignor shall execute all documents and take all actions as may be necessary or desirable to enable Assignee to prosecute, perfect, enforce, defend, register and/or record its right, title and interest in, to and under the Assigned IP, in each case, without further compensation but at the expense of Assignee.  In the event that Assignor fails to execute any such document or take any such action as set forth in the preceding sentence, Assignor hereby designates Assignee as Assignor's agent, and hereby grants to Assignee a power of attorney with full power of substitution, which power of attorney shall be deemed coupled with an interest, for the purpose of executing such documents or taking such actions.

5.      Assignor hereby authorizes and requests the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record and register Assignee as assignee and owner of the entire right, title and interest in, to and under the Assigned IP.

6.      As soon as practicable after execution of this Assignment, Assignor shall, at the cost and expense of the Assignee, use diligent efforts to support transition of the assigned intellectual property from Assignor to Assignee through legal counsel at Cooley LLP, Morrison & Foerster LLP and Reed Smith LLP, who the Assignor has engaged for acquisition and maintenance of the Intellectual Property, and instruct such legal counsel to cooperate as appropriate with the Assignee in furtherance of the activities contemplated in the Asset Purchase Agreement and this Assignment.  Assignor shall also use diligent effort to instruct any inventors and other employees who are under control of the Assignor to cooperate with the Assignee in furtherance of the activities contemplated in the Asset Purchase Agreement and this Assignment, including as appropriate any signatures, oaths, or declarations Assignee may request to file, prosecute, record, or transfer of the Assigned IP and to cooperate with and assist the Assignee in any litigation or other legal proceedings involving the Assigned IP.

7.      This Assignment shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to the choice of law principles thereof.  This Assignment is binding upon, and inures to the benefit of, the parties hereto and their respective legal representatives, successors and assigns.  No waiver, modification or change of any provision of this Assignment shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

8.      This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNOR:**

**ACHAOGEN, INC.**

By: _____
Name:
Title:

STATE OF                    )
                           ) ss
COUNTY OF                   )

On the _____ day of _____, _____, before me personally came _____, who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as _____ of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

_____
Notary Public

(PLACE STAMP AND SEAL ABOVE)

*[Signature Page to Intellectual Property Assignment Agreement]*

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNEE:**

**CIPLA USA, INC.**

By:

_____

Name:

Title:

STATE OF                    )

                              ) ss

COUNTY OF              )

                On the _____ day of _____, ____, before me personally came _____, who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as _____ of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

_____

Notary Public

(PLACE STAMP AND SEAL ABOVE)

**EXHIBIT A**

**ASSIGNED IP**

**[PATENTS]**

**[TRADEMARKS]**

# SCHEDULE 2.1(C)

## COMPANY OWNED INTELLECTUAL PROPERTY

### I.   PATENTS

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| United States of America | 60/989,645 11/21/2007 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| Austria | E-841756 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Australia | 2008326297 11/21/2008 | | 2008326297 02/21/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Belgium | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Bulgaria | | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Brazil | PI0819319-3 11/21/2008 | PI0819319-3 | PI0819319-3 1/15/2019 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Canada | 2706369 11/21/2008 | | 2706369 03/25/2014 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Switzerland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| China | 200880117193.1 11/21/2008 | 101868472A | ZL 200880117193.1 05/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Cyprus | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Czech Republic | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Germany | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Denmark | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL | Achaogen, Inc. | Registered/Validation of EP |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| | | | | AMINOGLYCOSIDE ANALOGS | | patent |
| Eurasian Patent Organization | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validated (Validated Armenia, Azerbaijan, Belarus, Kazakhstan, Kyrgyzstan, Russia, Moldova, Tajikistan, Turkmenistan. Each regional patent listed herein.) |
| Armenia | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Azerbaijan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Belarus | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Kazakhstan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Kyrgyzstan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Russia, | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Moldova | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Tajikistan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Turkmenistan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Estonia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| European Patent Office | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validated (Validated in AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MT, NL, NO, PL, PT, RO, SE, SI, SK, TR. Each regional patent listed herein.) |
| Spain | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL | Achaogen, Inc. | Registered/Validation of EP |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| | | | | AMINOGLYCOSIDE ANALOGS | | patent |
| Finland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| France | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| United Kingdom | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Greece | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Hong Kong | 11101563.2 11/21/2008 | 1147499 | HK1147499 01/26/2018 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered (via EP) |
| Croatia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Hungary | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Ireland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Israel | 205880 11/21/2008 | | 205880 02/01/2014 | AMINOGLYCOSIDE ANALOGS, COMPOSITIONS COMPRISING THE SAME AND USES THEREOF | Achaogen, Inc. | Registered |
| India | 4165/DELNP/2010 11/21/2008 | | 282636 04/20/2017 | NOVEL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Iceland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Italy | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Japan | 2010-535103 11/21/2008 | 2011-504508 | 4986310 05/11/2012 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Republic of Korea | 10-2010-7012835 11/21/2008 | 10-2010-0110297 | 10-1296099 08/07/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| Lithuania | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Luxembourg | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Latvia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Monaco | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Malta | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Mexico | MX/a/2010/005632 11/21/2008 | | 333945 10/12/2015 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Netherlands | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Norway | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Poland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Portugal | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Romania | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Sweden | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Slovenia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Slovakia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Turkey | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Taiwan | 097145246 11/21/2008 | 200927146 | I425947 02/11/2014 | ANTIBACTERIAL AMINOGLYCOSIDE | Achaogen, Inc. | Registered |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| | | | | ANALOGS | | |
| United States of America | 12/487,427 06/18/2009 | US 2010-0099661 A1 | 8,383,596 02/26/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Patent Cooperation Treaty | PCT/US2008/084399 11/21/2008 | WO 2009/067692 | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired/PCT Period Over |
| Brazil | BR1220180705035 11/21/2008 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Pending |
| China | 201310142186.X 11/21/2008 | 103360440A | ZL 2013101142186.X 08/31/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| European Patent Office | 16195678.4 11/21/2008 | 3150617 | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Pending |
| United States of America | 13/734,729 01/04/2013 | US 2013-0217642 A1 | 8,822,424 09/04/2014 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| United States of America | 14/334,511 07/17/2014 | US 2015-0045317 A1 | 9,266,919 02/23/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| United States of America | 15/001,797 01/20/2016 | US 2016-0368942 A1 | 9,688,711 06/27/2017 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| United States of America | 16/052,977 08/02/2018 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Pending |
| United States of America | 61/178,809 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,349 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 13/295,247 05/14/2010 | US 2012-0135948 A1 | 8,524,689 09/03/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Patent Cooperation Treaty | PCT/US2010/034884 05/14/2010 | WO 2010/132757 | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | | Expired |
| United States of America | 61/178,814 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,351 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of | 13/295,238 | US 2012-0135946 | 8,658,606 | ANTIBACTERIAL | Achaogen, Inc. | Registered |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| America | 11/14/2011 | A1 | 02/25/2014 | AMINOGLYCOSIDE ANALOGS | | |
| Patent Cooperation Treaty | PCT US2010/034886 05/14/2010 | WO 2010/132759 | | ANTIBACTERIAL DERIVATIVES OF DIBEKACIN | Achaogen, Inc. | Expired PCT Period Over |
| United States of America | 61/178,826 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,353 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 13/295,233 05/14/2010 | US 2012-0135945 A1 | 8,653,042 02/18/2014 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Patent Cooperation Treaty | PCT US2010/034888 05/14/2010 | WO 2010/132760 | | ANTIBACTERIAL DERIVATIVES OF TOBRAMYCIN | | Expired/PCT Period Over |
| United States of America | 61/178,854 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,354 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 13/295,231 05/14/2010 | US 2012-0165282A1 | 8,524,675 09/03/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Patent Cooperation Treaty | PCT US2010/034893 05/14/2010 | WO 2010/132765 | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired/PCT Period Over |
| United States of America | 61/178,834 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,356 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 13/295,227 05/14/2010 | US 2012-0184501 A1 | 8,492,354 07/23/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Surrendered in favor of Reissue Application No. 16/009,020 |
| Patent Cooperation Treaty | PCT US2010/034896 05/14/2010 | WO 2010/132768 | | ANTIBACTERIAL DERIVATIVES OF SISOMICIN | | Expired/PCT Period Over |
| United States of America | 16/009,020 06/14/2018 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Pending |
| United States of America | 61/178,461 05/14/2009 | | | TREATMENT OF KLEBSIELLA PNEUMONIAE | Achaogen, Inc. | Expired |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| United States of America | 61/305,463 02/17/2010 | | | INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Expired |
| Canada | 2761674 05/14/2010 | | 2761674 11/29/2016 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| China | 201080031078.X 05/14/2010 | 102481307A | ZL 201080031078.X 08/24/2016 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Hong Kong | 12111406.1 05/14/2010 | 1170663 | 1170663 1/17/2017 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Macau | J/002404 (132) 05/14/2010 | | J/002404 01/24/2017 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| United States of America | 13/294,426 11/11/2011 | US 2012-0214759 A1 | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Abandoned/Withdrawn from appeal |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| United States of America | 16/240,370 1/4/2019 | | | ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| Patent Cooperation Treaty | PCT/US2010/034898 05/14/2010 | WO 2010/132770 | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Expired/PCT Period Over |
| Canada | 2948868 05/14/2010 | | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| China | 201610573991.1 05/14/2010 | 106188175A | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| Hong Kong | 17105427.3 05/14/2010 | 1231886A | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| United States of America | 62/574,544 10/19/2017 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Expired |
| Argentina | 20180103039 10/18/2018 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |
| Pakistan | | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |
| Taiwan | 107136676 10/18/2018 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| Patent Cooperation Treaty | PCT/US2018/056536 10/18/2018 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |
| Patent Cooperation Treaty | PCT/US2017/045183 8/2/2017 | WO 2018/026969 3/15/2018 | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |
| Taiwan | 106126088 8/2/2017 | 201815826 5/1/2018 | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |
| Argentina | 20170102193 8/2/2017 | | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |
| European Patent Office | 17751568.1 8/2/2017 | 3494143 6/12/2019 | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |
| United States of America | 16/360,663 3/21/2019 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | | Filed |

## II.  TRADEMARKS

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| US Federal Q1 uf 3 | Design Only  SN: 87929555 | Published March 26, 2019 Filed: May 21, 2018 | (Int'l Class: 05) antibiotics | Achaogen, Inc. (Delaware Corp.) 1 Tower Place, Suite 300 South San Francisco California 94080 |
| US Federal Q1 uf 4 | Design Only | Published March 26, 2019 Filed: May 21, 2018 | (Int'l Class: 05) antibiotics | Achaogen, Inc. (Delaware Corp.) 1 Tower Place, Suite 300 South San Francisco California 94080 |

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | SN: 87930012 | | | |
| US Federal<br>Q1<br>uf 5 | ZEMDRI<br>RN: 5661889<br>SN: 87080092 | Registered January 22, 2019<br>Int'l Class: 05<br>First Use: July 17, 2018<br>Filed: June 22, 2016 | (Int'l Class: 05)<br>Antibiotics | Achaogen, Inc. (Delaware Corp.)<br>1 Tower Place, Suite 300 South San<br>Francisco California 94080 |
| US Federal<br>Q1<br>uf 6 | ZEMDRI and Design<br>ZEMDRI<br>SN: 87929654 | Published March 26, 2019<br>Filed: May 21, 2018 | (Int'l Class: 05)<br>antibiotics | Achaogen, Inc. (Delaware Corp.)<br>1 Tower Place, Suite 300 South San<br>Francisco California 94080 |
| US Federal<br>Q1<br>uf 7 | ZEMDRI and Design<br>ZEMDRI<br>SN: 87930066 | Published March 26, 2019<br>Filed: May 21, 2018 | (Int'l Class: 05)<br>antibiotics | Achaogen, Inc. (Delaware Corp.)<br>1 Tower Place, Suite 300 South San<br>Francisco California 94080 |
| Canada<br>Q1<br>ca 9 | Design Only | Canada<br>Filed<br>Last Status Received: Pending<br>Application November 27, 2018<br>Office Status: Filing date<br>accorded<br>Filed: November 21, 2018 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 1 Tower Place,<br>Suite 300 South San Francisco, CA<br>94080, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | AN: 1931696 | | | |
| Canada<br>QI<br>ca 10 | Design Only<br><br>AN: 1931691 | Canada<br>Filed<br>Last Status Received: Pending<br>Application November 27, 2018<br>Office Status: Filing date accorded<br>Filed: November 21, 2018 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco, CA 94080, United States of America |
| Canada<br>QI<br>ca 11 | XEMDRO<br>AN:<br>1812517 | Canada<br>Allowed<br>Last Status Received: Application pending publication August 3, 2018<br>Office Status: Application published<br>Filed: December 5, 2016 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 7000 Shoreline Court, Suite 371 South San Francisco, CA 94080, United States of America |
| Canada<br>QI<br>ca 12 | ZEMDRI<br>AN: 1812518 | Canada<br>Allowed<br>Last Status Received: Application pending publication August 3, 2018<br>Office Status: Application published<br>Filed: December 5, 2016 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 7000 Shoreline Court, Suite 371 South San Francisco, CA 94080, United States of America |
| Canada<br>QI<br>ca 13 | ZEMDRI and Design<br>Z·EMDRI<br>AN: 1931698 | Canada<br>Filed<br>Last Status Received: Pending<br>Application November 27, 2018<br>Office Status: Filing date accorded<br>Filed: November 21, 2018 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco, CA 94080, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| Canada<br>Q1<br>ca 14 | ZEMDRI and Design<br><br>AN: 1931703 | Canada<br>Filed<br>Last Status Received: Pending<br>Application November 27, 2018<br>Office Status: Filing date accorded<br>Filed: November 21, 2018 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco, CA 94080, United States of America |
| Mexico<br>Q1<br>mx 16 | Design Only<br><br>AN: M2I52428 | Mexico<br>Published<br>Last Status Received: Published<br>Filed: November 20, 2018 | (Translation)<br>(Int'l Class: 05)<br>Antibiotics. | ACHAOGEN, INC. 1 TOWER PLACE NUM. EXT. SUITE 300, 94080, SOUTH SAN FRANCISCO, CA, United States of America |
| Mexico<br>Q1<br>mx 17 | Design Only<br><br>AN: M2I53909 | Mexico<br>Published<br>Last Status Received: Published<br>Filed: November 20, 2018 | (Translation)<br>(Int'l Class: 05)<br>Antibiotics. | ACHAOGEN, INC. TOWER PLACE NUM. EXT. 1 NUM. INT. SUITE 300, 94080, SOUTH SAN FRANCISCO, CA, United States of America |
| Mexico<br>Q1<br>mx 18 | XEMDRO<br>RN: 1746906<br>AN: M1831146 | Mexico<br>Registered<br>Last Status Received: Registered<br>Filed: December 9, 2016<br>Registered: April 24, 2017<br>Expiration Date: December 9, 2026 | (Translation)<br>(Int'l Class: 05)<br>Antibiotics. | ACHAOGEN, INC. SHORELINE COURT NUM. EXT. 7000 NUM. INT. SUITE 371, 94080, SOUTH SAN FRANCISCO, CA., United States of America |
| Mexico<br>Q1 | ZEMDRI<br>RN: 1746907 | Mexico<br>Registered | (Translation)<br>(Int'l Class: 05) | ACHAOGEN, INC. SHORELINE COURT NUM. EXT. 7000 NUM. |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| mx 19 | AN: M1831148 | Last Status Received: Registered Filed: December 9, 2016 Registered: April 24, 2017 Expiration Date: December 9, 2026 | Antibiotics. | INT. SUITE 371, 94080, SOUTH SAN FRANCISCO, CA., United States of America |
| Mexico Q1 mx 20 | ZEMDRI and Design  ZEMDRI AN: M2153892 | Mexico Published Last Status Received: Published Filed: November 20, 2018 | (Translation) (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. TOWER PLACE NUM. EXT. 1 NUM. INT. SUITE 300, 94080, SOUTH SAN FRANCISCO, CA, United States of America |
| Mexico Q1 mx 21 | ZEMDRI and Design  ZEMDRI AN: M2156856 | Mexico Published Last Status Received: Published Filed: November 20, 2018 | (Translation) (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. TOWER PLACE NUM. EXT. 1 NUM. INT. SUITE 300, 94080, SOUTH SAN FRANCISCO, CA, United States of America |
| WIPO Q1 wo 23 | Design Only  RN: 1441507 | International Registered Last Status Received: Registered April 15, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: Australia, China, European Union, Israel, Japan, Mexico, Switzerland, Turkey, United Kingdom |
| WIPO Q1 wo 24 | Design Only | International Registered Last Status Received: Registered March 26, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: Australia, China, European Union, Israel, Japan, Mexico, Switzerland, |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | RN: 1442826 | | | Turkey, United Kingdom |
| WIPO QI wo 25 | ZEMDRI and Design <br><br> ZEMDRI <br><br> RN: 1442745 | International Registered Last Status Received: Registered November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: Australia, China, European Union, Israel, Japan, Mexico, Switzerland, Turkey, United Kingdom |
| WIPO QI wo 26 | ZEMDRI and Design <br><br> ZEMDRI <br><br> RN: 1443260 | International Registered Last Status Received: Registered April 2, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: Australia, China, European Union, Israel, Japan, Mexico, Switzerland, Turkey, United Kingdom |
| Iceland QI is 28 | ZEMDRI RN: V0106877 AN: V0106877 | Iceland Registered Last Status Received: Registered Filed: November 15, 2017 Registered: November 30, 2017 Expiration Date: November 30, 2027 | (Translation) (Int'l Class: 05) Antibiotics. | Nafn: Achaogen, Inc., a corporation of the State of Delaware, United States of America Heimilisfang: 1 Tower Place, Suite 300, South San Francisco, California 94080, US, US, United States of America |
| Norway QI no 29 | ZEMDRI RN: 297414 AN: 201715319 | Norway Registered Last Status Received: Registered April 11, 2018 Filed: November 16, 2017 Expiration Date: November 16, | (Translation) (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300, CA94080, SOUTH SAN FRANCISCO, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | 2027 | | |
| Switzerland<br>Q1<br>ch 30 | XEMDRO<br>RN: 699873<br>AN: 64827/2016 | Switzerland<br>Registered<br>Last Status Received: Registered<br>Filed: December 5, 2016<br>Registered: March 14, 2017<br>Expiration Date: December 5, 2026 | (Translation)<br>(Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. 7000 Shoreline Court<br>Suite 371, 94080 South San Francisco, California, United States of America |
| Switzerland<br>Q1<br>ch 31 | ZEMDRI<br>RN: 699961<br>AN: 64828/2016 | Switzerland<br>Registered<br>Last Status Received: Registered<br>Filed: December 5, 2016<br>Registered: March 16, 2017<br>Expiration Date: December 5, 2026 | (Translation)<br>(Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. 7000 Shoreline Court Suite 371, 94080 South San Francisco, California, United States of America |
| Turkey<br>Q1<br>tr 33 | Design Only<br><br>AN: 2019/01458 | Turkey<br>Published<br>Last Status Received: Published<br>Filed: November 20, 2018 | (Int'l Class: 05)<br>Antibiotics. | ACHAOGEN, INC. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America |
| Turkey<br>Q1<br>tr 34 | Design Only<br><br>AN: 2019/04068 | Turkey<br>Published<br>Last Status Received: Published<br>Filed: November 20, 2018 | (Int'l Class: 05)<br>Antibiotics. | ACHAOGEN, INC. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| Turkey<br>Q1<br>tr 35 | Xemdro<br><br>**XEMDRO**<br><br>AN: 2016/99237 | Turkey<br>Published<br>Last Status Received: Published<br>Filed: December 8, 2016 | (Translation)<br>(Int'l Class: 05)<br>antibiotics | ACHAOGEN, INC. 7000 Shoreline Court, Suite 371, South San Francisco, California 94080, United States of America |
| Turkey<br>Q1<br>tr 36 | zemdri<br><br>**ZEMDRI**<br><br>RN: 2016 99232<br>AN: 201699232 | Turkey<br>Registered<br>Last Status Received: Registered<br>Filed: December 8, 2016<br>Registered: October 3, 2017 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC. 7000 Shoreline Court, Suite 371, South San Francisco, California 94080, United States of America |
| United Kingdom<br>Q1<br>gb 38 | XEMDRO<br>RN: 3172211<br>AN: 3172211 | United Kingdom<br>Registered<br>Last Status Received: Registered<br>September 30, 2016<br>Filed: June 30, 2016<br>Expiration Date: June 30, 2026 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. (Company or Organisation Delaware) 7000 Shoreline Court, Suite 371, 94080, South San Francisco, California, United States of America |
| United Kingdom<br>Q1<br>gb 39 | ZEMDRI<br>RN: 3172247<br>AN: 3172247 | United Kingdom<br>Registered<br>Last Status Received: Registered<br>September 30, 2016<br>Filed: June 30, 2016<br>Expiration Date: June 30, 2026 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. (Company or Organisation Delaware) 7000 Shoreline Court, Suite 371, 94080, South San Francisco, California, United States of America |
| European Union (EUTM)<br>Q1<br>eu 41 | XEMDRO<br>RN: 015595499<br>AN: 015595499 | European Union<br>Registered<br>Last Status Received: Registered<br>October 19, 2016<br>Filed: June 29, 2016 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. (Corporation Delaware) 7000 Shoreline Court, Suite 371, 94080, South San Francisco, California, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | Registered: October 17, 2016<br>Expiration Date: June 29, 2026 | | |
| European Union (EUTM)<br>QI<br>eu 42 | ZEMDRI<br>RN: 015955515<br>AN: 015955515 | European Union<br>Registered<br>Last Status Received: Registered<br>October 19, 2016<br>Filed: June 29, 2016<br>Registered: October 17, 2016<br>Expiration Date: June 29, 2026 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. (Corporation Delaware) 7000 Shoreline Court, Suite 371, 94080, South San Francisco, California, United States of America |
| Israel<br>QI<br>il 44 | XEMDRO<br>AN: 290115 | Israel<br>Registered<br>Last Status Received: Registered<br>Filed: December 4, 2016<br>Registered: April 9, 2018<br>Expiration Date: December 4, 2026 | (Int'l Class: 05)<br>Antibiotics; all included in class 5. | Achaogen, Inc. 7000 Shoreline Court, Suite 371, South San Francisco, California, 94080, U.S.A., United States of America |
| Israel<br>QI<br>il 45 | ZEMDRI<br>AN: 290114 | Israel<br>Registered<br>Last Status Received: Registered<br>Filed: December 4, 2016<br>Registered: April 9, 2018<br>Expiration Date: December 4, 2026 | (Int'l Class: 05)<br>Antibiotics; all included in class 5. | Achaogen, Inc. 7000 Shoreline Court, Suite 371, South San Francisco, California, 94080, U.S.A., United States of America |
| South Africa<br>QI<br>za 47 | ZEMDRI<br>AN: 2017/33426 | South Africa<br>Published<br>Last Status Received: Published<br>Filed: November 16, 2017 | (Int'l Class: 05)<br>Antibiotics | Achaogen, Inc. a corporation of the State of Delaware 1 Tower Place, Suite 300, South San Francisco, California, 94080, United States of America |
| Australia<br>QI<br>au 49 | Design Only | Australia<br>Filed<br>Last Status Received: Pending Application<br>Office Status: Published: Awaiting examination<br>Filed: November 20, 2018<br>Int'l Reg Date: November 20, 2018 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | AN: 1981466 Disclaimer: The mark consists of stylized human figure stepping out of a ring. | | | |
| Australia QI au 50 | Design Only  AN: 1980719 Disclaimer: The mark consists of stylized human figure in the color purple stepping out of a ring in the color green. The color(s) Purple and Green is/are claimed as a feature of the mark. The mark consists of stylized human figure in the color purple stepping out of a ring in the color green. | Australia Filed Last Status Received: Pending Application Office Status: Published: Awaiting examination Filed: November 20, 2018 Int'l Reg Date: November 20, 2018 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. United States of America |
| Australia QI au 51 | XEMIDRO RN: 1813625 AN: 1813625 Disclaimer: Convention priority claimed: 22 June 2016, United States of America, No. 87/080087 in respect of ALL ITEMS IN THIS CLASS ARE CLAIMED IN THE CONVENTION APPLICATION in class 5.* | Australia Registered Last Status Received: Registered Office Status: Registered: Registered/protected Filed: December 5, 2016 Registered: December 5, 2016 Expiration Date: December 5, 2026 | (Int'l Class: 05) Antibiotics | Achaogen, Inc. incorporated in the State of Delaware incorporated in the State of Delaware United States of America |
| Australia QI au 52 | ZEMDRI RN: 1813626 AN: 1813626 Disclaimer: Convention priority claimed: 22 June 2016, United States of America, No. | Australia Registered Last Status Received: Registered Office Status: Registered: Registered/protected Filed: December 5, 2016 | (Int'l Class: 05) Antibiotics | Achaogen, Inc. incorporated in the State of Delaware incorporated in the State of Delaware United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | 87/080092 in respect of ALL ITEMS IN THIS CLASS ARE CLAIMED IN THE CONVENTION APPLICATION in class 5.* | Registered: December 5, 2016 Expiration Date: December 5, 2026 | | |
| Australia Q1 au 53 | ZEMDRI and Design AN: 1982221 Disclaimer: The mark consists of stylized human figure in the color purple stepping out of a ring in the color green all above the word ZEMDRI in the color purple. The color(s) green and purple is/are claimed as a feature of the mark. The mark consists of stylized human figure in the color purple stepping out of a ring in the color green all above the word ZEMDRI in the color purple. | Australia Filed Last Status Received: Pending Application Office Status: Published: Awaiting examination Filed: November 20, 2018 Int'l Reg Date: November 20, 2018 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. United States of America |
| Australia Q1 au 54 | ZEMDRI and Design  ZEMDRI  AN: 1981456 Disclaimer: The mark consists of stylized human figure stepping out of a ring all above the word ZEMDRI. | Australia Filed Last Status Received: Pending Application Office Status: Published: Awaiting examination Filed: November 20, 2018 Int'l Reg Date: November 20, 2018 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. United States of America |
| China Q1 cn 55 | XEMDRO  XEMDRO  RN: 22301161 AN: 22301161 | China Registered Last Status Received: Registered Filed: December 19, 2016 Registered: January 28, 2018 Expiration Date: January 27, 2028 | (Translation) (Int'l Class: 05) antibiotics | 爱超挶有限公司 加利福尼亚州 94080 南旧金山 7000 沿海大楼 371 室, United States of America  ACHAOGEN, INC. 7000 SHORELINE COURT, SUITE 371, SOUTH SAN FRANCISCO, CALIFORNIA |

