**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Achaogen, Inc.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 19-10844 (BLS)<br><br>**Requested Hearing Date:**<br>October 31, 2019 at 10:30 a.m. (ET)<br>**Requested Objections Due:**<br>October 29, 2019 at 12:00 p.m. (ET) |

**DEBTOR'S MOTION FOR AN ORDER (I) APPROVING THE DEBTOR'S ENTRY INTO THE LETTER OF INTENT WITH XUANZHU (HK) BIOPHARMACEUTICAL LIMITED, (II) AUTHORIZING THE DEBTOR AND XUANZHU TO PERFORM THEIR OBLIGATIONS THEREUNDER, INCLUDING THE BREAKUP FEE AND EXPENSE REIMBURSEMENT AND (III) GRANTING RELATED RELIEF**

Achaogen, Inc., as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case, hereby moves (the "Motion") for entry of an order under sections 105(a) and 363(b) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving the Debtor's entry into that certain letter of intent, executed October 15, 2019 (the "LOI") with XuanZhu (HK) Biopharmaceutical Limited ("XuanZhu"), relating to the XuanZhu's acquisition of certain of the Debtor's intellectual property and technical rights for the active pharmaceutical ingredient Plazomicin Sulfate (ACHN-490) ("API" or "Plazomicin") within the territory comprised of PRC, Hong Kong, Macau and Taiwan (the "Territory"), (ii) authorizing the Debtor and XuanZhu to perform in accordance with the terms of the LOI, including payment of the breakup fee and expense reimbursement, if necessary, and (iii) granting related relief. In support of this Motion, the Debtor respectfully states as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 3693. The Debtor's mailing address for purposes of this Chapter 11 Case is 548 Market Street, #70987, San Francisco, California 94104-5401.

**JURISDICTION**

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The Debtor consents pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. The bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy

**BACKGROUND**

**A.    General Background**

4. On April 15, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code thereby commencing this case (the "Chapter 11 Case"). The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "Committee") was appointed in this Chapter 11 Case on April 23, 2019. No trustee or examiner has been appointed in this Chapter 11 Case.

5. A description of the Debtor's business and the facts and circumstances leading to this Chapter 11 Case are set forth in the Declaration of Blake Wise in Support of First Day Relief [D.I. 3] (the "First Day Declaration") and incorporated herein by reference.

6.      On the Petition Date, the Debtor filed a motion for court approval of certain bidding procedures (the "Bidding Procedures") designed for the Debtor to maximize value for its assets through an expedited sale process [D.I. 30]. By order entered on May 1, 2019 [D.I. 123] (the "Bidding Procedures Order"), the Court approved the Bidding Procedures for the purpose of soliciting the highest and best offers to purchase all or substantially all of the Debtor's assets.

7.      In accordance with the Bidding Procedures, the Debtor commenced an auction (the "Auction") for substantially all of its assets on June 3, 2019, at 10:00 a.m. (prevailing Pacific Time).

8.      On June 13, 2019, the Debtor filed the *Notice of Completion of Auction and Selection of Successful Bidder* [D.I. 266] (the "Notice of Auction Results"), which designated Cipla USA Inc. ("Cipla") as the Successful Bidder for the Debtor's rights to ZEMDRI (Plazomicin) and related assets and liabilities other than the China License Rights (as defined in the Cipla Plazomicin Sale Agreement). The Notice of Auction Results also designated the following Successful Bidders: Qilu Antibiotics Pharmaceutical Co., Ltd. ("Qilu") for the Debtor's China License Rights to ZEMDRI, Unity Biotechnology, Inc. ("Unity") for the Tie2 antibody program, and Heritage Global Partners, Inc. ("Heritage") for certain of the Debtor's equipment.

9.      On June 12, 2019, at 10:00 a.m. (prevailing Pacific Time), the Debtor commenced a separate auction for the C-Scape program assets ("C-Scape"). Subsequently, on June 18, 2019, the Debtor filed the *Notice of Completion of C-Scape Auction and Selection of Successful Bidder* [D.I. 285] that designated Cipla as the Successful Bidder for C-Scape.