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | | | 94080, UNITED STATES OF AMERICA, United States of America |
| China<br>QI<br>cn 56 | ZEMDRI<br><br>ZEMDRI<br><br>RN: 2230162<br>AN: 2230162 | China<br>Registered<br>Last Status Received: Registered<br>Filed: December 19, 2016<br>Registered: January 28, 2018<br>Expiration Date: January 27, 2028 | (Translation)<br>(Int'l Class: 05)<br>antibiotics | 爱越撰有限公司 加利福尼亚州 94080 南旧金山 7000 沿海大楼 371 室, United States of America<br><br>ACHAOGEN, INC.<br>7000 SHORELINE COURT, SUITE 371, SOUTH SAN FRANCISCO, CALIFORNIA 94080, UNITED STATES OF AMERICA, United States of America |
| Hong Kong<br>QI<br>hk 58 | ZEMDRI and Design<br><br>ZEMDRI<br><br>AN: 304338135 | Hong Kong<br>Published<br>Last Status Received: Published<br>December 8, 2017<br>Filed: November 16, 2017 | (Int'l Class: 05)<br>Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300, South San Francisco, California 94080, United States of America |
| India<br>QI<br>in 60 | ZEMDRI<br>AN: 3681462 | DELHI - Filed<br>Last Status Received: Objection pending<br>Filed: November 18, 2017 | (Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC. Body Incorporate 1 Tower Place Suite 300 South San Francisco, California 94080 United States of America, United States of America |
| New Zealand<br>QI<br>nz 62 | XEMDRO<br>RN: 1056597<br>AN: 1056597 | New Zealand<br>Registered<br>Last Status Received: Registered<br>June 7, 2017<br>Office Status: Registered<br>Filed: December 5, 2016<br>Expiration Date: June 22, 2026 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. a corporation of the State of Delaware 7000 Shoreline Court, Suite 371 California 94080 South San Francisco, United States of America |
| New Zealand<br>QI<br>nz 63 | ZEMDRI<br>RN: 1056598<br>AN: 1056598 | New Zealand<br>Registered<br>Last Status Received: Registered<br>June 7, 2017<br>Office Status: Registered | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. a corporation of the State of Delaware 7000 Shoreline Court, Suite 371 California 94080 South San Francisco, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | Filed: December 5, 2016<br>Expiration Date: June 22, 2026 | | |
| Republic of Korea<br>QI<br>kr 64 | ZEMDRI<br><br>**ZEMDRI**<br><br>RN: 4013898770000<br>AN: 4020170168251 | Republic of Korea<br>Registered<br>Last Status Received: Registered<br>Filed: December 29, 2017<br>Registered: August 22, 2018 | (Translation)<br>(Int'l Class: 05)<br>Antibiotics | ACHAOGEN, INC. 아카오젠,<br>인크포레이[이]티드 * Tower Place,<br>Suite ***, South San Francisco,<br>California *****, United States of<br>America, United States of America |
| Singapore<br>QI<br>sg 66 | No Text Elements<br><br>**ZEMDRI**<br><br>AN: 40201722640X | Singapore<br>Published<br>Last Status Received: Published<br>April 6, 2018<br>Filed: November 16, 2017 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. 1 Tower Place,<br>Suite 300,South San Francisco,<br>California 94080,United States of<br>America,Delaware, United States of<br>America, United States of America |
| Taiwan<br>QI<br>tw 68 | Logo design (in black-and-white)<br><br><br><br>AN: 107075189 | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察預有限公司<br>美國<br>United States of America |
| Taiwan<br>QI<br>tw 69 | Logo design (in color) | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | AN: 107075187 | | | 爾察裪有限公司<br>美國<br>United States of America |
| Taiwan<br>QI<br>tw 70 | ZEMDRI<br>AN: 106072193 | Taiwan<br>Other<br>Filed: November 16, 2017 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC. 1 Tower Place,<br>Suite 300, South San Francisco,<br>California 94080 U.S.A. United<br>States of America |
| Taiwan<br>QI<br>tw 71 | ZEMDRI<br>AN: 107075184 | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察裪有限公司<br>美國<br>United States of America |
| Taiwan<br>QI<br>tw 72 | ZEMDRI | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br>爾察裪有限公司 |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | ZEMDRI (logo) AN: 107075186 | | | 美國 United States of America |
| Taiwan Q1 tw 73 | ZEMDRI **ZEMDRI** RN: 01919327 AN: 106072193 | Taiwan Registered Last Status Received: Registered Filed: November 16, 2017 Registered: June 16, 2018 Expiration Date: June 15, 2028 | (Translation) (Int'l Class: 05) antibiotics. | ACHAOGEN, INC. 美國 United States of America 爾聚祺有限公司 美國 United States of America |
| Argentina Q1 ar 75 | XEMDRO RN: 2948099 AN: 3565052 | Argentina Registered Last Status Received: Registered Filed: December 7, 2016 Registered: August 7, 2018 Expiration Date: August 7, 2028 | (Translation) (Int'l Class: 05) Only: antibiotics. | ACHAOGEN, INC. 7000 SHORELINE COURT SUITE 371, SOUTH SAN FRANCISCO CP. 94080, United States of America |
| Argentina Q1 ar 76 | ZEMDRI RN: 2928489 AN: 3565053 | Argentina Registered Last Status Received: Registered Filed: December 7, 2016 Registered: March 9, 2018 Expiration Date: March 9, 2028 | (Translation) (Int'l Class: 05) Only: antibiotics. | ACHAOGEN, INC. 7000 SHORELINE COURT SUITE 371, SOUTH SAN FRANCISCO CP. 94080, United States of America |
| Brazil Q1 br 78 | XEMDRO RN: 912032103 AN: 912032103 | Brazil Registered Last Status Received: Registered Filed: December 9, 2016 | (Translation) (Int'l Class: 05) antibiotics. | ACHAOGEN, INC. |

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| Brazil QI br 79 | ZEMDRI RN: 912032081 AN: 912032081 | Registered: October 2, 2018 Expiration Date: October 2, 2028 Brazil Registered Last Status Received: Registered Filed: December 9, 2016 Registered: October 2, 2018 Expiration Date: October 2, 2028 | (Translation) (Int'l Class: 05) antibiotics. | ACHAOGEN, INC. |
| Colombia QI co 80 | XEMDRO RN: 570091 AN: SD20160053447 | Colombia Registered Last Status Received: Registered Filed: December 12, 2016 Registered: June 9, 2017 Expiration Date: June 9, 2027 | (Translation) (Int'l Class: 05) ]: Antibiotics. | ACHAOGEN, INC 7000 SHORELINE COURT, SUITE 371, SAN FRANCISCO CALIFORNIA; US, United States of America |
| Colombia QI co 81 | ZEMDRI RN: 570163 AN: SD20160053449 | Colombia Registered Last Status Received: Registered Filed: December 12, 2016 Registered: June 12, 2017 Expiration Date: June 12, 2027 | (Translation) (Int'l Class: 05) ]: Antibiotics. | ACHAOGEN, INC 7000 SHORELINE COURT, SUITE 371, SAN FRANCISCO CALIFORNIA; US, United States of America |

| Country | Trademark | Application No. | Filing Date | Registration No. | Registration Date | Status | Class | Renewal Date |
|---|---|---|---|---|---|---|---|---|
| JAPAN | ZEMDRI | 2016-137421 | 12/6/2016 | 5943897 | 4/28/2017 | REGISTERED | 5 | 04/28/2027 RENEWAL |
| RUSSIA | ZEMDRI | 2016746344 | 12/7/2016 | 2016746344 | 9/9/2017 | REGISTERED | 5 | 12/07/2026 RENEWAL |
| JAPAN | XEMDRO | 2016-137419 | 12/6/2016 | 5943896 | 4/28/2017 | REGISTERED | 5 | 04/28/2027 RENEWAL |
| RUSSIA | XEMDRO | 2016746300 | 12/7/2016 | 2016746300 | 8/30/2017 | REGISTERED | 5 | 12/07/2026 RENEWAL |
| UNITED STATES | XEMDRO | 87/080,087 | 6/22/2016 | | | ABANDONED | 5 | |
| UNITED STATES | ZEMDRO | 87/080,094 | 6/22/2016 | | | ABANDONED | 5 | |

## III. COPYRIGHTS

No registered copyrights.

## IV. REGISTERED DOMAINS

| Domain Name |
| --- |
| aboutenrezovi.co.uk |
| aboutenrezovi.com |
| aboutenrezovi.de |
| aboutenrezovi.es |
| aboutenrezovi.net |
| aboutenrezovi.org |
| aboutenrezovi.us |
| aboutrezevico.co.uk |
| aboutrezevico.com |
| aboutrezevico.de |
| aboutrezevico.es |
| aboutrezevico.net |
| aboutrezevico.org |
| aboutrezevico.us |
| aboutxemdri.com |
| aboutxemdri.us |
| aboutxemdro.co.uk |
| aboutxemdro.com |
| aboutxemdro.de |
| aboutxemdro.es |
| aboutxemdro.net |
| aboutxemdro.org |

aboutxemdro.us
aboutzemdri.co.uk
aboutzemdri.com
aboutzemdri.de
aboutzemdri.es
aboutzemdri.net
aboutzemdri.org
aboutzemdri.us
aboutzemdro.co.uk
aboutzemdro.com
aboutzemdro.de
aboutzemdro.es
aboutzemdro.net
aboutzemdro.org
aboutzemdro.us
ACHAGEN.COM
ACHAOGEN-BUT.COM
ACHAOGEN-PLAZOMICIN.COM
ACHAOGEN-PLAZOMICIN.INFO
ACHAOGEN-PLAZOMICIN.NET
achaogen.info
achaogen.net
achaogen.org
achaogen.us
achaogenenrezovi.co.uk
achaogenenrezovi.com
achaogenenrezovi.de
achaogenenrezovi.es

achaogenenrezovi.net
achaogenenrezovi.org
achaogenenrezovi.us
achaogenhotline.com
achaogenrezevico.co.uk
achaogenrezevico.com
achaogenrezevico.de
achaogenrezevico.es
achaogenrezevico.net
achaogenrezevico.org
achaogenrezevico.us
achaogenxemdri.com
achaogenxemdro.co.uk
achaogenxemdro.com
achaogenxemdro.de
achaogenxemdro.es
achaogenxemdro.net
achaogenxemdro.org
achaogenxemdro.us
achaogenzemdri.co.uk
achaogenzemdri.com
achaogenzemdri.de
achaogenzemdri.es
achaogenzemdri.net
achaogenzemdri.org
achaogenzemdri.us
achaogenzemdro.co.uk
achaogenzemdro.com

| |
|---|
| achaogenzemdro.de |
| achaogenzemdro.es |
| achaogenzemdro.net |
| achaogenzemdro.org |
| achaogenzemdro.us |
| ACHOAGEN.COM |
| ACHOAGEN.INFO |
| ACHOAGEN.NET |
| ACHOAGEN.ORG |
| ACHOGEN.COM |
| akao.work |
| akaoenrezovi.co.uk |
| akaoenrezovi.com |
| akaoenrezovi.de |
| akaoenrezovi.es |
| akaoenrezovi.net |
| akaoenrezovi.org |
| akaoenrezovi.us |
| akaorezevico.co.uk |
| akaorezevico.com |
| akaorezevico.de |
| akaorezevico.es |
| akaorezevico.net |
| akaorezevico.org |
| akaorezevico.us |
| akaoxemdri.com |
| akaoxemdro.co.uk |
| akaoxemdro.com |

| |
|---|
| akaoxemdro.de |
| akaoxemdro.es |
| akaoxemdro.net |
| akaoxemdro.org |
| akaoxemdro.us |
| akaozemdri.co.uk |
| akaozemdri.com |
| akaozemdri.de |
| akaozemdri.es |
| akaozemdri.net |
| akaozemdri.org |
| akaozemdri.us |
| akaozemdro.co.uk |
| akaozemdro.com |
| akaozemdro.de |
| akaozemdro.es |
| akaozemdro.net |
| akaozemdro.org |
| akaozemdro.us |
| enrezovi.co |
| enrezovi.co.nz |
| enrezovi.co.uk |
| enrezovi.com |
| enrezovi.com.br |
| enrezovi.com.mx |
| enrezovi.de |
| enrezovi.es |
| enrezovi.fr |

| |
|---|
| enrezovi.it |
| enrezovi.kr |
| enrezovi.net |
| enrezovi.org |
| enrezovi.tw |
| enrezovi.us |
| enrezovirx.co.uk |
| enrezovirx.com |
| enrezovirx.de |
| enrezovirx.es |
| enrezovirx.net |
| enrezovirx.org |
| enrezovirx.us |
| FREEPLAZOMICIN.COM |
| NEOGLYCOSIDE.COM |
| NEOGLYCOSIDE.INFO |
| NEOGLYCOSIDE.NET |
| NEOGLYCOSIDE.ORG |
| NEOGLYCOSIDES.COM |
| NEOGLYCOSIDES.INFO |
| NEOGLYCOSIDES.NET |
| NEOGLYCOSIDES.ORG |
| PLAZOMICIN.BIZ |
| PLAZOMICIN.CO |
| PLAZOMICIN.COM |
| PLAZOMICIN.INFO |
| PLAZOMICIN.MOBI |
| PLAZOMICIN.NET |

| |
|---|
| PLAZOMICIN.ORG |
| PLAZOMICIN.US |
| PLAZOMICIN.WS |
| PLAZOMICINBLOG.COM |
| PLAZOMICINNOW.COM |
| PLAZOMICINONLINE.COM |
| PLAZOMICINS.COM |
| PLAZOMICINSHOP.COM |
| PLAZOMICINSITE.COM |
| PLAZOMICINSTORE.COM |
| PLAZOMICINSUCKS.COM |
| PLAZOMICINSUCKS.INFO |
| PLAZOMICINSUCKS.NET |
| PLAZOMICINSUCKS.ORG |
| rezevico.co.uk |
| rezevico.com |
| rezevico.de |
| rezevico.es |
| rezevico.net |
| rezevico.org |
| rezevico.us |
| rezevicorx.co.uk |
| rezevicorx.com |
| rezevicorx.de |
| rezevicorx.es |
| rezevicorx.net |
| rezevicorx.org |
| rezevicorx.us |

| THEPLAZOMICIN.COM |
|---|
| xemdri.com |
| xemdrirx.com |
| xemdro.co |
| xemdro.co.nz |
| xemdro.co.uk |
| xemdro.com |
| xemdro.com.br |
| xemdro.com.mx |
| xemdro.de |
| xemdro.es |
| xemdro.fr |
| xemdro.it |
| xemdro.kr |
| xemdro.net |
| xemdro.org |
| xemdro.us |
| xemdrorx.co.uk |
| xemdrorx.com |
| xemdrorx.de |
| xemdrorx.es |
| xemdrorx.net |
| xemdrorx.org |
| xemdrorx.us |
| zemdri.co |
| zemdri.co.nz |
| zemdri.co.uk |
| zemdri.com |

| zemdri.com.br | zemdri.com.mx | zemdri.de | zemdri.es | zemdri.fr | zemdri.it | zemdri.kr | zemdri.net | zemdri.org | zemdri.tw | zemdri.us | zemdrirx.co.uk | zemdrirx.com | zemdrirx.de | zemdrirx.es | zemdrirx.net | zemdrirx.org | zemdrirx.us | zemdro.co.uk | zemdro.com | zemdro.de | zemdro.es | zemdro.net | zemdro.org | zemdro.us | zemdrorx.co.uk | zemdrorx.com | zemdrorx.de |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| |
|---|
| zemdrorx.es |
| zemdrorx.net |
| zemdrorx.org |
| zemdrorx.us |
| aboutxemdri.net |
| aboutxemdri.org |
| achaogenrsvp.com |
| achaogenspeakerbureau.com |
| achaogenspeakers.com |
| achaogenxemdri.net |
| achaogenxemdri.org |
| achaogenxemdri.us |
| akao-ruo.biz |
| akao-ruo.co |
| akao-ruo.com |
| akao-ruo.info |
| akao-ruo.io |
| akao-ruo.net |
| akao-ruo.online |
| akao-ruo.org |
| akao-ruo.store |
| akao-ruo.us |
| akaoxemdri.net |
| akaoxemdri.org |
| akaoxemdri.us |
| cutiandbsinformation.com |
| cutiinformation.com |
| enrezovi.ch |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| enrezovi.cn | enrezovi.in | enrezovi.ru | xemdri.net | xemdri.org | xemdri.us | xemdrirx.net | xemdrirx.org | xemdrirx.us | xemdro.ch | xemdro.cn | xemdro.ru | xemdro.tw | zemdri.ch | zemdri.cn | zemdri.in | zemdri.ru |

**SCHEDULE 2.1(I)**

**CHAPTER 5 ACTIONS AND CLAIMS**

None.

**SCHEDULE 5.11(A)**

**CONTRACT AND CURE SCHEDULE**

**Part A**

| Contract Counterparty | Contract/Lease Title | Cure Amount ($) |
|---|---|---|
| Beckman Coulter, Inc. | Master services agreement | 4,298 |
| bioMerieux | Master services agreement | - |
| Blaine Healthcare Associates, Inc. | Consulting Agreement | - |
| Cardinal Health 105, Inc. | Exclusive Distribution Agreement | 5,619 |
| Dotmatics, Inc. | Hosted Software Agreement | 19,790 |
| EMH Consulting LLC | Consulting agreement | - |
| EUCAST | Master Services Agreement | - |
| Eurofins Lancaster Laboratories Inc | Master Services Agreement w/Amendments | 16,642 |
| Friedland Strategic Consulting, LLC | Consulting agreement | - |
| Hill & Hill Quality Associates, LLC | Consulting Agreement | - |
| Hospira, Inc. | Pfizer CenterOne Plazomicin Project  Kalamazoo Statement of Work | - |
| Ionis Pharmaceuticals, Inc. | Ionis Pharmaceuticals, License Agreement | 8,598 |
| Jones Microbiology Institute, Inc. | Master Services Agreement | 209,339 |
| Laboratory Specialists, Inc. | Master Services Agreement | 12,644 |
| Lutz Wevelsiep | Consulting Agreement | 5,034 |
| Mast International Division | Master Services Agreement | 19,616 |
| PCI of Illinois | Commercial packing agreement | 748 |
| PPD Development | Analysis of Plazomicin SulfateDrug Product | 47,818 |
| Region Kronoberg | EUCAST & Region Kronoberg, Study Proposal | 32,137 |
| Remel, Inc. | Master Services Agreement - Thermo Fisher Scientific | 78,000 |
| Veeva System, Inc. | Managed Services | 46,169 |
| **Total** | | **$ 506,452** |

**Part B**

| Contract Counterparty | Contract/Lease Title | Cure Amount ($) |
|---|---|---|
| Microgenics Corp | Collaborative Development and Commercialization Agreement | 589,000 |
| Pfizer, Inc. | Letter of Engagement | 94,654 |
| **Total** | | **$ 683,654** |

**SCHEDULE 3.4**

**TITLE TO ASSETS, LIENS**

None.