10.     As a result of these auctions, the Debtor entered into the following agreements: (a) an asset purchase agreement dated June 20, 2019, with Cipla (the "Cipla Plazomicin Sale

Agreement") for the Debtor's rights to ZEMDRI (Plazomicin) and related assets and liabilities, other than the China License Rights (as defined in the Cipla Plazomicin Sale Agreement), (b) an asset purchase agreement dated June 20, 2019, with Cipla (the "Cipla C-Scape Sale Agreement," and together with the Cipla Plazomicin Sale Agreement, the "Cipla Sale Agreements") for C-Scape, (c) an asset purchase agreement dated June 21, 2019, with Unity (the "Unity Sale Agreement"), and (d) an asset purchase agreement dated June 23, 2019 with Heritage (the "Heritage Sale Agreement").  At the same time, the Debtor continued to negotiate a license agreement with Qilu for the Debtor's China License Rights to ZEMDRI.[2]

11.     The Court entered orders approving the Heritage Sale Agreement [D.I. 309] and the Unity Sale Agreement [D.I. 327] on June 26, 2019 and July 1, 2019, respectively. Subsequently, on July 23, 2019, the Court entered an order approving the Cipla Plazomicin Sale Agreement [D.I. 371]. The Sales (as defined in the applicable Sale Orders) closed on June 27, 2019, July 3, 2019, and July 23, 2019, respectively.  The Debtor has reduced its workforce to one employee, and—having sold its Plazomicin business—is no longer operating as a going concern.

12.     The Debtor has not yet consummated, however, sales of its C-Scape Assets or its China License Rights.  To that end, Cipla and Qilu have each informed the Debtor that neither will be consummating their respective transactions.  Cipla has further indicated that it is not in a position to consummate the sale of the China License Rights, for which it was designated the Back-up Bidder.  The Debtor believes the sale of these assets would maximize value for the estate and is in the best interests of the Debtor, its creditors and other parties in interest. Accordingly, for the last few months, the Debtor has sought out other potential third party

---

[2] This paragraph is for summary purposes only and is qualified in its entirety by reference to the applicable sale agreements.  In the case of any inconsistency between this Motion and one of the sale agreements, the applicable sale agreement will govern.

purchasers in an effort to consummate alternative transactions that will maximize the value of these assets for the benefit of the Debtor's creditors and estate. As explained below, XuanZhu expressed a willingness to proceed with a transaction, the general terms of which are set out in the LOI, subject to a breakup fee and expense reimbursement relating to its bid.

**B.**     **Summary of the Proposed LOI's Terms**

13.    In its effort to consummate an alternative sale of the China License Rights, the Debtor has engaged in good faith negotiations with XuanZhu for the sale of certain of the Debtor's intellectual property and technical rights (the "Licensed IP") for Plazomicin, including synthesis, formulations and intermediates thereof and any products incorporating the Plazomicin, within the Territory of PRC, Hong Kong, Macau and Taiwan.

14.    The parties reached an agreement on terms of a letter of intent and executed the LOI on October 15, 2019. Pursuant to paragraph 8 of the LOI, the Debtor now seeks Court approval for the parties to perform their obligations under paragraph 7 of the LOI (as detailed below), including the Debtor's compliance with an exclusivity provision and the Debtor's commitment to pay a break-up fee and expense reimbursement, if applicable. A copy of the LOI is attached hereto as **Exhibit A**.

15.    The key terms of the LOI are as follows:

| **Proposed Assets and Rights to be Acquired** LOI at 1 | XuanZhu, or one or more of its subsidiaries, affiliates or assignees, will acquire a perpetual and exclusive license from the Debtor of all of the Debtor's intellectual property and technical rights of any nature whatsoever for any and all uses (collectively, the "Licensed IP") for the active pharmaceutical ingredient Plazomicin Sulfate (ACHN-490) including synthesis, formulations and intermediates thereof (the "API") and any products incorporating the APA, within the territory comprised of PRC, Hong Kong, Macau and Taiwan (the "Territory"). The Licensed IP shall consist of all brand names, trade secrets, know-how, patents, patent applications, trademarks, service marks, tradenames and all derivatives thereof and intellectual property added thereto and all rights, |