**SCHEDULE 3.5**

**CLAIMS, LITIGATION AND DISPUTES**

1. In June 2018, the FDA issued a complete response letter for the bloodstream infection (BSI) indication the Seller sought for plazomicin. In December 2018, the Seller filed a Formal Dispute Resolution Request (FDRR) with the FDA regarding the BSI indication for plazomicin. The Seller believes that the data submitted in the New Drug Application for plazomicin provides substantial evidence of efficacy in treating BSI and that plazomicin should be approved for the proposed BSI indication. The FDA denied the Seller's first-round FDRR and the Seller is evaluating its current options, including requesting a further meeting with the reviewing division or further pursuing our appeal.

# SCHEDULE 3.6

## GOVERNMENTAL AUTHORIZATIONS

1. FDA Approval to sell ZEMDRI in US

2. Federal Fish and Wildlife permit

3. HHS CDC Permit to Import Infectious Agents, Infectious Substances and Vectors

4. San Mateo County Hazardous Waste LGQ Permit

5. San Mateo County Medical Waste LGQ Permit

6. South San Francisco Business License

7. State licenses to sell medicines

| Licensing State | License # | Expiration Date |
|---|---|---|
| Washington D.C. | DM1800093 | 4/30/2019 |
| Maryland | D06193 | 5/31/2019 |
| Oregon | M-0002972 | 6/30/2019 |
| North Dakota | Whol1994 | 6/30/2019 |
| Ohio | WVMF.01265710-020 | 6/30/2019 |
| Michigan | 5306005081 | 6/30/2019 |
| Georgia | PHWH004288 | 6/30/2019 |
| California | WLS7550 | 7/15/2019 |
| Oklahoma | 88-M-5210 | 7/31/2019 |
| Vermont | 39.0134131 | 7/31/2019 |
| Tennessee | 00004960 | 9/30/2019 |
| Washington | PHWH.FX.60962015 | 9/30/2019 |
| Texas | 1002345 | 10/28/2019 |
| Arizona | M001045 | 10/31/2019 |
| Montana | PHA-WDD-LIC-50859 | 11/30/2019 |
| Iowa | Pending | 12/31/2019 |

| State | Number | Expiration |
|---|---|---|
| South Dakota | 600-2805 | 12/31/2019 |
| North Carolina | 1479 | 12/31/2019 |
| Idaho | M45874 | 12/31/2019 |
| Alabama | 195479 | 12/31/2019 |
| Louisiana | 9050 | 12/31/2019 |
| Mississippi | 16596 / 16.4a | 12/31/2019 |
| New Jersey | 5005332 | 1/31/2020 |
| Pennsylvania | 100003995 | 2/29/2020 |
| Minnesota | 461565 | 5/31/2020 |
| Minnesota | 364203 | 5/31/2020 |
| Florida | 4665 | 5/31/2020 |
| West Virginia | MR0551640 | 6/30/2020 |
| Nevada | WH02367 | 10/31/2020 |
| Arkansas | WD04913 | 12/31/2020 |
| New Mexico | WD00012268 | 12/31/2020 |
| New York | 36440 | 1/31/2021 |
| Connecticut | CSM.0001252-OOS | No Expiration |