| | |
|---|---|
| | claims and applications relating to any of the foregoing, free and clear of all liens, encumbrances, interests, charges and claims of any nature whatsoever ("Liens") for use within the Territory on a non-terminable, royalty-free basis (except for the Royalty Advance, as defined below).<br><br>The parties agree to discuss alternatively structuring the Proposed Transaction (as defined in the LOI) as a sale of all right, title and interest in and to the Licensed IP in the Territory in lieu of a license pursuant to an order of this Court.[3] |
| **Royalty Advance**<br>LOI § 3 | XuanZhu shall pay $4,500,000 to the Debtor as a royalty advance for the license of the Licensed IP, payable as follows (i) $1,000,000 as a deposit into escrow, upon execution of the LOI (such deposit is refundable if a Definitive Agreement is not entered into between the parties), (ii) $1,000,000 as a deposit into escrow, upon execution of a Definitive Agreement and (iii) $2,500,000 at Closing. |
| **The Definitive Agreement**<br>LOI § 6 | As soon as reasonably practicable after execution of the LOI, the Debtor and XuanZhu will negotiate, execute and deliver a license agreement (the "Definitive Agreement") and the other documentation contemplated thereby. |
| **Exclusivity**<br>LOI § 7(a) | The Debtor agrees that, until the Diligence Ending Date (defined below), it will not, and will direct its directors, officers, shareholders, managers and other representatives not to, solicit, encourage, or participate in discussions or negotiations with, or provide any assistance or information to, or enter into any agreements with, any other party concerning the sale or license of the Licensed IP within the Territory; provided, however, that if the Debtor receives any unsolicited communications from a third party regarding an alternative transaction involving the sale or license of the Licensed IP within the Territory and it is advised by counsel that it is required by applicable law to consider such alternative transaction, it may consider such alternative transaction and take actions in furtherance of it without breaching paragraph 7 of the LOI.<br><br>Anything to the contrary notwithstanding, the exclusivity obligation of paragraph 7(a) of the LOI shall not prohibit or restrict the ability of the Debtor to litigate or negotiate a resolution of claims of the Debtor against Cipla USA Inc. ("Cipla") arising from or relating to the Cipla's breach of its obligations to purchase the rights to the Licensed IP in the Territory. |

---

[3] In the event the parties decide to structure the Proposed Transaction as a sale, the Debtor will work with Cipla to unwind the transfer of certain assets to Cipla to the extent such assets were transferred by order of this Court. Cipla has indicated to the Debtor a desire to pursue a sale transaction rather than a license.

| | |
|---|---|
| **Break-Up Fee and Expense Reimbursement** LOI § 7(a) | In the event that the Debtor executes an agreement governing an alternative transaction (an "Alternative Transaction Agreement") during the Diligence Period (as defined below), XuanZhu will be paid $200,000, as a reasonable estimate of the reasonable professional fees, costs and expenses incurred by XuanZhu in connection with the Proposed Transaction (defined as the proposal encompassed in the LOI) (the "Expense Reimbursement") plus $225,000 (representing 5% of the consideration that XuanZhu would have paid to the Debtor to consummate the Proposed Transaction (the "Break-Up Fee"). |
| **Bidding Procedures** LOI § 7(a) | If the Debtor executes an Alternative Transaction agreement in lieu of the Proposed Transaction during the Diligence Period, the Debtor shall, within two (2) calendar days after execution of such agreement, give XuanZhu notice of such agreement along with a complete copy of all documents comprising such Alternative Transaction Agreement. XuanZhu may then elect to enter into competitive bidding, with the highest and best bid to prevail. If XuanZhu so elects, and its bid is ultimately determined to be (and is approved by the Bankruptcy Court as) the highest and best bid, XuanZhu shall not be entitled to the Break-Up Fee or the Expense Reimbursement but will be entitled to receive reimbursement of all professional fees, costs and expenses incurred by XuanZhu (not to exceed $100,000 in the aggregate) solely in connection with such competitive bidding process and approval of its bid. <br><br> For the avoidance of doubt, if XuanZhu participates in a competitive bidding process following the Debtor's execution of an Alternative Transaction Agreement and its bid is not determined to be the highest and best bid, it shall be entitled to the full amounts of the Break-Up Fee and the Expense Reimbursement. |
| **Deposits** LOI § 7(b) | Upon execution of the LOI, XuanZhu shall make a wire transfer of funds into the Debtor's escrow account with US Bank in the amount of US$1,000,000 (the "Initial Deposit"). Upon execution of a Definitive Agreement, XuanZhu shall make a second wire transfer of funds into the Debtor's escrow account with US Bank in the amount of US$1,000,000 (the "Second Deposit," and together with the Initial Deposit, the "Deposit"). <br><br> In the event the Proposed Transaction closes, the Deposit shall be credited in full, without any reduction, to the US$4,500,000 royalty advance under paragraph 3 of the LOI. <br><br> If a Definitive Agreement is not entered into within sixty (60) calendar days after the date the LOI is executed for any reason, the Initial Deposit shall be immediately returned to XuanZhu in full without any |