**SCHEDULE 3.8**

**CONTRACTS**

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 1. | AB Sciex, LLC | Service Contract Quote | 62510 Collections Center Drive | | Chicago | IL | 606936-0625 |
| 2. | ABC Consulting LLC | Consulting Agreement | 1131 Ave F D Roosevelt | | San Juan | Puerto Rico | |
| 3. | Access Marketing & Communications dba Scrimmage | Master Service Agreement | 60 South 6th Street | Suite 2800 | Minneapolis | MN | 55402 |
| 4. | Access TCA, Inc | Scope of Work | 1 Main Street | | Whitinsville | MA | 1588 |
| 5. | Accretive Solutions - Northern California, Inc. | Permanent Placement Fee Agreement | 17101 Armstrong Ave | | Irvine | CA | 92614 |
| 6. | Acorn NMR, Inc. | Master Services Agreement | 7670 Las Positas Road | | Livermore | CA | 94551 |
| 7. | Active Cyber, LLC | Active Cyber, LLC, Master Service Agreement | 5001 Spring Valley Road | Suite 230E | Dallas | TX | 75244 |
| 8. | ADAMAS Consulting Group, Ltd | Consulting Agreement | 7 Wellington Business Park | | Crowthorne | UK | RG45 6LS |
| 9. | Adaptive Insights, Inc. | Subscription Services Agreement | 3350 W. Bayshore Road, Ste 200 | | Palo Alto | CA | 94303 |
| 10. | Adesis, Inc. | Adesis, Inc., Master Services Agreement | 27 McCullough Drive | | New Castle | DE | 19720 |
| 11. | Advanced Spectro Technologies, Inc. | Advanced Spectro Technologies, Inc., Master Services Agreement | 2333 Verna Court | | San Leandro | CA | 94577 |
| 12. | Advocea LLC | Advocea,Consulting Agreement | 2672 Bayshore Parkway, Ste 920 | | Mountain View | CA | 94043 |
| 13. | Aerotek Inc | Aerotek Scientific, LLC, Services Agreement | 3689 Collection Center Dr | | Chicago | IL | 60693 |
| 14. | AG Communications, LLC | AG Communications, LLC, Master Services Agreement | 909 Church Hill Road | | Fairfield | CT | 6825 |
| 15. | Agilent Technologies, Inc. | Budget Quote | 2850 Centerviell Road | | Wilmington | DE | 19808 |
| 16. | Airgas USA, LLC | Airgas, LLC, Equipment Sales Agreement | 1495 Illnois St | | San Francisco | CA | 94107 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 17. | Albany Molecular Research, Inc. | Master Services Agreement | 3065 Kent Avenue | | West Lafayette | IN | 47906 |
| 18. | Alexander Smith | Alexander Smith, Consulting Agreement | 1447 12th Avenue | | San Francisco | CA | 94122 |
| 19. | Alison Lin | Alison Lin – Consulting Agreement (master) | 315 Creedon Circle | | Alameda | CA | 64502 |
| 20. | Alturas Analytics, Inc. | Alturas, Archival Storage of CLP Study Documents 2019, SOW Q2089 CO #1, Quote 2930 | 1324 Alturas Drive | | Moscow | ID | 83843 |
| 21. | Amber Evanoff, LLC | Amber Evanoff, LLC, Consulting Agreement | 2402 California Street, Apt 207 | | San Francisco | CA | 94115 |
| 22. | Ami Patel | Ami Patel Master Consulting Agreement 03Jan19 | 9467 Martini Court | | Dublin | CA | 94568 |
| 23. | AMPAC Fine Chemicals, LLC | AMPAC Fine Chemicals, LLC, Master Services Agreement | Highway 50 and Hazel Avenue | | Rancho Cordova | CA | 95742 |
| 24. | AndersonBrecon, Inc. | Clinical Trial Supply Proposal | 4545 Assembly Drive | | Rockford | IL | 61109 |
| 25. | Antibody Solutions | MSA Exhibit B, C, D | 1130 Mountain View Alviso Rd | | Sunnyvale | CA | 94089 |
| 26. | Aon Risk Insurance Services West, Inc. | Aon Risk Services West, Engagement Letter | 425 Market Street, Suite 280 | | San Francisco | CA | 94105 |
| 27. | AP3 SF2 CT South LLC | AP3-SF2 CT South, LLC, Lease (Tower Place South San Francisco) | One Tower Place | Suite 225 | South San Francisco | CA | 94080 |
| 28. | Apex Life Sciences, LLC | Apex Life Sciences, Exhibit A Amendment 1 | 3750 Collections Center Drive | | Chicago | IL | 60693 |
| 29. | ARC Trinova Limited | ARC Trinova Limited, Master Services Agreement (BARDA) | Taylor Drive | Alnwick | Northumberland | UK | NE66 2DH |
| 30. | Arvys Proteins, Inc. | Order Form | 115 Technology Drive | Suite CP100 | Trumbull | CT | 6611 |
| 31. | AT&T Corporation | AT&T, Sales Order (Ethernet Private Line - 8946182) | 208 South Akard Street | | Dallas | TX | 75202 |
| 32. | Audio Visual Design Group | Order Form | 2143 E Francisco Blvd | | San Rafael | CA | 94901 |
| 33. | Automatic Data Processing, Inc. | Automatic Data Processing, Inc., Comprehensive Services Proposal | One ADP Blvd. Mail Stop 433 | | Roseland | NJ | 7068 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 34. | Axway Inc | Subscription and Service Agreement | 6811 E Mayo Blvd., | Suite 400 | Phoenix | AZ | 85054 |
| 35. | Beatriz Alvarez, LLC | Novation for Consulting Agreement | 1538 Magnolia Avenue | | Millbrae | CA | 94030 |
| 36. | Beckman Coulter, Inc. | Master services agreement | 250 S Kraemer Blvd | | Brea | CA | 92821 |
| 37. | bioMerieux | Master services agreement | 376 Chemin De L'Orme | | Marcy L'Etoile | France | 69 280 |
| 38. | Bistro Biotech Consulting, LLC | Bistro Biotech Consulting, Scientific Advisory Board Agreement Amendment 1 | 1086 Tulfo Farm Road | | Bridgewater | NJ | 8807 |
| 39. | Blaine Healthcare Associates, Inc. | Consulting Agreement | 4945 St. Thomas Drive | | Fair Oaks | CA | 95628 |
| 40. | BluePath Solutions Inc | BluePath Solutions, Inc., Consulting Agreement | 10951 West Pico Blvd | Suite 120 | Los Angeles | CA | 90064 |
| 41. | Box, Inc. | Service Order/Box Licensing | 900 Jefferson Ave | | Redwood City | CA | 94063 |
| 42. | Bristlecone, Inc. | Bristlecone, Inc., Consulting Agreement and Exhibit A | 10 Almaden Blvd, | Suite 600 | San Jose | CA | 95113 |
| 43. | CARB-X | Achaogen_Research Subaward Agreement 450002583_KC 2113 | – | | – | – | – |
| 44. | Cardinal Health 105, Inc. | Exclusive Distribution Agreement | 7000 Cardinal Place | | Dublin | OH | 43017 |
| 45. | CareFusion Solutions, LLC | MSA Work Order | 25565 Network Place | | Chicago | IL | 60673-1255 |
| 46. | CareMetx LLC | CareMetx, Master Services Agreement, Statement of Work B (Copay Services) | 6931 Arlington Road, Suite 308 | | Bethesda | MD | 20814 |
| 47. | Case Western Reserve University | Master Services Agreement, Exhibit A | 2061 Cornell Rd, Room 416 | | Cleveland | OH | 44106-5083 |
| 48. | CD&E Consulting LLC | Consulting Agreement | 1101 River Road | | Hillsborough | NJ | 8844 |
| 49. | Centers for Disease Control and Prevention | CDC, Material Transfer Agreement | 222 S. Central Avenue, Suite 1008 | | Saint Louis | MO | 63105 |
| 50. | Certara USA, Inc. | MSA | 222 S. Central Avenue, Suite 1008 | | Saint Louis | MO | 63105 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 51. | ChemShuttle, Inc. | ChemShuttle, Inc, Master Services Agreement | 3916 Trust Way | | Hayward | CA | 94545 |
| 52. | Clarivate Analytics, LLC | Clarivate, 2018 Renewal | 1500 Spring Garden, Fourth Floor | | Philadelphia | PA | 19130 |
| 53. | Clarke Consulting Incorporated | Clarke Consulting Incorporated, Letter of Engagement (IT) | 8605 Santa Monica Blvd # 19613 | | Los Angeles | CA | 90069 |
| 54. | ClearLight Diagnostics, LLC | ClearLight Diagnostics, LLC, Master Services Agreement | 428 Oakmead Parkway | | Sunnyvale | CA | 94085 |
| 55. | Cli-Metrics Service Company, Inc | Maintenance Proposal | 382 Martin Ave | | Santa Clara | CA | 95050 |
| 56. | Clinical Care Options, LLC | Grant Agreement | 12001 Sunrise Valley Drive | Suite 300 | Reston | VA | 20191 |
| 57. | Clinical Pharmacovigilance Consulting, LLC | Clinical Pharmacovigilance Consulting, Consulting Agreement (RahelaSteiner) Amendment 3 | 260 Oakview Drive | | San Carlos | CA | 94070 |
| 58. | Command Central | IntraMed and Command Central, MSA Exhibits | 230 Park Avenue South | | New York | NY | 10003 |
| 59. | Computer Science Corporation | Computer Science Corporation, Renewal Letter 2018-2019 | – | | – | – | – |
| 60. | Com-Strat, LLC | Com-Strat, LLC, Consulting Agreement | 1176 Starr Avenue | | St. Helena | CA | 94574 |
| 61. | Concur Technologies, Inc. | Order Form | 601 108th Avenue, NE Suite 1000 | | Bellevue | WA | 98004 |
| 62. | Connor Group Global Services, LLC | Engagement Letter | 3979 Freedom Cir #700 | | Santa Clara | CA | 95054 |
| 63. | Contract Source Interiors | Service Agreement | – | | – | – | – |
| 64. | Core Diagnostics, Inc. | MSA Exhibit A | 3535 Breakwater Avenue | | Hayward | CA | 94545 |
| 65. | Covance Central Laboratory Services LP | Master Services Agreement w/Amendments | PO Box 820824 | | Philadelphia | PA | 19182 |
| 66. | CVPartners, Inc. | Contingency Recruiter Agreement | 7076 Solutions Center | | Chicago | IL | 60677-7000 |
| 67. | Cynthia Elkins | Consulting Agreement and Exhibit A | 595 Church Street | | Mountainview | CA | 94041 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 68. | Dante Ricci, Ph.D | Dante Ricci, Ph.D, Consulting Agreement | 5426 Plumas Ave | | Richmond | CA | 94804 |
| 69. | David van Duin, M.D. | David van Duin, M.D., Consulting Agreement | 2521 Buxton Court | | Chapel Hill | NC | 27514 |
| 70. | DavosPharma | Master Services Agreement | 600 E. Crescent Avenue | | Upper Saddle River | NJ | 7458 |
| 71. | Definitive Healthcare, LLC | License Agreement | 550 Cochituate Road | Unit 4 | Framingham | MA | 1701 |
| 72. | Deloitte Consulting LLP | AMS Engagement Letter | 4022 Sells Drive | | Hermitage | TN | 37076 |
| 73. | DGA Architech Inc | Service Agreement - 4th Floor Formulation | 550 Ellis Street | | Mountain View | CA | 94043 |
| 74. | Distance Learning Providers, Inc. | Distance Learning Providers, Inc., MSA Exhibit A | 800 Wilshire Blvd | Suite 200 | Los Angeles | CA | 90017 |
| 75. | DocuSign, Inc. | DocuSign, Order Form | 221 Main St #1550 | | San Francisco | CA | 94105 |
| 76. | Dohmen Life Science Services, LLC | Statement of Work | 24740 Network Place | | Chicago | IL | 60673-1247 |
| 77. | Dotmatics, Inc. | Hosted Software Agreement | Windhill | | Bishop's Stortford | United Kingdom | CM 23 2ND |
| 78. | Dr. Andrew Shorr | Dr. Andrew Shorr, Consulting Agreement | 9005 Cherbourg Dr | | Potomac | MD | 20854 |
| 79. | DR/Decision Resources, LLC | License Agreement | 100 District Avenue | Suite 213 | Burlington | MA | 1803 |
| 80. | dtw Research, Inc. | Subscription Letter | 4812 First Coast Hwy | | Fernandina Beach | FL | 32034 |
| 81. | d-Wise Technologies, Inc. | d-Wise Technologies, Inc., Master Services Agreement and SOW 1 | 1500 Perimeter Park Dr Suite 150 | | Morrisville | NC | 27560 |
| 82. | Dymaxium Healthcare Innovations, Ltd. | Master Service Agreement and SOW | 180 John Street | Suite 214 | Toronto | Canada | M5T 1X5 |
| 83. | EAN Services, LLC | EAN Services, LLC, Participation Addendum | – | | – | – | – |
| 84. | Educational Resource Systems, Inc. | ERS – Statement of Work #3 (OPAT) | 2 Bridge Avenue | Suite 623 | Red Bank | NJ | 7701 |
| 85. | Eliana Saxon Armstrong | Eliana Saxon Armstrong, Consulting Agreement | – | | – | – | – |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 86. | Elsevier Office of Continuing Medical Education | Grant Agreement | 1600 John F. Kennedy Blvd, Ste # 1800 | | Philadelphia | PA | 19103 |
| 87. | EMH Consulting LLC | Consulting agreement | 17 Smith Avenue | | Lexington | MA | 2421 |
| 88. | Engine Room Consulting Services, Inc | Outsourcing Services Agreement | 4725 First Street | | Pleasanton | CA | 94566 |
| 89. | Erika Ammirati | Erika Ammirati, Consulting Agreement | 575 Shirlynn Court | | Los Altos | CA | 94022 |
| 90. | ESTEVE QUIMICA, SA | MSA GMP & Exhibits | AVDA, MARE DE DEU DE MONTSERRAT, 12 | | Barcelona | Spain | 8024 |
| 91. | EUCAST | Master Services Agreement | – | | – | – | – |
| 92. | Eurofins Lancaster Laboratories Inc | Master Services Agreement w/Amendments | 2425 New Holland Pike | | Lancaster | PA | 17601 |
| 93. | European Congress of Clinical Microbiology and Infectious Diseases | Invoice | – | | – | – | – |
| 94. | Experimentica Ltd. | MSA Exhibit B | Microkatu 1 | Kuopio | Kuopio | Finland | 70211 |
| 95. | Explora BioLabs A California Corporation | Vivarium Service Agreement | 11175 Flintkote Avenue | Suite B | San Diego | CA | 92121 |
| 96. | Fabbrica Lombarda Amino Acid, S.P.A. | Fabbrica Lombarda Amino Acid, S.P.A., Master Service Agreement Exhibit A | – | | – | – | – |
| 97. | FFF Enterprises, Inc. | ZEMDRI Returns Exception Letter (Wesley) | PO Box 840150 | | Los Angeles | CA | 90084-0150 |
| 98. | Fisher Clinical Services, Inc. | Fisher Clinical Services, Inc., Master Services Agreement | – | | – | – | – |
| 99. | Flagship Facility Services, Inc. | Flagship Facility Services, Services Agreement Exhibit A Amendment 1 | 1050 N 5th Street | | San Jose | CA | 95112 |
| 100. | Foundry & Lux | Event Agreement | 151 Oyster Point Blvd | | South San Francisco | CA | 94080 |
| 101. | Frank Rimerman + Co., LLP | MCA Work Order 2 | Dept 2626 | PO Box 39290 | Los Angeles | CA | 90039-0290 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 102. | FreeThink Technologies, Inc. | FreeThink Technologies, Inc., Master Services Agreement | – | | – | – | – |
| 103. | Friedland Strategic Consulting, LLC | Consulting agreement | 52 Golden Aster Court | | Brisbane | CA | 94005 |
| 104. | Full Service Technology Solutions, Inc. | MSA | 44061 Old Warm Springs Blvd. | | Fremont | CA | 94536 |
| 105. | Gary Fujimoto | Purchase Order | 20 Farm Road | | Los Altos | CA | 94024 |
| 106. | George Miller, PhD | George Miller, PhD, Consulting Agreement Exhibit A Amendment 1 | 855 Partridge Ave | | Menlo Park | CA | 94025 |
| 107. | Global Healthcare Exchange (Vendormate) | Global Healthcare Exchange (Vendormate), Master Services Agreement | 1315 W Century Drive, Suite 100 | | Louisville | CO | 80027 |
| 108. | Good Apple Publishing, LLC | Good Apple Digital, LLC, Master Services Agreement | 200 Park Avenue South | Suite 1501 | New York | NY | 10003 |
| 109. | Greenleaf Health, Inc. | Greenleaf, Professional Services Agreement | 1055 Thomas Jefferson St NW, Suite 450 | | Washington | DC | 20007 |
| 110. | Groupaya, Inc. | Retainer Agreement | 424 Alvarado Street | | San Francisco | CA | 94114 |
| 111. | Hartford Hospital | Hartford Hospital, MSA Exhibit G Amendment 1 | 80 Seymour Street | | Hartford | CT | 6102 |
| 112. | HawkPartners LLC | HawkPartners, LLC, Consulting Agreement | 101 Huntington Ave, Suite 2201 | | Boston | MA | 2199 |
| 113. | Heritage Global Partners, Inc. | Heritage Global Partners, Inc., Exclusive Auction Agreement | – | | – | – | – |
| 114. | Highpoint Solutions, LLC | Managed Services | 301 E Germantown Pike | | East Norriton | PA | 19401 |
| 115. | Hill & Hill Quality Associates, LLC | Consulting Agreement | 20643 Crow Creek Rd., Suite 100 | | Castro Valley | CA | 94552 |
| 116. | Hire Power Professional Services | Hire Power, Consultant Staffing Agreement Exhibit A (Feng Jin) | 41207 N Panther Creek Trail | | Anthem | AZ | 85086 |
| 117. | Hospira, Inc. | Pfizer CenterOne Plazomicin Project Kalamazoo Statement of Work | PO Box 100539 | | Atlanta | GA | 30384-0539 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 118. | Hovione International Limited | Work Plan C-04 A#1 | Sete Casas 2674-506 | | Loures | PT | 2674-506 |
| 119. | HPM Systems, Inc. | HPM Systems Inc., Quote 218272 (Calibration Services 2018-2019) | 70 Saratoga Ave., Suite 200 | | Santa Clara | CA | 95051 |
| 120. | Hypha Discovery Limited | Hypha Discovery Limited, Master Services Agreement | 957 Buckingham Avenue | | Slough | United Kingdom | SL1 4NKL |
| 121. | Ian Wilding Associates Limited | Consulting Agreement Exhibit A | 10Glebe Street | Beeston | Nottingham, Notts | GB | NG9 1BZ |
| 122. | ibacon GmbH | ibacon GmbH, Master Services Agreement | Arheilger Weg 17 | | Rossdorf | DE | 64380 |
| 123. | Icagen, Corp. | MSA Exhibit F | 1900 Glades Road , Suite 265 | | Boca Raton | FL | 33431 |
| 124. | Icon Clinical Research Ltd-Ireland | Master Services Agreement | South County Business Park, Carmanhall and Leopardstown | | Dublin | Ireland | 18 |
| 125. | Impact Clinical, LLC | Impact Clinical, Exhibit F Amendment 2 | 1835A South Centre City Pkwy | | Escondido | CA | 92025 |
| 126. | Institut fuer biologische Analytik und Consultin IBACON GmbH | ibacon, Master Services Agreement Exhibit A | Arheilger Weg 17 | | Rossdorf | DE | 64380 |
| 127. | Institute for Clinical Pharmacodynamics, Inc. | ICPD, MSA Exhibit T Amendment 2 | 242 Broadway | Suite 101 | Schenectady | NY | 12305 |
| 128. | Intelligize, Inc. | Intelligize, Inc. Order Form | 1920 Association Drive, Suite 200 | | Reston | VA | 20191 |
| 129. | IntelliSyn Pharma, Inc. | Internap, Inc., Master Services Agreement | 7171 Frederick-Banting | Laboratory 3314 | Montreal | Canada | H4S 1Z9 |
| 130. | International Health Mgt Associates, Inc. | Master Services Agreement | 2122 Palmer Drive | | Schaumburg | IL | 60173 |
| 131. | Ionis Pharmaceuticals, Inc. | Ionis Pharmaceuticals, License Agreement | 2855 Gazelle Court | | Carlbad | CA | 92010 |
| 132. | IQVIA AG | IQVIA, Statement of Work (ZEMDRI Wave 1 ATU) | 100 IMS Drive | | Parsippany | NJ | 7054 |
| 133. | JadeBio, Inc. | JadeBio, Inc., Master Services Agreement | 505 Coast Blvd South, Ste 310 | | La Jolla | CA | 92037 |
| 134. | JAMES A. POLLI, PHD, RPH | Consulting Agreement | 12115 Frederick Road | | Ellicott City | MD | 21042 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 135. | JH Technologies | Service/Repair Estimate | 213 Hammond Ave | | Fremont | CA | 94539 |
| 136. | Jochum Shore & Trossevin PC | Engagement Letter | 1100 H Street NW | Suite 410 | Washington | DC | 20005 |
| 137. | Jones Microbiology Institute, Inc. | Master Services Agreement | 345 Beaver Kreek Centre, Suite A | | North Liberty | IA | 52317 |
| 138. | JSJD Media LLC | JSJD Media, LLC d/b/a Association Revenue Partners, Master Services Agreement | 500 N Central Expressway, | Suite 231 | Plano | TX | 75074 |
| 139. | KBA Docusys, Inc | KBA Docusys, Lease and Maintenance Agreement | PO Box 41602 | | Philadelphia | PA | 19101-1602 |
| 140. | Kindle Communications, LLC | Kindle Communications, LLC, Master Services Agreement | 168 N. Clinton Street | 6th Floor | Chicago | IL | 60661 |
| 141. | Kirksville Web Design | Kirksville Web Design, Master Services Agreement | – | | – | – | – |
| 142. | Kovanus, Inc. | Contingency Recruiter Agreement | 2000 Crow Canyon Pl # 250 | | San Ramon | CA | 94538 |
| 143. | KPMG | Startup Services Engagement Letter | 3 Chestnut Ridge Road | | Montvale | NJ | 7645 |
| 144. | Kristie Kooken | Kristie Kooken, Consulting Agreement | 5160 Diamond Heights | Blvd. C101 | San Francisco | CA | 94131 |
| 145. | Kristin Lowland Lanzi | Kristin Lanzi, Consulting Agreement | 162 Dorado Ter | | San Francisco | CA | 94112 |
| 146. | Kurzweil and Associates | Consulting Agreement Exhibit A Amendment 1 | 204 Riviera Dr. | | San Rafael | CA | 94960 |
| 147. | Laboratorio Hidalgo | Laboratorio Hidalgo, Clinical Trial Agreement Amendment 2 | – | | – | – | – |
| 148. | Laboratory Specialists, Inc. | Master Services Agreement | 26214 Center Ridge Road | | Westlake | OH | 44145 |
| 149. | LabWorks Equipment Service, Inc. | Service Proposal | 102 Hamilton Drive, Ste. B | | Novato | CA | 94949 |
| 150. | Lhasa Limited Registered Office | Variations Agreement | Granary Wharf'house | | Leeds | UK | |
| 151. | Ligand Pharmaceuticals | Crystal Bioscience, Inc., Collaboration Agreement | 5980 Horton Street, Suite 405 | | Emeryville | CA | 94608 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 152. | Lindquist, LLP | Lindquist, LLP, 401k Engagement Letter | 5000 Executive Parkway, Suite 400 | | San Ramon | CA | 94583 |
| 153. | Little Rumble | Little Rumble, Master Services Agreement | 59 Monte Vista Avenue | | Oakland | CA | 94611 |
| 154. | Lucy-Panganiban-Lustan | Lucy Panganiban-Lustan, Consulting Agreement | 5527 Bordeaux Court | | Vallejo | CA | 94591-6308 |
| 155. | Lutz Weveliseip | Consulting Agreement | Roistauden 7 | | Steinen | Germany | 79585 |
| 156. | Macromoltek, Inc. | Macromoltek, Inc., Master Services Agreement and Exhibit A | 2110 Hartford Road | | Austin | TX | 78703 |
| 157. | MAD-ID | Grant Request | 537 Calico Retreat | | Mount Pleasant | SC | 29464 |
| 158. | Mary Poulhazan | Mary Poulhazan, Consulting Agreement | 2960 Rollingwood Drive | | San Bruno | CA | 94066 |
| 159. | Mason Professional Services, LLC | Mason Professional Services, LLC, Consulting Agreement | PO Box 170280 | | Chicago | IL | 60617 |
| 160. | Mast International Division | Master Services Agreement | Mast House, Derby Road, Bottle | | Merseyside | United Kingdom | L20 1EA |
| 161. | Master Control Inc. | End User License Agreement | 6350 South | Suite 300 East | Salt Lake City | UT | 84121 |
| 162. | Maxygen | Maxygen, Bill of Sale | – | | – | – | – |
| 163. | Medical Communication Technologies, Inc | IntegriChain, Inc., MSA and Project Addendum | 201 South Maple Avenue | | Ambler | PA | 19002 |
| 164. | Medical Media Services, Inc. | Medical Media Services, Inc., Master Services Agreement | 43 Briarcliff Rd. | | Larchmont | NY | 10538 |
| 165. | Medscape, LLC | Grant Agreement | 12186 Collections Center Drive | | Chicago | IL | 60693 |
| 166. | Metrohm USA, Inc. | Material Transfer Agreement | 6555 Pelican Creek Circle | | Riverview | FL | 33578 |
| 167. | Michael Fischbach, PhD | Michael Fischbach, PhD, Consulting Agreement | 950 Casanueva Place | | Stanford | CA | 94305 |
| 168. | Michael Jung, PhD | Michael Jung, Ph.D, Consulting Agreement, Exhibit C | 2335 Manning Avenue | | Los Angeles | CA | 90064 |
| 169. | Michal Nowicki | Michal Nowicki, Consulting Agreement | Bordowskiego 9 m.5 | | Czestochowa | Poland | PL42-218 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 170. | Microgenics Corp | Collaborative Development and Commercialization Agreement | 46500 Kato Road | | Fremont | CA | 94538 |
| 171. | Micron Research Limited | The Micron Group Ltd, Master Services Agreement | Alexander House, 38 Forehill | | Cambridgeshire | GB | CB7 4AF |
| 172. | Microsoft Corporation | Microsoft, Volume Licensing Customer Price Sheet-0737229.001 | One Microsoft Way | | Redmond | WA | 98052-6399 |
| 173. | MidWinter Solutions Limited | MidWinter Solutions Limited, Master Service Agreement | 10 Granary Wharf Business Park | Wetmore Rd, Burton-on-Trent | Stratfordshire | UK | DE14 1DU |
| 174. | Mimecast North America, Inc. | Mimecast (SHI), Quote 15786673 | 480 Pleasant Street | Suite C10 | Watertown | MA | 2472 |
| 175. | Modality Solutions, LLC | Modality Solutions, LLC., Master Services Agreement | 1238 Mossy Oak Drive | | League City | TX | 77573 |
| 176. | Moss Adams LLP | 2018 SOX Compliance Engagement Letter | 101 2nd St Suite 900 | | San Francisco | CA | 94105 |
| 177. | Motus, LLC | Order Form - Reimbursement Solution | Two Financial Center, 60 South Street | 12th Floor | Boston | MA | 2111 |
| 178. | MPI Research, Inc. | Archived Materials Report | 54943 N Main St. | | Mattawan | MI | 49071 |
| 179. | Napoleone Ferrara, MD | Napoleone Ferrara, SAB Amendment 1 | 550 Front Street, # 1103 | | San Diego | CA | 92101 |
| 180. | National Institute of Allergy and Infectious Diseases | National Institute of Allergy and Infectious Diseases, Division of Microbiology and Infectious Diseases | – | | – | – | – |
| 181. | National Institutes of Health | National Institutes of Health, NIH Registration Form | – | | – | – | – |
| 182. | NDA Regulatory Development, Inc. | Consulting agreement | One Broadway, 14th Floor | | Cambridge | MA | 2142 |
| 183. | New Cingular Wireless PCS, LLC | Service agreement | – | | – | – | – |
| 184. | Nexus Contingent Workforce | Nexus Contingent Workforce, Services Agreement | 4901 Morena Blvd, Suite 122 | | San Diego | CA | 92117 |
| 185. | Nine41 Consulting, Inc. | Consulting Quote | 2518 E. Lincoln Lane | | St. George | UT | 84790 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 186. | Nor-Cal Moving Services | NorCal Moving - 4th Floor Consolidation Move | 3129 Corporate Place | | Hayward | CA | 94545 |
| 187. | Novome Biotechnologies, Inc. | Novome, Bill of Sale | – | | – | – | – |
| 188. | Nuventra, Inc. | Nuventra, Inc., Master Services Agreement | – | | – | – | – |
| 189. | Okta, Inc. | Okta, Master Subscription Agreement | 301 Brannan Street | | San Francisco | CA | 94107 |
| 190. | Opats LLC | OPATS LLC, Master Services Agreement | 31829 RANCHO VISTA ROAD | | Temecula | CA | 92592 |
| 191. | Operational Compliance Solutions, LLC | OCS - Consulting Agreement Exhibit B | 506 Blair Ave. | | Piedmont | CA | 94611 |
| 192. | Optiva Biotechnology | Opus Regulatory, Inc., Consulting Agreement Exhibit A Amendment 3 (Nancy Nazari) (agr102557) 27Feb19_FE | 245 1st Street, 18th Floor | | Cambridge | MA | 2142 |
| 193. | Orvera Scientific Ltd. | Consulting Agreement | 38 Eaton Avenue | | Toronto | Canada | M4J 2Z5 |
| 194. | Paradigm Structural Engineers, Inc. | Consulting Agreement | 639 Front Street | 4Th Floor | San Francisco | CA | 94111 |
| 195. | Parexel International, LLC | Parexel, Service Agreement Exhibit H Amendment 1 | The Quays, 101-105 Oxford Road | | Uxbridge | UK | UB8 1LZ |
| 196. | Patricia Nash | Consulting Agreement Amendment 2 | 675 29th Ave | | San Mateo | CA | 94403 |
| 197. | Paul B. Watkins, Inc. | Paul B. Watkins, Consulting Agreement Exhibit B | 116 Carolina Ave | | Chapel Hill | NC | 27514 |
| 198. | PCI of Illinois | Commercial packing agreement | Baarerstrasse 113a | | ZUG | CH | 6300 |
| 199. | PerkinElmer Informatics, Inc. | Service Estimate EMS6162 | 710 Bridgeport Ave | | Shelton | CT | 6484 |
| 200. | Pfizer, Inc. | Letter of Engagement | 235 East 42nd Street | | New York | NY | 10017 |
| 201. | Pharmacology Discovery Services Services Taiwan, Ltd. | Statement of Work | – | | – | – | – |
| 202. | PharmaLex GmbH | Consulting Agreement | Bahnstraße 42–46 | | Friedrichsdorf | Germany | 61381 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 203. | Pharm-Olam International, Ltd | Pharm-Olam International, Ltd, Master Services Agreement | 450 N. Sam Houston Parkway #250 | | Houston | TX | 77060 |
| 204. | PM Biosolutions, Inc | PM Biosolutions, Consulting Agreement, Exhibit D | 86 Keith Street | | St. Augustine | FL | 32084 |
| 205. | Politico LLC | Service Agreement | 1000 Wilson Blvd | | Arlington | VA | 22209 |
| 206. | Powered Research LLC | MSA Exhibit B | PO Box 14466 | | RTP | NC | 27709 |
| 207. | PPD Development | Analysis of Plazomicin SulfateDrug Product | 26361 Network Place | | Chicago | IL | 60673 |
| 208. | Prashant Donthamsetti | Consulting Agreement Exhibit A | 442 Cavour St. | | Oakland | CA | 94618 |
| 209. | PrimeVigilance Limited | Master service agreement | 26-28 Frederick Sanger Road | | Guilford, Surry | UK | GU2 7YD |
| 210. | Princeton Search, LLC | Service Agreement and SOW Amendment #1 | 23 Orchard Rd, Suite 103 | | Skillman | NJ | 8558 |
| 211. | ProCE, Inc. | Grant Agreement - CME | 848 W. Bartlett Road | Suite 3E | Bartlett | IL | 60103 |
| 212. | Protiviii Inc. | Consulting agreement | 2884 Sand Hill Road, Suite 200 | | Menlo Park | CA | 94025 |
| 213. | Quintara Discovery, Inc. | Quintara Discovery, Inc., MSA Amendment 1 | 969-G Edgewater Blvd. # 695 | | Foster City | CA | 94404 |
| 214. | Quintiles IMS Incorporated | Quintiles IMS, Pricing Insights Proposal | 4820 Emperor Blvd | | Durham | CT | 27703 |
| 215. | Red House Consulting, LLC | Red House Consulting, LLC, Scope of Work 2018 | 2830 Russell Street | | Berkeley | CA | 94705 |
| 216. | Reed Smith, LLP | Letter of Agreement | 101 2nd St #1800 | | San Francisco | CA | 94105 |
| 217. | Rees Scientific | Rees Scientific, Environmental Monitoring –Quote 70094RQ2 | 1007 Whitehead Road Ext | | Trenton | NJ | 8638 |
| 218. | Region Kronoberg | EUCAST & Region Kronoberg, Study Proposal | Nygatan 20, 352 31 | | Vxzjo | Sweden | 351 85 |
| 219. | Remel, Inc. | Master Services Agreement - Thermo Fisher Scientific | 12076 Santa Fe Trail Drive | | Lenexa | KS | 66215 |
| 220. | ResearchTriangle Institute dba RTI International; RTI Health Solutions | RTI Health Solutions, Master Service Agreement Exhibit A | PO Box 121294 | | Research Triangle Park | NC | 27709 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 221. | Resources Connection Inc. | Master Services Agreement, Exhibit A | 17101 Armstrong Avenue, Suite 100 | | Irvine | CA | 92614 |
| 222. | RevHealth, LLC | RevHealth, LLC, Consulting Agreement Exhibit B | 55 Bank Street | | Morristown | NJ | 7960 |
| 223. | Right Management, Inc | Right Management, Master Services Agreement | 24677 Network Place | | Chicago | IL | 60673-1246 |
| 224. | Rock Solid Meetings and Events | Consulting Agreement Exhibit B Amendment #1 | 321 High School Rd, Suite D3 / 103 | | Bainbridge Island | WA | 98110 |
| 225. | S. Hanessian Consultants, Inc. | S. Hanessian Consultants Inc., Consulting Agreement Exhibit B | 65 Gables Court | | Beaconsfield | Canada | H9W 5H3 |
| 226. | SADA Systems, Inc. | Ordering Document | 5250 Lankershim Blvd #620 | | North Hollywood | CA | 91601 |
| 227. | Sana Biotechnology, Inc. | Sana Biotech, Notice of Term Commencement | – | | – | – | – |
| 228. | SAS Institute, Inc. | SAS Institute, Inc., MLA Amendment 2 to Services Supplement #3 | 100 SAS Campus Drive | | Cary | NC | 27513 |
| 229. | Savills Studley, Inc. | Project Advisory Services Agreement | 150 California Street, 14th Floor | | San Francisco | CA | 94111 |
| 230. | SC Builders, Inc. | Service Agreement TI Mavericks Conference Room Change Order #1 | 910 Thompson Place | | Sunnyvale | CA | 94085 |
| 231. | Schoenherr Consulting, LLC | Schoenherr Consulting, LLC, Consulting Agreement | 1 Hawthorne Street | 18D | San Francisco | CA | |
| 232. | Science Exchange Inc. | Master Services Agreement | 555 Bryant Street | Suite 939 | Palo Alto | CA | 94301 |
| 233. | Scout RFP, Inc. | Scout RFP, Order Form 2 | 318 Brannan Street, | Floor 1 | San Francisco | CA | 94107 |
| 234. | Sequoia Consulting Group, LLC | Consulting Agreement Exhibit A Amendment 1 | 125 N. Acacia Ave | Suite 101 | Solana Beach | CA | 92075 |
| 235. | SeraCare Life Sciences, Inc. | SeraCare Life Sciences, Inc., Master Services Agreement | 37 Birch St | | Milford | MA | 1757 |
| 236. | Shahriar Mobashery | Chemistry Advisory Board Meeting Agreement - Shahriar Mobashery | 14542 Heatherton Dr. | | Granger | IN | 46530 |
| 237. | Shanghai Mediclion Inc. | MSA Exhibit D | 585 Chuanda Road | | Shanghai | China | 201299 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 238. | Shuang Wu | Shuang Wu, Consulting Agreement | 411 Imperial Dr | | Pacifica | CA | 94044 |
| 239. | Simon-Kucher & Partners, LLC | Simon-Kucher & Partners, LLC, Master Services Agreement | One Canal Park | | Cambridge | MA | 2141 |
| 240. | Simulations Plus, Inc. | Consulting Agreement and Exhibit A | 42505 Tenth Street West | | Lancaster | CA | 93534 |
| 241. | Sky Insurance Technologies, LLC | Sky Insurance Technologies, Services Agreement | 18 Interchange Blvd | Suite A | Greenville | SC | 29607 |
| 242. | Slack Technologies, Inc. | Slack Technologies, Inc. Renewal | 6900 Grove Rd | | Thorofare | NJ | 8086 |
| 243. | Society of Infectious Diseases Pharmacists | Purchase Order | 1300 Wilson Blvd., Suite 300 | | Arlington | VA | 22209 |
| 244. | Softworld, Inc. | SoftWorld, Inc. MSA Exhibit R (AGR10546) 08MAR19_FE | 281 Winter Street, Suite 301 | | Waltham | MA | 2451 |
| 245. | SP Scientific | Service Agreement | PO Box 48330 | | Newark | NJ | 7101 |
| 246. | Spanning Cloud Apps LLC | Subscription Agreement | 33117 Collection Center Drive | | Chicago | IL | 60693 |
| 247. | SRI International | SRI International, MSA Task Order 9 | 333 Ravenswood Ave | | Menlo Park | CA | 94025 |
| 248. | Steeprock, Inc. | SteepRock, Inc., Statement of Work | 67 Lower Church Hill Road | | Washington | CT | 6794 |
| 249. | Stevens, Blair & Company LLC | Stevens, Blair and Company, LLC, Consulting Agreement, Exhibit B | 1660 Summerhouse Lane #702 | | Sarasota | FL | 34242 |
| 250. | Stock & Option Solutions, Inc. | Stock & Options Solutions, MSA Exhibit A | 1475 S. Bascom Ave. | Suite 203 | Campbell | CA | 95008-0603 |
| 251. | Strickland Quality Assurance Ltd | Consulting agreement | Windswept, Holywell, St Ives | | Cambridgeshire | United Kingdom | PE27 4TQ |
| 252. | Sundia Meditech Company, Ltd. | MSA Exhibit H | Blding 8, 249 Faladi Road, Pilot Free Trade Zone | | Shanghai | CN | 201203 |
| 253. | Switch, Ltd. | Order Form | 6795 S. Edmond St. | | Las Vegas | NV | 89118 |
| 254. | Sygnature Discovery Limited | Sygnature Discovery Limited, Master Services Agreement | Biocity | | Nottingham | GB | NG1 1GF |
| 255. | Takmos LLC (dba Renee C Hartsook) | Takmos LLC, Consulting Agreement Exhibit A | 4744 Telephone Road | Ste. 3-195 | Ventura | CA | 93003 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 256. | Teem Technologies, Inc | Teem Technologies, Inc., Renewal Agreement (AGR10533) 28Feb19_FE | 224 South 200 West suite 100 | | Salt Lake City | UT | 84101 |
| 257. | Tervela, Inc. | Tervela, Cloud FastPath Addendum 1 Order Form Subscription Renewal | 50 Milk Street | | Boston | MA | 2109 |
| 258. | The Big Quiz Thing, LLC | The Big Quiz Thing, LLC, Performance Agreement | 28 2ns Street, 3rd Floor | | San Francisco | CA | 94105 |
| 259. | The Hibbert Company | Master Services Agreement Exhibit A | 400 Pennington Ave | | Trenton | NJ | 8618 |
| 260. | The Lyndon Group, LLC | Lyndon Group MSA and Exhibit A | 220 Newport Center Dr | #11-529 | Newport Beach | CA | 92660 |
| 261. | The McMahon Group LLC | McMahon Group, Master Services Agreement, Exhibit A | 545 West 45th Street - 8th Floor | | New York | NY | 10036-3409 |
| 262. | The McManus Group, LLC | Consulting Agreement | 610 10th ST NW, Suite 300 | | Washington | DC | 20001 |
| 263. | The Piras Group | The Piras Group, Master Services Agreement | 231 Marketplace, #534 | | San Ramon | CA | 94583 |
| 264. | Thermo | Statement of Work | 12088 Collections Center Drive | | Chicago | IL | 60693 |
| 265. | Thesaurus Information & Strategies, Inc. | Thesaurus Information & Strategies, Inc., MSA Exhibit A Amendment 1 | 885 North San Antonio Road | | Los Altos | CA | 94022 |
| 266. | Thomas Silhavy | Thomas Silhavy, SAB Amendment 1 | 22 Van Doren Way | | Belle Mead | NJ | 8502 |
| 267. | TM Consulting Services LLC | TM Consulting Services, Consulting Agreement Exhibit A Amendment 2 | 426 Antelope Drive | | Sedona | AZ | 86336 |
| 268. | Total Renal Research Inc. | Total Renal Research, Inc. d/b/a DaVita Clinical Research_Exhibit A (AGR10537) 22FEB19_FE | 21602 Vermont Ave | | Torrance | CA | 90502 |
| 269. | Tracelink, Inc. | Enterprise Agreement | 400 Riverpark Drive, Suite 200 | | North Reading | MA | 1864 |
| 270. | TransPerfect Global, Inc. | Master Service Agreement | 3 Park Avenue, 39th Floor | | New York | NY | 10016 |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 271. | Trinity Partners, LLC | Trinity Partners, LLC, Consulting Agreement Amendment 1 | 230 Third Avenue | | Waltham | MA | 2451 |
| 272. | Two Labs Marketing, LLC | Independent Contractor Agreement | 110 Riverbend Ave | | Powell | OH | 43065 |
| 273. | U.S. Department of Veterans Affairs | VA, Cooperative Research and Development Agreement (CRADA) | PO Box 76, Bldg. 37 | 1st Ave, North of Cermak Road | Hines | IL | 60141 |
| 274. | Unanet, Inc. | License Proposal | 22970 Indian Creek Drive | Suite 200 | Dulles | VA | 20166 |
| 275. | University of Houston | University of Houston, Material Transfer Agreement | – | | – | – | – |
| 276. | University of Kentucky | University of Kentucky (Burgess), Material Transfer Agreement | – | | – | – | – |
| 277. | University of Pittsburgh | University of Pittsburgh, Investigator Initiated Research Agreement | 116 Atwood Street, Suite 201 | | Pittsburgh | PA | 15260 |
| 278. | University of South Florida Board of Trustees | University of South Florida Board of Trustees, Material Transfer Agreement | 3702 Spectrum Blvd, Suite 165 | | Tampa | Fl | 33612 |
| 279. | UpCounsel Inc | UpCounsel, Inc._Exhibit A Amendment No. 1_21Feb19 | 275 Sacramento Street, 3rd Floor | | San Francisco | CA | 94105 |
| 280. | Validated Cloud Inc. | Validated Cloud, Order Form #20171221-00 | 330 Bear Hill Road, Ste 205 | | Waltham | MA | 2451 |
| 281. | Veeva System, Inc. | Managed Services | 4280 Hacienda Drive | | Pleasanton | CA | 94588 |
| 282. | Venture Technologies | Consulting Agreement and Exhibit A | Dept 2357 PO Box 11407 | | Birmingham | AL | 35246 |
| 283. | Veolia ES Technical Solutions | Environmental Services Agreement | 1125 Hensley St | | Richmond | CA | 94801 |
| 284. | Vertical Ergonomics | Vertical Ergonomics, Consulting Agreement Exhibit A Amendment 1 | 476 Ridgecrest Circle | | Livermore | CA | 94551 |
| 285. | Viva Biotech (Shanghai) Ltd | Viva Biotech (Shanghai), Master Services Agreement | 334 Aidisheng Rd. High-Tech Park | | Zhangjiang | China | 201203 |
| 286. | Wemberly Scientific, Inc. | Wemberly Scientific, Inc., Consulting Agreement | – | | – | – | – |