| | |
|---|---|
| | reduction, and the parties shall have no further rights or obligations to one another, unless the Transaction Procedures Order (as defined below) has been entered and XuanZhu is entitled to the Expense Reimbursement and the Break-Up Fee in connection with an Alternative Transaction Agreement under the terms of paragraph 7(a) of the LOI. The Debtor agrees, and the Transaction Procedures Order shall provide, that the automatic stay under section 362 of the Bankruptcy Code shall be lifted to permit XuanZhu to pursue such remedy. |
| **Termination Notice & Diligence Period** LOI § 7(c) | XuanZhu agrees to immediately notify the Debtor in writing if it no longer intends to pursue the Proposed Transaction (a "Transaction Termination Notice"). As used herein, the term "Diligence Period" means the period commencing on the date of the Debtor's execution of the LOI and ending on the earlier of (i) the 45th day immediately following such date and (ii) the date on which the Diligence Period expires or terminates (the "Diligence Ending Date"). |
| **Bankruptcy Court Approval** LOI § 8 | As promptly as practicable after the execution of the LOI, and subject to the Debtor's receipt of the Initial Deposit, the Debtor will file with the Bankruptcy Court a motion seeking entry of an order authorizing the observance and performance by the parties of the terms of paragraph 7 of the LOI (the "Transaction Procedures Order"). The obligations of the Debtor under paragraph 7(a) of the LOI shall only be effective and binding on the Debtor upon the entry of the Transaction Procedures Order. |
| **Binding Nature** LOI § 9 | Except with respect to paragraphs 7, 8, 9 and 10 of the LOI which are binding on the parties, the LOI shall not constitute a binding agreement between XuanZhu and the Debtor, but merely sets forth their present intentions with respect to the Proposed Transaction. |

## **RELIEF REQUESTED**

16. By this Motion, the Debtor requests entry of an order (i) approving the Debtor's entry into the LOI, (ii) authorizing the Debtor to perform in connection with the terms of the LOI, including payment of the Break-Up Fee and Expense Reimbursement, if necessary, and (iii) granting related relief.

**BASIS FOR RELIEF REQUESTED**

A. **The Debtor's Entry into the LOI Should Be Approved**

17. Section 363(b) of the Bankruptcy Code authorizes a debtor to enter into transactions outside of the ordinary course of business with court approval. *See* 11 U.S.C. § 363(b). Courts in the Third Circuit have authorized the use or sale of property of the estate outside of the ordinary course of business when such use or sale is grounded upon a "sound business purpose" and is proposed in good faith. *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) (noting that it is "well-settled" that a debtor may use its assets outside the ordinary course where such use "represents the sound exercise of business judgment"); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (stating that a debtor's use or sale of property of the estate may be authorized when the debtor shows "that a sound business purpose justifies such actions").

18. To determine whether the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs, Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *rev'd on other grounds*, 607 F.3d 957 (3d Cir. 2010); *see also In re Helm*, 335 B.R. 528, 538-39 (Bankr. S.D.N.Y. 2006). Once a debtor articulates a valid business justification under section 363(b) of the Bankruptcy Code, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interests of the debtor's estate. *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule therefore shields a debtor's management from judicial second guessing, and mandates that a court approve

a debtor's business decision unless that decision is the product of bad faith or gross abuse of discretion. *See id.*