| # | Contract Counterparty | Contract/Lease Title | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| 287. | Workday, Inc. | MSA Order Form 00131021.0 | 6230 Stoneridge Mall Rd | | Pleasanton | CA | 94588 |
| 288. | Xtelesis Corporation | Xtelesis Corporation (VOIP) | PO Box 712269 | | Cottonwood Heights | UT | 84171 |
| 289. | Yourway Transport, Inc. | Yourway Transport, Inc. - SOW | 6681 Snowdrift Road | | Allentown | PA | 18106 |
| 290. | Zendesk, Inc. | Zendesk, 2018 Renewal | 1019 Market St | | San Francisco | CA | 94103 |
| 291. | Zoom Video Communications, Inc. | Zoom, Renewal 2018-2019 AmendmentQ274574 | 55 Almaden Blvd., Suite 600 | | San Jose | CA | 95113 |
| 292. | ZS Associates, Inc. | ZS Associates Inc. Consulting agreement Exhibit K Amendment 1 (Judith Kulich) | 400 South El Camino Real | | San Mateo | CA | 94402 |
| 293. | Mayo Foundation | Collaboration Agreement | – | | – | – | – |
| 294. | John Hoskins | Consulting agreement | – | | – | – | – |
| 295. | Atrea, Inc. | Consent to Sublease Agreement | – | | – | – | – |
| 296. | Oracle America, Inc. | Ordering Document | – | | – | – | – |

**COMPANY OWNED INTELLECTUAL PROPERTY, COMPANY USED
INTELLECTUAL PROPERTY AND IP AGREEMENTS**

## Company Owned Intellectual Property

Please see Schedule 2.1(c), which information set forth therein is incorporated herein by reference.

## Company Used Intellectual Property

1. License Agreement, dated as of January 25, 2006, by and between Achaogen, Inc. and Ionis Pharmaceuticals, Inc.

2. In the ordinary course of entering into agreements with our vendors, research collaborators and other business partners, the Seller grants and receives certain limited licenses to Intellectual Property related to or arising from such agreements.

## IP Agreements

1. Consulting Agreement, dated as of November 22, 2016, by and between Achaogen, Inc. and Venture Technologies.

2. End User License Agreement, dated as of September 1, 2017, by and between Achaogen, Inc. and Master Control Inc.

3. G Suite Ordering Document 100 Enterprise Licenses, dated as of July 31, 2017, by and between Achaogen, Inc. and SADA Systems, Inc.

4. G Suite Ordering Document 50 Enterprise Licenses, dated as of April 11, 2018, by and between Achaogen, Inc. and SADA Systems, Inc.

5. License Agreement, dated as of January 25, 2006, by and between Achaogen, Inc. and Ionis Pharmaceuticals, Inc.

6. License Agreement, dated as of January 17, 2018, by and between Achaogen, Inc. and DR/Decision Resources, LLC.

7. License Agreement, dated as of February 9, 2018, by and between Achaogen, Inc. and DR/Decision Resources, LLC.

8. License Agreement, dated as of September 20, 2017, by and between Achaogen, Inc. and DR/Decision Resources, LLC.

9. License Agreement, dated as of December 4, 2017, by and between Achaogen, Inc. and Definitive Healthcare, LLC.

10. License Proposal, dated as of April 3, 2018, by and between Achaogen, Inc. and Unanet, Inc.

11. License Renewal, dated as of May 30, 2018, by and between Achaogen, Inc. and Clarivate Analytics, LLC.

12. Order Form 3 Part 11 Licenses, dated January 5, 2017, by and between Achaogen, Inc. and DocuSign, Inc.

13. Order Form 1 Part 11 License dated September 30, 2017, by and between Achaogen, Inc. and DocuSign, Inc.

14. Ordering Document 300 Enterprise Licenses, dated as of June 9, 2017, by and between Achaogen, Inc. and SADA Systems, Inc.

15. Software License Proposal, dated as of May 29, 2018, by and between Achaogen, Inc. and Unanet, Inc.

16. User Increase Quote 1 CFM License, dated as of May 16, 2017, by and between Achaogen, Inc. and SADA Systems, Inc.

**SCHEDULE 3.9(C)**

**INTELLECTUAL PROPERTY CLAIMS BROUGHT AGAINST THE SELLER**

Seller's ownership rights to Intellectual Property it developed under U.S. federally-funded research grants and contracts in connection with certain neglected diseases initiatives may be subject to certain rights that the government may have under applicable statute or the underlying contracts that govern such research grants.  Provisions in the Seller's U.S. government contracts, including its contracts with BARDA, may affect the Seller's intellectual property rights.

**SCHEDULE 3.10**

**TAXES**

1.  The Seller's 2018 property taxes related to its fixed assets are due in May 2019.

2.  The Seller received an extension to file its 2018 federal income taxes until October 15, 2019.

3.  The Seller received an extension to file its 2018 state income taxes until October 15, 2019.

**SCHEDULE 3.11**

**LEASED REAL PROPERTY**

1. Lease, dated as of August 12, 2016, as amended by that certain First Amendment, dated as April 7, 2017, and as further amended by that certain Second Amendment, dated as July 20, 2017, and as further amended by that certain Third Amendment, dated as August 17, 2017, and as further amended by that certain Fourth Amendment, dated as November 29, 2018, by and between AP3-SF2 CT SOUTH, LLC and Achaogen, Inc.

2. Sublease, dated as of January 25, 2019, by and between Achaogen, Inc. and Atreca, Inc.

3. Sublease, dated as of October 25, 2018, by and between Achaogen, Inc. and Sana Biotechnology, Inc.

4. Rental Agreement, dated as of January 15, 2019, by and between Achaogen, Inc. and Public Storage.

5. Rental Agreement, dated as of January 15, 2019, by and between Achaogen, Inc. and Public Storage.

## SCHEDULE 5.2

## OPERATION OF THE PLAZOMICIN BUSINESS

None.

# AMENDMENT NO. 1 TO
# ASSET PURCHASE AGREEMENT
## (Plazomicin)

This Amendment No. 1 (this "Amendment") to the Asset Purchase Agreement dated as of June 20, 2019, by and between Achaogen, Inc., a Delaware corporation (the "Seller"), and Cipla USA Inc., a Delaware corporation (the "Purchaser"), is made as of June 28, 2019. Purchaser and Seller are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, Purchaser and Seller wish to amend the Asset Purchase Agreement in the manner set forth in this Amendment.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained in the Asset Purchase Agreement and this Amendment and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, and intending to be legally bound hereby, the Parties hereby agree as follows:

**Section 1.**  Amendments to the Asset Purchase Agreement.

(a)  The definition of "Hovione Release" in Section 1.1 is hereby amended and restated to read as follows:

""Hovione Release" means (a) the written, unconditional release by Hovione, its Affiliates and Subsidiaries, and all of their respective current and former officers, directors, principals, employees, members, managers, advisors, attorneys, financial advisors, investment bankers, or agents, of all of their Claims, including all Claims arising from or in connection with the Hovione Agreement, the rejection by the Seller of the Hovione Agreement, and the Business, against the Seller, its estate, Affiliates and Subsidiaries, and all of their respective current and former officers, directors, principals, employees, members, managers, advisors, attorneys, financial advisors, investment bankers, or agents, in form and substance satisfactory to the Seller; or (b) a substantially similar release of all Claims arising from or in connection with the Hovione Agreement that goes into effect under the Sale Order as a result of the effectiveness of the New Hovione Agreement. The language set forth in Exhibit D to this Agreement shall be deemed sufficient for the Hovione Release if included in the Sale Order."

(b)  Section 2.1(b) is hereby amended and restated to read as follows:

Equipment.  The IT and computer equipment set forth on Schedule 2.1(b) hereto.

(c)  The amount "$4,650,000" set forth in Section 2.5(a) is hereby deleted and replaced with "4,800,000".

(d)     The date "June 28, 2019" set forth in Section 2.8 is hereby deleted and replaced with "July 18, 2019".

(e)     Section 5.9(b)(i) is hereby amended and restated to read as follows:

"(i)     cause the Bankruptcy Court to enter the Sale Order by no later than 11:59 p.m. prevailing Eastern time on July 18, 2019, subject to the second sentence of Section 10.2; and"

(f)     Section 5.9(b)(ii) is hereby amended and restated to read as follows:

"(ii)     consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event later than 11:59 p.m. prevailing Pacific time on or before July 19, 2019 (the "Outside Date")."

(g)     The last sentence of Section 5.11(a) is hereby deleted in its entirety.

(h)     Section 6.2(f) is hereby amended and restated to read as follows:

"Hovione Release. The Hovione Release must have been granted by Hovione or gone into effect under the Sale Order."

(i)     A new Section 5.17(h) is hereby added as follows:

"(h)     At the cost and expense of the Purchaser, promptly after the Closing, the Seller shall extract and otherwise cause all Purchased Assets that are stored or maintained by Box, Inc. to be transferred to the Purchaser or its designees."

(j)     The references to "Section 5.13" in the first and second sentences of Section 7.2(d) are hereby replaced with "Section 5.12".

(k)     The third sentence of Section 10.5 is hereby amended and restated to read as follows:

"The Purchaser may designate one or more Affiliates, including any special purpose entities that may be organized by the Purchaser for such purpose, to take title to or hold on behalf of the Purchaser, the Purchased Assets or any portion thereof and operate the business going forward, and upon written notice to the Seller of any such designation by the Purchaser, the Seller, at the cost and expense of the Purchaser, agrees to and/or cause its Affiliates to (as the case may be) provide all such assistance as may be reasonably required by the Purchaser in this regard and execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, the Purchaser's designees."

(l)        <u>Exhibit D</u> attached to this Amendment is hereby added to the Asset Purchase Agreement and the Table of Contents thereof.

(m)       <u>Schedule 2.1(b)</u> attached to this Amendment is hereby added to the Asset Purchase Agreement and the Table of Contents thereof.

(n)        <u>Schedule 2.1(c)</u> of the Asset Purchase Agreement is hereby amended and restated in its entirety with <u>Schedule 2.1(c)</u> attached to this Amendment.

**Section 2.**   <u>Limited Amendment</u>.  Except as specifically provided in this Amendment and as the context of this Amendment otherwise may require to give effect to the intent and purposes of this Amendment, the Asset Purchase Agreement shall remain in full force and effect. This Amendment is limited precisely as drafted and shall not constitute a modification, acceptance or waiver of any other provision of the Asset Purchase Agreement.

**Section 3.**   <u>Facsimile Signature; Counterparts</u>.  Facsimile or electronic transmission in portable document format of any signed original document or retransmission of any signed facsimile or electronic transmission in portable document format will be deemed the same as delivery of an original. This Amendment may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, but all of which shall constitute but one and the same agreement. Until and unless each Party to this Amendment has received a counterpart hereof signed by the other Parties, this Amendment shall have no effect and no Party to this Amendment shall have any obligation or right hereunder (whether by virtue of any other oral or written agreement or other communication).

**Section 4.**   <u>Governing Law</u>.  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

[SIGNATURES APPEAR ON THE FOLLOWING PAGES]

The Parties have executed and delivered this Amendment on the last date set forth in the preamble hereto.

**SELLER:**

ACHAOGEN, INC.

By: _____

Name: Blake Wise
Title: Chief Executive Officer

The Parties have executed and delivered this Amendment on the last date set forth in the preamble hereto.

**PURCHASER:**

CIPLA USA INC.

By: _____

Name: Nikhil Lalwani

Title: CEO – Cipla USA

# EXHIBIT D

## HOVIONE RELEASE LANGUAGE IN SALE ORDER

**Rejection of Hovione Agreement; Release of Hovione Claims**.  As agreed between the Debtor and Hovione Limited ("Hovione"), upon the effectiveness of a new supply agreement (which effectiveness shall occur no later than the Closing of the Sale to Buyer)  between Hovione and Buyer reflecting the terms agreed to between Hovione and Buyer at the Auction and otherwise reflecting the terms agreed to by Hovione and Buyer (the "New Hovione Agreement"), the Validation and Manufacturing Agreement, dated March 6, 2017, between the Debtor and Hovione, and all Work Plans (as defined therein), and all other agreements, instruments, or documents entered into or delivered in connection therewith, as any of the foregoing may have been amended, modified, or supplemented (the "Existing Hovione Agreement") shall automatically be rejected by the Debtor pursuant to section 365 of the Bankruptcy Code.  As further agreed between the Debtor and Hovione, upon the effectiveness of the New Hovione Agreement, (i) Hovione, its affiliates and subsidiaries, and all of their respective current and former officers, directors, principals, employees, members, managers, advisors, attorneys, financial advisors, investment bankers, or agents (collectively, the "Hovione Parties"), by way of this Sale Order, unconditionally release the Debtor, its estate, affiliates and subsidiaries, and all of their respective current and former officers, directors, principals, employees, members, managers, advisors, attorneys, financial advisors, investment bankers, and agents (collectively, the "Debtor Parties") and (ii) the Debtor Parties, by way of this Sale Order, unconditionally release the Hovione Parties, in each case from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever in connection with, or in any way relating to, the Debtor, the business or the Debtor's conduct thereof, or the Chapter 11 Case, including, without limitation, arising from or in connection with the Existing Hovione Agreement, the rejection by the Debtor of the Existing Hovione Agreement, the New Hovione Agreement, and any claims arising or which may otherwise be asserted under chapter 5 of the Bankruptcy Code, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, whether for tort, contract, violation of federal or state securities law or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the date of entry of this Sale Order.  Notwithstanding anything else herein to the contrary, if the New Hovione Agreement has not become effective as of the Closing of the Sale to Buyer under the Sale Agreement, Hovione's rights to assert Claims against the Debtor with respect to the rejection of the Existing Hovione Agreement are and shall be fully preserved.  Any Product (as defined in the Existing Hovione Agreement) and other materials in Hovione's possession as of the date of this Sale Order (including in any Hovione warehouse) is the exclusive property of Hovione and is not property of the Debtor's estate, nor is it a Purchased Asset under the Sale Agreement; provided, however, that notwithstanding anything to the contrary contained herein, Batch number seventeen (17), designated as "17KJ01.HQ00018," shall be the sole and exclusive property of Buyer and shall be deemed to be Purchased Asset under the Sale Agreement.  On the Closing Date under the Sale Agreement, Hovione shall deliver such Batch at the location designated by Buyer and Buyer shall reimburse Hovione for any delivery fees (evidenced by documentary records) relating to such Batch after such delivery.

## SCHEDULE 2.1(B)

## IT EQUIPMENT AND INFRASTRUCTURE

| IT Equipment | Qty Needed | Price |
|---|---|---|
| Macbook Air 13 | 8 | $4,800.00 |
| DELL XPS 13 | 7 | $4,200.00 |
| Apple IPAD Pro | 4 | $2,000.00 |
| Cisco Meraki MX250 Firewalls | 2 | $7,348.00 |
| Cisco Meraki MS350-24FP Switches | 2 | $6,500.00 |
| Netgear MX4300-24X24F Switches | 3 | $7,098.00 |
| Dell PowerEdge R740xd Servers | 6 | $94,397.00 |
| Synology RS3617xs+ Storage Appliances | 2 | $6,921.00 |
| Synology RX1217RP Storage Appliance | 1 | $1,750.00 |
| TrippLite KVM console | 1 | $150.00 |
| APC power distribution units | 2 | $150.00 |
| A few boxes containing various power and network cables | 1 | $100.00 |
| CiscoASA_5525-X | 1 | $4,500.00 |
| Cohesity NAS | 1 | $10,000.00 |
| Rounding | - | $86.00 |
| **TOTAL Purchase Price to Buyer (excluding S&H fees)** | | **$150,000** |

## SCHEDULE 2.1(C)

## COMPANY OWNED INTELLECTUAL PROPERTY

### I.    PATENTS

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| United States of America | 60/989,645 11/21/2007 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| Austria | E-841756 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Australia | 2008326297 11/21/2008 | | 2008326297 02/21/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Belgium | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Bulgaria | | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Brazil | PI0819319-3 11/21/2008 | PI0819319-3 | PI0819319-3 1/15/2019 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Canada | 2706369 11/21/2008 | | 2706369 03/25/2014 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Switzerland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| China | 200880117193.1 11/21/2008 | 101868472A | ZL 200880117193.1 05/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Cyprus | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Czech Republic | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Germany | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Denmark | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL | Achaogen, Inc. | Registered/Validation of EP |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| Eurasian Patent Organization | 201070597 11/21/2008 | | 017824 03/29/2013 | AMINOGLYCOSIDE ANALOGS ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | patent Registered/Validated (Validated Armenia, Azerbaijan, Belarus, Kazakhstan, Kyrgyzstan, Russia, Moldova, Tajikistan, Turkmenistan. Each regional patent listed herein.) |
| Armenia | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Azerbaijan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Belarus | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Kazakhstan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Kyrgyzstan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Russia, | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Moldova | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Tajikistan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Turkmenistan | 201070597 11/21/2008 | | 017824 03/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EA patent |
| Estonia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| European Patent Office | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validated (Validated in AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MT, NL, NO, PL, PT, RO, SE, SI, SK, TR. Each regional patent listed herein.) |
| Spain | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL | Achaogen, Inc. | Registered/Validation of EP |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| | | | | AMINOGLYCOSIDE ANALOGS | | patent |
| Finland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| France | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| United Kingdom | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Greece | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Hong Kong | 11101563.2 11/21/2008 | 1147499 | HK1147499 01/26/2018 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered (via EP) |
| Croatia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Hungary | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Ireland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Israel | 205880 11/21/2008 | | 205880 02/01/2014 | AMINOGLYCOSIDE ANALOGS, COMPOSITIONS COMPRISING THE SAME AND USES THEREOF | Achaogen, Inc. | Registered |
| India | 4165/DELNP/2010 11/21/2008 | | 282636 04/20/2017 | NOVEL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Iceland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Italy | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Japan | 2010-535103 11/21/2008 | 2011-504508 | 4986310 05/11/2012 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Republic of Korea | 10-2010-7012835 11/21/2008 | 10-2010-0110297 | 10-1296099 08/07/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| Lithuania | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Luxembourg | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Latvia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Monaco | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Malta | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Mexico | MX/a/2010/005632 11/21/2008 | | 333945 10/12/2015 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Netherlands | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Norway | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Poland | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Portugal | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Romania | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Sweden | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Slovenia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Slovakia | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Turkey | 08851633.1 11/21/2008 | 2217610 | 2217610 11/02/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered/Validation of EP patent |
| Taiwan | 097145246 11/21/2008 | 200927146 | I425947 02/11/2014 | ANTIBACTERIAL AMINOGLYCOSIDE | Achaogen, Inc. | Registered |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| | | | | ANALOGS | | |
| United States of America | 12/487,427 06/18/2009 | US 2010-0099661 A1 | 8,383,596 02/26/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Patent Cooperation Treaty | PCT/US2008/084399 11/21/2008 | WO 2009/067692 | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired/PCT Period Over |
| Brazil | BR1220180705035 11/21/2008 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Pending |
| China | 201310142186.X 11/21/2008 | 103360440A | ZL 2013101142186.X 08/31/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| European Patent Office | 16195678.4 11/21/2008 | 3150617 | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Pending |
| United States of America | 13/734,729 01/04/2013 | US 2013-0217642 A1 | 8,822,424 09/02/2014 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| United States of America | 14/334,511 07/17/2014 | US 2015-0045317 A1 | 9,266,919 02/23/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| United States of America | 15/001,797 01/20/2016 | US 2016-0368942 A1 | 9,688,711 06/27/2017 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| United States of America | 16/360,663 03/21/2019 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Pending |
| United States of America | 61/178,809 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,349 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 13/295,247 05/14/2010 | US 2012-0135948 A1 | 8,524,689 09/03/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Patent Cooperation Treaty | PCT/US2010/034884 05/14/2010 | WO 2010/132757 | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | | Expired |
| United States of America | 61/178,814 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,351 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of | 13/295,238 | US 2012-0135946 | 8,658,606 | ANTIBACTERIAL | Achaogen, Inc. | Registered |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| America | 11/14/2011 | A1 | 02/25/2014 | AMINOGLYCOSIDE ANALOGS | | |
| Patent Cooperation Treaty | PCT US2010/034886 05/14/2010 | WO 2010/132759 | | ANTIBACTERIAL DERIVATIVES OF DIBEKACIN | Achaogen, Inc. | Expired PCT Period Over |
| United States of America | 61/178,826 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,353 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 13/295,233 05/14/2010 | US 2012-0135945 A1 | 8,653,042 02/18/2014 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Patent Cooperation Treaty | PCT US2010/034888 05/14/2010 | WO 2010/132760 | | ANTIBACTERIAL DERIVATIVES OF TOBRAMYCIN | | Expired/PCT Period Over |
| United States of America | 61/178,854 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,354 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 13/295,231 05/14/2010 | US 2012-0165282A1 | 8,524,675 09/03/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Patent Cooperation Treaty | PCT US2010/034893 05/14/2010 | WO 2010/132765 | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired/PCT Period Over |
| United States of America | 61/178,834 05/15/2009 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 61/312,356 03/10/2010 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Expired |
| United States of America | 13/295,227 05/14/2010 | US 2012-0184501 A1 | 8,492,354 07/23/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Surrendered in favor of Reissue Application No. 16/009,020 |
| Patent Cooperation Treaty | PCT US2010/034896 05/14/2010 | WO 2010/132768 | | ANTIBACTERIAL DERIVATIVES OF SISOMICIN | | Expired/PCT Period Over |
| United States of America | 16/009,020 06/14/2018 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Pending |
| United States of America | 61/178,461 05/14/2009 | | | TREATMENT OF KLEBSIELLA PNEUMONIAE | Achaogen, Inc. | Expired |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| | | | | INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | | |
| United States of America | 61/305,463 02/17/2010 | | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Expired |
| Canada | 2761674 05/14/2010 | | 2761674 11/29/2016 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| China | 201080031078.X 05/14/2010 | 102481307A | ZL 201080031078.X 08/24/2016 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Hong Kong | 12111406.1 05/14/2010 | 1170663 | 1170663 1/17/2017 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Macau | J/002404 (132) 05/14/2010 | | J/002404 01/24/2017 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| United States of America | 13/294,426 11/11/2011 | US 2012-0214759 A1 | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Abandoned/Withdrawn from appeal |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| United States of America | 16/240,370 1/4/2019 | | | ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| Patent Cooperation Treaty | PCT/US2010/034898 05/14/2010 | WO 2010/132770 | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Expired/PCT Period Over |
| Canada | 2948868 05/14/2010 | | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| China | 201610573991.1 05/14/2010 | 106188175A | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| Hong Kong | 17105427.3 05/14/2010 | 1231886A | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| United States of America | 62/574,544 10/19/2017 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Expired |
| Argentina | 20180103039 10/18/2018 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |
| Pakistan | 719/2018 10/18/2018 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |
| Taiwan | 107136676 10/18/2018 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| Patent Cooperation Treaty | PCT/US2018/056536 10/18/2018 | | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |
| Patent Cooperation Treaty | PCT/US2017/045183 8/2/2017 | WO 2018/026969 3/15/2018 | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |
| Taiwan | 106126088 8/2/2017 | 201815826 5/1/2018 | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |
| Argentina | 20170102193 8/2/2017 | | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |
| European Patent Office | 17751568.1 8/2/2017 | 3494143 6/12/2019 | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |
| United States of America | 16/360,663 3/21/2019 | | | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | | Filed |