19. In addition, under section 105(a), "the court may issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004). Section 105(a) empowers the Court to fashion orders necessary to further the purposes of other sections of the Bankruptcy Code. *See, e.g., Combustion Eng'g, Inc.*, 391 F.3d at 236 ("The general grant of equitable power contained in § 105(a) . . . must be exercised within the parameters of the Code itself."); *In re Padilla*, 389 B.R. 409, 425 (E.D. Pa. 2008) ("[A] court may invoke § 105(a) if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code . . . ."). As long as the Court does not invoke its equitable powers to achieve a result outside the scope of the Bankruptcy Code, the exercise of its equitable powers under section 105(a) is proper. *See In re Nixon*, 404 Fed.Appx. 575, 578 (3d Cir. 2010) ("The Bankruptcy Court's actions 'cannot trump specific provisions of the Bankruptcy Code.'" (citing *Combustion Eng'g, Inc.*, 391 F.3d at 236)).

20. In this Chapter 11 Case, the Debtor's decision to enter into the LOI represents a sound exercise of the Debtor's business judgment. As detailed above, the Debtor commenced an extensive sale process for all or substantially all of the Debtor's assets in an effort to maximize value to the Debtor's creditors and other stakeholders. This sale process resulted in the designation of four Successful Bidders for five distinct categories of the Debtor's assets. The Debtor then entered into four separate asset purchase agreements (while continuing to negotiate the licensing agreement with Qilu) and successfully closed three of the five Sales.

21. However, as noted above, Cipla and Qilu have each indicated they are not in a position to consummate their respective purchases of the C-Scape Assets and the China License Rights.[4] Accordingly, because the Debtor believes the sale of these assets would maximize the value for the estate and is in the best interest of the Debtor, its creditors and other parties in interest, the Debtor sought out alternative transactions for the sale of these assets. With respect to the China License Rights, the LOI represents a viable alternative transaction that will add $4,500,000 of cash value to the Debtor's estate. Without Court approval of the LOI, the Debtor will continue to retain the China License Rights at no benefit to the estate or its creditors, with the risk that it will be unable to dispose of those rights for value, in as much as the Debtor is no longer operating as a going concern business and has no need for these assets.

22. Accordingly, the Debtor submits that approval of its entry into the LOI and the binding terms and conditions thereunder is appropriate.

**B.    The Debtor's Obligations under Paragraph 7 of the LOI Should Be Approved**

23. To induce XuanZhu to enter into the LOI, the Debtor has agreed, subject to Court approval, to certain protections, including a Break-Up Fee and Expense Reimbursement, as detailed in paragraph 7(a) of the LOI. As bankruptcy courts have long recognized, break-up fees and other termination fees are a reasonable, normal and, in many cases, necessary component of significant sales conducted under the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.

---

[4] Notwithstanding the Debtor's efforts through the proposed transaction with XuanZhu to mitigate damages caused by Cipla and Qilu, the Debtor and its Estate expressly reserve all rights and claims it may have relating to Cipla, Qilu, and the China License Rights.

*Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659–60 (Bankr. S.D.N.Y. 1992). Specifically, "[b]reakup fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (internal quotations omitted); *see also Integrated*, 147 B.R. at 660–61 (noting that break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

24. Break-up fees are appropriate where they "provide some benefit to the debtor's estate," including (a) "induc[ing] a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely" and (b) promoting more competitive bidding "by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'lBrien Envt'l Energy, Inc.)*, 181 F.3d 527, 536–37 (3d Cir. 1999). In connection therewith, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* at 537.

25. Historically, bankruptcy courts have approved bidding incentives, such as break-up fees and expense reimbursements, under the business judgment rule. *See O'Brien*, 181 F.3d at 534–35; *Integrated*, 147 B.R. at 657 ("break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule"); *995 Fifth Ave.*, 96 B.R. at 28.

26. In addition to the traditional business judgment rule, the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context. The Third Circuit has held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of

section 503(b) of the Bankruptcy Code govern in the bankruptcy context. *See O'Brien*, 181 F.3d at 535. Accordingly, to be approved, bidding incentives must provide some benefit to a debtor's estate. *See id.* at 533.