## II.  TRADEMARKS

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| US Federal QI uf3 | Design Only<br><br>SN: 87929555 | Published March 26, 2019 Filed: May 21, 2018 | (Int'l Class: 05) antibiotics | Achaogen, Inc. (Delaware Corp.) 1 Tower Place, Suite 300 South San Francisco California 94080 |
| US Federal QI uf4 | Design Only | Published March 26, 2019 Filed: May 21, 2018 | (Int'l Class: 05) antibiotics | Achaogen, Inc. (Delaware Corp.) 1 Tower Place, Suite 300 South San Francisco California 94080 |

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | SN: 87930012 | | | |
| US Federal Q1 uf 5 | ZEMDRI RN: 5661889 SN: 87080092 | Registered January 22, 2019 Int'l Class: 05 First Use: July 17, 2018 Filed: June 22, 2016 | (Int'l Class: 05) Antibiotics | Achaogen, Inc. (Delaware Corp.) 1 Tower Place, Suite 300 South San Francisco California 94080 |
| US Federal Q1 uf 6 | ZEMDRI and Design ZEMDRI SN: 87929654 | Published March 26, 2019 Filed: May 21, 2018 | (Int'l Class: 05) antibiotics | Achaogen, Inc. (Delaware Corp.) 1 Tower Place, Suite 300 South San Francisco California 94080 |
| US Federal Q1 uf 7 | ZEMDRI and Design ZEMDRI SN: 87930066 | Published March 26, 2019 Filed: May 21, 2018 | (Int'l Class: 05) antibiotics | Achaogen, Inc. (Delaware Corp.) 1 Tower Place, Suite 300 South San Francisco California 94080 |
| Canada Q1 ca 9 | Design Only | Canada Filed Last Status Received: Pending Application November 27, 2018 Office Status: Filing date accorded Filed: November 21, 2018 | (Int'l Class: 05) Goods: (1) Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco, CA 94080, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | AN: 1931696 | | | |
| Canada<br>QI<br>ca 10 | Design Only<br><br>AN: 1931691 | Canada<br>Filed<br>Last Status Received: Pending<br>Application November 27, 2018<br>Office Status: Filing date accorded<br>Filed: November 21, 2018 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco, CA 94080, United States of America |
| Canada<br>QI<br>ca 11 | XEMDRO<br>AN:<br>1812517 | Canada<br>Allowed<br>Last Status Received: Application pending publication August 3, 2018<br>Office Status: Application published<br>Filed: December 5, 2016 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 7000 Shoreline Court, Suite 371 South San Francisco, CA 94080, United States of America |
| Canada<br>QI<br>ca 12 | ZEMDRI<br>AN: 1812518 | Canada<br>Allowed<br>Last Status Received: Application pending publication August 3, 2018<br>Office Status: Application published<br>Filed: December 5, 2016 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 7000 Shoreline Court, Suite 371 South San Francisco, CA 94080, United States of America |
| Canada<br>QI<br>ca 13 | ZEMDRI and Design<br><br>ZEMDRI<br>AN: 1931698 | Canada<br>Filed<br>Last Status Received: Pending<br>Application November 27, 2018<br>Office Status: Filing date accorded<br>Filed: November 21, 2018 | (Int'l Class: 05)<br>Goods: (1) Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco, CA 94080, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| Canada Q1 ca 14 | ZEMDRI and Design  AN: 1931703 | Canada Filed Last Status Received: Pending Application November 27, 2018 Office Status: Filing date accorded Filed: November 21, 2018 | (Int'l Class: 05) Goods: (1) Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco, CA 94080, United States of America |
| Mexico Q1 mx 16 | Design Only  AN: M2152428 | Mexico Published Last Status Received: Published Filed: November 20, 2018 | (Translation) (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. 1 TOWER PLACE NUM. EXT. SUITE 300, 94080, SOUTH SAN FRANCISCO, CA, United States of America |
| Mexico Q1 mx 17 | Design Only  AN: M2153909 | Mexico Published Last Status Received: Published Filed: November 20, 2018 | (Translation) (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. TOWER PLACE NUM. EXT. 1 NUM. INT. SUITE 300, 94080, SOUTH SAN FRANCISCO, CA, United States of America |
| Mexico Q1 mx 18 | XEMDRO RN: 1746906 AN: M1831146 | Mexico Registered Last Status Received: Registered Filed: December 9, 2016 Registered: April 24, 2017 Expiration Date: December 9, 2026 | (Translation) (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. SHORELINE COURT NUM. EXT. 7000 NUM. INT. SUITE 371, 94080, SOUTH SAN FRANCISCO, CA., United States of America |
| Mexico Q1 | ZEMDRI RN: 1746907 | Mexico Registered | (Translation) (Int'l Class: 05) | ACHAOGEN, INC. SHORELINE COURT NUM. EXT. 7000 NUM. |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| mx 19 | AN: M1831148 | Last Status Received: Registered Filed: December 9, 2016 Registered: April 24, 2017 Expiration Date: December 9, 2026 | Antibiotics. | INT. SUITE 371, 94080, SOUTH SAN FRANCISCO, CA., United States of America |
| Mexico Q1 mx 20 | ZEMDRI and Design  ZEMDRI  AN: M2153892 | Mexico Published Last Status Received: Published Filed: November 20, 2018 | (Translation) (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. TOWER PLACE NUM. EXT. 1 NUM. INT. SUITE 300, 94080, SOUTH SAN FRANCISCO, CA, United States of America |
| Mexico Q1 mx 21 | ZEMDRI and Design  ZEMDRI  AN: M2156856 | Mexico Published Last Status Received: Published Filed: November 20, 2018 | (Translation) (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. TOWER PLACE NUM. EXT. 1 NUM. INT. SUITE 300, 94080, SOUTH SAN FRANCISCO, CA, United States of America |
| WIPO Q1 wo 23 | Design Only  RN: 1441507 | International Registered Last Status Received: Registered April 15, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: Australia, China, European Union, Israel, Japan, Mexico, Switzerland, Turkey, United Kingdom |
| WIPO Q1 wo 24 | Design Only | International Registered Last Status Received: Registered March 26, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: Australia, China, European Union, Israel, Japan, Mexico, Switzerland, |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | RN: 1442826 | | | Turkey, United Kingdom |
| WIPO QI wo 25 | ZEMDRI and Design  ZEMDRI RN: 1442745 | International Registered Last Status Received: Registered November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: Australia, China, European Union, Israel, Japan, Mexico, Switzerland, Turkey, United Kingdom |
| WIPO QI wo 26 | ZEMDRI and Design  ZEMDRI RN: 1443260 | International Registered Last Status Received: Registered April 2, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: Australia, China, European Union, Israel, Japan, Mexico, Switzerland, Turkey, United Kingdom |
| Iceland QI is 28 | ZEMDRI RN: V0106877 AN: V0106877 | Iceland Registered Last Status Received: Registered Filed: November 15, 2017 Registered: November 30, 2017 Expiration Date: November 30, 2027 | (Translation) (Int'l Class: 05) Antibiotics. | Nafn: Achaogen, Inc., a corporation of the State of Delaware, United States of America Heimilisfang: 1 Tower Place, Suite 300, South San Francisco, California 94080, US, US, United States of America |
| Norway QI no 29 | ZEMDRI RN: 297414 AN: 201715319 | Norway Registered Last Status Received: Registered April 11, 2018 Filed: November 16, 2017 Expiration Date: November 16, | (Translation) (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300, CA94080, SOUTH SAN FRANCISCO, United States of America |

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | 2027 | | |
| Switzerland Q1 ch 30 | XEMDRO RN: 699873 AN: 64827/2016 | Switzerland Registered Last Status Received: Registered Filed: December 5, 2016 Registered: March 14, 2017 Expiration Date: December 5, 2026 | (Translation) (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 7000 Shoreline Court Suite 371, 94080 South San Francisco, California, United States of America |
| Switzerland Q1 ch 31 | ZEMDRI RN: 699961 AN: 64828/2016 | Switzerland Registered Last Status Received: Registered Filed: December 5, 2016 Registered: March 16, 2017 Expiration Date: December 5, 2026 | (Translation) (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 7000 Shoreline Court Suite 371, 94080 South San Francisco, California, United States of America |
| Turkey Q1 tr 33 | Design Only  AN: 2019/01458 | Turkey Published Last Status Received: Published Filed: November 20, 2018 | (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America |
| Turkey Q1 tr 34 | Design Only  AN: 2019/04068 | Turkey Published Last Status Received: Published Filed: November 20, 2018 | (Int'l Class: 05) Antibiotics. | ACHAOGEN, INC. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| Turkey QI tr 35 | Xemdro<br><br>**XEMDRO**<br><br>AN: 2016/99237 | Turkey<br>Published<br>Last Status Received: Published<br>Filed: December 8, 2016 | (Translation)<br>(Int'l Class: 05)<br>antibiotics | ACHAOGEN, INC. 7000 Shoreline Court, Suite 371, South San Francisco, California 94080, United States of America |
| Turkey QI tr 36 | zemdri<br><br>**ZEMDRI**<br><br>RN: 2016 99232<br>AN: 2016/99232 | Turkey<br>Registered<br>Last Status Received: Registered<br>Filed: December 8, 2016<br>Registered: October 3, 2017 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC. 7000 Shoreline Court, Suite 371, South San Francisco, California 94080, United States of America |
| United Kingdom QI gb 38 | XEMDRO<br>RN: 3172211<br>AN: 3172211 | United Kingdom<br>Registered<br>Last Status Received: Registered<br>September 30, 2016<br>Filed: June 30, 2016<br>Expiration Date: June 30, 2026 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. (Company or Organisation Delaware) 7000 Shoreline Court, Suite 371, 94080, South San Francisco, California, United States of America |
| United Kingdom QI gb 39 | ZEMDRI<br>RN: 3172247<br>AN: 3172247 | United Kingdom<br>Registered<br>Last Status Received: Registered<br>September 30, 2016<br>Filed: June 30, 2016<br>Expiration Date: June 30, 2026 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. (Company or Organisation Delaware) 7000 Shoreline Court, Suite 371, 94080, South San Francisco, California, United States of America |
| European Union (EUTM) QI eu 41 | XEMDRO<br>RN: 015595499<br>AN: 015595499 | European Union<br>Registered<br>Last Status Received: Registered<br>October 19, 2016<br>Filed: June 29, 2016 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. (Corporation Delaware) 7000 Shoreline Court, Suite 371, 94080, South San Francisco, California, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | Registered: October 17, 2016<br>Expiration Date: June 29, 2026 | | |
| European Union (EUTM)<br>Q1<br>eu 42 | ZEMDRI<br>RN: 015955515<br>AN: 015955515 | European Union<br>Registered<br>Last Status Received: Registered<br>October 19, 2016<br>Filed: June 29, 2016<br>Registered: October 17, 2016<br>Expiration Date: June 29, 2026 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. (Corporation Delaware) 7000 Shoreline Court, Suite 371, 94080, South San Francisco, California, United States of America |
| Israel<br>Q1<br>il 44 | XEMDRO<br>AN: 290115 | Israel<br>Registered<br>Last Status Received: Registered<br>Filed: December 4, 2016<br>Registered: April 9, 2018<br>Expiration Date: December 4, 2026 | (Int'l Class: 05)<br>Antibiotics; all included in class 5. | Achaogen, Inc. 7000 Shoreline Court, Suite 371, South San Francisco, California, 94080, U.S.A., United States of America |
| Israel<br>Q1<br>il 45 | ZEMDRI<br>AN: 290114 | Israel<br>Registered<br>Last Status Received: Registered<br>Filed: December 4, 2016<br>Registered: April 9, 2018<br>Expiration Date: December 4, 2026 | (Int'l Class: 05)<br>Antibiotics; all included in class 5. | Achaogen, Inc. 7000 Shoreline Court, Suite 371, South San Francisco, California, 94080, U.S.A., United States of America |
| South Africa<br>Q1<br>za 47 | ZEMDRI<br>AN: 2017/33426 | South Africa<br>Published<br>Last Status Received: Published<br>Filed: November 16, 2017 | (Int'l Class: 05)<br>Antibiotics | Achaogen, Inc. a corporation of the State of Delaware 1 Tower Place, Suite 300, South San Francisco, California, 94080, United States of America |
| Australia<br>Q1<br>au 49 | Design Only | Australia<br>Filed<br>Last Status Received: Pending Application<br>Office Status: Published:<br>Awaiting examination<br>Filed: November 20, 2018<br>Int'l Reg Date: November 20, 2018 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | AN: 1981466 Disclaimer: The mark consists of stylized human figure stepping out of a ring. | | | |
| Australia QI au 50 | Design Only  AN: 1980719 Disclaimer: The mark consists of stylized human figure in the color purple stepping out of a ring in the color green. The color(s) Purple and Green is/are claimed as a feature of the mark. The mark consists of stylized human figure in the color purple stepping out of a ring in the color green. | Australia Filed Last Status Received: Pending Application Office Status: Published: Awaiting examination Filed: November 20, 2018 Int'l Reg Date: November 20, 2018 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. United States of America |
| Australia QI au 51 | XEMDRO RN: 1813625 AN: 1813625 Disclaimer: Convention priority claimed: 22 June 2016, United States of America, No. 87/080087 in respect of ALL ITEMS IN THIS CLASS ARE CLAIMED IN THE CONVENTION APPLICATION in class 5.* | Australia Registered Last Status Received: Registered Office Status: Registered: Registered/protected Filed: December 5, 2016 Registered: December 5, 2016 Expiration Date: December 5, 2026 | (Int'l Class: 05) Antibiotics | Achaogen, Inc. incorporated in the State of Delaware incorporated in the State of Delaware United States of America |
| Australia QI au 52 | ZEMDRI RN: 1813626 AN: 1813626 Disclaimer: Convention priority claimed: 22 June 2016, United States of America, No. | Australia Registered Last Status Received: Registered Office Status: Registered: Registered/protected Filed: December 5, 2016 | (Int'l Class: 05) Antibiotics | Achaogen, Inc. incorporated in the State of Delaware incorporated in the State of Delaware United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | 87/080092 in respect of ALL ITEMS IN THIS CLASS ARE CLAIMED IN THE CONVENTION APPLICATION in class 5.* | Registered: December 5, 2016 Expiration Date: December 5, 2026 | | |
| Australia Q1 au 53 | ZEMDRI and Design AN: 1982221 Disclaimer: The mark consists of stylized human figure in the color purple stepping out of a ring in the color green all above the word ZEMDRI in the color purple. The color(s) green and purple is/are claimed as a feature of the mark. The mark consists of stylized human figure in the color purple stepping out of a ring in the color green all above the word ZEMDRI in the color purple. | Australia Filed Last Status Received: Pending Application Office Status: Published: Awaiting examination Filed: November 20, 2018 Int'l Reg Date: November 20, 2018 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. United States of America |
| Australia Q1 au 54 | ZEMDRI and Design AN: 1981456 Disclaimer: The mark consists of stylized human figure stepping out of a ring all above the word ZEMDRI. | Australia Filed Last Status Received: Pending Application Office Status: Published: Awaiting examination Filed: November 20, 2018 Int'l Reg Date: November 20, 2018 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. United States of America |
| China Q1 cn 55 | XEMDRO RN: 22301161 AN: 22301161 | China Registered Last Status Received: Registered Filed: December 19, 2016 Registered: January 28, 2018 Expiration Date: January 27, 2028 | (Translation) (Int'l Class: 05) antibiotics | 爱超根有限公司 加利福尼亚州 94080 南旧金山 7000 沿海大楼 371 室, United States of America ACHAOGEN, INC. 7000 SHORELINE COURT, SUITE 371, SOUTH SAN FRANCISCO, CALIFORNIA |

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | | | 94080, UNITED STATES OF AMERICA, United States of America |
| China<br>Q1<br>cn 56 | ZEMDRI<br><br>ZEMDRI<br><br>RN: 2230 1162<br>AN: 2230 1162 | China<br>Registered<br>Last Status Received: Registered<br>Filed: December 19, 2016<br>Registered: January 28, 2018<br>Expiration Date: January 27, 2028 | (Translation)<br>(Int'l Class: 05)<br>antibiotics | 爱越擦有限公司 加利福尼亚州 94080 南旧金山 7000 沿海大楼 371 室, United States of America<br><br>ACHAOGEN, INC.<br>7000 SHORELINE COURT, SUITE 371, SOUTH SAN FRANCISCO, CALIFORNIA 94080, UNITED STATES OF AMERICA, United States of America |
| Hong Kong<br>Q1<br>hk 58 | ZEMDRI and Design<br><br>ZEMDRI<br><br>AN: 304338135 | Hong Kong<br>Published<br>Last Status Received: Published<br>December 8, 2017<br>Filed: November 16, 2017 | (Int'l Class: 05)<br>Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300, South San Francisco, California 94080, United States of America |
| India<br>Q1<br>in 60 | ZEMDRI<br>AN: 3681462 | DELHI - Filed<br>Last Status Received: Objection pending<br>Filed: November 18, 2017 | (Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC. Body Incorporate 1 Tower Place Suite 300 South San Francisco, California 94080 United States of America, United States of America |
| New Zealand<br>Q1<br>nz 62 | XEMDRO<br>RN: 1056597<br>AN: 1056597 | New Zealand<br>Registered<br>Last Status Received: Registered<br>June 7, 2017<br>Office Status: Registered<br>Filed: December 5, 2016<br>Expiration Date: June 22, 2026 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. a corporation of the State of Delaware 7000 Shoreline Court, Suite 371 California 94080 South San Francisco, United States of America |
| New Zealand<br>Q1<br>nz 63 | ZEMDRI<br>RN: 1056598<br>AN: 1056598 | New Zealand<br>Registered<br>Last Status Received: Registered<br>June 7, 2017<br>Office Status: Registered | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. a corporation of the State of Delaware 7000 Shoreline Court, Suite 371 California 94080 South San Francisco, United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | Filed: December 5, 2016<br>Expiration Date: June 22, 2026 | | |
| Republic of Korea<br>QI<br>kr 64 | ZEMDRI<br><br>RN: 4013898770000<br>AN: 4020170168251 | Republic of Korea<br>Registered<br>Last Status Received: Registered<br>Filed: December 29, 2017<br>Registered: August 22, 2018 | (Translation)<br>(Int'l Class: 05)<br>Antibiotics | ACHAOGEN, INC. 아카오젠,<br>인크포레이이티드 * Tower Place,<br>Suite ***, South San Francisco,<br>California *****, United States of<br>America, United States of America |
| Singapore<br>QI<br>sg 66 | No Text Elements<br><br>ZEMDRI<br><br>AN: 40201722640X | Singapore<br>Published<br>Last Status Received: Published<br>April 6, 2018<br>Filed: November 16, 2017 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. 1 Tower Place,<br>Suite 300,South San Francisco,<br>California 94080,United States of<br>America,Delaware, United States of<br>America, United States of America |
| Taiwan<br>QI<br>tw 68 | Logo design (in black-and-white)<br><br>AN: 107075189 | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察恩有限公司<br>美國<br>United States of America |
| Taiwan<br>QI<br>tw 69 | Logo design (in color) | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| |  AN: 107075187 | | | 爾察裖有限公司 美國 United States of America |
| Taiwan QI tw 70 | ZEMDRI  AN: 106072193 | Taiwan Other Filed: November 16, 2017 | (Translation) (Int'l Class: 05) antibiotics. | ACHAOGEN, INC. 1 Tower Place, Suite 300, South San Francisco, California 94080 U.S.A. United States of America |
| Taiwan QI tw 71 | ZEMDRI  AN: 107075184 | Taiwan Other Last Status Received: Unknown Filed: November 21, 2018 | (Translation) (Int'l Class: 05) antibiotics. | ACHAOGEN, INC. 美國 United States of America 爾察裖有限公司 美國 United States of America |
| Taiwan QI tw 72 | ZEMDRI | Taiwan Other Last Status Received: Unknown Filed: November 21, 2018 | (Translation) (Int'l Class: 05) antibiotics. | ACHAOGEN, INC. 美國 United States of America 爾察裖有限公司 |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | ZEMDRI<br><br>AN: 107075186 | | | 美國<br>United States of America |
| Taiwan<br>Q1<br>tw 73 | ZEMDRI<br><br>**ZEMDRI**<br><br>RN: 01919327<br>AN: 106072193 | Taiwan<br>Registered<br>Last Status Received: Registered<br>Filed: November 16, 2017<br>Registered: June 16, 2018<br>Expiration Date: June 15, 2028 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br>爾簽褆有限公司<br>美國<br>United States of America |
| Argentina<br>Q1<br>ar 75 | XEMDRO<br>RN: 2948099<br>AN: 3565052 | Argentina<br>Registered<br>Last Status Received: Registered<br>Filed: December 7, 2016<br>Registered: August 7, 2018<br>Expiration Date: August 7, 2028 | (Translation)<br>(Int'l Class: 05)<br>Only: antibiotics. | ACHAOGEN, INC. 7000<br>SHORELINE COURT SUITE 371,<br>SOUTH SAN FRANCISCO CP.<br>94080, United States of America |
| Argentina<br>Q1<br>ar 76 | ZEMDRI<br>RN: 2928489<br>AN: 3565053 | Argentina<br>Registered<br>Last Status Received: Registered<br>Filed: December 7, 2016<br>Registered: March 9, 2018<br>Expiration Date: March 9, 2028 | (Translation)<br>(Int'l Class: 05)<br>Only: antibiotics. | ACHAOGEN, INC. 7000<br>SHORELINE COURT SUITE 371,<br>SOUTH SAN FRANCISCO CP.<br>94080, United States of America |
| Brazil<br>Q1<br>br 78 | XEMDRO<br>RN: 912032103<br>AN: 912032103 | Brazil<br>Registered<br>Last Status Received: Registered<br>Filed: December 9, 2016 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC. |