27. Evaluated under the Third Circuit's more rigorous "administrative expense" standard, the Break-Up Fee and Expense Reimbursement proposed in the LOI pass muster and should be approved. The LOI is the product of good faith, arm's length negotiations between the Debtor and XuanZhu. The Debtor believes that paragraph 7(a) of the LOI contains the most favorable terms, including the Break-Up Fee and Expense Reimbursement, achievable by the Debtor under the circumstances.

28. The Debtor has committed, subject to Court approval, to pay the Break-Up Fee and Expense Reimbursement only in the event that the Debtor executes an Alternative Transaction Agreement. In light of the Debtor's extensive postpetition marketing process and the exclusivity provision in paragraph 7(a) of the LOI, the Debtor believes that it is unlikely to receive a higher or better proposal than the Proposed Transaction. However, in the event that the Debtor is presented with an alternative transaction, the Break-Up Fee and Expense Reimbursement incentivize XuanZhu to enter into competitive bidding for the Licensed IP. Any higher or otherwise better offer that results from competitive bidding will provide additional value to the benefit of the Debtor's estate and its creditors.

29. Moreover, XuanZhu would not have entered into the LOI without the Break-Up Fee and Expense Reimbursement. The Break-Up Fee and Expense Reimbursement induced XuanZhu to value the Licensed IP to a dollar figure on which other interested parties could rely and submit a proposal for an alternative transaction. Accordingly, the Break-Up Fee and Expense Reimbursement will compensation XuanZhu for the benefit it provides to the Debtor's

estate in the event the LOI promotes the Debtor's entry into an Alternative Transaction Agreement.

30. The Committee and Silicon Valley Bank, N.A. (the "<u>DIP Lender</u>") both support approval of the LOI and the Break-Up Fee and Expense Reimbursement obligations set forth in paragraph 7(a) therein.

31. Accordingly, the Debtor believes that its commitment to the obligations set forth in paragraph 7(a) of the LOI is reasonable and necessary to preserve and enhance the value of its estate. For the reasons set forth above, the Debtor respectfully requests approval of the Break-Up Fee and Expense Reimbursement.

## **WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)**

32. To implement the LOI, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). If the effectiveness of Court approval of the LOI is delayed it may impair the Debtor's ability to executive a Definitive Agreement to sell the Licensed IP to XuanZhu. This would directly prejudice the Debtor's estate and its creditors by reducing the likelihood that the Debtor is able to consummate a sale of the Licensed IP.

## **NOTICE**

33. Copies of this Motion have been served upon the following by overnight delivery, hand delivery and/or email: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the buyers of the Debtor's assets; (c) counsel to the Committee; (d) counsel to the DIP Lender; and (e) any other party that has requested notice pursuant to Local Rule 2002-1(b). The Debtor respectfully submits that no further notice of this Motion is required under the circumstances.

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached as **Exhibit B** (i) approving the Debtor's entry into the LOI, (ii) authorizing the Debtor and XuanZhu to perform pursuant to the terms of the LOI, including payment of a Break-Up Fee and Expense Reimbursement, if necessary, and (iii) granting related relief.

| | |
|---|---|
| Dated: October 22, 2019<br>Wilmington, Delaware | MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br>*/s/ Paige N. Topper*<br>Derek C. Abbott (No. 3376)<br>Andrew R. Remming (No. 5120)<br>Matthew O. Talmo (No. 6333)<br>Paige N. Topper (No. 6470)<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Tel.: (302) 658-9200<br>Fax: (302) 658-3989<br>dabbott@mnat.com<br>aremming@mnat.com<br>mtalmo@mnat.com<br>ptopper@mnat.com<br><br>- and -<br><br>Richard L. Wynne (CA 120349) *admitted pro hac vice*<br>Erin N. Brady (CA 215038) *admitted pro hac vice*<br>HOGAN LOVELLS US LLP<br>1999 Avenue of the Stars, Suite 1400<br>Los Angeles, California 90067<br>Telephone: (310) 785-4600<br>Facsimile: (310) 785-4601<br>richard.wynne@hoganlovells.com<br>erin.brady@hoganlovells.com<br><br>- and - |

Christopher R. Bryant (NY 3934973) *admitted pro hac vice*
John D. Beck (TX 24073898) *admitted pro hac vice*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
chris.bryant@hoganlovells.com
john.beck@hoganlovells.com

*Counsel for Debtor and Debtor in Possession*