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| Brazil QI br 79 | ZEMDRI RN: 912032081 AN: 912032081 | Registered: October 2, 2018 Expiration Date: October 2, 2028<br>Brazil Registered Last Status Received: Registered Filed: December 9, 2016 Registered: October 2, 2018 Expiration Date: October 2, 2028 | (Translation) (Int'l Class: 05) antibiotics. | ACHAOGEN, INC. |
| Colombia QI co 80 | XEMDRO RN: 570091 AN: SD20160053447 | Colombia Registered Last Status Received: Registered Filed: December 12, 2016 Registered: June 9, 2017 Expiration Date: June 9, 2027 | (Translation) (Int'l Class: 05) J: Antibiotics. | ACHAOGEN, INC 7000 SHORELINE COURT, SUITE 371, SAN FRANCISCO CALIFORNIA; US, United States of America |
| Colombia QI co 81 | ZEMDRI RN: 570163 AN: SD20160053449 | Colombia Registered Last Status Received: Registered Filed: December 12, 2016 Registered: June 12, 2017 Expiration Date: June 12, 2027 | (Translation) (Int'l Class: 05) J: Antibiotics. | ACHAOGEN, INC 7000 SHORELINE COURT, SUITE 371, SAN FRANCISCO CALIFORNIA; US, United States of America |

| Country | Trademark | Application No. | Filing Date | Registration No. | Registration Date | Status | Class | Renewal Date |
|---|---|---|---|---|---|---|---|---|
| JAPAN | ZEMDRI | 2016-137421 | 12/6/2016 | 5943897 | 4/28/2017 | REGISTERED | 5 | 04/28/2027 RENEWAL |
| RUSSIA | ZEMDRI | 2016746344 | 12/7/2016 | 2016746344 | 9/9/2017 | REGISTERED | 5 | 12/07/2026 RENEWAL |
| JAPAN | XEMDRO | 2016-137419 | 12/6/2016 | 5943896 | 4/28/2017 | REGISTERED | 5 | 04/28/2027 RENEWAL |
| RUSSIA | XEMDRO | 2016746300 | 12/7/2016 | 2016746300 | 8/30/2017 | REGISTERED | 5 | 12/07/2026 RENEWAL |
| UNITED STATES | XEMDRO | 87/080,087 | 6/22/2016 | | | ABANDONED | 5 | |
| UNITED STATES | ZEMDRO | 87/080,094 | 6/22/2016 | | | ABANDONED | 5 | |

## III.  COPYRIGHTS

No registered copyrights.

## IV.  REGISTERED DOMAINS

| Domain Name |
| --- |
| aboutenrezovi.co.uk |
| aboutenrezovi.com |
| aboutenrezovi.de |
| aboutenrezovi.es |
| aboutenrezovi.net |
| aboutenrezovi.org |
| aboutenrezovi.us |
| aboutrezevico.co.uk |
| aboutrezevico.com |
| aboutrezevico.de |
| aboutrezevico.es |
| aboutrezevico.net |
| aboutrezevico.org |
| aboutrezevico.us |
| aboutxemdri.com |
| aboutxemdri.us |
| aboutxemdro.co.uk |
| aboutxemdro.com |
| aboutxemdro.de |
| aboutxemdro.es |
| aboutxemdro.net |
| aboutxemdro.org |

| |
|---|
| aboutxemdro.us |
| aboutzemdri.co.uk |
| aboutzemdri.com |
| aboutzemdri.de |
| aboutzemdri.es |
| aboutzemdri.net |
| aboutzemdri.org |
| aboutzemdri.us |
| aboutzemdro.co.uk |
| aboutzemdro.com |
| aboutzemdro.de |
| aboutzemdro.es |
| aboutzemdro.net |
| aboutzemdro.org |
| aboutzemdro.us |
| ACHAGEN.COM |
| ACHAGEN-BUT.COM |
| ACHAOGEN-PLAZOMICIN.COM |
| ACHAOGEN-PLAZOMICIN.INFO |
| ACHAOGEN-PLAZOMICIN.NET |
| achaogen.info |
| achaogen.net |
| achaogen.org |
| achaogen.us |
| achaogenenrezovi.co.uk |
| achaogenenrezovi.com |
| achaogenenrezovi.de |
| achaogenenrezovi.es |

```
achaogenenrezovi.net
achaogenenrezovi.org
achaogenenrezovi.us
achaogenhotline.com
achaogenrezevico.co.uk
achaogenrezevico.com
achaogenrezevico.de
achaogenrezevico.es
achaogenrezevico.net
achaogenrezevico.org
achaogenrezevico.us
achaogenxemdri.com
achaogenxemdro.co.uk
achaogenxemdro.com
achaogenxemdro.de
achaogenxemdro.es
achaogenxemdro.net
achaogenxemdro.org
achaogenxemdro.us
achaogenzemdri.co.uk
achaogenzemdri.com
achaogenzemdri.de
achaogenzemdri.es
achaogenzemdri.net
achaogenzemdri.org
achaogenzemdri.us
achaogenzemdro.co.uk
achaogenzemdro.com
```

achaogenzemdro.de
achaogenzemdro.es
achaogenzemdro.net
achaogenzemdro.org
achaogenzemdro.us
ACHOAGEN.COM
ACHOAGEN.INFO
ACHOAGEN.NET
ACHOAGEN.ORG
ACHOGEN.COM
akao.work
akaoenrezovi.co.uk
akaoenrezovi.com
akaoenrezovi.de
akaoenrezovi.es
akaoenrezovi.net
akaoenrezovi.org
akaoenrezovi.us
akaorezevico.co.uk
akaorezevico.com
akaorezevico.de
akaorezevico.es
akaorezevico.net
akaorezevico.org
akaorezevico.us
akaoxemdri.com
akaoxemdro.co.uk
akaoxemdro.com

| |
|---|
| akaoxemdro.de |
| akaoxemdro.es |
| akaoxemdro.net |
| akaoxemdro.org |
| akaoxemdro.us |
| akaozemdri.co.uk |
| akaozemdri.com |
| akaozemdri.de |
| akaozemdri.es |
| akaozemdri.net |
| akaozemdri.org |
| akaozemdri.us |
| akaozemdro.co.uk |
| akaozemdro.com |
| akaozemdro.de |
| akaozemdro.es |
| akaozemdro.net |
| akaozemdro.org |
| akaozemdro.us |
| enrezovi.co |
| enrezovi.co.nz |
| enrezovi.co.uk |
| enrezovi.com |
| enrezovi.com.br |
| enrezovi.com.mx |
| enrezovi.de |
| enrezovi.es |
| enrezovi.fr |

| |
|---|
| enrezovi.it |
| enrezovi.kr |
| enrezovi.net |
| enrezovi.org |
| enrezovi.tw |
| enrezovi.us |
| enrezovirx.co.uk |
| enrezovirx.com |
| enrezovirx.de |
| enrezovirx.es |
| enrezovirx.net |
| enrezovirx.org |
| enrezovirx.us |
| FREEPLAZOMICIN.COM |
| NEOGLYCOSIDE.COM |
| NEOGLYCOSIDE.INFO |
| NEOGLYCOSIDE.NET |
| NEOGLYCOSIDE.ORG |
| NEOGLYCOSIDES.COM |
| NEOGLYCOSIDES.INFO |
| NEOGLYCOSIDES.NET |
| NEOGLYCOSIDES.ORG |
| PLAZOMICIN.BIZ |
| PLAZOMICIN.CO |
| PLAZOMICIN.COM |
| PLAZOMICIN.INFO |
| PLAZOMICIN.MOBI |
| PLAZOMICIN.NET |

| |
|---|
| PLAZOMICIN.ORG |
| PLAZOMICIN.US |
| PLAZOMICIN.WS |
| PLAZOMICINBLOG.COM |
| PLAZOMICINNOW.COM |
| PLAZOMICINONLINE.COM |
| PLAZOMICINS.COM |
| PLAZOMICINSHOP.COM |
| PLAZOMICINSITE.COM |
| PLAZOMICINSTORE.COM |
| PLAZOMICINSUCKS.COM |
| PLAZOMICINSUCKS.INFO |
| PLAZOMICINSUCKS.NET |
| PLAZOMICINSUCKS.ORG |
| rezevico.co.uk |
| rezevico.com |
| rezevico.de |
| rezevico.es |
| rezevico.net |
| rezevico.org |
| rezevico.us |
| rezevicorx.co.uk |
| rezevicorx.com |
| rezevicorx.de |
| rezevicorx.es |
| rezevicorx.net |
| rezevicorx.org |
| rezevicorx.us |

| THEPLAZOMICIN.COM |
|---|
| xemdri.com |
| xemdrirx.com |
| xemdro.co |
| xemdro.co.nz |
| xemdro.co.uk |
| xemdro.com |
| xemdro.com.br |
| xemdro.com.mx |
| xemdro.de |
| xemdro.es |
| xemdro.fr |
| xemdro.it |
| xemdro.kr |
| xemdro.net |
| xemdro.org |
| xemdro.us |
| xemdrorx.co.uk |
| xemdrorx.com |
| xemdrorx.de |
| xemdrorx.es |
| xemdrorx.net |
| xemdrorx.org |
| xemdrorx.us |
| zemdri.co |
| zemdri.co.nz |
| zemdri.co.uk |
| zemdri.com |

| zemdri.com.br |
| zemdri.com.mx |
| zemdri.de |
| zemdri.es |
| zemdri.fr |
| zemdri.it |
| zemdri.kr |
| zemdri.net |
| zemdri.org |
| zemdri.tw |
| zemdri.us |
| zemdrirx.co.uk |
| zemdrirx.com |
| zemdrirx.de |
| zemdrirx.es |
| zemdrirx.net |
| zemdrirx.org |
| zemdrirx.us |
| zemdro.co.uk |
| zemdro.com |
| zemdro.de |
| zemdro.es |
| zemdro.net |
| zemdro.org |
| zemdro.us |
| zemdrorx.co.uk |
| zemdrorx.com |
| zemdrorx.de |

| |
|---|
| zemdrorx.es |
| zemdrorx.net |
| zemdrorx.org |
| zemdrorx.us |
| aboutxemdri.net |
| aboutxemdri.org |
| achaogenrsvp.com |
| achaogenspeakerbureau.com |
| achaogenspeakers.com |
| achaogenxemdri.net |
| achaogenxemdri.org |
| achaogenxemdri.us |
| akao-ruo.biz |
| akao-ruo.co |
| akao-ruo.com |
| akao-ruo.info |
| akao-ruo.io |
| akao-ruo.net |
| akao-ruo.online |
| akao-ruo.org |
| akao-ruo.store |
| akao-ruo.us |
| akaoxemdri.net |
| akaoxemdri.org |
| akaoxemdri.us |
| cutiandbsinformation.com |
| cutiinformation.com |
| enrezovi.ch |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| enrezovi.cn | enrezovi.in | enrezovi.ru | xemdri.net | xemdri.org | xemdri.us | xemdrirx.net | xemdrirx.org | xemdrirx.us | xemdro.ch | xemdro.cn | xemdro.ru | xemdro.tw | zemdri.ch | zemdri.cn | zemdri.in | zemdri.ru |

# EXHIBIT B

| Contract Counterparty | Contract/Lease Title | Cure Amount ($) |
|---|---|---|
| 360 Infusion | Purchasing Agreement | - |
| Albany Urology Clinic & Surgery Center | Purchasing Agreement | - |
| Allergy ARTS, LLP | Purchasing Agreement | - |
| Alturas Analytics, Inc. | Archival Storage of CLP Study Documents 2019, Master Service Agreements, SOW and Quotes | - |
| ASD Healthcare and Besse Medical, divisions of ASD Specialty Healthcare, LLC | Distribution Services Agreement | - |
| AT&T Corporation | AT&T, Sales Order (Ethernet Private Line - 8946182) | - |
| Bay Area Infectious Disease Associates | Purchasing Agreement | - |
| Beckman Coulter, Inc. | Master Services Agreement | 4,298 |
| bioMerieux | Master Services Agreement | - |
| Blaine Healthcare Associates, Inc. | Consulting Agreement | 10,500 |
| Capitol Infectious Disease Associates | Purchasing Agreement | - |
| Cardinal Health 105, Inc. | Exclusive Distribution Agreement | - |
| Cardinal Health 108, LLC | Wholesale Purchase and Distribution Services Agreement and all exhibits | - |
| CareMetx, LLC | Master Services Agreement | - |
| Case Western Reserve University | Master Services Agreement and all exhibits | - |
| Certara USA, Inc. | Master Services Agreement | 1,663 |
| Clinical Infectious Disease Specialists | Purchasing Agreement | - |
| Computer Science Corporation | Computer Science Corporation, Renewal letter 2018-2019 | - |
| Covance Central Laboratory Services LP | Master Services Agreement and all amendments including individual project agreement | 367 |
| David C. Wright, M.D. | Purchasing Agreement | - |
| Department of Health & Human Services - Center for Medicare & Medicaid | National Drug Rebate Agreement, Medicare Coverage Gap Discount Program Agreement & Pharmaceutical Pricing Agreement | - |
| Dohmen Life Science Services, LLC | Master Services Agreement with all Statement of Work | 15,424 |
| Dr. Donna O'Neil | Purchasing Agreement | - |
| Emerald Coast Infectious Diseases Medical Group, P.A. | Purchasing Agreement | - |
| Engine Room Consulting Services, Inc | Outsourcing Services Agreement | - |
| EUCAST | Master Services Agreement | - |
| Eurofins Lancaster Laboratories Inc | Master Services Agreement and all amendments | 16,642 |
| FFF Enterprises, Inc. | FFF Specialty Distribution - Specialty Distribution Services Agreement (FE) and ZEMDRI Returns Exception Letter (Wesley) | - |
| Fisher Clinical Services, Inc. | Master Services Agreement | - |
| Healix Infusion Therapy, LLC | Specialty Distribution Services and Purchasing Agreement | - |
| Hospira, Inc. | Hospira DSA FE along with all amendments and Pfizer CentreOne Plazomicin Project Kalamazoo Statement of Work | - |
| Houston Center for Infectious Diseases | Purchasing Agreement | - |
| ibacon GmbH | ibacon GmbH, Master Services Agreement | - |
| Icon Clinical Research Ltd-Ireland | Master Services Agreement and all amendments | 9,753 |
| Impact Clinical, LLC | Master Services Agreement and Master Services Agreement (BARDA) | 44,045 |
| Infectious Disease Associates | Purchasing Agreement | - |
| Infectious Disease Consultants | Purchasing Agreement | - |
| Infectious Disease Consultants | Purchasing Agreement | - |
| Infectious Disease Consultants | Purchasing Agreement | - |
| Infectious Disease Consultants | Purchasing Agreement | - |
| Infectious Disease Partners of Nevada | Purchasing Agreement | - |
| Infectious Disease Specialists of Southeastern Wisconsin, S.C. | Purchasing Agreement | - |
| Infectious Diseases Associates | Purchasing Agreement | - |
| Infusion Associates N.E. | Purchasing Agreement | - |
| Infusion4Health, Inc. | Purchasing Agreement | - |
| Institut fuer biologische Analytik und Consultin IBACON GmbH | Master Services Agreement and all exhibits | 59,503 |
| International Health Management Associates, Inc. | Master Services Agreement | 99,388 |
| Ionis Pharmaceuticals, Inc. | License Agreement | 8,598 |
| Jones Microbiology Institute, Inc. | Master Services and Transfer Agreement w/Amendments | 209,339 |
| Kovanos, Inc. | Contingency Recruiter Agreement | 5,105 |
| KPMG | Management Services Engagement Letter | 41,171 |
| Laboratory Specialists, Inc. | Master Services Agreement | 13,681 |
| Lala-Reddy Medical Corporation | Purchasing Agreement | - |
| Lexington Infectious Disease | Purchasing Agreement | - |

| Contract Counterparty | Contract/Lease Title | Cure Amount ($) |
|---|---|---|
| Mast International Division | Master Services Agreement and all amendments | 19,616 |
| Master Control Inc. | End User License Agreement | 1,173 |
| Mayo Foundation | Collaboration Agreement | 1,127 |
| McKesson Specialty Care Distribution Corporation | Pharmaceutical Products Purchase and Distribution Agreement | - |
| MED PED I D INCORPORATED | Purchasing Agreement and Amendment One | - |
| Medical Communication Technologies, Inc | IntegriChain, Inc., MSA and Project Addendum | 25,000 |
| Metro Infectious Disease Consultants, LLC | Purchasing Agreement | - |
| Microgenics Corp | Collaborative Development and Commercialization Agreement, Safety Data Exchange Agreement, Material Transfer Agreement, Quality Agreement | 831,000 |
| Micron Research Limited | The Micron Group Ltd. Master Services Agreement | 21,580 |
| Microsoft Corporation | Microsoft, Volume Licensing Customer Price Sheet-0737229,001 | - |
| Mimecast North America, Inc. | Mimecast (SHI), Quote 15786673 | - |
| NDA Regulatory Development, Inc. | Consulting agreement and all amendments | - |
| Okta, Inc. | Okta, Master Subscription Agreement | - |
| Opats LLC | OPATS LLC. Master Service Agreement | 6,425 |
| Operational Compliance Solutions, LLC | OCS - Consulting Agreement Exhibit B | 2,219 |
| Oracle America, Inc. | Ordering Document | - |
| Orange County Infectious Disease Associates | Purchasing Agreement | - |
| Paragon Healthcare, Inc. | Purchasing Agreement | - |
| PCI of Illinois | Commercial Packing Agreement | 748 |
| Pfizer, Inc. | Letter of Intent, Development Services Agreement, Quality Technical Agreement, all Change Orders | 141,699 |
| PPD Development | Lab Services and Master Services Agreement (BARDA) and Analysis of Plazomicin SulfateDrug Product | - |
| PrimeVigilance Limited | Master Services Agreement and all amendments | 37,197 |
| Protiviti Inc. | Consulting Agreement | - |
| Region Kronoberg | EUCAST & Region Kronoberg, Study Proposal | 32,137 |
| Remel, Inc. | Master Services Agreement - Thermo Fisher Scientific | 78,000 |
| SAS Institute, Inc. | MLA and all supplements and amendments | 8,000 |
| SHI International Corp | Master Services Agreement | - |
| Softworld, Inc. | Master Services Agreement | - |
| Sylvan Infectious Disease | Purchasing Agreement | - |
| Synchrogenix Information Strategies, LLC | Master Services Agreement | 853 |
| Threlkeld Threlkeld & Omer, PLLC | Purchasing Agreement | - |
| Tracelink, Inc. | Enterprise Agreement | - |
| U.S. Department of Veterans Affairs VA Federal Supply Schedule | Federal Supply Schedule Contract 36F79719DO035 | - |
| University of South Florida Board of Trustees | University of South Florida Board of Trustees, Material Transfer Agreement | - |
| Urology Austin, PLLC | Purchasing Agreement | - |
| Validated Cloud, Inc. | Validated Cloud, Order Form #20171221-00 | - |
| Veeva System, Inc. | Master Subscription Agreement, all Order Form and Statement of Work | 46,169 |
| West Texas Digestive Disease Center | Purchasing Agreement | - |
| **Total** | | **$ 1,792,417.21** |

**EXHIBIT C**

# TRANSITIONAL SERVICES AGREEMENT

     This Transitional Services Agreement (this "Agreement"), dated as of July __, 2019, by and between Achaogen, Inc., a Delaware corporation ("Achaogen") and Cipla USA Inc., a Delaware corporation (the "Buyer", and together with Achaogen, the "Parties"):

     WHEREAS, Achaogen and Buyer entered into an Asset Purchase Agreement, dated as of June 20, 2019 (the "Purchase Agreement") with respect to the Plazomicin Business[1] which provides, among other things, for the sale of certain assets and the transfer of certain liabilities of Achaogen identified therein, to Buyer (as set forth more fully in the Purchase Agreement, the "Transaction");

     WHEREAS, the U.S. Bankruptcy Court for the District of Delaware entered an order approving the Transaction on July __, 2019, on the terms set forth therein and in the Purchase Agreement;

     WHEREAS, following the Closing contemplated by the Purchase Agreement, Buyer will own and operate the Purchased Assets; and

     WHEREAS, the Parties have a need for, and have requested that the other Party provide the Services (as defined below) during the Post-Closing Access and Cooperation Period, or such other period as provided in the Exhibits, and the Parties have agreed to provide the Services to the other Party and its Affiliates during the Post-Closing Access and Cooperation Period, or such other period as provided in the Exhibits, pursuant to the terms and conditions set forth in this Agreement.

     NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, and for the mutual benefits to be derived from this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

    Capitalized terms used in this Agreement, unless defined herein, shall have the meanings assigned to them in the Purchase Agreement.

    1.1.   Achaogen shall have the meaning specified in the preamble hereto.

    1.2.   Administrative Representative(s) shall have the meaning specified in Section 4.1.

    1.3.   Affiliate shall have the meaning set forth in the Purchase Agreement.

    1.4.   Agreement shall have the meaning specified in the preamble hereto.

---

[1] Capitalized terms used in this Agreement, unless defined herein, shall have the meanings assigned to them in the Purchase Agreement.

1.5.     Bankruptcy Case shall mean Achaogen's Chapter 11 Case (No. 19-10844) currently pending in the Bankruptcy Court.

1.6.     Buyer shall have the meaning specified in the preamble hereto.

1.7.     Exhibits shall mean Exhibit A and Exhibit B attached to this Agreement and incorporated herein by this reference for all purposes.

1.8.     Fees shall have the meaning specified in Section 3.1.

1.9.     Party shall have the meaning set forth in the preamble hereto.

1.10.    Personnel shall have the meaning specified in Section 2.3.

1.11.    Post-Closing Access and Cooperation Period shall have the meaning specified in the Purchase Agreement.

1.12.    Provider shall mean Achaogen, in connection with Services provided by Achaogen under Exhibit A, or Buyer, in connection with Services provided by Buyer under Exhibit B, as the context requires.

1.13.    Purchase Agreement shall have the meaning specified in the recitals hereto.

1.14.    Recipient shall mean Buyer, in connection with Services received under Exhibit A, or Achaogen, in connection with Services received under Exhibit B, as the context requires.

1.15.    Service(s) shall have the meaning specified in Section 2.1(a).

1.16.    Transaction shall have the meaning specified in the recitals hereto.

## ARTICLE II
## SERVICES TO BE PROVIDED

2.1.    Services; Term.

(a)     Without limiting any provisions of the Purchase Agreement, or any provisions of the Sale Order, and subject to the terms and conditions set forth herein (including Section 7.1) and on the Exhibits, Provider shall provide the services designated on the Exhibits (the "Services" and each a "Service") to Recipient during the Post-Closing Access and Cooperation Period; *provided*, that if the applicable Exhibit specifies a period of service shorter than such period with respect to a Service, Provider shall be obligated to provide such Service only for such shorter period and the Post-Closing Access and Cooperation Period with respect to such Service shall refer to such earlier date on which the shorter period ends. Termination of a Service under Section 7.1 shall not relieve Provider of its obligations to provide the remaining non-terminated Services.

(b)     Buyer may terminate any or all Services provided by Achaogen under Exhibit A prior to the period as specified thereon, upon written notice to Achaogen; *provided,*

*however,* that, without the prior written consent of Achaogen (such consent not to be unreasonably withheld, conditioned or delayed), such termination shall not become effective prior to the date that is 10 days after receipt by Achaogen of such written notice; and *provided, further,* that in each case Buyer shall pay to Achaogen, promptly after demand therefor from Achaogen, any and all accrued and unpaid Fees of the service providers set forth in <u>Schedule I</u> to <u>Exhibit A</u>, including, without limitation, any retention bonuses or other accrued incentives to the extent payable thereunder. Once a Service is terminated by Buyer, Achaogen shall not be obligated to later reinstate such Service. Buyer may not terminate any Services provided to Achaogen at any time absent Achaogen's express written consent.

(c)     Except as set forth in the Purchase Agreement, Provider shall not have any obligation to provide services other than the Services. Recipient may, during the term of this Agreement, request that Provider provide services in addition to the Services and Provider shall reasonably consider all such requests in good faith. Except as set forth in the Purchase Agreement, if Provider determines to provide any such additional service, the Parties shall negotiate in good faith the terms on which that additional service will be provided and, if those terms are mutually agreed upon, the additional service will be deemed to form part of the Services and the applicable Exhibit shall be updated to reflect such addition. The foregoing provision shall not be construed as imposing any obligation on the part of either Party to enter into any other agreement or agreements with the other Party, nor construed as an agreement by either Party to negotiate with the other Party in the event that Provider determines not to provide the relevant additional service in accordance with the provisions hereof.

2.2.     <u>Terms and Conditions of Services</u>.

(a)     In no event will Provider be required to provide any Service that it believes does not comply or is not compatible with applicable law or third party obligations.

(b)     Provider may in its discretion provide the Services either through its own resources or the resources of its Subsidiaries or Affiliates or by contracting with reputable independent contractors; *provided* that, except as provided in <u>Article V</u>, Provider shall not be obligated to procure any Service(s) from any third party for the benefit of Recipient.

(c)     The provision of the Services may be limited by third-party licenses relating to systems and processes. If the provision of any such Service to Recipient requires the use of independent systems that are subject to a third party license, separate licenses shall be obtained by Recipient at no cost to Provider. If Recipient is unable or unwilling to obtain such separate licenses, Provider shall not be obligated to provide such Service under this Agreement to the extent such license is required therefor.

(d)     Under no circumstances shall Provider be obligated to provide any Service requiring an opinion, advice or representation as to which liability may be created for Provider or its Affiliates due to claims from any other person or entity, including, without limitation, any Governmental Authority (e.g., legal opinions or advice, tax opinions or advice, compliance opinions or advice).

(e)     The Parties acknowledge that the provision of Services hereunder may require Provider to enter into new or amended agreements with third parties. Provider shall use commercially reasonable efforts (in the case of Achaogen, taking into account its financial condition and status as a Chapter 11 debtor) to enter into such agreements for a time period not to exceed the Post-Closing Access and Cooperation Period. Recipient shall be consulted in connection with any such agreements; *provided* that in the event that Recipient does not accept the terms of any such agreement, Provider shall not be obligated to provide the Service for which such agreement was required. Recipient shall be responsible for all costs and expenses associated with or arising in connection with such new or amended agreements (including (i) the reasonable costs associated with the negotiation thereof and (ii) any costs or expenses associated with or arising in connection with early termination of a Service by Recipient) to the extent that such new or amended agreements relate to the provision of Services.

2.3.    Personnel. Buyer shall only be responsible for Fees of the services providers set forth in Schedule I to Exhibit A hereto (the "Personnel") to the extent the Personnel (or any other service providers) provide the Services for or on behalf of Buyer. Buyer may directly engage some or all of the Personnel (or any other service providers) to provide services on its behalf, including any of the Services; provided, that Buyer shall continue to be responsible to pay Achaogen for any Fees for any Services provided within the scope of this Agreement. Nothing in this Agreement shall prohibit Buyer, through its Administrative Representative, to (i) directly engage the Personnel or any other person in any capacity following the expiration or termination of this Agreement; (ii) interact with the Personnel with respect to the Services provided hereunder; or (iii) have direct oversight over the provision of Services by the Personnel. In the event that any service provider set forth on Schedule I to Exhibit A is no longer willing or able to perform services within the scope of this Agreement, Buyer and Achaogen shall work jointly to identify a replacement.

## ARTICLE III
## FEES

3.1.    General. Services shall be billed by Provider in accordance with the terms set forth in the Exhibits in an amount equal to the costs, including out-of-pocket costs and expenses, to be incurred by Provider in providing such Services, except as otherwise set forth therein (the "Fees"). Further, each Party shall pay reasonable professional fees borne by the other Party in connection with the performance, management, and facilitation of obligations under this Agreement, to the extent such professional services are required for the provision of Services; provided, that Buyer shall not be responsible for the fees of MERU, LLC or any of its Affiliates, including in connection with Nick Campbell's services as Administrative Representative in accordance with Section 4.1 hereunder. For the avoidance of doubt, MERU, LLC will not be obligated to perform any services at the request of Buyer or otherwise. Notwithstanding anything contained in this Agreement, neither Party shall be responsible for any Fees or other costs or expenses that arise from the negligence, intentional misconduct, or violation of law of the other Party or any of its Affiliates, agents or representatives.

3.2.    Payments. Payment of Fees shall be made in the manner specified in the Exhibits. Interest shall be payable on any amounts which are not paid by the due date for payment. Interest shall accrue and be calculated on a daily basis at an annual rate equal to the prime rate

(which shall mean the "prime rate" published in the "Money Rates" section of The Wall Street Journal) plus 1.5% or, if less, the maximum rate allowed by law.  Recipient shall be entitled to set off or reduce payments of the Fees by any amounts owed to it by Provider under this Agreement or any other agreement, at which time the interest hereunder shall stop accruing.

## ARTICLE IV
## ADMINISTRATIVE REPRESENTATIVES

4.1.    <u>Administrative Representatives</u>.  Nick Campbell, Managing Partner of MERU, LLC and Chief Restructuring Officer of Achaogen, and Biplab Mazumdar, Head – Director, Finance of Buyer, shall serve as administrative representatives ("<u>Administrative Representatives</u>") of Achaogen and Buyer, respectively, to facilitate day-to-day communications and performance under this Agreement.  Each Party may treat an act of an Administrative Representative of the other Party as being authorized by such other Party.  Each Party may replace its Administrative Representative by giving written notice of the replacement to the other Party.

## ARTICLE V
## THIRD PARTY AGREEMENTS

5.1.    To the extent that it is not practicable to have Recipient as the contracting Party for a third-party obligation relating to any Service, and with the consent of Recipient, Provider shall, at Recipient's expense, use commercially reasonable efforts (in the case of Achaogen, taking into account its financial condition and status as a Chapter 11 debtor) to cause all such third-party contracts to extend to and be enforceable by Recipient, or to assign such contracts to Recipient.  In the event that such contracts are not extendable or assignable, Provider shall act as agent for Recipient in the pursuit of any claims, issues, demands or actions against such third-party provider at Recipient's expense.   Notwithstanding the foregoing, nothing under this Agreement shall require any Party to assume any third-party contract or agreement without the express written consent of both Parties (which may be withheld for any reason or no reason).

## ARTICLE VI
## AUTHORITY; INFORMATION; COOPERATION

6.1.    <u>Information Regarding Services</u>.  Recipient shall make available to Provider any information required or reasonably requested by Provider regarding the performance of any Service.  Provider shall be entitled to rely upon the genuineness, validity and truthfulness of any document, instrument or other writing presented by Recipient in connection with this Agreement.  Provider shall not be liable for any impairment of any Service caused by its not receiving information, either timely or at all, or by its receiving inaccurate or incomplete information from Recipient that is required or reasonably requested regarding that Service.

6.2.    <u>Cooperation</u>. Without limiting any provisions of the Purchase Agreement, or any provisions of the Sale Order, the Parties shall cooperate with each other in all reasonable respects in matters relating to the provision and receipt of Services.

## ARTICLE VII
## MISCELLANEOUS

7.1.    Termination.  In addition to the termination provisions set forth in Section 2.1(b) hereunder:

(a)    This Agreement shall automatically terminate upon the conclusion of the Post-Closing Access and Cooperation Period, or such shorter period as specified in the Exhibits, and may otherwise be terminated or extended by the Parties in accordance with Section 7.1(b)-(d).

(b)    A Party may terminate this Agreement solely with respect to a particular Service by giving written notice to the other Party if the other Party commits a material breach of any of its obligations under this Agreement with respect to that Service and fails to cure such breach within 14 calendar days after receipt of written notice of such breach by the terminating Party unless such breach is incapable of being cured within such time.

(c)    A Party may terminate this Agreement by giving written notice to the other if the other Party commits a material breach of any of its obligations under Section 3.2 and fails to cure such breach within 14 calendar days after receipt of written notice of such breach by the terminating Party unless such breach is incapable of being cured within such time.

(d)    Following the termination or the expiration of this Agreement or a particular Service, Recipient shall promptly pay all amounts accrued and payable hereunder.  Article VII and Sections 2.1, 3.2, and 7.11 and the last sentence of Section 2.2(e) shall survive the termination or the expiration of this Agreement or a particular Service.

7.2.    Amendments; Waivers.  To be effective, any amendment or waiver to or under this Agreement must be in writing and be signed by each Party.  Neither the failure of any Party to exercise any right, power or remedy provided under this Agreement or to insist upon compliance by the other Party with its obligations hereunder, nor any custom or practice of the Parties at variance with the terms hereof shall constitute a waiver by such Party of its right to exercise any such right, power or remedy or to demand such compliance, or otherwise affect such Party's rights, powers, remedies, duties, or obligations under the Purchase Agreement or Sale Order.

7.3.    Expenses. Except as otherwise expressly provided in this Agreement, each Party will bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the transactions contemplated herein, including all fees and expenses of its lawyers, consultants and other agents.  Further, each Party will bear its respective fees and expenses incurred in connection with any dispute that arises under this Agreement.

7.4.    Limitation on Liability.  Notwithstanding any other provision of this Agreement to the contrary, in no event will any Party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of the

conduct of such Party pursuant to this Agreement, regardless of whether the nonperforming Party was advised of the possibility of such damages or not.

7.5. <u>Independent Contractor Status</u>. Nothing in this Agreement shall constitute or be deemed to constitute a partnership or joint venture between the Parties. Neither Party is now, nor shall it be made by this Agreement, an agent, employee or legal representative of the other Party or any of its Affiliates for any purpose pursuant to this Agreement. Each Party is and shall be an independent contractor in the performance of Services hereunder and nothing herein shall be construed to be inconsistent with this status.

7.6. <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS OF COMPETENT JURISDICTION LOCATED IN THE STATE OF DELAWARE OR IN THE BANKRUPTCY COURT (FOR SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION) AND EACH OF THE PARTIES HERETO IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, GENERALLY AND UNCONDITIONALLY, AND WAIVES ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

7.7. <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

7.8. <u>Entire Agreement</u>. This Agreement and the Purchase Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof.

7.9. <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing. Any such notice, request, demand, claim or other communication hereunder shall be deemed duly given or made upon receipt when it shall be delivered by hand, certified or registered mail, electronic mail or facsimile to the Party to which it is addressed at such Party's address specified below, or at such other address as such Party shall have designated by notice in accordance with this <u>Section 7.9</u>:

If to **Achaogen:**

Achaogen, Inc.
1372 Peachtree Street, NW, Suite 2121
Atlanta, GA 30309
Attn: Nick Campbell, Managing Partner
Email: nick@wearemeru.com

with a copy (which will not constitute notice) to:

Hogan Lovells US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Attn:   Richard Wynne, Esq.
          Erin Brady, Esq.
Email:  rick.wynne@hoganlovells.com
          erin.brady@hoganlovells.com

If to **Buyer:**

Cipla USA Inc.
c/o Cipla Ltd.
House, Peninsula Business Park
Ganapatrao Kadam Marg, Lower Parel West
Mumbai, Maharashtra 400013, India
Attn: A.S. Kumar, Esq., Global General Counsel
Email: as.kumar@cipla.com
          co.secretary@cipla.com

with a copy (which will not constitute notice) to:

Kelley Drye & Warren LLP
101 Park Avenue, 27th Floor
New York, New York 10178
Attn: Deepak Nambiar, Esq.
Email: DNambiar@KelleyDrye.com

7.10.   Interpretation.  Article and section captions are not a part of this Agreement and are provided solely for the convenience of the Parties.

7.11.   Confidentiality.  Section 5.6 of the Purchase Agreement is incorporated into this Agreement *mutatis mutandis*.

7.12.   Severability.  In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is

8

determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.

7.13. <u>Counterparts; Third Party Beneficiaries</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed to constitute an original of the same Agreement, and all of which together shall constitute one single Agreement. A complete set of counterparts shall be made available to each Party. No Person not a party to this Agreement shall have rights under this Agreement as a third-party beneficiary or otherwise.

[*Remainder of page left intentionally blank*]

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the parties as of the day first above written.

**Achaogen:**

ACHAOGEN, INC.

By:_____
    Name:
    Title:

**Buyer:**

CIPLA USA INC.

By:_____
    Name:
    Title:

## EXHIBIT A

## TRANSITION SERVICES FROM ACHAOGEN TO BUYER

The services described herein exclusively constitute the Services to be provided by Achaogen to Buyer pursuant to the Agreement.  All capitalized terms used herein and not defined shall have the meaning set forth in the Agreement, or if not defined therein, the Purchase Agreement.

| Types of Service | Estimated Monthly Fees[1] | Time Period |
|---|---|---|
| Back office services related to accounting, bookkeeping, payment processing, tax, and other similar support services to maintain the books and records and ensure continuity of business. | $56,000 | Closing – October 21, 2019 |
| Facilitate the introduction between (i) Buyer and (ii) Sean Doyle, Head of Operations & Infrastructure at Achaogen, and Protiviti Inc. (collectively, the "Data Facilitators"); *provided, however*, this Service shall not extend beyond such introduction with the Data Facilitators, and Buyer shall be responsible for any engagement of the Data Facilitators in connection with the extraction of pertaining information from Box, Inc. related to the Purchased Assets. | At Buyer's expense | Closing – October 21, 2019 |

---

[1] Includes actual costs related to work performed including, but not limited to, salary, taxes, benefits, accrued Incentives (as defined below) and fees and expenses related to the Personnel.

**PERSONNEL PROVIDED**

<u>Caitlin Hurd - Controller</u>

*Manage Accounts Receivable (AR) / Accounts Payable (AP) Process*
- Review and approve incoming invoices in line with the Oracle workflow process making sure AP is properly accounted for in the AP subledger
  - Bifurcate books and records between Buyer and the Achaogen estate
  - Send weekly report of post-Closing invoices to Buyer to review and approve for processing
- Coordinate with the 3PL regarding invoicing and AR during the transition
- Review bank accounts for product revenue and other operating related deposits to record in the AR subledger
- Approve payment runs in Oracle and wire and ACH transfers in Silicon Valley Bank, N.A. ("<u>SVB</u>")
- Reconcile AP payments to cash disbursements in Oracle
- Respond to inquiries from vendors and consultants

*Maintain Books and Records*
- Record and reconcile subledgers including cash, AR and AP
- Prepare monthly product revenue entries using agreed upon gross to net assumptions
- Record monthly journal entries for payroll, credit cards, AR and AP reclasses, interest accruals and prepaid amortizations
- Track and record royalty payments and manage reconciliation process
- Prepare monthly inventory rollforward to track inventory movements
- Complete reconciliations for remaining asset and balance sheet accounts
- Close the books monthly and prepare financial statements

*Business Continuity and Transition*
- Provide all payments with respect to Executory Contracts after the Closing until such contracts are either rejected or assumed and assigned to Buyer, as directed by Buyer
- Assist with the preparation and review of reports related to government price reporting and coordinate with external consultant to ensure timely reporting
- Assist with the transfer of government price reporting and other programs from Achaogen to Buyer
- Review and summarize billing, milestone or payment terms for key assumed contracts

*Cure Amounts*
- Payment of Cure Amounts to contract counterparties for contracts assumed by Buyer under the Purchaser Agreement.
- Maintain records regarding payment of Cure Amounts.

<u>Theresa Gonzales - AP Clerk</u>
- Scan and code invoices as either pre- or post-Closing
- Initiate invoices through Oracle workflow for approval
- Release invoices for payment batches in Oracle
- Set up wire templates for transfers at SVB
- Set up new vendors in Oracle

<u>Palash Kundu - ERP Manager</u>
- Set up Oracle access for new users or changes for existing users
- Set up process to bifurcate and label invoices for Achaogen estate and Buyer
- Manage the re-routing of Achaogen invoices that are missing purchase orders and assisting in making sure these get to accounting for processing
- Manage the re-routing of Buyer invoices where the original purpose order or invoice requestor is no longer with Achaogen and assisting in making sure these get to accounting for approval and processing
- Set up new bank information and integrate into Oracle

## SYSTEMS & REPORTING

Buyer will assume the Executory Contracts to the extent set forth in the Purchase Agreement and/or make available the financial and IT systems currently used by Achaogen, subject to the terms of any applicable third-party contracts and the extent required by Achaogen to perform the Services hereunder and for the duration set forth herein.

Achaogen will submit weekly payable reports to Buyer by Tuesday of each week for the disbursements proposed to be paid for that week. Buyer will send the approved payables and funding to Achaogen no later than 9:00 a.m. prevailing Pacific Time on Wednesday of each week. Achaogen will make disbursements by Friday of the same week unless agreed to separately with Buyer.

## BILLING

Achaogen will invoice Buyer for services rendered on a monthly basis. All invoices will be paid on receipt of the applicable invoice therefor. Fees and expenses will be paid on a cost basis with no mark up; provided, that Services performed by the Personnel (or any additional or replacement personnel approved by Buyer, such consent not to be unreasonably withheld, conditioned or delayed) shall be paid for by Buyer. For salaried employees and/or fixed costs, Achaogen will provide a detailed break-out of the allocation between Buyer and the Achaogen estate. For the avoidance of doubt, the allocation will be based on the time dedicated to each activity. To the extent that (i) the Parties jointly determine it is necessary to provide full-time employees with retention bonuses or other incentives ("<u>Incentives</u>") to remain employed through the duration of this Agreement and (ii) with the exception of the incentives to be paid to Caitlin Hurd as set forth in the following sentence, the payment of such Incentives is approved by the Bankruptcy Court, Buyer shall be solely responsible for funding the cost of such

Incentives.  Achaogen and Buyer have jointly determined that it is necessary and appropriate to provide certain incentives to Caitlin Hurd, and agree to Fees of $4,168 per week[3], and a one-time Incentive payment of $36,400, for her full-time commitment (40 hours or more per week) through October 21, 2019.  Notwithstanding the foregoing, Buyer shall not be required to pay such Incentive to Caitlin Hurd if it terminates her Services for cause (which shall include fraud, embezzlement, misappropriation of funds, or commission of a felony, each in connection with her performance of the Services, or complete abandonment of her duties hereunder), or if she resigns prior to October 21, 2019.

---

[3] Includes salary, insurance/benefits, and payroll taxes.

# EXHIBIT B

## TRANSITION SERVICES FROM BUYER TO ACHAOGEN

The services described herein exclusively constitute the Services to be provided by Buyer to Achaogen pursuant to the Agreement. All capitalized terms used herein and not defined shall have the meaning set forth in the Agreement, or if not defined therein, the Purchase Agreement.

| Types of Service | Time Period |
|---|---|
| Upon reasonable advance notice, provide Achaogen and Achaogen's affiliates with access during reasonable business hours to Buyer's personnel and the books and records related to the Purchased Assets in accordance with Section 10.15(b) of the Purchase Agreement. | Post-Closing Access and Cooperation Period |
| Maintain records of any payments and distributions made by or on account of Achaogen's estate in connection with the Purchased Assets, and provide such other information as reasonably requested by Achaogen, including accounting, tax and other information that is reasonably required Achaogen to prepare periodic reports during its Chapter 11 Case. | Post-Closing Access and Cooperation Period |

## BILLING

Buyer will invoice Achaogen for Services rendered on a monthly basis, except for payments in connection with Additional Contracts hereunder, which Buyer shall be responsible for. All invoices will be paid on receipt of the applicable invoice therefor. Fees and expenses will be paid on a cost basis with no mark up.