# EXHIBIT A

## Xuanzhu Sale Agreement

ASSET PURCHASE AGREEMENT

by and between

ACHAOGEN, INC.,

SELLER

and

XUANZHU (HK) BIOPHARMACEUTICAL LIMITED

PURCHASER

DATED AS OF DECEMBER 29, 2019

# TABLE OF CONTENTS

Page

**ARTICLE 1** DEFINITIONS AND CONSTRUCTION ..................................................2

**Section 1.1** Definitions. For the purposes of this Agreement: ............................2
**Section 1.2** Construction ........................................................................................14

**ARTICLE 2** THE TRANSACTION ............................................................................15

**Section 2.1** Sale and Purchase of China Purchased Assets...............................15
**Section 2.2** Excluded Assets ................................................................................16
**Section 2.3** Assumed Liabilities ..........................................................................18
**Section 2.4** Excluded Liabilities ..........................................................................19
**Section 2.5** Consideration. ....................................................................................19
**Section 2.6** Deposit ................................................................................................21
**Section 2.7** Allocation of Purchase Price............................................................21
**Section 2.8** Closing ................................................................................................22
**Section 2.9** Closing Deliveries.............................................................................22
**Section 2.10** Consents..............................................................................................24
**Section 2.11** Seller Acknowledgments ..................................................................25

**ARTICLE 3** REPRESENTATIONS AND WARRANTIES OF THE SELLER........................25

**Section 3.1** Organization.......................................................................................26
**Section 3.2** Authority and Enforceability ...........................................................26
**Section 3.3** No Conflict.........................................................................................26
**Section 3.4** Title to Assets; Liens ........................................................................27
**Section 3.5** Claims, Litigation and Disputes.......................................................27
**Section 3.6** Compliance With Laws; Governmental Authorizations..................27
**Section 3.7** Environmental Matters......................................................................27
**Section 3.8** Contracts ............................................................................................28
**Section 3.9** China Intellectual Property. ..............................................................28
**Section 3.10** Taxes...................................................................................................31
**Section 3.11** Action.................................................................................................31
**Section 3.12** Data Room .........................................................................................31

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF THE PURCHASER................31

**Section 4.1** Organization and Good Standing......................................................32
**Section 4.2** Authority and Enforceability ............................................................32
**Section 4.3** No Conflict..........................................................................................32
**Section 4.4** Legal Proceedings..............................................................................32
**Section 4.5** Availability of Funds .........................................................................32
**Section 4.6** No Knowledge of Breach or Inaccuracy...........................................32
**Section 4.7** Independent Investigation .................................................................33

**ARTICLE 5** COVENANTS .........................................................................................................33

    **Section 5.1**    Access and Investigation.................................................................33
    **Section 5.2**    Operation of the China Plazomicin Business.................................33
    **Section 5.3**    Employee Matters ..........................................................................35
    **Section 5.4**    Consents and Filings; Commercially Reasonable Efforts. ............35
    **Section 5.5**    Supplements to Disclosure Schedules ............................................36
    **Section 5.6**    Confidentiality ...............................................................................37
    **Section 5.7**    Public Announcements ...................................................................37
    **Section 5.8**    Bulk Transfer Laws........................................................................37
    **Section 5.9**    Bankruptcy Court Matters..............................................................37
    **Section 5.10**    Bankruptcy Court Approval ...........................................................39
    **Section 5.11**    No Solicitation. ..............................................................................39
    **Section 5.12**    Transaction Supplement.................................................................41
    **Section 5.13**    Payments Received. .......................................................................41
    **Section 5.14**    Cessation of Use of Acquired China Intellectual Property. ...........42
    **Section 5.15**    Transfer of Governmental Authorizations and China IP Registrations. .........42
    **Section 5.16**    Further Actions ..............................................................................42
    **Section 5.17**    Use of Seller Corporate Names......................................................43

**ARTICLE 6** CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE.............................43

    **Section 6.1**    Conditions to the Obligation of the Purchaser ...............................43
    **Section 6.2**    Conditions to the Obligations of the Seller.....................................44

**ARTICLE 7** TERMINATION.......................................................................................................45

    **Section 7.1**    Termination Events.........................................................................45
    **Section 7.2**    Effect of Termination.....................................................................46

**ARTICLE 8** NO SURVIVAL .......................................................................................................47

    **Section 8.1**    No Survival of Representations and Warranties and Certain Covenants ........47

**ARTICLE 9** TAX MATTERS .......................................................................................................47

    **Section 9.1**    Transfer Taxes ...............................................................................47
    **Section 9.2**    Proration items ...............................................................................48

**ARTICLE 10** GENERAL PROVISIONS ......................................................................................48

    **Section 10.1**    Notices ...........................................................................................48
    **Section 10.2**    Amendment....................................................................................50
    **Section 10.3**    Waiver and Remedies ....................................................................50
    **Section 10.4**    Entire Agreement ...........................................................................50
    **Section 10.5**    Assignment, Successors and No Third Party Rights ......................50
    **Section 10.6**    Severability ....................................................................................51
    **Section 10.7**    Exhibits and Schedules ..................................................................51
    **Section 10.8**    Interpretation..................................................................................52
    **Section 10.9**    Expenses ........................................................................................52

**Section 10.10**  Limitation on Liability ..................................................................52
**Section 10.11**  Specific Performance .................................................................52
**Section 10.12**  Governing Law; Jurisdiction; Waiver of Jury Trial ......................52
**Section 10.13**  No Joint Venture ........................................................................53
**Section 10.14**  Counterparts; Signatures ...........................................................53
**Section 10.15**  Preservation of Records; Post-Closing Access and Cooperation. ..................53

## **Exhibits**

Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement
Exhibit C – Form of China Intellectual Property Assignment
Exhibit D – Form of Support Agreement
Exhibit E – Form of Sale Order

## **Schedules**

Schedule 2.1(c) –China Intellectual Property

## **Seller Disclosure Schedules**

Schedule 3.4 – Title to Assets, Liens
Schedule 3.5 – Claims, Litigation and Disputes
Schedule 3.6 – Governmental Authorizations
Schedule 3.9(a) – Company Owned China Intellectual Property, Company Used China Intellectual Property and China IP Agreements
Schedules 3.9(c) – China Intellectual Property Claims Brought Against the Seller
Schedule 3.10 – Taxes
Schedule 5.2 – Operation of the China Plazomicin Business

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of December 29, 2019, by and between Achaogen, Inc., a Delaware corporation, debtor and debtor in possession (the "Seller" or "Debtor"), and Xuanzhu (HK) Biopharmaceutical Limited, a Hong Kong private limited company (the "Purchaser").  Capitalized terms have the meanings given below.

## RECITALS

WHEREAS, the Seller is a biopharmaceutical company focused on the development and commercialization of innovative antibacterial agents for multi-drug resistant gram-negative infections (the "Business");

WHEREAS, on April 15, 2019, the Seller filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (Case No. 19-10844-BLS), and is operating and managing its businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, subject to and upon the terms and conditions herein, the Seller desires to sell, assign, transfer, convey and deliver and cause its Subsidiaries to sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, all of the China Purchased Assets, subject to the terms and conditions described in this Agreement;

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order approving such sale free and clear of all Liens and Claims, all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Transaction Procedures Order; and

WHEREAS, the Seller and the Purchaser have negotiated in good faith and at arm's length for the purchase and sale of the China Purchased Assets, and the assumption of certain Liabilities associated therewith, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements, representations and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

**Section 1.1**     <u>Definitions</u>.  For the purposes of this Agreement:

"<u>Acquired China Intellectual Property</u>" has the meaning set forth in <u>Section 2.1(c)</u>.

"<u>Affiliate</u>" means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the specified Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, under no circumstance will the Purchaser and the Seller be deemed Affiliates of one another notwithstanding the possession by the Purchaser (whether or not exercised) of any rights with respect to the Seller or otherwise as a result of the transactions contemplated in this Agreement.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation</u>" has the meaning set forth in <u>Section 2.7(a)</u>.

"<u>Allocation Statement</u>" has the meaning set forth in <u>Section 2.7(a)</u>.

"<u>Alternative Transaction</u>" means a written agreement between the Debtor and a third party for an alternative transaction regarding the China Purchased Assets to the transactions contemplated by this Agreement.

"<u>AMP Assets</u>" means all of the assets of the Seller, wherever located, relating to the AMP Development Program, including China Intellectual Property, Contracts and Governmental Authorizations.

"<u>AMP Development Program</u>" means the AMP development program of the Seller relating to novel beta-lactam agents.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.9(a)(vi)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure.

"Bill of Sale" has the meaning set forth in Section 2.9(a)(i).

"Budget" has the meaning set forth in the DIP Loan Agreement.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday or any day on which banking institutions in Delaware are closed either under applicable Law or action of any Governmental Authority.

"Business Payments" has the meaning set forth in Section 5.13.

"Chapter 5 Actions and Claims" means, with respect to any Person, all avoidance actions, claims or causes of action that constitute property of such Person's bankruptcy estate under section 541 of the Bankruptcy Code, including claims and causes of action under chapter 5 of the Bankruptcy Code or any other applicable law, and all proceeds therefrom.

"Chapter 11 Case" means the case commenced by the Debtor under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (Case No. 19-10844-BLS).

"China Intellectual Property" mean all Intellectual Property pertaining to only the China Territory, but not including the Excluded IP.

"China Intellectual Property Assignment" has the meaning set forth in Section 2.9(a)(vi).

"China IP Agreements" means all agreements (including outstanding decrees, orders, judgments, settlement agreements, or stipulations) to which the Seller or any of its Subsidiaries is a party which contain provisions: (i) granting to any Person rights in Company Owned China Intellectual Property or Company Used China Intellectual Property; (ii) granting to the Seller or any Subsidiary thereof any rights in Company Used China Intellectual Property; (iii) consenting to another Person's use of Company Owned China Intellectual Property or Company Used China Intellectual Property, or covenanting not to sue any Person for infringement of any such China Intellectual Property; (iv) restricting the Seller's or any of its Affiliates' use of Company Owned China Intellectual Property or any Company Used China Intellectual Property; or (v) otherwise relate to China Intellectual Property covering the Product.

"China Plazomicin Business" means Seller's Business related to the Product pertaining to the China Territory, including the Exploitation of the Product.

"China Product Trademarks" means the China Trademarks used or held for use by the Seller or its Affiliates for the Product in the China Plazomicin Business and any registrations thereof or any pending applications relating thereto, including any unregistered China Trademark rights related to the Product as may exist through use before, on or after the Closing Date within or pertaining to the China Territory (for clarity, excluding any Seller Corporate Names).

"China Purchased Assets" has the meaning set forth in Section 2.1.

"China Territory" means the People's Republic of China, Hong Kong, Macau and Taiwan.

"China Trademarks" means trademarks, trade names, service marks, designs, logos, brand names, emblems, signs or insignia, slogans, Internet addresses and domain names, other similar designations of source or origin and general intangibles of like nature, together with the registrations and applications for registrations pertaining to any of the foregoing, any derivations of any of the foregoing, all goodwill associated therewith, and rights to sue for past infringement thereof within or pertaining to the China Territory.

"Cipla" has the meaning set forth in Section 2.11(a).

"Cipla Closing Date" has the meaning set forth in Section 2.11(a).

"Cipla Plazomicin APA" has the meaning set forth in Section 2.9(a)(ii).

"Cipla Plazomicin Sale Order" has the meaning set forth in Section 2.11(a).

"Cipla Plazomicin Transaction" has the meaning set forth in Section 2.11(a).

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"Closing Payment" has the meaning set forth in Section 2.5(a)(i).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, including the regulations promulgated thereunder.

"Collective Bargaining Agreement" means any written or oral agreement, memorandum of understanding or other contractual obligation between the Seller and any labor organization or other authorized employee representative representing Service Providers.

"Commercially Available China IP" has the meaning set forth in Section 3.9(e).

"Company China IP Registrations" means all of the Seller's China Intellectual Property that is subject to any issuance registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in the China Territory, including registered China Trademarks, domain names and Copyrights, issued and reissued Patents and pending applications or filings for any of the foregoing, but not including the Seller Corporate Names.

"Company Owned China Intellectual Property" means all China Intellectual Property owned or purported to be owned, in whole or in part by the Seller or any of its Subsidiaries, and required only for and used or held only for use in connection with the China Plazomicin Business, including the China Intellectual Property as set forth on Schedule 2.1(c) and subject to Section 2.1, but not including the Seller Corporate Names or the Excluded IP.

"Company Used China Intellectual Property" means the Seller's rights and interest in all China Intellectual Property owned or controlled by a Third Party and licensed or otherwise made available to the Seller or any Subsidiary or used or held for use by the Seller or any Subsidiary, in whole or in part, that is required only for and used or held only for use in connection with the China Plazomicin Business, in each case, subject to Section 2.1, other than Commercially Available IP and the Excluded IP.

"Confidential Information" means any information that is not generally known to the public and that is or has been used, developed or obtained by the Seller and its Affiliates to the extent it relates to the China Purchased Assets, including: (i) products or services; (ii) fees, costs and pricing structures; (iii) designs and specifications; (iv) analyses; (v) drawings, photographs and reports; (vi) computer software, including electronic mail, operating systems, applications and program listings; (vii) flow charts, transaction summaries and models, manuals and documentation; (viii) databases; (ix) financial reports, investment summaries, and accounting and business methods; (x) ideas, formulas, compositions, inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice; (xi) suppliers, customers and clients and supplier, customer, contact or client lists and other marketing data or plans; (xii) know-how; (xiii) manufacturing and production processes and techniques; (xiv) research and development information; (xv) files and records; and (xvi) all similar and related information in whatever form, except that Confidential Information will not include any information that (1) has been published in a form generally available to the public or becomes part of the public domain, other than as a result of a disclosure by the parties hereto or their respective representatives; (2) was known or was otherwise in possession of the receiving party prior to the time of disclosure of such information by the disclosing party or (3) is developed by the receiving party independent of and without reference to any Confidential Information disclosed by the disclosing party under this Agreement.

"Contract" means any contract, agreement, lease, license, commitment, understanding, franchise, warranty, guaranty, mortgage, note, bond or other instrument or consensual obligation that is legally binding.

"Copyrights" means all copyrights, including copyrights in software and in the content contained on any Web site, artwork (including editable jpeg images), packaging material, patient information leaflets, promotional material, advertising material, and those which are registered, applied for registration or used, whether registrable or not, by the Seller, and rights to sue for past infringement thereof.

"C-Scape Assets" means all of the assets of the Seller, wherever located, relating to the C-Scape Development Program, including China Intellectual Property, Contracts and Governmental Authorizations.

"C-Scape Development Program" means the C-Scape development program of the Seller which consists of a potential therapeutic including clavulanic acid and ceftibuten.

"Data Room" has the meaning set forth in Section 3.12.

"Deposit" has the meaning set forth in Section 2.6.

"DIP Loan Agreement" means the Senior Secured Superpriority Debtor-in-Possession Loan and Security Agreement, dated as of April 15, 2019, by and among the Seller, and Silicon Valley Bank, as lender.

"Employee Plan" means any written: (i) "employee benefit plan" as defined in Section 3(3) of ERISA; (ii) compensation, employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, agreement, arrangement, program or policy; or (iii) other plan, agreement, arrangement, program or policy providing for compensation, bonuses, profit-sharing, equity or equity-based compensation or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangement), medical, dental, vision, prescription or fringe benefits, life insurance, relocation or expatriate benefits, perquisites, disability or sick leave benefits, employee assistance program, workers' compensation, supplemental unemployment benefits or post-employment or retirement benefits (including compensation, pension, health, medical or insurance benefits), in each case (A) that is sponsored, maintained, administered, contributed to or entered into by the Seller for the current or future benefit of any current or former Service Provider or (B) for which the Seller has any direct or indirect liability.

"Environmental Law" means any Law concerning: (i) the treatment, disposal, emission, discharge, Release or threatened Release of Hazardous Material; or (ii) the protection of the environment (including natural resources, air and surface or subsurface land or waters).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any rules or regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in Section 2.1(j).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Exploitation", and related terms such as "Exploit", shall mean, with respect to the Product or any other product, the research, development, manufacture, having manufactured, testing, storage, import, export, distribution, sale, licensing, use, having used, offering for sale, having sold, disposition, registering, holding or keeping (whether for disposal or otherwise), commercializing, advertising, marketing and promotion of the Product or such other product, as

applicable, and applying for and receiving regulatory approvals, including from the FDA (on compliance with all requirements including clinical trials) related to the Product or such other product, and including the outsourcing of any of the foregoing activities in each case within or pertaining to the China Territory.

"FDA" means the United States Food and Drug Administration.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Bankruptcy Rule 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of: (A) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed with Closing; and (B) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which the Purchaser, in its sole and absolute discretion, elects to proceed.

"Governmental Authority" means any: (i) nation, region, state, county, city, town, village, district or other jurisdiction; (ii) federal, state, local, municipal, foreign or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal); (iv) multinational organization exercising judicial, legislative or regulatory power; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government.

"Governmental Authorization" means any approval, consent, ratification, waiver, license, permit, registration or other authorization issued or granted by any Governmental Authority.

"Hazardous Material" means any waste or other substance that is listed, defined, designated or classified as hazardous, radioactive or toxic or a pollutant or a contaminant under any Environmental Law, including any admixture or solution thereof, and including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials in any form or condition and polychlorinated biphenyls.

"Hovione" means Hovione Limited, a company with its principal place of business at Loughbeg, Ringaskiddy, Cork, County Cork, Ireland.

"Intellectual Property means all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (i) all Patents and applications for Patents and all related reissues, reexaminations, divisions, renewals, extensions, provisionals, continuations and continuations-in-part, including any future applications or filings of the foregoing; (ii) all Copyrights, Copyright registrations and Copyright applications, copyrightable works and all other corresponding rights; (iii) all mask works, mask work registrations and mask work applications and all other corresponding rights; (iv) all advertising material, trade dress and trade names, logos, Internet addresses and domain names, China Trademarks and service marks and related registrations and applications, including any intent to use applications, supplemental registrations and any renewals or extensions, all other indicia of commercial source or origin and all goodwill associated with any of the foregoing; (v) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, clinical trial data and information, safety data and pharmacovigilance data, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind; (vi) all computer software (including source and object code), firmware, development tools, algorithms, files, records, technical drawings and related documentation, data and manuals; (vii) all databases and data collections; (viii) all licenses and permits to the extent transferable; (ix) all rights pertaining to the foregoing, including those arising under international treaties and convention rights, (x) all rights and powers to assert, defend and recover title to any of the foregoing, (xi) all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any of the foregoing, (xii) all proceeds, income, royalties, damages and payments now and/or hereafter due and payable under and/or in respect of all of the foregoing (including with respect to past, present or future infringement or violation thereof), (xiii) all administrative rights arising from the foregoing, including the right to prosecute applications and oppose, interfere with or challenge the applications of others, the rights to obtain renewals, continuations, divisions, and extensions of legal protection pertaining to any of the foregoing, and (xiv) all other intellectual property rights irrespective of not being registered or applied for registration.

"Judgment" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Knowledge of the Seller" or "the Seller's Knowledge" means the actual knowledge of any executive officer of the Seller after due inquiry into the facts or circumstances supporting any representation, warranty or statement qualified by such terms.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance or code.

"Liability" means any liability or obligation, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due.

"Lien" means any possessory or non-possessory lien, license (other than with respect to any Company Used China Intellectual Property), encumbrance, claim or charge against or other interest in any property or assets, whether voluntary or involuntary and whether statutory or contractual, including any mortgage, deed of trust, deed to secure debt, pledge, assignment, hypothecation, security interest, attachment, judgment, levy, conditional sale agreement, right of first refusal, right of first offer, option, restriction of any kind, including any restriction on use, transfer, receipt of income or exercise of any other attribute of ownership or other arrangement, and including any agreement to give any of the foregoing.

"LOI" means the letter of intent between the Seller and Purchaser, executed October 15, 2019, as approved by the Transaction Procedures Order [Dkt. No. 516].

"Material Adverse Effect" means any event, change, circumstance, effect or other matter that has a material adverse effect on: (i) the condition or value of any material portion of the China Purchased Assets; or (ii) the ability of the Seller to consummate timely the transactions contemplated by this Agreement; provided, however, that none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect: any event, change, circumstance, effect or other matter resulting from or related to: (A) any Excluded Assets or Excluded Liabilities; (B) any outbreak or escalation of war or major hostilities or any act of terrorism; (C) changes in Laws, United States generally accepted accounting principles or enforcement or interpretation thereof; (D) changes that generally affect the industries and markets in which the Seller operates which does not disproportionately affect Seller; (E) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions; (F) any failure, in and of itself, of the Seller to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics; (G) any action taken or failed to be taken pursuant to or in accordance with this Agreement or at the request of, or consented to by, the Purchaser; (H) the filing or continuation of the Chapter 11 Case or any action approved by the Bankruptcy Court (or any other Governmental Authority in connection with any such Proceeding); (I) the execution or delivery of this Agreement, the consummation of the transactions contemplated by this Agreement or the public announcement or other publicity with respect to any of the foregoing; or (J) any change in or termination of the relationship of the Seller with its Service Providers, customers or suppliers.

"Materials of Environmental Concern" means all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances

Pollution Contingency Plan, 40 C.F.R. § 300.5, or defined as such by, or regulated as such under, any Environmental Law.

"<u>Non-Proration Items</u>" has the meaning set forth in <u>Section 9.2</u>.

"<u>Order</u>" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"<u>Other Seller Taxes</u>" has the meaning set forth in <u>Section 9.2</u>.

"<u>Outside Date</u>" has the meaning set forth in **Error! Reference source not found.**.

"<u>Patent</u>" means all patents and industrial designs, including any continuations, divisionals, continuations-in-part, renewals, reissues and applications for any of the foregoing, and rights to pursue future applications and filings for any of the foregoing and to rights to sue for past infringement thereof.

"<u>Person</u>" means an individual or an entity, including a corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity, or any Governmental Authority.

"<u>Petition</u>" has the meaning set forth in the Recitals.

"<u>Petition Date</u>" means April 15, 2019, the date on which the Petition was filed in the Bankruptcy Court.

"<u>Post-Closing Access and Support Period</u>" has the meaning set forth in <u>Section 10.15(a)</u>.

"<u>Proceeding</u>" means any action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"<u>Product</u>" means plazomicin sulfate for Exploitation within the China Territory.

"<u>Proration Items</u>" has the meaning set forth in <u>Section 9.2</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Purchaser</u>" has the meaning set forth in the Preamble.

"<u>Receivables</u>" has the meaning set forth in <u>Section 2.2(q)</u>.

"<u>Regulatory Approval</u>" shall mean (a) any approval by the FDA of any "new drug application" or "premarket approval application" (as such terms are used under the United States

Federal Food, Drug, and Cosmetic Act) with respect to a product and (b) any other approval, decision, license, registration, designation or authorization by a Governmental Authority necessary to lawfully Exploit a product, in each case of clauses (a) and (b), together with any approval of any subsequent submissions, supplements or amendments thereto or any applications therefor.

"Regulatory Documentation" shall mean original documents in any format in the possession or control of the Seller and/or its Subsidiaries as of the Closing, of all Regulatory Approvals, dossiers, quality specifications for the manufacture, import, release and testing of the Product and its components and all correspondence with, or reports or other materials submitted to, any Governmental Authority related to the Exploitation of the Product, including all U.S. and non-U.S. regulatory applications, filings, submissions and approvals (including all Investigational New Drug Applications and New Drug Applications with the FDA, and foreign counterparts thereof, all Regulatory Approvals and all complaint files, periodic safety reports and adverse drug experience reports) for the Product, the Exploitation of the Product or use of any China Purchased Asset or related to the China Plazomicin Business, and all technical and other information contained therein, and all correspondence with the FDA and other Governmental Authorities relating to any of the foregoing, including correspondence related to any serious adverse events associated with the Product.

"Release" means the release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating of any Hazardous Material into the environment.

"Sale Hearing" means the hearing to be conducted by the Bankruptcy Court to approve this Agreement and seek entry of the Sale Order.

"Sale Order" means, collectively, one or more orders of the Bankruptcy Court in form and substance acceptable to the Purchaser and the Seller: (i) approving the sale of the China Purchased Assets to the Purchaser as a private sale under Section 363 of the Bankruptcy Code, free and clear of all Claims and Liens pursuant to Section 363(f) of the Bankruptcy Code, on the terms and conditions set forth in this Agreement and the Support Agreement; (ii) authorizing consummation of the transactions contemplated hereby; (iii) containing findings that the transactions contemplated by this Agreement and the Support Agreement are undertaken by the Seller and the Purchaser (solely in its capacity as such) at arm's length and without collusion, and that the Purchaser acted in good faith, within the meaning of sections 363(m) and (n) of the Bankruptcy Code; (v) assuring that the Purchaser shall not assume any of the Sellers' liabilities and will not be subject to successor liability for any claims or causes of action of any kind or character against the Seller, whether known or unknown, unless expressly assumed as an Assumed Liability pursuant to this Agreement and the Support Agreement; (vi) providing that the Bankruptcy Court shall retain jurisdiction to hear any disputes arising in connection with the transactions contemplated by this Agreement and the Support Agreement, and (vii) providing that the Sale Order shall be effective immediately upon entry and shall be excepted from the 14-day stay period under Rule 6004(h) of the Bankruptcy Rules; provided, that the form of Sale

Order substantially set forth in <u>Exhibit E</u> shall be deemed acceptable to the Purchaser and the Seller.

"<u>Schedule</u>" means a schedule included in the Seller Disclosure Schedule and the other schedules attached hereto.

"<u>SEC</u>" means the Securities and Exchange Commission.

"<u>Seller</u>" has the meaning set forth in the Preamble.

"<u>Seller Corporate Names</u>" means those China Trademarks, names and logos of Seller or any of its Affiliates other than the China Product Trademarks, including any China Trademarks that consist of or include any corporate name or corporate logo of Seller or any of its Affiliates.

"<u>Seller Disclosure Schedule</u>" has the meaning set forth in <u>ARTICLE 3</u>.

"<u>Seller SEC Documents</u>" means all forms, statements, documents and reports filed or furnished by the Seller with the SEC since January 1, 2015, as amended through the date hereof.

"<u>Service Provider</u>" means any director, officer, employee or individual independent contractor of the Seller.

"<u>Stipulation</u>" means that certain *Stipulation Amending the Cipla Sale Documents* dated December 29, 2019, among the Seller, the Purchaser and Cipla to be filed with the Bankruptcy Court.

"<u>Straddle Period</u>" means any taxable period beginning before the Closing Date and ending after the Closing Date.

"<u>Subsidiary</u>" means, with respect to a specified Person, any corporation or other Person of which equity securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held directly or indirectly by the specified Person. When used in this Agreement without reference to a particular Person, "Subsidiary" means a Subsidiary of the Seller. Notwithstanding the foregoing, under no circumstance will the Seller be deemed a Subsidiary of the Purchaser notwithstanding the possession by the Purchaser (whether or not exercised) of any rights of control with respect to the Seller.

"<u>Successful Offeror</u>" means the counterparty to the Debtor under an Alternative Transaction or other party who shall have submitted the highest and otherwise best offer in accordance with the Transactions Procedures and the Transaction Procedures Order.

"<u>Supplement</u>" has the meaning set forth in <u>Section 5.12</u>.

"Support Agreement" has the meaning set forth in Section 2.9(a)(iv).

"Tax" means: (i) any federal, state, local, foreign or other tax, charge, fee, duty (including customs duty), levy or assessment, including any income, gross receipts, net proceeds, alternative or add-on minimum, corporation, ad valorem, turnover, real property, personal property (tangible or intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, profits, occupational, premium, interest equalization, windfall profits, severance, license, registration, payroll, environmental (including Taxes under section 59A of the Code), capital stock, capital duty, disability, estimated, gains, wealth, welfare, employee's income withholding, other withholding, unemployment or social security or other tax of whatever kind (including any fee, assessment or other charges in the nature of or in lieu of any tax) that is imposed by any Governmental Authority; (ii) any interest, fines, penalties or additions resulting from, attributable to, or incurred in connection with any items described in this paragraph or any related contest or dispute; and (iii) any Liability for the Taxes of another Person.

"Tax Return" means any report, return, declaration, claim for refund, or information return or statement related to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party" means any Person and/or group of Persons (including any Governmental Authority) other than the Seller, the Purchaser or any of their respective Affiliates.

"Transaction Procedures" means the procedure governing the receipt and consideration of other offers for the China Purchased Assets in the event that the Seller enters into an Alternative Transaction as provided in the LOI and in this Agreement.

"Transaction Procedures Order" means the order entered by the Bankruptcy Court on October 31, 2019, approving the LOI and the Transaction Procedures [Dkt. No. 516].

"Transfer Taxes" has the meaning set forth in Section 9.1.

**Section 1.2** Construction. Any reference in this Agreement to an "Article," "Section," "Exhibit" or "Schedule" refers to the corresponding Article, Section, Exhibit or Schedule of or to this Agreement, unless the context indicates otherwise. The table of contents and the headings of Articles and Sections and Schedules are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement. All words used in this Agreement are to be construed to be of such gender or number as the circumstances require. The words "including," "includes" or "include" are to be read as listing non-exclusive examples of the matters referred to, whether or not words such as "without limitation" or "but not limited to" are used in each instance. Where this Agreement states that a party "shall", "will" or "must" perform in some manner or otherwise act or omit to act, it means that the party is legally obligated to do so in accordance with this Agreement. Any reference to a statute is deemed also to refer to any amendments or successor legislation as in effect at the relevant time. Any

reference to a Contract or other document as of a given date means the Contract or other document as amended, supplemented and modified from time to time through such date. Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires. The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if." References to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or."

## ARTICLE 2
## THE TRANSACTION

**Section 2.1** <u>Sale and Purchase of China Purchased Assets</u>. In accordance with the provisions of this Agreement and the Sale Order, at and effective as of the Closing, the Seller will, and/or will cause its Subsidiaries to the extent transferable under applicable Law, sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Seller, all of the Seller's right, title and interest in and to all of the properties and assets of the Seller relating to the China Plazomicin Business as of the Closing Date, free and clear of all Liens and Claims other than the Assumed Liabilities, including the following (all of the assets to be sold, conveyed, assigned, transferred or delivered to the Purchaser are referred to as the "<u>China Purchased Assets</u>"):

(a) [Intentionally Omitted.]

(b) [Intentionally Omitted.]

(c) <u>China Intellectual Property</u>. All Company Owned China Intellectual Property and all Company Used China Intellectual Property including: (i) any related Patents, Copyrights, and China Trademarks therein, (ii) all of the Seller's and Subsidiaries' China Territory Intellectual Property rights in connection with the Product (except for Commercially Available China IP and the Seller Corporate Names), (iii) the Company Owned China Intellectual Property set forth on <u>Schedule 2.1(c)</u>; and (iv) any other Company Used China Intellectual Property set forth on <u>Schedule 3.9(a)</u> of the Seller Disclosure Schedule, but not including the Excluded IP (collectively, the "<u>Acquired China Intellectual Property</u>"); <u>provided</u>, that the Purchaser may, in its sole discretion, remove any Intellectual Property from the Acquired China Intellectual Property at any time prior to Closing by giving written notice thereof to Seller, and such removed Intellectual Property shall not be deemed to be Acquired China Intellectual Property or China Purchased Assets hereunder; <u>provided</u>, <u>further</u>, that any such removal of China Intellectual Property shall not, in and of itself, reduce the Purchase Price or any other consideration or obligation owed by Purchaser hereunder, or cause Seller to be in breach of its representations, warranties or covenants under this Agreement;

(d) [Intentionally Omitted.]

(e)　　Authorizations.  All Governmental Authorizations pertaining solely to the China Territory held by the Seller, to the extent transferable, relating to any China Purchased Assets, Assumed Liabilities or the China Plazomicin Business, including all Regulatory Approvals, to the extent transferable, held by the Seller or any Subsidiary with respect to the Exploitation of the Product, and all rights under, interests in and deposits under the foregoing, and pending applications for any thereof, including the Governmental Authorizations and Regulatory Approvals listed on Schedule 3.6 of the Seller Disclosure Schedule.

(f)　　Correspondence.  All correspondence with or to any Governmental Authority (including letters, minutes and official contact reports relating to any communications with any Governmental Authority) relating solely to any China Purchased Assets, Assumed Liabilities or the China Plazomicin Business that are within the Seller's control or accessible to the Seller, including any Regulatory Documentation;

(g)　　[Intentionally Omitted.]

(h)　　Books and Records.  All information, books, records, files and papers, and information and records relating to any China Purchased Asset, Assumed Liability, or the China Plazomicin Business that are within the Seller's control or accessible to the Seller, including any original documentation relating solely to the Acquired China Intellectual Property, all records of disclosure under the Physician Payments Sunshine Act (42 U.S.C. §1320a-7h) and any other applicable Laws, in each case in any format;

(i)　　Claims.  All of the Seller's claims, causes of action, defenses and rights of recovery or set-off, rights of subrogation and all other rights of any kind (each of the foregoing, a "Legal Right") against Third Parties relating to or arising from any of the China Purchased Assets or Assumed Liabilities (excluding all Legal Rights against any Third Party (including Cipla and  Qilu Antibiotics Pharmaceutical Co.) relating to or arising from the "Auction", the "Cipla Sale Documents", the "License Agreement" (as such terms are defined in the Stipulation), and/or actions or inactions that any Third Party has taken, may take or will seek to take in the future with respect to the Seller or its assets during the course of the Chapter 11 Case);

(j)　　[Intentionally Omitted.]

**Section 2.2**　　Excluded Assets.  Notwithstanding the terms of Section 2.1, the Seller will retain and will not sell, convey, assign, transfer or deliver to the Purchaser, and the Purchaser will not purchase or acquire, and the China Purchased Assets do not include, any of the following assets described below (the "Excluded Assets"):

(a)　　Equity Interests.  All equity interests in the Seller and its Subsidiaries;

(b)　　Employee Plans.  All rights and interests related to the Employee Plans.

(c)　　Books and Records.  All minute books and records, stock ledgers, Tax records and all other materials that the Seller is required by Law to retain or which relate

primarily to an Excluded Asset or Excluded Liability; provided, however, that the Seller shall provide the Purchaser with reasonable access to and copies of any such materials;

(d)     Insurance.   All insurance providing coverage for current or former directors and officers, and all claims and proceeds to the extent related to the Excluded Assets and Excluded Liabilities;

(e)     Claims.   All rights, claims or causes of action that the Seller may have against any Person with respect to any Excluded Assets or Excluded Liability;

(f)     Chapter 5 Actions and Claims. All Chapter 5 Actions and Claims;

(g)     Estate Claims.   All estate claims of the Seller (except to the extent constituting China Purchased Assets pursuant to Section 2.1(i));

(h)     Accounts and Deposits. All: (i) cash, cash equivalents, bank deposits, investment accounts, lockboxes, certificates of deposit, marketable securities, bank accounts, corporate credit cards and other similar cash items; and (ii) deposits, pre-payments, refunds, rebates, credits and similar items, including rent and utility deposits, prepaid rent and all other prepaid charges and expenses, in each case attributable to any period of time (or portion thereof) ending on or prior to the Closing Date;

(i)     Prepaid Expenses.   All prepaid charges and expenses of the Seller to the extent related to the Excluded Assets;

(j)     Real Property.   All rights in respect to any real property leased by the Seller.

(k)     Tax Refunds.   All rights to refunds, rebates, credits or similar benefits relating to Taxes and other governmental charges of whatever nature attributable to any period of time (or portion thereof) ending on or prior to the Closing Date;

(l)     Equipment.   All furniture, fixtures, equipment, and other similar personal property owned by the Seller, including all trade fixtures, supplies, computer equipment, applications, systems and motor vehicles owned by the Seller, including any substitutions or replacements thereof, which may occur within the ordinary course of business, made between the date of this Agreement and the Closing Date, regardless of where located;

(m)     C-Scape Assets and AMP Assets.   All of the C-Scape Assets and all of the AMP Assets;

(n)     Excluded IP.   Any Company Owned Intellectual Property (as defined in Cipla Plazomicin APA), Company Used Intellectual Property (as defined in Cipla Plazomicin APA) or other Intellectual Property rights, title and interest of any kind that (i) pertain only to territories outside the China Territory, (ii) pertain to more than one territory when at least one

territory is outside the China Territory and at least one territory is inside the China Territory, or (iii) is otherwise required for Cipla to Exploit the Product (as defined in the Cipla Plazomicin APA) in the territories outside the China Territory (collectively, the "Excluded IP");

(o)    Cipla Assets.  Any Assets sold to Cipla under the Cipla Plazomicin APA, other than those which are rescinded under the Sale Order;

(p)    Non-Plazomicin Assets.  All of the Seller's assets and properties not related to the China Plazomicin Business (including the Seller Corporate Names and related domain names and internet addresses, and all assets relating to the Seller's Tie2 program), subject to Section 5.17;

(q)    Receivables.  All accounts receivable and other receivables (together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto) arising from or relating to the China Purchased Assets or the China Plazomicin Business prior to the Closing, and all causes of action pertaining to the collection of the foregoing ("Receivables"); and

(r)    This Agreement.  All of the Seller's rights under this Agreement, the Support Agreement and all agreements ancillary to the foregoing (including payments comprising part of the Purchase Price).

**Section 2.3**    Assumed Liabilities.  In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due the following Liabilities of the Seller, in each case other than the Excluded Liabilities (the "Assumed Liabilities"):

(a)    Post-Closing Liabilities.  All Liabilities arising after the Closing under the the Governmental Authorizations included in the China Purchased Assets to the extent that such Liabilities are related to and are required to be performed during the periods after Closing;

(b)    Transfer Taxes.  All Liabilities for Transfer Taxes borne by the Purchaser pursuant to Section 9.1.

**Section 2.4**    Excluded Liabilities.    Notwithstanding any other provision of this Agreement and the Support Agreement or any other writing to the contrary, the Purchaser is assuming only the Assumed Liabilities and except for the Assumed Liabilities, it is not assuming, nor shall it agree to pay, perform, be responsible for or discharge, any other Liability of the Seller or any Affiliate of the Seller or the Business including the China Plazomicin Business, of whatever nature, whether presently in existence or arising hereafter, and whether absolute, contingent, accrued, known or unknown (the "Excluded Liabilities").  Without limiting the generality of the prior sentence, Excluded Liabilities include the following:

(a)    Operating Liabilities.  All Liabilities which are not Assumed Liabilities to the extent relating to claims, events or conditions arising out of or relating in any way to the

operation of the Business or the ownership of the China Purchased Assets prior to the Closing, including as a result of the manufacture, design, use, operation, storage, acquisition, development or construction of a China Purchased Asset during the period prior to the Closing, and any Liabilities for warranty claims and product liability claims or similar claims, whether occurring prior to or post-Closing, and all Liabilities to customers relating to any Product sold by or on behalf of the Seller or any of its Subsidiary prior to the Closing;

(b) Taxes. Any Liability for Taxes of the Seller or attributable to the China Plazomicin Business or the China Purchased Assets for any period of time (or portion thereof) ending on or prior to the Closing Date (other than the Taxes expressly assumed by the Purchaser pursuant to Section 9.1 and the obligations of the Purchaser under Section 2.5), and any Liability for Taxes attributable to the Excluded Assets at any time;

(c) Employee Liabilities. All Liabilities and obligations arising out of, relating to or in connection with any Person employed by, or acting as an independent contractor on the property of or on behalf of, the Seller or its Affiliates at any time, including those related to payment, claims or benefits under workers' compensation Laws or any other Law;

(d) Employee Plans. All Liabilities related to the Employee Plans or the Service Providers.

(e) Costs. All Liabilities of the Seller for costs and expenses incurred in connection with this Agreement and the Support Agreement and the transactions contemplated hereby;

(f) Recalls. All Liabilities arising out of or relating to the voluntary or mandatory recall or market withdrawal of any Product or post-sale warning in respect of any Product sold by or on behalf of any of the Seller or its Affiliates prior to the Closing;

(g) Breach of Law. Liabilities arising out of or based on any violation, on or prior to the Closing Date, of any statute, law, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Authority to which Seller, its Affiliates, or the Business is subject, including any criminal acts by Seller or its Affiliates;

(h) Litigation Claims. Any litigation claims against the Seller, including any tort claims, breach of contract claims, employment claims and discrimination claims;

(i) Chargebacks. Liabilities arising from chargebacks or related charges by Seller or its Affiliates prior to Closing, and all Liabilities arising out of or relating to the return of any Product, or for any credits, rebates, refunds or other amounts payable in respect of any Product, sold by or on behalf of any of the Seller or its Affiliates or prior to the Closing

(j) Trade Accounts Payable. Any Liability for trade accounts payable;

(k) Environmental. Any Liabilities arising under any Environmental Law;

(l)     Real Property.  Any Liabilities arising from or relating to any lease agreement or real property interest of Seller or its Affiliates, or any other real estate that was otherwise used in connection with the Business;

(m)     Transaction Expenses.  Any Liabilities of Seller or its Affiliates arising under or relating to this Agreement and the Support Agreement, including any broker, finder, agent or other fees or commissions in connection with the transactions contemplated hereunder;

(n)     Indebtedness. Any Liability in respect of any indebtedness for borrowed money of the Seller, including any Liability in respect of the Senior Secured Superpriority Debtor-in-Possession Loan and Security Agreement, dated as of April 15, 2019, by and among the Seller, and Silicon Valley Bank, as lender;

(o)     BARDA Liabilities.  To the extent permitted by Law, any Liability arising out of or relating to any Contracts with or grants made by the U.S. Biomedical Advanced Research and Development Authority, including any clawback of funds granted to the Seller;

(p)     Excluded Assets.  Any Liability arising out of or related to any Excluded Asset; and

(q)     Other.  Any Liabilities that are not Assumed Liabilities.

For the avoidance of doubt, all Liabilities arising out of, relating to or incurred in connection with the China Purchased Assets arising out of and related to period after the Closing shall be Liabilities of the Purchaser.

**Section 2.5**     Consideration.

(a)     The consideration conveyed by Seller for the China Purchased Assets (the "Purchase Price") consists of: (i) cash in the amount of U.S. $4,500,000 at Closing (the "Closing Payment"); and (ii) assumption by the Purchaser of the Assumed Liabilities.

(b)     The Purchaser shall pay all amounts due pursuant to this Section 2.5 in United States Dollars, in each case, by wire transfer of immediately available funds to the bank account(s) the Seller designates in writing from time to time.

(c)     All references to "Seller" in this Section 2.5 shall be deemed to include any trustee, administrator, receiver, receiver-manager, interim receiver or monitor or similar officer or entity appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any Person appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan or otherwise.

(d)     If the Purchaser is required by law in any jurisdiction within the China Territory or any other jurisdiction, to make any deduction or withholding on any amount of Taxes on account of any payment to be made to the Seller hereunder, then (a) the amount of

payment due from the Purchaser shall be increased to the extent necessary to ensure that, after making such deduction, the Seller receives and retains (free of any liability in respect of that deduction) a sum equal to the sum which would have been received and retained if no such deduction had been required, (b) the Purchaser shall timely and properly remit any such Taxes to the appropriate Governmental Authority, and (c) the Purchaser shall provide to the Seller, within ninety (90) days of receipt, all original Tax receipts or other government certifications from the Governmental Authority with respect to the Tax so withheld, or if a Tax receipt cannot legally be issued in the name of the Seller, then a schedule showing the amount of any Tax so withheld. For the avoidance of doubt, it is the intention and agreement of the Parties that the Seller shall receive cash proceeds in the amount of $4,500,000 (which includes the Deposit) upon consummation of the transaction. Any refund or credit of any such Tax paid or withheld by the Purchaser to the Seller shall be paid immediately to Purchaser.

**Section 2.6**    Deposit. The parties acknowledge that the Purchaser previously delivered a good faith cash deposit to the Seller, equal to U.S. $1,000,000 by wire transfer to US Bank, National Association, as master escrow agent. The parties also acknowledge that the Purchaser delivered to the master escrow agent an additional U.S. $1,000,000 upon execution of this Agreement for an aggregate deposit of U.S. $2,000,000 (the "Deposit") which shall be credited in full towards the Closing Payment.

**Section 2.7**    Allocation of Purchase Price.

(a)    Within sixty (60) days after the Closing Date, the Purchaser shall deliver to the Seller, or any trustee appointed under the terms set forth in any bankruptcy plan confirmed by the Seller (as applicable), an allocation statement (the "Allocation Statement"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities, as adjusted for payments made pursuant to ARTICLE 9, among the China Purchased Assets, in accordance with and solely for the purposes of section 1060 of the Code and any comparable provisions of state or local Law (the "Allocation"). The Seller will review the Allocation Statement and the Allocation, and, to the extent the Seller disagrees with the content of the Allocation Statement, the Seller will inform the Purchaser of such disagreement within thirty (30) days after receipt of the Allocation Statement. The Seller and the Purchaser will attempt in good faith to resolve any such disagreement. If the Seller and the Purchaser are unable to reach a good faith agreement on the content of the Allocation Statement within ninety (90) days of the Closing Date, the Seller and the Purchaser will each use its own allocation statement. For purposes of this Section 2.7, all actions of the Seller may be the obligations or rights of a liquidating trustee of the Seller's estate.

(b)    If the Purchaser and the Seller agree on the Allocation Statement, the Purchaser and the Seller will report the Allocation of the Purchase Price in a manner consistent with the Allocation Statement and will act in accordance with the Allocation Statement in the preparation and filing of all Tax Returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise, except as required by applicable Law.

(c)    The Purchaser and the Seller will promptly inform one another of any challenge by any Governmental Authority to the Allocation made pursuant to this <u>Section 2.7</u> and agree to consult with and keep each other informed with respect to the status of, and any discussion, proposal or submission with respect to, such challenge.

**Section 2.8**    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement and the Support Agreement (the "<u>Closing</u>") will take place at the offices of Hogan Lovells US LLP, 4085 Campbell Avenue, Suite 100, Menlo Park, California 94025, subject to the satisfaction or waiver of the conditions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> hereto, no later than January 10, 2020, starting at 11:59 p.m., prevailing Eastern time, if not conducted electronically at the option of the parties hereto. The date and time on and at which the Closing actually occurs is referred to in this Agreement as the "<u>Closing Date</u>."  All actions to be taken and all documents to be executed and delivered by the parties hereto at the Closing shall be deemed to have been taken and executed simultaneously, and no action shall be deemed taken nor any document executed and delivered until all have been taken, executed and delivered.

**Section 2.9**    <u>Closing Deliveries</u>.

(a)    At the Closing, the **<u>Seller</u>** will deliver or cause to be delivered to the Purchaser:

(i)    the Sale Order;

(ii)    written proof in a form reasonably satisfactory to Purchaser (which may be the Sale Order in substantially the form set forth in <u>Exhibit E</u>) that that certain agreement between the Seller and Cipla USA Inc. ("<u>Cipla</u>") dated June 20, 2019 (the "<u>Cipla Plazomicin APA</u>"), and any and all related documents or instructions, have been terminated, rescinded or abandoned in all respects to the extent that they relate to the China Purchased Assets;

(iii)    a bill of sale in the form of <u>Exhibit A</u> (the "<u>Bill of Sale</u>") executed by the Seller;

(iv)    an assignment and assumption agreement in the form of <u>Exhibit B</u> (the "<u>Assignment and Assumption Agreement</u>") executed by the Seller.

(v)    a certificate, dated as of the Closing Date, executed by the Seller confirming the satisfaction of the conditions specified in <u>Sections 6.1(a)</u> and <u>6.1(b)</u>;

(vi)    an intellectual property assignment agreement in the form of <u>Exhibit C</u> (the "<u>China Intellectual Property Assignment</u>") executed by the Seller;

(vii)    the License and Mutual Support Agreement by and between Cipla and the Purchaser in the form of <u>Exhibit D</u> (the "<u>Support Agreement</u>") executed by Cipla; and

(viii) such other instruments of sale, transfer, conveyance and assignment as the Purchaser reasonably requests for the purpose of consummating the transactions contemplated by this Agreement and the Support Agreement (which shall not prejudice the rights of the Seller or subject the Seller to any additional Liabilities).

(b) At the Closing, the Purchaser will deliver or cause to be delivered to the Seller or for the Seller's benefit:

(i) the Closing Payment by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing, less the amount of the Deposit and any interest thereon at the rate specified, if any, in the master escrow agreement with US Bank, National Association (the "Escrow Agreement");

(ii) the Assignment and Assumption Agreement executed by the Purchaser;

(iii) evidence of the ability to satisfy the Assumed Liabilities (other than those to be satisfied in cash on the Closing Date) to the extent necessary to satisfy the Bankruptcy Code, or as required by order of the Bankruptcy Court;

(iv) the Bill of Sale executed by the Purchaser;

(v) a certificate, dated as of the Closing Date, executed by the Purchaser confirming the satisfaction of the conditions specified in Sections 6.2(a) and 6.2(b); and

(vi) the China Intellectual Property Assignment executed by the Purchaser;

(vii) [Intentionally Omitted]; and

(viii) such other instruments of assumption as the Seller reasonably requests for the purpose of consummating the transactions contemplated by this Agreement and the Support Agreement (which shall not prejudice the rights of the Purchaser or subject the Purchaser to any Liabilities beyond the Assumed Liabilities).

**Section 2.10** Consents. Notwithstanding any other provision of this Agreement and the Support Agreement, this Agreement does not effectuate or operate as an assignment of any Contract to the extent that such Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable, as of the Closing. As to any China Purchased Asset, including any Governmental Authorization, the Seller will use commercially reasonable efforts to obtain as promptly as practicable prior to the Closing (and, prior to the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing the Chapter 11 Case, and subject to the availability of funds for such purpose, use commercially reasonable efforts to continue seeking

after the Closing, if consent is not obtained prior to the Closing), the consent of the other parties to transfer such China Purchased Asset to the Purchaser or, if required, novation thereof to the Purchaser or, alternatively, written confirmation from such parties reasonably satisfactory to the Seller and the Purchaser that such consent is not required.  In no event, however, will the Seller be obligated to pay any money to any Person or to offer or grant financial or other accommodations to any Person in connection with obtaining any consent, waiver, confirmation, novation or approval with respect to any such Contract.  If any required consent, waiver, confirmation, novation or approval is not obtained with respect to any such China Purchased Asset prior to the Closing, then to the extent permitted by applicable Law, the Seller and the Purchaser will cooperate to establish an agency type or other similar arrangement reasonably satisfactory to the Seller and the Purchaser under which the Purchaser would obtain (including by means of subcontracting, sublicensing or subleasing arrangement), to the extent practicable, all rights, and assume the corresponding Assumed Liabilities thereunder for the period of time that the Purchaser shall receive such rights, or under which the Seller would enforce, for the benefit of the Purchaser, with the Purchaser assuming and agreeing to pay the Seller's Liabilities and expenses (other than Excluded Liabilities) for the period of time that the Purchaser shall receive such benefits, any and all rights of the Seller against a Third Party to any such China Purchased Asset.  In such event: (a) the Seller will promptly pay to the Purchaser when received all moneys relating to the period on or after the Closing Date received by it under any China Purchased Asset not transferred pursuant to this Section 2.10; and (b) for the period of time set forth in clause (a) the Purchaser will promptly pay, perform or discharge when due any Assumed Liabilities arising thereunder after the Closing Date but not transferred to the Purchaser pursuant to this Section 2.10.  The failure by the Purchaser or the Seller to obtain any required consent, waiver, confirmation, novation or approval with respect to any Contract will not relieve any party from its obligation to consummate at the Closing the transactions contemplated by this Agreement and the Support Agreement.  The Purchaser acknowledges that no adjustment to the Purchase Price will be made for any China Purchased Assets that are not assigned and that the Purchaser will have no claim against the Seller after the Closing in respect of any such unassigned China Purchased Assets.

**Section 2.11**  Seller Acknowledgments. The Seller has advised the Purchaser, and the Purchaser hereby acknowledges that anything to the contrary notwithstanding:

(a)  on July 23, 2019 (the "Cipla Closing Date"), pursuant to the Cipla Plazomicin APA and the Bankruptcy Court's order approving the Cipla Plazomicin APA (the "Cipla Plazomicin Sale Order"), the Seller transferred to Cipla the global rights and assets with respect to the Plazomicin Business (as defined in the Cipla Plazomicin APA) (including the China Purchased Assets (other than the China Trademarks)) (the "Cipla Plazomicin Transaction"), subject to the right of the Seller to grant a license of the China License Rights to a third party (that would be assumed by Cipla);

(b)  the Seller has no operations, limited resources (financial or otherwise), and no employees; and

(c)     the Seller intends to exit bankruptcy and dissolve as soon as practicable in 2020.

# ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as follows, except as (i) disclosed in the Seller SEC Documents available prior to the date hereof or (ii) set forth on the disclosure schedule delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and the Support Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule"):

**Section 3.1**     <u>Organization</u>.   The Seller is a corporation duly organized and validly existing and in good standing under the Laws of the State of Delaware.  Except as a result of the filing of the Petition, the Seller has all requisite power and authority to conduct the China Plazomicin Business as presently conducted. The Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such qualification is necessary, except for those jurisdictions where failure to be so qualified would not reasonably be expected to have, a Material Adverse Effect.   The Seller has heretofore delivered to the Purchaser true and complete copies of the certificate of incorporation, bylaws or other material governing documents of the Seller and its Subsidiaries as currently in effect.  The Seller does not have any Subsidiaries other than Achaogen UK Ltd. and Achaogen Ireland Limited.

**Section 3.2**     <u>Authority and Enforceability</u>.  Subject only to the entry of the Transaction Procedures Order and the Sale Order, the Seller has all requisite corporate power, authority and capacity to execute and deliver this Agreement and the Support Agreement and the other agreements contemplated hereunder and to perform its obligations under this Agreement and the Support Agreement and such other agreements.  Subject only to the entry of the Transaction Procedures Order and the Sale Order, the execution, delivery and performance of this Agreement and the Support Agreement and the other agreements contemplated hereunder and the consummation of the transactions contemplated by this Agreement and the Support Agreement and such other agreements by the Seller have been duly authorized by all necessary action on the part of the Seller.  The Seller has duly and validly executed and delivered this Agreement and the Support Agreement.  Assuming the due authorization, execution and delivery of this Agreement and the Support Agreement by the Purchaser and subject to the entry of the Sale Order, this Agreement constitutes the valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**Section 3.3**     <u>No Conflict</u>.   Subject only to the entry of the Transaction Procedures Order and the Sale Order, neither the execution, delivery and performance of this Agreement and the Support Agreement by the Seller, nor the consummation by the Seller of the transactions contemplated by this Agreement and the Support Agreement, will: (a) conflict with or violate the organizational documents of Seller or any of its Subsidiaries; (b) result in a breach or default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any

notice, consent, approval, or waiver under, any material Contract to which the Seller or its Subsidiaries are a party or to which the China Purchased Assets are bound in any case with or without notice or lapse of time or both (other than needed consents for transfer of licenses to Company Used China Intellectual Property); (c) violate any Law or Judgment applicable to the Seller or its Subsidiaries, the China Plazomicin Business or the China Purchased Assets; (d) result in the imposition of any Lien or other encumbrance on any of the assets of the Seller; or (e) require the Seller to obtain any Governmental Authorization or otherwise require any consent, approval or notice to any Governmental Authority.

**Section 3.4** <u>Title to Assets; Liens</u>.  Except as set forth on <u>Schedule 3.4</u> of the Seller Disclosure Schedule, subject to the entry of the Sale Order, at Closing, the Purchaser will be vested with good and marketable title to all of the China Purchased Assets, which China Purchased Assets shall be conveyed free and clear of any Liens or Claims by order of the Bankruptcy Court.  No Subsidiary of the Seller owns or has any interest in the China Purchased Assets.

**Section 3.5** <u>Claims, Litigation and Disputes</u>.  Except as set forth on <u>Schedule 3.5</u> of the Seller Disclosure Schedule, there are currently no pending or, to the Knowledge of the Seller, threatened in writing, lawsuits, administrative or regulatory proceedings, actions, orders, arbitration or reviews, or formal complaints or investigations or inquiries, including grand jury subpoenas by any Person, concerning or against the Seller or any of its Subsidiaries, or to which the China Plazomicin Business or any of the China Purchased Assets may be subject.

**Section 3.6** <u>Compliance With Laws; Governmental Authorizations</u>.  Each of the Seller and its Subsidiaries are in compliance with all Laws, Orders, ordinances, decrees, rules or regulations of any Governmental Authority applicable to the China Plazomicin Business or the China Purchased Assets, except such noncompliance which has not had, and would not reasonably be expected to have, a Material Adverse Effect.  <u>Schedule 3.6</u> of the Seller Disclosure Schedule sets forth all material Governmental Authorizations held by the Seller.  The Seller has in effect the Governmental Authorizations necessary to conduct the China Plazomicin Business in all material respects as it is currently being conducted in accordance with the Laws of any Governmental Authority having jurisdiction over its properties or activities, except for any such failure to obtain a Governmental Authorization that has not had, and would not reasonably be expected to have, a Material Adverse Effect (it being understood that it shall be the sole and exclusive obligation of the Purchaser to obtain any Governmental Authorizations necessary for future operations, provided that the Seller shall provide reasonable assistance regarding the transfer of any Governmental Authorizations held by the Seller in accordance with <u>Section 5.15</u>). The Seller has not received any written notice from a Governmental Authority of any proceeding, inquiry, investigation, violation or alleged violation of any Laws or Orders related to the China Plazomicin Business or the China Purchased Assets or of any pending or threatened withdrawal, suspension or termination of a Governmental Authorization.  All material fees and charges due and payable with respect to the Governmental Authorizations held by the Seller have been made in full.

**Section 3.7**    Environmental Matters.  To the Seller's Knowledge, the operation of the Business by the Seller is being conducted in material compliance with all applicable Environmental Laws and under all environmental, health and safety Governmental Authorizations and other authorizations required under all applicable Environmental Laws to operate the Business as it is currently being operated.  All such Governmental Authorizations or other authorizations are in full force and effect.  No material penalty has been assessed and no investigation or review is pending or, to the Knowledge of the Seller, threatened in writing by any Governmental Authority with respect to any alleged failure by the Seller to comply with any applicable Environmental Law or to have any material environmental, health or safety Governmental Authorization or other authorization required under any applicable Environmental Law in connection with the operation of the Business.  To the Seller's Knowledge, there are no past or present facts, circumstances or conditions, including the Release of any Materials of Environmental Concern that could reasonably be expected to result in a material claim under applicable Environmental Laws against the Seller.

**Section 3.8**    Contracts.  The Seller is not a party to any Contracts that is material to the operation of the China Plazomicin Business.

**Section 3.9**    China Intellectual Property.

(a)    Schedule 3.9(a) of the Seller Disclosure Schedule sets forth a true and complete list of all of the Company Owned China Intellectual Property, Company Used China Intellectual Property and China IP Agreements, including a true and complete list of all: (i) Patents and Patent applications, including serial numbers for each filed application and Patent numbers for each issued Patent, included in the foregoing; (ii) China Trademark registrations, applications and material unregistered China Trademarks, included in the foregoing; (iii) domain names, included in the foregoing; and (iv) Copyright registrations, applications and material unregistered Copyrights, included in the foregoing.  The Seller has provided to the Purchaser true and complete copies of all China IP Agreements that are included in the Acquired China Intellectual Property, together with all amendments and material written notices relating to the foregoing.  Each China IP Agreement included in the Company Owned China Intellectual Property, Company Used China Intellectual Property and Acquired China Intellectual Property is valid and binding on the Seller and, to Seller's Knowledge, the other parties thereto in accordance with its terms and is in full force and effect.  Neither the Seller nor, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of breach or default of or any intention to terminate, any China IP Agreement included in the Acquired China Intellectual Property.  No Subsidiary of the Seller owns or has any interest in the Acquired China Intellectual Property or any other China Intellectual Property relating to the China Plazomicin Business.

(b)    Except for United Stated federal research grants and customary funding arrangements with Governmental Authorities, no funding, facility or personnel of any Governmental Authority were used, directly or indirectly, to develop or create, in whole or in

part, the Product or any Company Owned China Intellectual Property or Company Used China Intellectual Property.

(c)     Except as set forth in Schedule 3.9(c) in the Seller Disclosure Schedule, the Seller solely and exclusively owns all Company Owned China Intellectual Property and is properly licensed under or has the valid and enforceable right to use all Company Used China Intellectual Property, free and clear of all Liens and Claims, and none of such rights will be affected by the consummation of the transactions contemplated by this Agreement and the Support Agreement (subject to any necessary consents for the transfer of any Company Used China Intellectual Property). The Seller is neither party to or bound by any Contract that impairs its ability to use, sell, transfer, assign, license or convey any of the Company Owned China Intellectual Property. There are no inquiries, investigations, Claims, opposition, interference, or cancellation proceedings challenging or contesting any of the Company Owned China Intellectual Property, or to the Seller's Knowledge, the Company Used China Intellectual Property, and the Seller has not received written notice from any Third Party: (i) alleging infringement by the Seller of China Intellectual Property rights of any Person; or (ii) challenging or threatening to challenge the Seller's right, title, or interest with respect to its ownership, use of, or continued use or right to preclude others from using any Acquired China Intellectual Property as currently used, or the validity, enforceability or registrability of any such China Intellectual Property.  To the Seller's Knowledge, the Seller has not infringed, misappropriated or otherwise violated any China Intellectual Property of any Person, and neither the conduct of the China Plazomicin Business nor the Acquired China Intellectual Property (or any use thereof) infringes, misappropriates or otherwise violates the rights of any Person including any China Intellectual Property owned or purported to be owned by any Third Party.

(d)     To Seller's Knowledge, no Third Party is purporting to or infringing, misappropriating, diluting, or otherwise violating any Acquired China Intellectual Property.  The Seller has not brought or threatened in writing a Claim against any Person: (i) alleging infringement, misappropriation or other violation of Acquired China Intellectual Property; or (ii) challenging any Person's ownership or use of, or the validity, enforceability or registrability of any Acquired China Intellectual Property.  The Seller has not licensed or transferred ownership of, or, except in the ordinary course of business and as would not adversely affect such China Intellectual Property, granted or authorized the retention of any license or right under or with respect to, or authorized the retention of any right with respect to ownership of, any Acquired China Intellectual Property.  No Third Party has brought or threatened in writing a Claim against the Seller: (i) challenging any Person's ownership or use of, or the validity, enforceability or registrability of any Acquired China Intellectual Property; or (ii) alleging infringement of any Third Party's China Intellectual Property relating to Exploitation of the Product and/or the China Plazomicin Business by the Seller.  The Seller is not aware of any Third Party China Intellectual Property that would be infringed by operation of the China Plazomicin Business, including Exploitation of the Product.

(e)     Except for commercially available China Intellectual Property, including commercially available software and other China Intellectual Property licensed to the Seller

under so-called "shrink-wrap" licenses (collectively, "Commercially Available China IP") and the Excluded IP that will be licensed to the Purchaser by Cipla pursuant to the Support Agreement, the Company Owned China Intellectual Property and the Company Used China Intellectual Property is the only Intellectual Property used by Seller in or necessary for the operation of the China Plazomicin Business by the Seller, including all licenses relating to aminoglycocide necessary for the Exploitation of the Product.  The Company Owned China Intellectual Property and, to the Seller's Knowledge, the Company Used China Intellectual Property: (i) has been duly maintained, including the payment of all required fees, and all necessary documents, recordations and certificates have been filed with the relevant governmental entity for the purposes of prosecuting, perfecting and maintaining and such China Intellectual Property; (ii) to the Knowledge of the Seller, is subsisting, in full force and effect and there are no orders, materials, information, facts or circumstances that would render any such China Intellectual Property invalid, cancelled, abandoned or unenforceable or that would materially affect any pending application or renewal for any such China Intellectual Property; (iii) has not been cancelled, expired or abandoned or adjudged invalid or unenforceable; and (iv) to the Knowledge of the Seller, is valid and enforceable (except for pending Patent applications in various jurisdictions, which by their nature as applications are not yet enforceable).  To the Seller's Knowledge and based on reasonable search and inquiry, no China Intellectual Property owned or Controlled by a Third Party prevents the Seller from operation of the China Plazomicin Business, including the Exploitation of the Product.

(f)     The Seller has taken commercially reasonable measures to protect its rights, title and interests in and to all Company Owned China Intellectual Property and Company Used China Intellectual Property, and to maintain, protect, and preserve the security, confidentiality, value and ownership of all material non-public Company Owned China Intellectual Property and Company Used China Intellectual Property relating to the China Plazomicin Business, including by implementing commercially reasonable security measures and requiring any Person to whom the Seller provides access to such non-public Company Owned China Intellectual Property to execute and deliver to the Seller a valid and enforceable (except as enforceability may be limited by: (i) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (ii) Laws governing specific performance, injunctive relief and other equitable remedies) confidentiality agreement in customary form.

(g)     All current and, to Seller's Knowledge, former directors, officers, and employees of Seller who are or were involved in, or who have participated in or contributed to, the conception, development, creation, reduction to practice, improvement to or modification of the Product or Acquired China Intellectual Property or any other China Intellectual Property used by Seller or held for use in the China Plazomicin Business have executed and delivered to the Seller a written agreement that (i) includes customary confidentiality terms and (ii) assigns to the Seller any China Intellectual Property rights conceived, developed, created, or reduced to practice by such director, officer or employee in the course of services performed for the Seller by such director, officer or employee.  No current or, to Seller's Knowledge, former director, officer or employee of Seller retains any China Intellectual Property rights to the Acquired China Intellectual Property.

(h)     The consummation of the transactions contemplated hereunder will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, Purchaser's right to own, use or hold for use any Acquired China Intellectual Property as owned, used or held for use in the conduct of the China Plazomicin Business as currently conducted.

**Section 3.10**   Taxes.   Except as set forth in Schedule 3.10 in the Seller Disclosure Schedule, (a) the Seller has filed or has caused to be filed on a timely basis all Tax Returns that are or were required to be filed with respect to the China Purchased Assets; (b) all such Tax Returns accurately reflect all Taxes and other Liabilities required to be reflected thereon; (c) all Taxes due and payable by the Seller with respect to the China Purchased Assets, whether or not shown on a Tax Return, have been paid in full, other than those Taxes which have been stayed by the filing of the Petition; (d) the Seller has not requested or consented to extend to a date later than the Closing Date the time in which any Tax may be assessed or collected by any Governmental Authority with respect to the China Purchased Assets; (e) no deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of Tax has been proposed, asserted or assessed by any Governmental Authority against the Seller with respect to the China Purchased Assets and there is no action, suit, taxing authority proceeding or audit now in progress, pending or, to the Knowledge of the Seller, threatened in writing against or relating to the Seller with respect thereto; (f) there are no pending audits by any taxing authority in connection with the China Purchased Assets; (g) the Seller is not a party to, or bound by, any Tax indemnity, Tax-sharing, or Tax allocation agreement that relates to the China Purchased Assets (other than as set forth in this Agreement); and (h) there are no Liens for Taxes (other than for current Taxes not yet due and payable or Liens for Taxes filed as a result of the Chapter 11 Case) upon the China Purchased Assets.

**Section 3.11**   Action.   To the Knowledge of the Seller no action or omission by Cipla or by Qilu Antibiotics Pharmaceutical Co. has occurred since the Cipla Closing Date that would make any of the representations and warranties set forth in this Article III with respect to the China Purchased Assets inaccurate.

**Section 3.12**   Data Room.   The data room furnished to the Purchaser by the Seller and accessed at https://achaogen.securevdr.com/ (the "Data Room") included and shall include, for at least one (1) year after Closing, all Proprietary Data (as that term is defined in the Support Agreement), and the Purchaser shall have unfettered access to the Data Room for at least one (1) year after the Closing.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller as follows:

**Section 4.1**    Organization and Good Standing.  The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of Hong Kong and has all requisite corporate power and authority to conduct its business as it is presently conducted.

**Section 4.2**    Authority and Enforceability.  The Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and the Support Agreement and to perform its obligations under this Agreement and the Support Agreement.  The execution, delivery and performance of this Agreement and the Support Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Purchaser.  The Purchaser has duly and validly executed and delivered this Agreement and the Support Agreement.  Assuming the due authorization, execution and delivery of this Agreement and the Support Agreement by the Seller and subject to the entry of the Sale Order, this Agreement constitutes the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to: (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (b) Laws governing specific performance, injunctive relief and other equitable remedies.

**Section 4.3**    No Conflict.  Neither the Purchaser's execution, delivery and performance of this Agreement and the Support Agreement, nor the consummation by the Purchaser of the transactions contemplated by this Agreement and the Support Agreement, will: (a) conflict with or violate the Purchaser's organizational documents; (b) result in a breach or default under or create in any Person the right terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any material Contract to which the Purchaser is a party or by which the Purchaser is bound, in any case with or without due notice or lapse of time or both; (c) result in the imposition of any Lien or other encumbrance on any of the assets of the Purchaser; (d) violate any Law or Judgment applicable to the Purchaser; or (e) require the Purchaser to obtain any Governmental Authorization or make any filing with any Governmental Authority, subject only to the entry of the Sale Order.

**Section 4.4**    Legal Proceedings.  There is no Proceeding pending or, to the Purchaser's knowledge, threatened against the Purchaser that questions or challenges the validity of this Agreement and the Support Agreement or that may prevent, delay, make illegal or otherwise interfere with the ability of the Purchaser to consummate any of the transactions contemplated by this Agreement and the Support Agreement.

**Section 4.5**    Availability of Funds.  The Purchaser has immediately available cash in an amount sufficient to allow the Purchaser to perform all of its obligations under this Agreement and the Support Agreement.

**Section 4.6**    No Knowledge of Breach or Inaccuracy.  To the Purchaser's knowledge, as of the date of this Agreement, there is no breach of, or inaccuracy in, or any fact, event, breach, condition or occurrence that may constitute a breach of, or inaccuracy in, any representation or warranty made by the Seller in this Agreement.

**Section 4.7**    <u>Independent Investigation</u>.    The Purchaser has conducted its own independent investigation, review and analysis of the China Plazomicin Business and the China Purchased Assets as it has deemed appropriate, which investigation, review and analysis was done by the Purchaser and its representatives.  In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of the Seller or its representatives (except the representations and warranties set forth in ARTICLE 3, including the related portions of the Disclosure Letter).  The Purchaser acknowledges and agrees that: (a) other than the representations and warranties set forth in <u>ARTICLE 3</u>, none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders make or have made any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the Business, the China Plazomicin Business, the China Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement, and the Purchaser is purchasing the China Purchased Assets from the Seller "as is" and "where is"; and (b) none of the Seller, any of its Affiliates, or any of their respective officers, directors, employees, agents, representatives or stockholders will have or will be subject to any Liability or indemnification obligation to the Purchaser or any other Person resulting from the distribution to the Purchaser or its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business, the China Plazomicin Business, or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to the Purchaser or its Affiliates or representatives, whether orally or in writing.

## ARTICLE 5
## COVENANTS

**Section 5.1**    <u>Access and Investigation</u>.    Until the Closing, subject to existing confidentiality agreements and upon reasonable advance notice from the Purchaser, the Seller will allow the Purchaser and its representatives reasonable access during normal business hours and without unreasonable interference with the operation of the China Plazomicin Business to such materials and information about the China Plazomicin Business in the possession of the Seller as the Purchaser may reasonably request.

**Section 5.2**    <u>Operation of the China Plazomicin Business</u>.

(a)    Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case (it being understood that no provision of this <u>Section 5.2</u> will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as expressly set forth in this Agreement and the Support Agreement or <u>Section 5.2</u> of the Seller Disclosure Schedule; or (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed), the Seller will operate, and will conduct the China Plazomicin Business in the ordinary course of business in all material respects and use its

commercially reasonable efforts to (1) preserve intact the China Plazomicin Business's relationships with its suppliers, customers and others doing business with it, subject to the limitation that any payments necessary for the forgoing shall be provided for and within the amounts in the Budget approved from time to time; (2) shall continue to maintain all advertising material, all documentation that would constitute acquired Regulatory Documentation and all books and records on a basis consistent with past practice; and shall (3) continue to make all necessary or appropriate filings and payments with and to Governmental Authorities in connection with the China Plazomicin Business and the China Intellectual Property in a timely manner, and maintain in effect all existing Regulatory Approvals and Governmental Authorizations required for the ongoing operation of the China Plazomicin Business as presently conducted.

(b)      Until the Closing, except: (i) as required by Law, including in connection with the Chapter 11 Case (it being understood that no provision of this Section 5.2 will require the Seller to make any payment to any of its creditors with respect to any amount owed to such creditors on the Petition Date or which would otherwise violate the Bankruptcy Code); (ii) as expressly set forth in this Agreement and the Support Agreement or Schedule 5.2 of the Seller Disclosure Schedule; (iii) as otherwise consented to by the Purchaser (which consent will not be unreasonably withheld, conditioned or delayed); or (iv) pursuant to any orders approving debtor in possession financing and/or use of cash collateral, or any KEIP/KERP orders or other orders affecting employees, entered by the Bankruptcy Court in the Chapter 11 Case, the Seller will not:

(i)      amend or terminate any material Contract that could reasonably be expected to have an adverse impact on the China Purchased Assets or delay the Closing;

(ii)      amend the certificate of incorporation, by-laws or other governing documents of the Seller or any Subsidiary;

(iii)      waive or release any material right or claim with respect to the China Purchased Assets;

(iv)      sell, lease, transfer, license or otherwise dispose of, or permit any Lien on any portion of, the China Purchased Assets, other than in respect of inventory in the ordinary course of business;

(v)      incur or suffer to exist any indebtedness for borrowed money except any such indebtedness that is an Excluded Liability;

(vi)      acquire, by merger or consolidation with, or by purchase of all or a substantial portion of the assets or stock of, or by any other manner, any business or entity, make any investment in any Person;

(vii)      transfer or dispose of, abandon, lapse, allow to lapse, sell, assign, subject to any Lien, grant any right or license to, any Acquired China Intellectual Property, or disclose (except as necessary in the conduct of the China Plazomicin

Business consistent with past practice) to any Person, other than Purchaser or its representatives, any trade secret, formula, process or know-how that is not a matter of public knowledge prior to such disclosure;

(viii)   grant any refunds, credits, rebates or other allowances to any supplier, vendor, customer or distributor related to the China Plazomicin Business except in the ordinary course of business;

(ix)   settle, or offer or propose to settle, any material claim or Action arising out or relating to the China Plazomicin Business or relating to the transactions contemplated by this Agreement and the Support Agreement;

(x)   fail to pay any Tax on or before the date when it becomes due and payable; or

(xi)   agree in writing to take any of the foregoing actions.

**Section 5.3**   <u>Employee Matters</u>.  The Purchaser shall have the right, but not the obligation, to offer employment on an at-will basis or otherwise engage any of the Service Providers, at any time on or after the Closing Date, on such terms and conditions established by the Purchaser in its sole discretion. In no event shall the Purchaser be obligated to hire any engage any Service Providers for any period following the Closing. The Purchaser shall have no obligation to continue or assume any Employee Plan of the Seller or to offer any Employee Plan to Service Providers.

**Section 5.4**   <u>Consents and Filings; Commercially Reasonable Efforts</u>.

(a)   Subject to the terms and conditions of this Agreement and the Support Agreement, each of the parties will use their respective commercially reasonable efforts: (i) to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and the Support Agreement; and (ii) as promptly as practicable after the date of this Agreement, to obtain all Governmental Authorizations from, and make all filings with, all Governmental Authorities, and to obtain all other consents, waiver approvals or authorizations of, declarations, filings or registrations with, or notices to all other Third Parties, that are necessary or advisable in connection with the authorization, execution and delivery of this Agreement and the Support Agreement and the consummation of the transactions contemplated by this Agreement and the Support Agreement, including the transfer and/or assignment of the China Purchased Assets to Purchaser as contemplated herein, in either case, in form and substance reasonably satisfactory to Purchaser.

(b)   Each of the Seller and the Purchaser will promptly notify the other of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement and the Support Agreement, and will permit the other party to review in advance any proposed communication by such party to any

Governmental Authority. Neither the Seller nor the Purchaser will agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the transactions contemplated by this Agreement and the Support Agreement unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority, gives the other party the opportunity to attend and participate at such meeting. Each of the Seller and the Purchaser will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other party may reasonably request in connection with the foregoing. Each of the Seller and the Purchaser will provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the Support Agreement and the transactions contemplated by this Agreement and the Support Agreement.

**Section 5.5** <u>Supplements to Disclosure Schedules</u>. The Seller may, from time to time up to seven (7) Business Days prior to the Closing (unless a shorter period is approved by the Purchaser), by written notice to the Purchaser, supplement the Seller Disclosure Schedule or add a schedule to the Seller Disclosure Schedule (such added schedule to be deemed a supplement hereunder) in order to disclose any matter which, if occurring prior to the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule or to correct any inaccuracy or breach in the representations and warranties made by the Seller in this Agreement; <u>provided</u>, that any such supplement shall give Purchaser an unconditional right to terminate this Agreement under <u>Section 7.1(a)(ii)</u> within seven (7) Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedules. Subject to this <u>Section 5.5</u>, none of such supplements to the Seller Disclosure Schedule will be deemed to cure the representations and warranties to which such matters relate with respect to the satisfaction of the conditions set forth in <u>Section 6.1(a)</u> or otherwise affect any other term or condition contained in this Agreement and the Support Agreement; <u>provided</u>, however, that, unless the Purchaser delivers a notice of termination with respect to such matter as contemplated by <u>Section 7.1(a)(ii)</u> within seven (7) Business Days of the receipt by the Purchaser of any supplement to the Seller Disclosure Schedule pursuant to this <u>Section 5.5</u>, the Purchaser will be deemed to have waived any and all rights to terminate this Agreement pursuant to <u>Section 7.1(a)(ii)</u> or otherwise arising out of or relating to the contents of such supplement and the resulting breach or breaches of the representations and warranties and the Purchaser will be deemed to have accepted the contents of such supplement for all purposes of this Agreement and the Support Agreement; and <u>provided</u>, <u>further</u>, that from and after the date the Sale Order has been entered, the Seller will have no Liability pursuant to this Agreement and the Support Agreement for any matters arising out of or relating to any of the matters disclosed on the Seller Disclosure Schedule, as supplemented or amended by the Seller prior to the date the Sale Order has been entered.

**Section 5.6** <u>Confidentiality</u>. Effective upon the Closing Date, all confidentiality agreements between the Seller and the Purchaser concerning the Seller, the Business (including the China Plazomicin Business) or the transactions contemplated hereby shall terminate except as set forth in this <u>Section 5.6</u> (other than with respect to the Excluded Assets and Excluded Liabilities). Following the Closing, the Seller will, and will instruct its directors, officers,

Service Providers and advisors to, hold in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all Confidential Information, except to the extent that such Confidential Information: (a) must be disclosed in connection with the obligations of the Seller pursuant to this Agreement and the Support Agreement; (b) can be shown to have been in the public domain through no fault of the Seller; (c) becomes a matter of public record as a result of the Chapter 11 Case and filings made with the Bankruptcy Court with respect thereto; or (d) was later lawfully acquired by the Seller from sources other than those related to its prior ownership of the Business. Notwithstanding the foregoing, in no event will this Section 5.6 limit or otherwise restrict the right of the Seller to disclose such Confidential Information: (i) to its and its Affiliates' respective directors, officers, Service Providers, agents and advisors to the extent reasonably required to facilitate any delivery or performance of this Agreement and the Support Agreement; (ii) to any Governmental Authority or arbitrator to the extent reasonably required in connection with any Proceeding relating to the enforcement of this Agreement and the Support Agreement; or (iii) as otherwise required by applicable Law.

**Section 5.7** <u>Public Announcements</u>. Prior to the Closing, neither the Purchaser nor the Seller will issue any press release or make any other public announcement relating to this Agreement and the Support Agreement or the transactions contemplated hereby without the prior written approval of the other party (which approval will not be unreasonably withheld, conditioned or delayed), unless required by applicable Law or by any listing agreement with any national securities exchange. Prior to issuing any such press release or making any such other public announcement as required by applicable Law or by any listing agreement with any national securities exchange and without the other party's prior written approval, the disclosing party will give the other party a copy of the proposed press release or other public announcement and reasonable opportunity to comment on the same.

**Section 5.8** <u>Bulk Transfer Laws</u>. The Seller shall ensure that the Sale Order shall provide either that: (a) the Seller has complied with any applicable bulk sale or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement and the Support Agreement; or (b) compliance with such Laws described in the foregoing clause (a) is not necessary or appropriate under the circumstances.

**Section 5.9** <u>Bankruptcy Court Matters</u>.

(a) The Purchaser and the Seller will use their respective good faith and commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as practicable after its entry.

(b) [<u>Intentionally Omitted.</u>]

(c) The Seller and the Purchaser shall use their respective commercially reasonable efforts to consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event later than 11:59 p.m. prevailing Eastern Time on or before January 10, 2019 (the "<u>Outside Date</u>").

(d)     The Purchaser will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Purchaser of its obligations under this Agreement and the Support Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and the Support Agreement and demonstrating that the Purchaser is a good faith buyer entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

(e)     If an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from either the Transaction Procedures Order or the Sale Order, the Seller will promptly notify the Purchaser of such appeal, petition, motion or stay request and the Seller, with input from the Purchaser, will take all reasonable steps at the Seller's expense to defend against such appeal, petition, motion or stay request. Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed, Purchaser has received the protections afforded under Sections 363(m) and (n) of the Bankruptcy Code, and the Purchaser, in its sole discretion, waives in writing the condition set forth in Section 6.1(d) that the Sale Order be a Final Order.

(f)     The Seller and the Purchaser shall comply with all of their respective obligations under the Transaction Procedures Order and the Sale Order after the entry of the Sale Order by the Bankruptcy Court.

(g)     The Seller shall comply (or obtain an order waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement and the Support Agreement. The Seller shall serve on all required Persons, including: (i) all Persons who are known to possess or assert a Claim or Lien against or interest in the China Purchased Assets; (ii) all applicable Governmental Authorities; (iii) all other Persons required by any order of the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules; (iv) Cipla; and (v) using commercially reasonable efforts to serve any other Persons that the Purchaser reasonably may request, any notice of the motions, hearings, or orders necessary to comply with its obligations under this Section 5.9 and to consummate the transactions contemplated hereby.

**Section 5.10**   Bankruptcy Court Approval.  The Purchaser and the Seller acknowledge that, under the Bankruptcy Code, the sale of China Purchased Assets is subject to approval of the Bankruptcy Court. The Purchaser and the Seller acknowledge that to obtain such approval pursuant to the Sale Order, the Seller must demonstrate that it has taken reasonable steps in the exercise of its business judgment to obtain the highest and best value for the China Purchased Assets, including giving such notice of the transactions contemplated by this Agreement and the Support Agreement to creditors and other interested parties as may be ordered by the Bankruptcy Court, providing information about the China Purchased Assets to prospective offerors in accordance with the provisions of this Agreement, entertaining higher or better offers from

qualified offerors in accordance with the provisions of this Agreement and, if necessary, proposing to the Bankruptcy Court a sale of the China Purchased Assets to another offeror that has entered into an Alternative Transaction in accordance with the provisions of this Agreement. The Seller acknowledges and agrees that Purchaser is entitled to receive the termination fee and expense reimbursement on the terms and conditions provided in <u>Section 7.2(d)</u> of this Agreement.

    **Section 5.11**   <u>No Solicitation.</u>

    (a)    Subject to the terms of <u>Section 5.11(c)</u>, Seller agrees that from the date of this Agreement until the earlier to occur of the termination of this Agreement pursuant to <u>Article VII</u> and the Closing, neither it nor any of its Subsidiaries shall, nor shall it nor any of its Subsidiaries authorize or permit any of the officers, directors, employees, investment bankers, attorneys, accountants, representatives, consultants or other agents retained by it ("<u>Representatives</u>") or any of its Subsidiaries to directly or indirectly: (i) solicit, initiate, encourage, induce or knowingly facilitate the communication, making, submission or announcement of any Alternative Transaction or take any action that could reasonably be expected to lead to an Alternative Transaction; (ii) furnish any non-public information relating to the China Purchased Assets to any Person in connection with or in response to any proposal or inquiry that could lead to an Alternative Transaction; (iii) engage in discussions or negotiations with any Person with respect to any proposal or inquiry that could lead to an Alternative Transaction (other than informing such Persons of the terms of this <u>Section 5.11</u>); (iv) approve, endorse or recommend any proposal regarding an Alternative Transaction; (v) execute or enter into any letter of intent or similar document or any Contract contemplating or otherwise relating to any Alternative Transaction; or (vi) grant any waiver or release under any confidentiality, standstill or similar agreement (other than to the Purchaser); <u>provided</u>, <u>however</u>, that, notwithstanding anything contained in this <u>Section 5.11(a)</u>, Seller may furnish nonpublic information and may enter into a confidentiality or nondisclosure agreement regarding the China Purchased Assets to, and enter into discussions or negotiations with, any Person in response to a bona fide written proposal regarding an Alternative Transaction if: (A) Seller is not in material breach of this <u>Section 5.11</u>; (B) Seller concludes, in good faith, based on the advice of outside legal counsel, that the failure to take such action is reasonably likely to result in a breach of the fiduciary duties of the Seller under applicable Law; (C) at least two (2) Business Days prior to furnishing any such nonpublic information to, or entering into discussions with, such Person, Seller gives Purchaser written notice of the identity of such Person and of Seller's intention to furnish nonpublic information to, or enter into discussions with, such Person; and (D) at least two (2) Business Days prior to furnishing any such nonpublic information to such Person, Seller furnishes such nonpublic information to Purchaser (to the extent such nonpublic information has not been previously furnished by Seller to Purchaser). Without limiting the generality of the foregoing, each party acknowledges and agrees that, in the event any Representative of such party (whether or not such Representative is purporting to act on behalf of such party) takes any action that, if taken by such party, would constitute a breach of this <u>Section 5.11</u> by such party, the taking of such action by such Representative shall be deemed to constitute a breach of this <u>Section 5.11</u> by such party for purposes of this Agreement.

(b)     If the Seller or any of its Representatives receives a proposal or inquiry regarding an Alternative Transaction at any time pre-Closing, then the Seller shall promptly and in no event later than the latter of 24 hours and the next Business Day after the Seller becomes aware of such proposal or inquiry advise the Purchaser orally and in writing of such proposal or inquiry (including the identity of the Person making or submitting such proposal or inquiry and the material terms thereof).  Such party shall keep Purchaser fully informed on a current basis with respect to the status and terms of any such proposal or inquiry and any modification or proposed modification thereto.

(c)     From the date of this Agreement until the earlier to occur of the termination of this Agreement pursuant to Article VII and the Closing, except as set forth in this Section 5.11(c), Seller shall not enter into (or permit any Subsidiary to enter into) any agreement in principle, letter of intent, term sheet, acquisition agreement, merger agreement, option agreement, joint venture agreement, partnership agreement or any other Contract relating to any Alternative Transaction.  Notwithstanding the foregoing, at any time prior to the Closing, Seller may enter into (or permit any Subsidiary to enter into) such a Contract, if: (i) Seller promptly notifies the Purchaser, in writing, at least two (2) Business Days (the "Notice Period") before entering into (or causing a Subsidiary to enter into) an Alternative Transaction Contract, of its intention to take such action, which notice shall state expressly that Seller has received a proposal for an Alternative Transaction and that Seller intends to enter into an Alternative Transaction; (ii) Seller attaches to such notice the most current version of the proposed Alternative Transaction Contract (which version shall be updated on a prompt basis) and the identity of the potential Successful Offeror; (iii) Seller shall, and shall cause its Subsidiaries to, and shall use its commercially reasonable efforts to cause its and its Subsidiaries' Representatives to, during the Notice Period, negotiate with the Purchaser in good faith to make such adjustments in the terms and conditions of this Agreement so that such Alternative Transaction ceases to constitute an Alternative Transaction which Seller is required to negotiate or accept under applicable law, if the Purchaser, in its discretion, agrees to make such adjustments (it being agreed that in the event that, after commencement of the Notice Period, there is any material revision to the terms of an Alternative Transaction, including, any revision in price, the Notice Period shall be extended, if applicable, to ensure that at least two (2) Business Days remains in the Notice Period subsequent to the time Seller notifies the Purchaser of any such material revision); and (iv) Seller determines in good faith, after consultation with its independent financial advisor, if any, and its outside legal counsel, that such Alternative Transaction continues to require Seller's negotiation or acceptance under applicable law after taking into account any adjustments made by the Purchaser during the Notice Period in the terms and conditions of this Agreement.

(d)     In the event that Purchaser adjusts the terms and conditions of this Agreement in response to an Alternative Transaction proposal and Purchaser becomes the Successful Offeror, Purchaser shall be entitled to reimbursement of such reasonable, additional professional fees, costs and expenses incurred by Purchaser at Closing not to exceed $100,000; provided, however, such amount shall be taking into consideration when assessing the competing offers.

(e)　Each party shall immediately cease and cause to be terminated any existing discussions, negotiations and communications with any Person that relate to any Alternative Transaction as of the date of this Agreement and cause the destruction or return by such Person (or its agents or advisors) of any nonpublic information provided to such Person (or its agents or advisors).

**Section 5.12**　Transaction Supplement.　In the event that the Debtor enters into an Alternative Transaction, the Seller will promptly file with the Bankruptcy Court a supplement (the "Supplement") that will inform the Bankruptcy Court of that event.　The Supplement will identify, among other things: (i) the Successful Offeror as the proposed purchaser of the China Purchased Assets; (ii) the amount and form of consideration to be paid by the Successful Offeror for the China Purchased Assets; and (iii) the Assumed Liabilities to be assumed by the Successful Offeror.　In addition, the Seller will attach to the Supplement: (a) the proposed or revised proposed Sale Order, with any revisions necessary to reflect the Alternative Transaction, approving the sale to the Successful Offeror; (b) a copy of the Alternative Transaction for the Successful Bidder and all related documents for the sale of the China Purchased Assets; and (c) any additional information or documentation relevant to the Successful Bidder.　The Seller will file the Supplement on the docket for the Chapter 11 Case as promptly as is reasonably practicable prior to the Sale Hearing, and may give notice of such filing to parties in interest in the Chapter 11 Case, but will not be required to serve the same on any persons or entities other than the Purchaser and the Official Committee of Unsecured Creditor.

**Section 5.13**　Payments Received.　The Seller, on the one hand, and the Purchaser, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.　Without limiting the generality of the foregoing, the Seller (prior to the entry by the Bankruptcy Court of an order confirming a Chapter 11 plan or dismissing the Chapter 11 Case) agrees to cooperate with the Purchaser, at the sole cost of the Purchaser, to inform parties owing payments to the China Plazomicin Business after the Closing that constitute China Purchased Assets (the "Business Payments") of the accounts of the Purchaser that should receive such Business Payments following the Closing and otherwise reasonably assist the Purchaser to ensure that such Business Payments are made to such accounts. The Seller, on the one hand, and the Purchaser, on the other hand, hereby agrees that any payments mistakenly received by it or its respective Affiliates shall be promptly transferred and delivered back to the other party or its Affiliate, as applicable.

**Section 5.14**　Cessation of Use of Acquired China Intellectual Property.　For the avoidance of doubt and notwithstanding anything in this Agreement and the Support Agreement to the contrary: (a) the Seller acknowledges and agrees that, from and after the Closing, the Seller shall not have any right, title or interest in or to any Acquired China Intellectual Property; and (b) from and after the Closing, the Seller shall cease and discontinue any and all use or other Exploitation of any and all Acquired China Intellectual Property.

**Section 5.15**   Transfer of Governmental Authorizations and China IP Registrations. From and after the date hereof, the Seller, on the one hand (subject to the availability of funds for such purpose), and the Purchaser, on the other hand, shall, and shall cause their respective Affiliates to, reasonably cooperate to transfer to the Purchaser as of the Closing (or as soon as reasonably practicable thereafter) all Company China IP Registrations and Governmental Authorizations included in the China Purchased Assets, including any that is necessary for the import, manufacture, distribution, marketing and sale by the Purchaser of the products of the China Plazomicin Business under applicable Law, in each case, to the extent such Company China IP Registrations and Governmental Authorizations are transferable, and to enable the continued maintenance of any Company China IP Registrations; provided that: (a) any reasonable, documented out-of-pocket costs associated with such cooperation by the Seller after the Closing (including the *pro rata* portion of the costs of any Service Provider directly providing such cooperation after the Closing, as determined by the amount of time dedicated by such Service Provider to such cooperation as a proportion of all time dedicated by such Service Provider to the Seller) shall be borne by the Purchaser; and (b) nothing in this Section 5.15 shall be deemed to require the Seller to remain a debtor in the Chapter 11 Case or maintain its corporate existence for any period of time; provided that the foregoing shall not be deemed to require the Seller to take any action in violation of the DIP Loan Agreement.

**Section 5.16**   Further Actions.

(a)   The Seller shall use its commercially reasonable efforts to assist the Purchaser in negotiating and entering into a new supply agreement with Hovione or identifying an alternative supplier.

(b)   The Purchaser shall pay the cost of maintaining the Data Room following the Closing as contemplated by Section 3.12.

(c)   [Intentionally Omitted.]

(d)   [Intentionally Omitted.]

(e)   [Intentionally Omitted.]

(f)   Subject to the other express provisions of this Agreement, upon the request of either party to this Agreement, the other party will execute and deliver such other documents, instruments and agreements as the requesting party may reasonably require for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement and the Support Agreement.

**Section 5.17**   Use of Seller Corporate Names.  Notwithstanding anything to the contrary in this Agreement and the Support Agreement, the Purchaser and any successor or permitted assignee under Section 10.5 shall have a non-exclusive, non-transferable, royalty free, fully paid-up license to use the Seller Corporate Names within the China Territory.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATION TO CLOSE

**Section 6.1**  Conditions to the Obligation of the Purchaser.  The obligation of the Purchaser to consummate the transactions contemplated by this Agreement and the Support Agreement is subject to the Purchaser becoming the Successful Offeror and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Purchaser, in whole or in part, in its sole and absolute discretion):

(a)  Accuracy of Representations and Warranties.  The representations and warranties of the Seller in ARTICLE 3 must be true and correct in all respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (disregarding all materiality qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a Material Adverse Effect;

(b)  Performance of Covenants.  All of the covenants and obligations that the Seller is required to perform or comply with under this Agreement and the Support Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c)  No Action.  There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement and the Support Agreement;

(d)  Sale Order.  The Sale Order must be a Final Order and must be in form and content satisfactory to the Purchaser;

(e)  No Material Adverse Effect.  There shall not have occurred any event or occurrence (regardless of whether such event or occurrence constitutes a breach of any representation, warranty, or covenant of the Seller under this Agreement and the Support Agreement) after the date of this Agreement which has had, or would reasonably be expected to have, a Material Adverse Effect; and

(f)  Transaction Documents.  The Seller must have delivered or caused to be delivered each document under Section 2.9(a).

**Section 6.2**  Conditions to the Obligations of the Seller.  The obligation of the Seller to perform any obligations hereunder, including to consummate the transactions contemplated by this Agreement and the Support Agreement, is subject to the Purchaser becoming the Successful Offeror and to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a) <u>Accuracy of Representations and Warranties</u>. The representations and warranties of the Purchaser in <u>ARTICLE 4</u> must be true and correct in all respects as of the Closing (other than representations and warranties which by their terms are made as of a specific date, which shall have been true and correct in all respects as of such date), except where the failure of such representations and warranties to be so true and correct (disregarding all materiality qualifiers contained therein for this purpose) has not had, and would not reasonably be expected to have, a material adverse effect on the Purchaser's ability to timely complete the transactions contemplated by this Agreement and the Support Agreement;

(b) <u>Performance of Covenants</u>. All of the covenants and obligations that the Purchaser is required to perform or comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects;

(c) <u>No Action</u>. There must not be in effect any Law or Judgment that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement and the Support Agreement;

(d) <u>Sale Order</u>. The Sale Order must be a Final Order and must be in form and content satisfactory to the Seller;

(e) <u>Transaction Documents</u>. The Purchaser must have delivered or caused to be delivered to the Seller each document that <u>Section 2.9(b)</u> requires it to deliver; and

## ARTICLE 7
## TERMINATION

**Section 7.1** <u>Termination Events</u>.

(a) This Agreement may, by written notice given before the Closing, be terminated (other than those provisions which, by their terms, survive termination, including <u>Section 7.2(d)</u>):

(i) by mutual consent of the Purchaser and the Seller;

(ii) **by the Purchaser** (so long as the Purchaser is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if (A) there has been a breach of any of the Seller's representations, warranties or covenants contained in this Agreement which would result in the failure of the conditions set forth in <u>Section 6.1(a)</u> or <u>Section 6.1(b)</u>, as applicable, to be satisfied, and which breach has not been cured within ten (10) days after written notice of such breach has been delivered to the Seller from the Purchaser or cannot be cured by the Outside Date; (B) Purchaser elects to terminate this Agreement as provided in <u>Section 5.5</u>; or (C) any other condition set forth in <u>Section 6.1</u> remains unsatisfied by the Outside Date;

(iii)     **by the Seller** (so long as the Seller is not then in material breach of any of its representations, warranties or covenants contained in this Agreement), if (A) there has been a breach of any of the Purchaser's representations, warranties or covenants contained in this Agreement which would result in the failure of a condition set forth in Section 6.2(a) or Section 6.2(b), as applicable, to be satisfied, and which breach has not been cured within ten (10) days after written notice of such breach has been delivered to the Purchaser from the Seller or cannot be cured by the Outside Date; or (B) any other condition set forth in Section 6.2 remains unsatisfied by the Outside Date;

(iv)     **by either the Purchaser or the Seller**, if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and the Support Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(a)(iv) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 7.1(a)(iv) occurring;

(v)     **by the Purchaser** if: (A) the Chapter 11 Case is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code; or (B) an examiner with expanded powers or trustee is appointed in the Chapter 11 Case; or

(b)     This Agreement shall terminate automatically (other than those provisions which, by their terms, survive termination including Section 7.2(d)) in the event, and only at the time that, in compliance with Section 5.11, Seller enters into a binding, written agreement governing an Alternative Transaction and Purchaser elects in writing not to submit a further offer to purchase the China Purchased Assets or to top an offer presented by a party for an Alternative Transaction.

**Section 7.2**     Effect of Termination.

(a)     If this Agreement is terminated pursuant to Section 7.1, this Agreement and all rights and obligations of the parties under this Agreement automatically end without Liability against any other party or its Affiliates, except that Section 5.7 (*Public Announcements*), ARTICLE 10 (*General Provisions*) (except for Section 10.11 (*Specific Performance*)) and this Section 7.2 shall remain in full force and survive any termination of this Agreement. Notwithstanding the foregoing, but except as contemplated in Section 7.2(b) below (in which case the forfeiture of the Deposit as liquidated damages shall be the sole and exclusive remedy), in the event this Agreement is terminated by a party because of the knowing and intentional breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal rights and remedies hereunder and under applicable Law will survive such termination unimpaired.

(b)      Following entry by the Bankruptcy Court of the Sale Order authorizing the sale to the Purchaser as the Successful Offeror, the Deposit shall be forfeited to the Seller as liquidated damages if the Purchaser fails to consummate the sale as the result of a breach by the Purchaser of any of its obligations under this Agreement; provided, however, that the Deposit shall also be so forfeited if this Agreement is terminated pursuant to Section 7.1(a)(iii) prior to the entry of such Sale Order.

(c)      Subject to clause ((b)) above, the Seller shall return the Deposit (with interest thereon at the rate specified, if any, in the Escrow Agreement) to the Purchaser within five (5) Business Days (i) following entry by the Bankruptcy Court of an order authorizing the sale of the China Purchased Assets to a Person other than the Purchaser entered into an Alternative Transaction, in which case clause (d) below shall apply, or (ii) following termination by Purchaser under Section 7.1(b).

(d)      In the event that this Agreement is terminated pursuant to Section 7.1(b) in connection with an Alternative Transaction, then Seller shall return the Deposit to Purchaser ;and shall pay to Purchaser (A) an expense reimbursement in an amount equal to the reasonable costs and expenses incurred by Purchaser in connection with the transactions contemplated hereby (including the LOI, the Support Agreement and this Agreement); provided, that such expense reimbursement shall in no event exceed $225,000 plus (B) a termination fee in the amount of $135,000.

# ARTICLE 8
# NO SURVIVAL

**Section 8.1**      No Survival of Representations and Warranties and Certain Covenants. Each of the representations, warranties and covenants (other than covenants that, by their terms, survive the Closing or termination of this Agreement) in this Agreement or any agreement or certificate to be executed or delivered in connection with the transactions contemplated by this Agreement and the Support Agreement shall terminate at the Closing or upon termination of this Agreement pursuant to Section 7.1 and, following the Closing or the termination of this Agreement, as the case may be, no party shall make any claim whatsoever for any breach of any such representation, warranty or covenant hereunder, subject to Section 7.2. Nothing in this Section 8.1 shall limit the ability of Purchaser to seek or obtain a return of the Deposit in accordance with this Agreement or the Escrow Agreement.

# ARTICLE 9
# TAX MATTERS

**Section 9.1**      Transfer Taxes. The Purchaser will pay in a timely manner all applicable sales, use, ad valorem, property, transfer, conveyance, documentary, recording, notarial, value added, excise, registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"),

arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement and the Support Agreement, including expenses and fees relating to registering Acquired China Intellectual Property in the name of the Purchaser or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by Law on the Purchaser, the China Purchased Assets or the Seller. Any Tax Returns that must be filed in connection with any Transfer Taxes will be prepared by the party that customarily has primary responsibility for filing such Tax Returns pursuant to the applicable Law under and according to which the respective Tax Returns are due to be filed; provided, however, that the preparing party will deliver such Tax Returns for the other party's review and approval (not to be unreasonably withheld, conditioned or delayed) at least ten (10) Business Days prior to the applicable due date. The parties will cooperate with each other in the provision of any information or preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes, or otherwise to comply with its obligations with respect to Transfer Taxes.

**Section 9.2**     Proration items.  Personal property Taxes, real property Taxes and other similar Taxes (the "Proration Items") with respect to the China Purchased Assets for any taxable period beginning before the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between the Purchaser and the Seller as of the Closing Date. The amount of the Proration Items attributable to the Seller shall be equal to the amount of Tax for the period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the period through and including the Closing Date and the denominator of which shall be the entire number of days in the period. For purposes of allocating all other Taxes ("Non-Proration Items") with respect to the China Purchased Assets for any Straddle Period, such Taxes shall be allocated between the pre-Closing portion of such Straddle Period and the post-Closing portion of such Straddle Period based on an interim closing of the books at the end of the day on the Closing Date. The Seller shall bear any Non-Proration Items allocable to the pre-Closing portion of any Straddle Period and any other unpaid Taxes with respect to the China Purchased Assets for Tax periods ending on or prior to the Closing Date (such Non-Proration Items and other pre-Closing Date Taxes, "Other Seller Taxes"). The amount of all such Proration Items attributable to the Seller and the amount of any Other Seller Taxes shall be estimated as of the Closing Date and deducted from the Purchase Price at the Closing; provided, however that final payments with respect to the Proration Items or Other Seller Taxes that are not able to be calculated as of the Closing Date shall be calculated and the Seller (or any successor thereof or any estate) shall pay over any additional amount as soon as practicable after the Closing Date, but no later than five (5) Business Days after determination of such additional amounts.

### ARTICLE 10
### GENERAL PROVISIONS

**Section 10.1**   Notices.  All notices and other communications under this Agreement must be in writing and are deemed duly delivered when: (a) delivered, if delivered personally or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or by email with confirmation of receipt (or, the first Business Day following such transmission if the

date of transmission is not a Business Day); or (c) received or rejected by the addressee, if sent by United States of America certified or registered mail, return receipt requested; in each case to the following addresses or facsimile numbers and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number or individual as a party may designate by notice to the other party):

If to the **Seller**:

      Meru, LLC
      1372 Peachtree Street, NW, Suite 2121
      Atlanta, GA 30309
      Attn:   Nick Campbell, Managing Partner
      Email: nick@wearemeru.com

with a copy (which will not constitute notice) to:

      Hogan Lovells US LLP
      1999 Avenue of the Stars, Suite 1400
      Los Angeles, California 90067
      Attn:   Richard Wynne, Esq.
             Erin Brady, Esq.
      Email: rick.wynne@hoganlovells.com
             erin.brady@hoganlovells.com

following the Closing, with a copy (which will not constitute notice) to:

      Akin Gump Strauss Hauer & Feld LLP
      One Bryant Park
      New York, NY 10036
      Attn:   Arik Preis, Esq.
      Email: apreis@akingump.com

      Morrison & Foerster LLP
      250 West 55th Street
      New York, NY 10019
      Attn:   Todd Goren, Esq.
      Email: tgoren@mofo.com

If to the **Purchaser**:

      Xuanzhu (HK) Biopharmaceutical Limited
      FLAT/RM 4312
      Office Tower, Convention Plaza
      1 Harbour Road, Wanchai

Hong Kong
Attn:   Choi Yiau Chong, Director
Email:  cyc@sihuanpharm.com


with a copy (which will not constitute notice) to:

Pryor Cashman LLP
7 Times Square
New York, New York 10036-6569
Attn:   H. Lawrence Remmel, Esq.
Email: LRemmel@pryorcashman.com

**Section 10.2**   <u>Amendment</u>.   Except as otherwise expressly contemplated by this Agreement, this Agreement may not be amended, supplemented or otherwise modified except in a written document signed by each party hereto and that identifies itself as an amendment to this Agreement.   Notwithstanding anything to the contrary herein, any deadline set forth in this Agreement that: (a) does not fall on a Business Day shall automatically be extended to the next Business Day; or (b) requires the Bankruptcy Court to either (i) hold a hearing by a specified date, or (ii) enter an order by a specified date, shall be subject to the Bankruptcy Court's availability, calendar or discretion and such deadline shall automatically be extended to such date as the Bankruptcy Court is available or its calendar shall permit it to hold such hearing or enter such order, as applicable.   All deadlines set forth herein may be modified by the parties in accordance with this <u>Section 10.2</u>.

**Section 10.3**   <u>Waiver and Remedies</u>.   The parties may, but are not required to: (a) extend the time for performance of any of the obligations or other acts of the other party to this Agreement; (b) waive any inaccuracies in the representations and warranties of the other party to this Agreement contained in this Agreement; or (c) waive compliance with any of the covenants or conditions for the benefit of such party contained in this Agreement.   Subject to <u>Section 5.5</u>: (i) any such extension or waiver by a party to this Agreement will be valid only if set forth in a written document signed on behalf of the party granting such waiver or extension; (ii) no extension or waiver will apply to any time for performance, inaccuracy in any representation or warranty, or noncompliance with any covenant or condition, as the case may be, other than that which is specified in the written extension or waiver; and (iii) no failure or delay by a party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy. Notwithstanding anything to the contrary herein, any deadline set forth in this Agreement that does not fall on a Business Day shall automatically be extended to the next Business Day.

**Section 10.4**   <u>Entire Agreement</u>.   This Agreement (including the Schedules and Exhibits hereto and the documents and instruments referred to in this Agreement and the Support

Agreement that are to be delivered at or prior to the Closing) constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties, or either of them, written or oral, with respect to the subject matter of this Agreement.

**Section 10.5** <u>Assignment, Successors and No Third Party Rights</u>.  This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any Person appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan).  No party may delegate any performance of its obligations under this Agreement, except that the Purchaser may at any time delegate the performance of its obligations (other than the obligation to pay the Purchase Price) to any Affiliate of the Purchaser so long as the Purchaser remains fully responsible for the performance of the delegated obligation.  The Purchaser may designate one or more Affiliates, including any special purpose entities that may be organized by the Purchaser for such purpose, to take title to the China Purchased Assets or any portion thereof and operate the business going forward, and upon written notice to the Seller of any such designation by the Purchaser, the Seller agrees to execute and deliver all instruments of transfer with respect to the China Purchased Assets directly to, and in the name of, the Purchaser's designees. No designation shall affect, in any way, any guaranty of payment and performance provided to the Seller by the Purchaser, and such guaranty shall continue to obligate the guarantor. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement (which includes any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of the Seller under Chapter 11 or Chapter 7 of the Bankruptcy Code and any Person appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan), any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this <u>Section 10.5</u>.

**Section 10.6** <u>Severability</u>.  In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.

**Section 10.7** <u>Exhibits and Schedules</u>.  The Exhibits and Schedules to this Agreement are incorporated herein by reference and made a part of this Agreement.  The Seller Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of ARTICLE 3.  The disclosure in any section or paragraph of the Seller Disclosure Schedule, and those in any amendment or supplement thereto, shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered or lettered section or paragraph of ARTICLE 3, except to the extent

that (a) such information is cross-referenced in another part of the Seller Disclosure Schedule; or (b) it is reasonably apparent on the face of the disclosure (without reference to any document referred to therein or any independent knowledge on the part of the reader regarding the matter disclosed) that such information qualifies another representation or warranty of the Seller in ARTICLE 3. The information contained in the Seller Disclosure Schedule is intended only to qualify the representations and warranties of the Seller contained in this Agreement and shall not be deemed to expand in any way the scope or effect of any such representations or warranties. Certain of the information contained in the Seller Disclosure Schedule may not be required to be disclosed pursuant to this Agreement and be included solely for informational purposes. The inclusion of any information in the Seller Disclosure Schedule shall not be construed as an admission or acknowledgement, in and of itself, that such information is material to the Business or the Seller or any of its Subsidiaries. No information contained in the Seller Disclosure Schedule shall be deemed to be an admission of any liability or obligation by the Seller to any third party of any matter whatsoever, including of any violation of Law or breach of any agreement.

**Section 10.8** <u>Interpretation</u>. In the negotiation of this Agreement, each party has received advice from its own attorney. The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no provision of this Agreement will be interpreted for or against either party because that party or its attorney drafted the provision.

**Section 10.9** <u>Expenses</u>. Except as otherwise provided herein, each party will pay its own direct and indirect expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated by this Agreement, including all fees and expenses of its advisors and representatives.

**Section 10.10** <u>Limitation on Liability</u>. Notwithstanding any other provision of this Agreement to the contrary, in no event will any party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of the conduct of such party pursuant to this Agreement, regardless of whether the nonperforming party was advised of the possibility of such damages or not.

**Section 10.11** <u>Specific Performance</u>. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by either party in accordance with such party's specific terms or were otherwise breached by such party. The parties accordingly agree that, prior to the termination of this Agreement pursuant to <u>Section 7.1</u>, in addition to any other remedy to which a non-breaching party is entitled at law or in equity, the non-breaching party is entitled to injunctive relief to prevent breaches of this Agreement by the breaching party and otherwise to enforce specifically the provisions of this Agreement against the breaching party; <u>provided</u> that, the non-breaching party shall only be entitled to injunctive relief if such non-breaching party is not otherwise in breach of this Agreement or if the breaching party is not otherwise entitled to terminate this Agreement. Each party expressly waives any requirement that the other party obtains any bond or provides any

indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement. Notwithstanding anything contained in this Section 10.11, the liquidated damages set forth in Section 7.2(b) shall be the sole and exclusive remedy of the Seller if the Purchaser fails to consummate the transactions contemplated under this Agreement and the Support Agreement as the result of a breach by the Purchaser of any of its obligations hereunder.

**Section 10.12** Governing Law; Jurisdiction; Waiver of Jury Trial. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS OF COMPETENT JURISDICTION LOCATED IN THE STATE OF DELAWARE OR IN THE BANKRUPTCY COURT (FOR SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION) AND EACH OF THE PARTIES HERETO IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, GENERALLY AND UNCONDITIONALLY, AND WAIVES ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

**Section 10.13** No Joint Venture. Nothing in this Agreement creates a joint venture or partnership between the parties. This Agreement does not authorize any party hereto (a) to bind or commit, or to act as an agent, employee or legal representative of, any other party, except as may be specifically set forth in other provisions of this Agreement, or (b) to have the power to control the activities and operations of any other party. Each party agrees not to hold itself out as having any authority or relationship contrary to this Section 10.13.

**Section 10.14** Counterparts; Signatures. The parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement. This Agreement is effective upon delivery of one executed counterpart from each party to the other party. The signatures of all parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email

transmission that includes a copy of the sending party's signature(s) is as effective as signing and delivering the counterpart in person.

**Section 10.15** <u>Preservation of Records; Post-Closing Access and Cooperation</u>.

(a)    For a period equal to the lesser of: (i) eighteen (18) months after the Closing Date; and (ii) the closing of the Chapter 11 Case by the Bankruptcy Court (the "<u>Post-Closing Access and Support Period</u>"), the Purchaser shall preserve and retain all books and records in its possession that are China Purchased Assets (including any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations) relating to the China Purchased Assets prior to the Closing Date.

(b)    During the Post-Closing Access and Support Period, subject to existing confidentiality agreements and upon reasonable advance notice from the Seller (or its designee or successor), the Purchaser shall provide reasonable cooperation to the Seller and its representatives (or its designee or successors, which may include the trustee of a liquidating trust) for the purpose of winding-up its affairs and finalizing the administration of the Chapter 11 Case, including its books and records with respect to the China Purchased Assets prior to the Closing Date, at the sole cost of the Seller.  During the Post-Closing Access and Support Period, the Purchaser shall cooperate with, and shall permit and use its reasonable commercial efforts to cause, its personnel to cooperate with the Seller (or, its designee or successors) after the Closing and upon receipt of prior written notice, in furnishing information, testimony and other assistance with respect to the China Purchased Assets for periods prior to the Closing Date as reasonably required in connection with any action or proceeding relating to the Chapter 11 Case; provided, that such access does not unreasonably interfere with the Purchaser's business or operations.

[SIGNATURES APPEAR ON THE FOLLOWING PAGES]

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

**SELLER:**

ACHAOGEN, INC

By: _____

Name: Nicholas K. Campbell

Title: Chief Restructuring Officer

[Signature Page to APA]

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

**PURCHASER:**

XUANZHU (HK) BIOPHARMACEUTICAL
LIMITED

By: _____
Name:  CHOI Yiau Chong
Title:  Director

## FORM OF BILL OF SALE

This **BILL OF SALE** (this "Bill of Sale") is made as of the ___ day of _____, 2019, by and between Achaogen, Inc. ("Seller"), to and in favor of Xuanzhu (HK) Biopharmaceutical Limited, a Hong Kong private limited company ("Purchaser"). Seller and Purchaser are each a "Party" hereto and are collectively referred to herein as the "Parties". All capitalized terms that are not otherwise defined herein shall have the meanings given to such terms in the Agreement (as defined below).

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement dated _____, 2019 (the "Agreement"), pursuant to which the Seller agreed to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agreed to purchase from Seller, all of Seller's right, title and interest in and to the China Purchased Assets, free and clear of all liens, pledges, mortgages, hypothecations and other encumbrances other than the Assumed Liabilities (the "Sale");

WHEREAS, the Bankruptcy Court entered the Sale Order on _____, 2019, approving the Sale of the China Purchased Assets to Purchaser on the terms set forth in the Agreement and in the Sale Order; and

WHEREAS, pursuant to the Agreement, Seller has agreed to execute and deliver this Bill of Sale to effectuate the sale, transfer, assignment, conveyance and delivery of the China Purchased Assets to Purchaser and its successors and assigns.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1.      For and in consideration of payment by Purchaser to Seller of the Purchase Price, all upon the terms and subject to the conditions set forth in the Agreement, the receipt, sufficiency and adequacy of which are hereby acknowledged and accepted by Seller, Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, its successors and assigns, all of Seller's entire right, title and interest in, to and under the China Purchased Assets, free and clear of all liens, pledges, mortgages, hypothecations and other encumbrances other than the Assumed Liabilities, the same to be held and enjoyed by Purchaser for its use and enjoyment, and for the use and enjoyment of its successors, assigns and other legal representatives, as the same would have been held and enjoyed by Seller had this sale, transfer, assignment, conveyance and delivery not been made.

2.      Seller and Purchaser hereby agree to execute and deliver any and all additional documents that Seller or Purchaser may reasonably request in order to more fully effect the agreements set forth in this Bill of Sale.

3.      This Bill of Sale shall be subject to the terms and conditions set forth in the Agreement and the Sale Order. Seller and Purchaser hereby acknowledge and agree that the

provisions of this Bill of Sale shall not modify or limit the full force and effect of the terms and provisions of the Agreement or the Sale Order, and that in the event of a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the Agreement, the terms and provisions of the Agreement, as approved by the Sale Order, shall prevail, govern and control in all respects without limitation.

4.     Section 10.12 of the Agreement is hereby incorporated by reference into this Bill of Sale and shall apply as if fully set forth herein *mutatis mutandis*.

5.     The Parties may execute this Bill of Sale in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement.  This Bill of Sale is effective upon delivery of one executed counterpart from one Party to the other Party.  The signatures of all Parties need not appear on the same counterpart. The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

6.     The undertakings, covenants and agreements set forth herein shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties have executed this Bill of Sale as of the date first above written.

SELLER:

**ACHAOGEN, INC.**


By: _____
Name:
Title:

PURCHASER:

**XUANZHU (HK) BIOPHARMACEUTICAL LIMITED**


By: _____
Name:
Title:

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT**, dated as of _____, 2019 (this "Agreement"), among Achaogen, Inc., as assignor (the "Assignor"), a Delaware corporation, and Xuanzhu (HK) Biopharmaceutical Limited, a Hong Kong private limited company, in its capacity as assignee (the "Purchaser"), of the Assumed Liabilities.  Assignor and Assignee are each a "Party" hereto and are collectively referred to herein as the "Parties".  Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Assignor and Purchaser are parties to the Asset Purchase Agreement, dated as of [_____], 2019 (the "Purchase Agreement"), pursuant to which the Assignor has agreed to sell, assign, transfer, convey and deliver to the Purchaser all of the Seller's right, title and interest in and to the China Purchased Assets and assign to the Purchaser the Assumed Liabilities and the Purchaser has agreed to purchase, acquire and accept all of the Assignor's right, title and interest in the China Purchased Assets and assume the Assumed Liabilities from and after the Closing Date; and

WHEREAS, this Agreement is being provided to evidence the Assignor's assignment to the Purchaser, and the Purchaser's assumption, of the Assumed Liabilities, pursuant to the terms and conditions of the Purchase Agreement from and after the Closing Date.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.	Assignment and Assumption of Liabilities. The Assignor hereby assigns, transfers and sets over unto the Purchaser all of the Assumed Liabilities and the Purchaser hereby assumes the Assumed Liabilities pursuant to the terms and conditions of the Purchase Agreement and Sale Order, including, without limitation, liability for the due performance of all the terms, covenants and conditions of the Assignor pursuant to, arising under or related to the Assumed Liabilities from and after the Closing on the Closing Date.  Notwithstanding anything herein to the contrary, this Agreement shall not be deemed to be an assignment by the Assignor to the Purchaser or an assumption by the Purchaser of any of the Excluded Liabilities or Excluded Assets.

2.	Headings. The section headings used herein are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

3.	Governing Law; Jurisdiction; Waiver of Jury Trial. Section 10.12 of the Purchase Agreement is hereby incorporated by reference into this Agreement and shall apply as if fully set forth herein mutatis mutandis.

4.	Severability; Conflicts. In the event that any provision of this Agreement, or the application of any such provision to any Person or set of circumstances, shall be determined to

be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by applicable Law.  In the event of any conflict between the terms and provisions of this Agreement and the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

5.  <u>Successors and Assigns</u>. This Agreement shall bind the Parties, their legal representatives, and their permitted successors and assigns.

6.  <u>Entire Agreement</u>. This Agreement and the Purchase Agreement constitute the entire agreement between the Parties.  No amendment or modification of this Agreement shall be binding or valid unless set forth in writing and executed by the Parties.

7.  <u>Counterparts</u>. The Parties may execute this Agreement in multiple counterparts, each of which constitutes an original as against the party that signed it, and all of which together constitute one agreement.  This Agreement is effective upon delivery of one executed counterpart from one Party to the other Party.  The signatures of all Parties need not appear on the same counterpart.  The delivery of signed counterparts by facsimile or email transmission that includes a copy of the sending Party's signature(s) is as effective as signing and delivering the counterpart in person.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties have caused this agreement to be executed on the date first above written.

**ASSIGNOR:**

**ACHAOGEN, INC.**

By: _____
Name:
Title:

**PURCHASER:**

**XUANZHU (HK) BIOPHARMACEUTICAL LIMITED**

By: _____
Name:
Title:

## EXHIBIT C

**FORM OF CHINA INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

THIS CHINA INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "Assignment"), effective as of _____, 2019 (the "Effective Date"), is by and between Xuanzhu (HK) Biopharmaceutical Limited, a Hong Kong private limited company ("Assignee") and Achaogen, Inc., a Delaware corporation ("Assignor").

**WITNESETH:**

WHEREAS, pursuant to the terms and subject to the conditions of the Asset Purchase Agreement, dated [•], 2019 (the "Asset Purchase Agreement"), between Assignee and Assignor, Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, among other things, the China Purchased Assets; and

WHEREAS, pursuant to the Asset Purchase Agreement, Assignor desires to sell, assign, convey, deliver and transfer the entire right, title and interest in, to and under all of the China Intellectual Property included in the China Purchased Assets, including the China Intellectual Property set forth on Exhibit A hereto (the "China Assigned IP"), to Assignee and Assignee desires to acquire the entire right, title and interest in, to and under such China Assigned IP.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Asset Purchase Agreement and subject to the terms and conditions therein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2.      Assignor hereby irrevocably sells, assigns, conveys, delivers and transfers to Assignee the entire right, title and interest in, to and under (i) the China Assigned IP, together with all goodwill associated therewith, in each case to be held and enjoyed by Assignee for its own use and enjoyment as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, including the right to claim priority under the International Convention for the Protection of Industrial Property and under any other international arrangement to which the United States of America is or hereafter becomes a signatory (but not, for the avoidance of doubt, any Excluded Liability), (ii) all rights to sue, claim and recover for past, present and future infringement, misappropriation, dilution or other violation of any China Assigned IP, and (iii) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing.

3.      Concurrent with the execution of this Assignment, Assignor shall transfer any and all domain names and social media accounts included in the China Assigned IP from Assignor's account to Assignee's account (such that Assignee will be listed as the registrant and/or owner of such domain names and social media accounts in the applicable registrar) and

shall deliver to Assignee all necessary Auth-Info codes and all other required passwords necessary to unlock and control such domain names and social media accounts.

4.     Upon the reasonable request by Assignee, Assignor shall execute all documents and take all actions as may be necessary or desirable to enable Assignee to prosecute, perfect, enforce, defend, register and/or record its right, title and interest in, to and under the Assigned IP, in each case, without further compensation but at the expense of Assignee. In the event that Assignor fails to execute any such document or take any such action as set forth in the preceding sentence, Assignor hereby designates Assignee as Assignor's agent, and hereby grants to Assignee a power of attorney with full power of substitution, which power of attorney shall be deemed coupled with an interest, for the purpose of executing such documents or taking such actions.

5.     Assignor hereby authorizes and requests the officials of the China Territory, to record and register Assignee as assignee and owner of the entire right, title and interest in, to and under the China Assigned IP.

6.     As soon as practicable after execution of this Assignment, Assignor shall, at the cost and expense of the Assignee, use diligent efforts to support transition of the assigned intellectual property from Assignor to Assignee through legal counsel at Cooley LLP, who the Assignor has engaged for acquisition and maintenance of the China Assigned IP, and instruct its legal counsel to cooperate as appropriate with the Assignee in furtherance of the activities contemplated in the Asset Purchase Agreement and this Assignment. Assignor shall also use diligent effort to instruct any inventors and other employees who are under control of the Assignor to cooperate with the Assignee in furtherance of the activities contemplated in the Asset Purchase Agreement and this Assignment, including as appropriate any signatures, oaths, or declarations Assignee may request to file, prosecute, record, or transfer of the China Assigned IP and to cooperate with and assist the Assignee in any litigation or other legal proceedings involving the China Assigned IP.

7.     This Assignment shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to the choice of law principles thereof. This Assignment is binding upon, and inures to the benefit of, the parties hereto and their respective legal representatives, successors and assigns. No waiver, modification or change of any provision of this Assignment shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

8.     This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNOR:**

**ACHAOGEN, INC.**

By: _____
Name:
Title:

STATE OF                 )
                          ) ss
COUNTY OF            )

On the _____ day of _____, _____, before me personally came _____, who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as _____ of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

_____
Notary Public

(PLACE STAMP AND SEAL ABOVE)

*[Signature Page to China Intellectual Property Assignment Agreement]*

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**AS ASSIGNEE:**

**XUANZHU (HK) BIOPHARMACEUTICAL LIMITED**

By: _____
Name:
Title:

STATE OF                          )
                                       ) ss
COUNTY OF                      )

On the ____ day of _____, ____, before me personally came _____, who is personally known to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and did depose and say to me that he or she executed the same in his or her capacity as _____ of _____, the entity described in and which executed the foregoing instrument, and that he or she executed and delivered said instrument pursuant to authority given by the board of directors of such entity (or other applicable authority of such entity).

_____
Notary Public

(PLACE STAMP AND SEAL ABOVE)

\

# EXHIBIT A

## CHINA ASSIGNED IP

# I.  PATENTS

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| China | 200880117193.1 11/21/2008 | 101868472A | ZL 200880117193.1 05/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Hong Kong | 11101563.2 11/21/2008 | 1147499 | HK1147499 01/26/2018 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered (via EP) |
| Taiwan | 097145246 11/21/2008 | 200927146 | I425947 02/11/2014 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| China | 201310142186.X 11/21/2008 | 103360440A | ZL 201310142186.X 08/31/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| China | 201080031078.X 05/14/2010 | 102481307A | ZL 201080031078.X 08/24/2016 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Hong Kong | 12111406.1 05/14/2010 | 1170663 | 1170663 11/17/2017 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Macau | J/002404 (J32) 05/14/2010 | | J/002404 01/24/2017 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| China | 201610573991.1 05/14/2010 | 106188175A | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| Hong Kong | 1710542 7.3 05/14/2010 | 1231886A | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| Taiwan | 107136676 10/18/2018 | 201922233 6/16/2019 | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |
| Taiwan | 106126088 8/2/2017 | 201815826 5/1/2018 | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |

## II.   TRADEMARKS

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| WIPO Q1 wo 23 | Design Only  RN: 1441507 | International Registered Last Status Received: Registered April 15, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Madrid Protocol: China[1] |
| WIPO Q1 wo 24 | Design Only | International Registered Last Status Received: Registered March 26, 2019 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: |

---

[1] For the avoidance of doubt, this transfer only includes the transfer of trademark rights in China, Hong Kong, Taiwan, or Macau, as applicable.

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | <br>RN: 1442826 | Registered: November 20, 2018<br>Expiration Date: November 20, 2028 | | Madrid Protocol:<br>China[2] |
| WIPO<br>QI<br>wo 25 | ZEMDRI and Design<br><br>RN: 1442745 | International<br>Registered<br>Last Status Received: Registered November 20, 2018<br>Expiration Date: November 20, 2028 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 360 South San Francisco CA 94080, United States of America<br>Claimed Countries:<br>Madrid Protocol:<br>China[3] |
| WIPO<br>QI<br>wo 26 | ZEMDRI and Design<br><br>RN: 1443260 | International<br>Registered<br>Last Status Received: Registered April 2, 2019<br>Registered: November 20, 2018<br>Expiration Date: November 20, 2028 | (Int'l Class: 05)<br>Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 360 South San Francisco CA 94080, United States of America<br>Claimed Countries:<br>Madrid Protocol:<br>China[4] |
| China<br>QI<br>cn 55 | XEMDRO<br>XEMDRO<br>RN: 22301161<br>AN: 22301161 | China<br>Registered<br>Last Status Received: Registered<br>Filed: December 19, 2016<br>Registered: January 28, 2018<br>Expiration Date: January 27, 2028 | (Translation)<br>(Int'l Class: 05)<br>antibiotics | 爱趋根有限公司 加利福尼亚州 94080 南旧金山 7000 沿海大楼 371 室, United States of America<br><br>ACHAOGEN, INC.<br>7000 SHORELINE COURT, SUITE 371, SOUTH SAN FRANCISCO, CALIFORNIA |

---

[2] For the avoidance of doubt, this transfer only includes the transfer of trademark rights in China, Hong Kong, Taiwan, or Macau, as applicable.
[3] For the avoidance of doubt, this transfer only includes the transfer of trademark rights in China, Hong Kong, Taiwan, or Macau, as applicable.
[4] For the avoidance of doubt, this transfer only includes the transfer of trademark rights in China, Hong Kong, Taiwan, or Macau, as applicable.

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | | | | 94080, UNITED STATES OF AMERICA, United States of America |
| China<br>QI<br>cn 56 | ZEMDRI<br><br>ZEMDRI<br><br>RN: 2230162<br>AN: 2230162 | China<br>Registered<br>Last Status Received: Registered<br>Filed: December 19, 2016<br>Registered: January 28, 2018<br>Expiration Date: January 27, 2028 | (Translation)<br>(Int'l Class: 05)<br>antibiotics | 爱超根有限公司 加利福尼亚州 94080 南旧金山 7000 沿海大楼 371 室, United States of America<br><br>ACHAOGEN, INC.<br>7000 SHORELINE COURT,<br>SUITE 371, SOUTH SAN<br>FRANCISCO, CALIFORNIA<br>94080, UNITED STATES OF<br>AMERICA, United States of America |
| Hong Kong<br>QI<br>hk 58 | ZEMDRI and Design<br><br>ZEMDRI<br><br>AN: 304338135 | Hong Kong<br>Published<br>Last Status Received: Published<br>December 8, 2017<br>Filed: November 16, 2017 | (Int'l Class: 05)<br>Antibiotics | Achaogen, Inc. 1 Tower Place,<br>Suite 300, South San Francisco,<br>California 94080, United States of America |
| Taiwan<br>QI<br>tw 68 | Logo design (in black-and-white)<br><br><br><br>AN: 107075189 | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察銷有限公司<br>美國<br>United States of America |
| Taiwan<br>QI<br>tw 69 | Logo design (in color) | Taiwan<br>Other<br>Last Status Received: Unknown | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America |

| TM Record | TM/AN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| |  AN: 107075187 | Filed: November 21, 2018 | | 爾察褚有限公司<br>美國<br>United States of America |
| Taiwan<br>Q1<br>tw 70 | ZEMDRI<br>**ZEMDRI**<br>AN: 106072193 | Taiwan<br>Other<br>Filed: November 16, 2017 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC. 1 Tower Place, Suite 300, South San Francisco, California 94080 U.S.A. United States of America |
| Taiwan<br>Q1<br>tw 71 | ZEMDRI<br><br>AN: 107075184 | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br>爾察褚有限公司<br>美國<br>United States of America |
| Taiwan<br>Q1<br>tw 72 | ZEMDRI | Taiwan<br>Other<br>Last Status Received: Unknown | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國 |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| |  ZEMDRI<br><br>AN: 107075186 | Filed: November 21, 2018 | | United States of America<br><br>爾察補有限公司<br>美國<br>United States of America |
| Taiwan<br>Q1<br>tw 73 | ZEMDRI<br><br>**ZEMDRI**<br><br>RN: 01919327<br>AN: 106072193 | Taiwan<br>Registered<br>Last Status Received: Registered<br>Filed: November 16, 2017<br>Registered: June 16, 2018<br>Expiration Date: June 15, 2028 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>United States of America<br><br>爾察補有限公司<br>美國<br>United States of America |

## III.    COPYRIGHTS

No registered copyrights.

## IV.    REGISTERED DOMAINS

**Domain Name**

| enrezovi.tw | zemdri.tw | enrezovi.cn | xemdro.cn | xemdro.tw | zemdri.cn |
|---|---|---|---|---|---|

# Exhibit D

## Support Agreement

# LICENSE AND MUTUAL SUPPORT AGREEMENT

This License and Mutual Support Agreement (the "Agreement"), effective as of the 29th day of December, 2019 (the "Effective Date"), is made between Cipla USA, Inc., a Delaware corporation ("Cipla"), and Xuanzhu (HK) Biopharmaceutical Limited, a Hong Kong private limited company ("Xuanzhu").

WHEREAS, in connection with that certain Chapter 11 bankruptcy case filed in the United States Bankruptcy Court for the District of Delaware ("Court"), captioned *In re Achaogen, Inc.* and bearing Case No. 19-10844 (BLS), Achaogen, Inc. ("Achaogen") has filed a motion for approval of that certain Stipulation and Agreed Order Amending the Cipla Sale Documents (the "Cipla Stipulation") dated December 29, 2019 (capitalized terms used but not defined in this Agreement shall have the meanings ascribed to such terms in the Cipla Stipulation) pursuant to which (i) the China Purchased Assets Rescission will be effectuated, and (ii) Xuanzhu will acquire the China Purchased Assets pursuant to the Xuanzhu APA, in each case subject to the Conditions;

WHEREAS, prior to the effectiveness of the China Purchased Assets Rescission and Xuanzhu's acquisition of the China Purchased Assets, Cipla acquired the Global Rights pursuant to the Cipla APA;

WHEREAS, as a result of the China Purchased Assets Rescission, the Global Rights do not include the China Purchased Assets; and

WHEREAS, in order to provide for coordinated action relating to certain aspects of the manufacture, regulation, marketing and sale of the aminoglycoside antibiotic plazomicin sulfate ("Plazomicin"), Cipla and Xuanzhu have agreed to enter into this Agreement.

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, Cipla and Xuanzhu hereby agree as follows:

1.      Mutual Support.

1.1     Description of Support.  Xuanzhu hereby agrees to provide to Cipla, and Cipla hereby specifically commissions Xuanzhu to provide to Cipla, the support more specifically described in Exhibit A attached hereto and incorporated herein by reference (the "Xuanzhu Support").  Cipla hereby agrees to provide to Xuanzhu, and Xuanzhu hereby specifically commissions Cipla to provide to Xuanzhu, the support more specifically described in Exhibit B attached hereto and incorporated herein by reference (the "Cipla Support" and together with the Xuanzhu Support, the "Support").

1.2     Not An Agent.  Neither party is appointed as the other party's agent for any purpose whatsoever hereunder.  Neither party will hold itself out as the agent of the other or otherwise purport to bind the other party to any third-party obligations.  This Agreement shall not create a partnership or joint venture between the parties hereto.

1.3    <u>Confidentiality</u>. (A) For purposes of this Agreement, "Confidential Information" means any technical data, marketing, organization, business or financial or other information provided by the Discloser in the course of providing Support hereunder, (ii) the party disclosing Confidential Information shall be referred to as the "Discloser," (iii) the party to whom Confidential Information is disclosed shall be referred to as the "Recipient," and (iv) Achaogen shall also be considered a "Discloser" with respect to any Confidential Information that it has disclosed or discloses in the future to Xuanzhu, for which Xuanzhu shall be subject to the obligations hereunder as a "Recipient" thereof.   Except as expressly set forth below, Recipient shall hold in confidence, and shall not use for any purpose except as expressly set forth in this Agreement, any and all Confidential Information disclosed to Recipient under this Agreement.  Confidential Information shall not include information which:

(a)     can be shown, by competent written evidence, that at the time of disclosure is in the public domain or thereafter becomes part of the public domain by publication or otherwise, other than by breach of this Agreement by Recipient;

(b)     can be shown, by competent written evidence, to have been in Recipient's possession at the time of disclosure by Discloser and was not acquired, directly or indirectly, from Discloser; or

(c)     can be shown, by competent written evidence, to have been developed by Recipient independently of the information provided by Discloser.

In addition, Confidential Information shall not include information received from a third party other than Achaogen, provided such third party had a lawful right to disclose such information to Recipient without restriction.

Notwithstanding Recipient's obligations hereunder, Recipient shall also be free to (i) disclose Confidential Information as required by regulatory authorities in any jurisdiction where Recipient has applied for or obtained marketing approval for Plazomicin, provided always that (a) Recipient has determined that such disclosure is necessary or appropriate in furtherance of Recipient's efforts to Commercialize Plazomicin in such jurisdiction, and (b) reasonable prior written notice is provided to Discloser and Recipient in good faith considers any recommendations Discloser may make in respect of the scope of such disclosure, and (ii) disclose Confidential Information that is required to be disclosed to a third party pursuant to any applicable law or regulation or the order of any court or tribunal of competent jurisdiction, so long as (a) reasonable prior written notice is provided to Discloser and Recipient in good faith cooperates with Discloser, at Discloser's sole cost and expense, in respect of Discloser's efforts to obtain a protective order governing, or otherwise limit the scope of the required disclosure of, the Confidential Information, and (b) such disclosure is limited to Confidential Information required to be disclosed in order to comply with such law, regulation or order, after taking into account the results of the Discloser's efforts to obtain a protective order or other limitation on the scope of the required disclosure.

(B)     Recipient shall use the Confidential Information solely in furtherance of its Commercialization (as that term is defined below) of Plazomicin and shall not use the Confidential Information for any other purpose.  Recipient's right to use the Confidential Information shall end on the date this Agreement is terminated or expires in accordance with its terms, whereupon Recipient shall (i) return to Discloser or, at Discloser's discretion, verifiably destroy all tangible materials incorporating the Confidential Information disclosed to Recipient pursuant hereto, and (ii) verifiably erase any electronic files incorporating the Confidential Information disclosed to Recipient pursuant hereto; provided, however, that Recipient may retain one copy of all Confidential Information in its legal archives for the sole purpose of ensuring its continuing compliance with this Agreement and defending against any claims that Recipient has breached this Agreement; provided, further, that the requirement under this sentence shall not apply to Confidential Information disclosed by Achaogen.

(C)     Recipient shall only disclose Confidential Information to those of its affiliates, collaborators, joint venturers, manufacturers and distributors, and its and their officers, directors, employees and legal advisors who have a need to know such Confidential Information in order to properly perform their job duties, who are bound by obligations of confidentiality that are not less restrictive than those set forth in this Agreement.  In addition, Recipient shall use the same degree of care, but in no event less than a reasonable degree of care, to safeguard the confidentiality of the Confidential Information as it uses to safeguard the confidentiality of its own valuable trade secrets, shall keep all tangible copies of Confidential Information disclosed to it pursuant to this Agreement in a safe and secure place that is at least as safe and secure as the place where Recipient keeps its own valuable trade secrets, and shall use the most current security means to secure and otherwise protect from unauthorized access or use any computer networks and hardware controlled by Recipient and affording access to copies of any Confidential Information stored on machine readable media.  Recipient acknowledges that nothing herein constitutes a license or other transfer of rights in respect of any Confidential Information.

(D)     Recipient acknowledges and agrees that unauthorized disclosure of Confidential Information in violation of the terms of this Agreement may cause Discloser irreparable harm and that Discloser shall be entitled to injunctive relief and such other equitable relief as a court of competent jurisdiction may order in connection with a breach, or threatened breach, by Recipient of its non-disclosure obligations set forth in this Agreement and that Recipient shall not oppose any such request, nor shall Recipient seek to compel Discloser to post a bond or other security in connection with such request.

(E)     Recipient's obligations under this Section shall survive termination or expiration of this Agreement until the later of (i) the tenth (10th) anniversary of the date of this Agreement first set forth above, and (ii) the seventh (7th) anniversary of the date of termination or expiration of this Agreement.

1.4     Mutual Right of Reference.  (A)  Cipla hereby grants to Xuanzhu a Right of Reference (as that term is defined in 21 C.F.R. § 314.3(b) (and any foreign counterpart to

such regulation), to Cipla's regulatory filings (including communications from a regulatory authority) relating to NDA No. 210303, as the NDA existed on the date acquired from Achaogen (the "As Approved NDA"), to the extent necessary or useful in connection with the Commercialization of Plazomicin in the China Territory, and to the extent such filings were either (a) acquired by Cipla from Achaogen under the Cipla APA, (b) solely relate to intellectual property acquired by Cipla from Achaogen under the Cipla APA, or (c) solely relate to changes in formulation, composition, process of manufacture or other elements of Plazomicin made after the date the NDA was acquired from Achaogen for purposes of drug safety (any such change a "Drug Safety Change") and does not include, in any material respects, any intellectual property that was independently developed by Cipla after the closing of the Cipla APA except to the extent such independently developed intellectual property covers or embodies any Drug Safety Change. Without limiting the foregoing, Xuanzhu and Cipla acknowledge and agree that Xuanzhu's Right of Reference shall include regulatory filings relating to the As Approved NDA and filed with or communicated by a regulatory authority after the date the As Approved NDA was acquired by Cipla, but only to the extent such filings are in furtherance of maintenance of the As Approved NDA, and not for, without limitation, any improvements or enhancements of the product that is the subject of the As Approved NDA. Xuanzhu hereby grants to Cipla a Right of Reference to Xuanzhu's regulatory filings (including communications from a regulatory authority) referencing the As Approved NDA to the extent necessary or useful in connection with the Commercialization of plazomicin outside the China Territory, and (x) acquired by Xuanzhu from Achaogen under the Xuanzhu APA, (y) solely relate to intellectual property acquired by Xuanzhu from Achaogen under the Xuanzhu APA or (z) solely relates to a Drug Safety Change and does not include, in any material respects, any intellectual property that was independently developed by Xuanzhu after the closing of the Xuanzhu APA. Without limiting the foregoing, Xuanzhu and Cipla acknowledge and agree that Cipla's Right of Reference shall include regulatory filings relating to the As Approved NDA and filed with or communicated by a regulatory authority after the date the As Approved NDA was acquired by Cipla, except to the extent such filing applies to a voluntarily-filed request, by Xuanzhu, for approval of an improvement to the formulation of Plazomicin. Each party's Right of Reference set forth above is subject to the terms and conditions of this Agreement. Each party shall, if reasonably requested by the other party, provide a signed statement to this effect in accordance with 21 C.F.R. § 314.50(g)(3) or any foreign counterpart to such regulation, for the limited purpose of such party exercising its Right of Reference as set forth above. Notwithstanding the foregoing, no party shall be required to expend any funds or assume additional liabilities or affirmative obligations on account of any Right of Reference under this Section 1.4.

(B)     Xuanzhu covenants and agrees that it shall not grant a Right of Reference to regulatory filings relating to Plazomicin to any third party seeking regulatory approval for any drug outside the China Territory without Cipla's express prior written consent, which consent may be given or withheld at Cipla's sole, absolute and unfettered discretion.

(C)     Cipla covenants and agrees that it shall not grant a Right of Reference to regulatory filings relating to Plazomicin to any third party seeking regulatory approval for

any drug in the China Territory without Xuanzhu's express prior written consent, which consent may be given or withheld at Xuanzhu's sole, absolute and unfettered discretion.

2.  License, Enforcement and Defense and Co-existence.

2.1  License. (A) Cipla hereby grants to Xuanzhu (i) a royalty-free, fully-paid, irrevocable, perpetual, and exclusive (even as to Cipla) license, under Cipla's trade secret, copyright and other intellectual property rights covering or embodied by the Proprietary Data and China Relevant Excluded IP (as those terms are defined below), to copy, display, distribute, perform, translate, modify and otherwise use and practice the Proprietary Data and China Relevant Excluded IP in the China Territory for any lawful purpose relating to the Commercialization of Plazomicin in the China Territory, and (ii) a royalty-free, fully-paid, irrevocable, perpetual, non-exclusive license, under Cipla's trade secret, copyright and other intellectual property rights covering or embodied by the Proprietary Data and China Relevant Excluded IP, to copy, display, distribute, perform, translate, modify and otherwise use and practice the Proprietary Data and China Relevant Excluded IP outside the China Territory, solely in connection with or in furtherance of the formulation, clinical testing and regulatory approval of, and regulatory compliance in connection with the Commercialization of, Plazomicin in the China Territory. The license under this Section 2.1 shall be transferrable and sublicensable; provided, however, that to the extent sublicensed, Xuanzhu shall be liable to Cipla for damages resulting from a breach of this Agreement, by the applicable sublicensee. With respect to any licenses granted by Cipla to Xuanzhu under this Agreement or the Cipla Stipulation, including licenses to Proprietary Data and Intellectual Property (as defined in the Xuanzhu APA), Xuanzhu shall be responsible for any obligations of Cipla that are directly related to the sale of Plazomicin in the China Territory, including any payments due to third parties under any applicable license agreements. For clarity, and notwithstanding anything to the contrary in this Agreement or elsewhere, license agreements in the preceding sentence shall include the License Agreement between Achaogen and Isis Pharmaceuticals, Inc. (n/k/a Ionis), dated January 25, 2006, and any obligations thereunder assumed by Cipla. Xuanzhu shall pay any payments due under the preceding two sentences directly to the third party.

2.2  Certain Definitions. For purposes of this Agreement, (A) the term "Proprietary Data" means, solely to the extent necessary for Commercialization of Plazomicin in the China Territory, all data, compilations of data, specifications, formulae, software source code, lab notes, graphs, charts, spread sheets, financial analyses, software libraries, techniques, know-how and other information of whatever form, howsoever communicated and whether or not confidential, that was sold or otherwise transferred to Cipla pursuant to the Cipla APA and which is in the possession or control of Cipla or its affiliates at any time after the Effective Date, (B) the term "China Relevant Excluded IP" means Excluded IP, as that term is defined in the Xuanzhu APA, that is useful in the China Territory, but only to the extent recognized under, and otherwise valid and enforceable in, the China Territory, and (C) the term "Commercialization" means the clinical development, non-clinical development, registration, regulatory approval, manufacture, importation, exportation, use, sale, offer for sale, transport, distribution,

promotion, marketing or other exploitation for commercial benefit of a product or service. Without limiting the foregoing, Proprietary Data includes data, compilations of data, specifications, formulae, software source code, lab notes, graphs, charts, spread sheets, financial analyses, software libraries, techniques, know-how and other information of whatever form licensed to Cipla pursuant to any Assumed Contracts, as that term is defined in the Cipla APA. For clarity, but without limiting Xuanzhu's Right of Reference set forth in Section 1.4 above, Proprietary Data does not include any data developed or acquired through a license, including the specific types of data listed in this section, by Cipla after the Effective Date of the Cipla APA. For further clarity, Proprietary Data does not include any data, including the specific types of data listed in this section, that was not acquired by Cipla or licensed to Cipla pursuant to the Cipla APA.

2.3     Disclosure and Transfer. To the extent not already in the data room provided by Achaogen and upon Xuanzhu's request, and during the term of this Agreement, Cipla shall provide Xuanzhu with access to, and at Xuanzhu's sole cost and expense copies of, all Proprietary Data and any other China Relevant Excluded IP available in documented or otherwise tangible form, in the same form and format as was furnished by Achaogen to Cipla. Cipla makes no warranty as to the Proprietary Data or China Relevant Excluded IP for any purpose.

2.4     Acknowledgement. Xuanzhu acknowledges and agrees that the Proprietary Data and any other China Relevant Excluded IP available in documented or otherwise tangible form that has not been published or otherwise made available to third parties on a non-confidential basis also constitutes Confidential Information in respect of which Cipla is the Discloser. Nothing in Section 2.1 above shall limit or otherwise alter Xuanzhu's obligations under Section 1.3 above.

2.5     Enforcement and Defense. Cipla shall, at Cipla's sole cost and expense, be solely responsible for enforcing and defending trade secret and other intellectual property rights covering or embodied by the Proprietary Data and China Relevant Excluded IP outside the China Territory. Xuanzhu shall, at Xuanzhu's sole cost and expense, be solely responsible for enforcing and defending trade secret and other intellectual property rights covering or embodied by the Proprietary Data and China Relevant Excluded IP within the China Territory. Cipla and Xuanzhu shall not challenge each other's plazomicin Intellectual Property rights (as defined in the Cipla APA) in their respective territories, i.e., neither shall take part in any enforcement, defense, challenges, or otherwise actions that may affect the ownership, validity or enforceability of the other's plazomicin Intellectual Property rights (as defined in the Cipla APA) in the other's respective territory. Each party shall have the right, at their sole cost and expense, to prosecute patents relating to the Proprietary Data and China Relevant Excluded IP in their respective territories, and to retain rights thereto including Commercialization.

2.6     Prosecution and Maintenance of Owned Intellectual Property. (A) Xuanzhu shall be solely responsible for the prosecution and maintenance of Company Owned China Intellectual Property (as defined in the Xuanzhu APA), at its sole cost. Upon Cipla's

written request, Xuanzhu shall provide Cipla with copies of any or all sent or received correspondence between Xuanzhu (or on its behalf) and any government entity concerning the Company China IP Registrations constituting Patents, including applications, office actions, responses, affidavits or declarations, within 15 days of sending or receiving such request.

(B)  Cipla shall be solely responsible for the prosecution and maintenance of Company Owned Intellectual Property (as defined in the Cipla APA), at its sole cost.  Upon Xuanzhu's written request, Cipla shall provide Xuanzhu with copies of any or all sent or received correspondence between Cipla (or on its behalf) and any government entity concerning the Company IP Registrations constituting Patents, including applications, office actions, responses, affidavits or declarations, within 15 days of sending or receiving such request.

2.7    <u>Prohibition on Patent Prosecution</u>.  (A)  Neither Xuanzhu nor any of its affiliates shall prosecute any patents relating to plazomicin or derived from the Proprietary Data in any territory outside the China Territory.

(B)    Neither Cipla nor any of its affiliates shall prosecute any Patents relating to Plazomicin or derived from the Proprietary Data in the China Territory.

2.8    <u>No Adverse Impact</u>.  (A)  Xuanzhu represents and warrants that Xuanzhu and its affiliates shall not take any action in the China Territory that could adversely affect Cipla's plazomicin business globally, including any actions that adversely affect Cipla's Intellectual Property rights (as defined in the Cipla APA) globally.  Xuanzhu covenants and agrees that neither it nor any of its affiliates shall challenge or assist any third party in challenging (except to the extent such assistance is required by applicable court order) any Cipla-owned Intellectual Property (as defined in the Cipla APA) relating to plazomicin in any territory outside the China Territory.

(B)  Cipla represents and warrants that Cipla and its affiliates shall not take any action outside the China Territory that could adversely affect Xuanzhu's Plazomicin business in the China Territory, including any actions that adversely affect Xuanzhu's Intellectual Property rights (as defined in the Cipla APA) in the China Territory.  Cipla covenants and agrees that neither it nor any of its affiliates shall challenge or assist any third party in challenging (except to the extent such assistance is required by applicable court order) any Xuanzhu-owned Intellectual Property (as defined in the Cipla APA) relating to Plazomicin in the China Territory.

(C)    Xuanzhu shall not, directly or indirectly, pursue Commercialization of, commercialize, or otherwise exploit any Plazomicin product outside the China Territory.

(D)  Cipla shall not, directly or indirectly, pursue Commercialization of, commercialize, or otherwise exploit any Plazomicin product in the China Territory.

2.9     Trademark Covenants.  (A)  Xuanzhu covenants and agrees, on behalf of itself and its affiliates, that (i) it shall not use for any purpose, file for or otherwise seek to register any trademark for or containing the word "ZEMDRI" or similar marks in the China Territory (such trademarks, the "Zemdri China Trademarks"); provided however, nothing herein shall limit Xuanzhu's right to register or use a trademark in the China Territory consisting of or including the design attached hereto as Exhibit C, which the parties understand to be owned by Cipla and licensed to Xuanzhu (under Section 1(e) of the Stipulation and Agreed Order Amending the Cipla Sale Documents); (ii) it shall not use, file for or otherwise seek to register or use trademarks covering any product or service relating to plazomicin outside the China Territory, and (iii) it shall not oppose the registration or use, by Cipla or any Cipla affiliate, of any trademarks outside the China Territory covering any product or service relating to plazomicin.  Xuanzhu shall—to the extent permitted by law—maintain the Zemdri China Trademarks but shall not use the Zemdri China Trademarks for any purpose (including, without limitation, in connection with any plazomicin product or other product), except to maintain the registration and preclude any  third party from using or acquiring them.  If Xuanzhu elects to abandon any Zemdri China Trademarks, such trademarks shall be transferred to Cipla for no consideration.

(B)  Cipla covenants and agrees, on behalf of itself and its affiliates, that (i) it shall not use for any purpose, file for or otherwise seek to register any trademark for or containing the word "XEMDRO" or similar marks outside the China Territory; provided however, nothing herein shall limit Cipla's right to register or use a trademark outside the China Territory consisting of or including the design attached hereto as Exhibit C, which the parties understand to be owned by Cipla and licensed to Xuanzhu (under Section 1(e) of the Stipulation and Agreed Order Amending the Cipla Sale Documents); (ii) it shall not use, file for or otherwise seek to register or use trademarks covering any product or service relating to plazomicin within the China Territory, and (iii) it shall not oppose the registration or use, by Xuanzhu or any Xuanzhu affiliate, of any trademarks within the China Territory covering any product or service relating to plazomicin.

(C)   The obligations of this section 2.9 shall extend, with regard to each respective trademark, for the duration of the use of that trademark in the respective territory.

2.10  With respect to any domain names transferred to Xuanzhu by Achaogen pursuant to the Xuanzhu APA for the China Territory that include the word Zemdri ("Zemdri China Domains"), Xuanzhu shall—to the extent permitted by law—maintain such Zemdri China Domains but shall not use the Zemdri China Domains for any purpose (including, without limitation, creating and using a website with such domain name), except to maintain the registration and preclude any  third party from using or acquiring them.  If Xuanzhu elects to abandon any Zemdri China Domains, such domains shall be transferred to Cipla for no consideration.

2.11  No Other Obligation. Other than as expressly outlined in this Agreement, neither party shall have any obligation to the other party under this Agreement, implied or otherwise.

3.     <u>Consideration and Reimbursement</u>.

3.1    <u>No Monetary Consideration</u>. Each of Cipla and Xuanzhu acknowledge and agree that it shall not receive monetary consideration for the Support; rather, (A) in consideration of the Cipla Support provided by Cipla, Xuanzhu shall provide the Xuanzhu Support to Cipla; and (B) in consideration of the Xuanzhu Support provided by Xuanzhu, Cipla shall provide the Cipla Support to Xuanzhu.

3.2    <u>Reimbursement</u>. Neither party shall be obligated to travel or incur any expense in the course of providing Support hereunder except to the extent the other party has agreed to reimburse such expenses. Cipla and Xuanzhu shall each reimburse the other for all pre-approved travel and other costs and expenses required to be incurred in providing the Support. Invoices for reimbursement shall be accompanied by receipts and other supporting documentation reasonably acceptable to the party providing reimbursement, and shall be submitted not more frequently than once a month.

4.     <u>Term</u>

4.1    <u>Term</u>. Except as otherwise set forth in this Agreement and subject to Section 4.2 below, the term of this Agreement shall commence on the Effective Date and will expire on the first (1st) anniversary of the Effective Date. The rights, duties and obligations of the parties arising pursuant to Sections 1.2, 2.1, 2.5, 2.7, 2.8, 2.9, 2.10, 2.11, 3.2, 5.1, 5.2, 5.3 and 5.4 of this Agreement, as well as the Support obligations under paragraph I.(a) and I.(c) of <u>Exhibit A</u> and I.(a) I.(b) and I.(d) of <u>Exhibit B</u> shall survive termination, and Section 1.4 and part II of <u>Exhibit B</u> shall survive until the earlier of (i) the date on which Plazomicin is the subject of a marketing approval in the People's Republic of China, and (ii) the fifth (5th) anniversary of the Effective Date.

4.2    <u>Effectiveness of Agreement</u>. This Agreement shall become effective and binding on the parties only upon the entry of the Sale Order and, if a separate order is required, an order of the Bankruptcy Court approving the Cipla Stipulation.

5.     <u>Miscellaneous</u>

5.1    <u>Limitation on Damages and Warranties</u>. (A) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR SPECIAL, PUNITIVE, CONSEQUENTIAL OR OTHER SPECULATIVE DAMAGES OF ANY NATURE INCLUDING, WITHOUT LIMITATION, LOST PROFITS, EVEN IF A PARTY HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATIONS SHALL NOT APPLY TO CLAIMS ARISING IN CONNECTION WITH A BREACH OF SECTIONS 1.3, 1.4, 2.1 OR 2.3 OF THIS AGREEMENT.

(B) XUANZHU WARRANTS AND REPRESENTS THAT (1) IT HAS THE RIGHT TO DISCLOSE TO CIPLA ANY CONFIDENTIAL INFORMATION IN RESPECT OF WHICH XUANZHU IS THE DISCLOSER, AND (2) IT HAS NO KNOWLEDGE OF ANY POTENTIAL CLAIMS AGAINST CIPLA AS OF THE DATE OF THIS AGREEMENT. CIPLA WARRANTS AND REPRESENTS TO XUANZHU THAT

(X) Cipla has the right to disclose to Xuanzhu any Proprietary Data, as well as Confidential Information in respect of which Cipla is the Discloser, and (Y) it has no knowledge of any potential claims against Xuanzhu as of the date of this Agreement . Except as so warranted, the Support, Proprietary Data and other Confidential Information is provided without any warranty whatsoever. Each of Xuanzhu and Cipla excludes any express or implied warranty of merchantability or fitness for a particular purpose in respect of the Support, or of non-infringement, completeness or accuracy in respect of any Proprietary Data or other Confidential Information for which it is a Discloser. Each of Xuanzhu and Cipla, in its capacity as a Recipient hereunder, acknowledges and agrees that it assumes all risks associated with its use of and reliance on the Proprietary Data or any Confidential Information provided by the Discloser.

5.2     Additional Provisions.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall be deemed to be one and the same instrument.  This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and permitted assigns. Neither party may assign this Agreement or delegate its duties and obligations hereunder without the prior written consent of the other, except in connection with the sale of all or substantially all of the assets of a party.  Any assignment in violation of this provision shall be void *ab initio* and of no force or effect.  This Agreement may be modified, amended, or supplemented only by means of a written instrument signed by both parties. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous oral and prior written agreements and understandings.   In the event that any provision of this Agreement shall, for any reason, be held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid or unenforceable provision had not been included herein.

5.3     Notices.  All notices, requests, demands and other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given upon the date of receipt if delivered by recognized international overnight courier to the addresses set forth below, or via email transmission (with automated confirmation of receipt) to the email addresses set forth below, in each case to the attention of the person identified below:

If to Xuanzhu:

with a copy (which shall not constitute notice) to:

If to Cipla:

Cipla USA Inc.
10 Independence Blvd.,

Suite 300
Warren, NJ 07059
Attn: Deep Sagar, Associate Director, Legal
Email: deep.sagar@cipla.com

with a copy (which shall not constitute notice) to:

Cipla Ltd.
Cipla House, Peninsula Business Park
Ganapatrao Kadam Marg, Lower Parel West
Mumbai, Maharashtra 400013, India
Attn: A.S. Kumar, Esq., Global General Counsel
Email: as.kumar@cipla.com
cosecretary@cipla.com

and

Kelley Drye & Warren LLP
101 Park Avenue, 27thFloor
New York, New York 10178
Attn: Deepak Nambiar, Esq.
Email: DNambiar@KelleyDrye.com

Either party may change its designated addresses by notice to the other party in the manner provided in this Section.

5.4    <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York irrespective of any conflict of laws principles.   The parties hereby agree that any action or proceeding arising from or in connection with this Agreement shall only be brought in a federal or state court located in New York County, State of New York and having jurisdiction with respect to such action or proceeding.   Each of the parties hereto irrevocably consents and submits to the jurisdiction of such courts.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

DocuSign Envelope ID: 86379C87-38E6-4215-BCC9-D4B14F59C57A

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed as a binding agreement between the parties effective as of the date first written above.

CIPLA USA, INC.

By: _____

Name: Elizabeth Garrett Ingram

Title: Chief Commercial Officer

[*Signature Page to License and Mutual Support Agreement*]

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed as a binding agreement between the parties effective as of the date first written above.

XUANZHU (HK)
BIOPHARMACEUTICAL
LIMITED

By:

Name: F. Leslie Boyd, Jr., Ph.D.
Title: Chief Business Officer

<u>EXHIBIT A</u>

<u>XUANZHU SUPPORT</u>

Xuanzhu Support, to the extent required or reasonably requested by Cipla, consist of, but shall not exceed, the following:

I.      <u>Regulatory Approvals and Data Sharing</u>.

(a)     Xuanzhu shall notify Cipla promptly (but in no event later than forty-eight (48) hours) following its determination that any event, incident or circumstance has occurred that may result in the need for a recall, market suspension, or market withdrawal of Plazomicin in any jurisdiction in the China Territory and shall include in such notice the reasoning behind such determination and any supporting facts.  Xuanzhu shall have the unilateral right to make a final determination whether to voluntarily implement any such recall, market suspension, or market withdrawal.  If a recall, market suspension, or market withdrawal of Plazomicin in any jurisdiction in the China Territory is mandated by a regulatory authority, then Xuanzhu shall initiate such a recall, market suspension, or market withdrawal in compliance with applicable law.  For all such recalls, market suspensions, or market withdrawals, Xuanzhu shall be solely responsible for the execution thereof, and shall be responsible for all costs of any such recall, market suspension, or market withdrawal.

(b)     If Cipla believes that Xuanzhu or any of its affiliates or licensees is taking or intends to take any action (including any recall action) with respect to Plazomicin that could have a material adverse impact upon the regulatory status of plazomicin in any jurisdiction outside the China Territory, Cipla may bring the matter to the attention of Xuanzhu and the parties will discuss and endeavor to resolve such concern in good faith. Without limiting the foregoing, unless Xuanzhu otherwise agrees in writing, none of Cipla or its affiliates or its or their licensees will (i) communicate with any regulatory authority having jurisdiction in the China Territory unless so ordered by such regulatory authority, in which case Cipla will immediately notify Xuanzhu of such order, or (ii) submit any regulatory documentation or seek regulatory approvals for Plazomicin within the China Territory.

(c)     Xuanzhu shall promptly notify Cipla of any suspected or actual infringement of intellectual property rights relating to plazomicin by any third party, or of any allegations that any intellectual property rights that it acquired pursuant to the Cipla APA infringes on the intellectual property rights of any third party, to the extent that any such actual or suspected infringement affects Cipla in any material respect.

(d) Information disclosed under provisions I(a)-(c) will be subject to the Confidentiality provisions of section 1.3 of this Agreement, including its survival provisions in 1.3(E).

EXHIBIT B

CIPLA SUPPORT

Cipla Support shall, to the extent required or reasonably requested by Xuanzhu, consist of, but shall not exceed, the following:

I.  Regulatory Approvals and Data Sharing.

(a)  To the extent required by regulatory authorities in the China Territory, Cipla shall itself file (if expressly required by regulatory authorities), or cooperate to enable Xuanzhu to file, with such regulatory authorities information and materials in Cipla's possession or control (in such form as the relevant regulatory authority may require) addressing the following for Plazomicin:  annual reports (which may include but not be limited to global development and launch status); periodic updated safety reports; ongoing global and completed studies; newly generated safety results; significant chemistry manufacturing control updates and variations; overall safety evaluations; summaries of significant risk and risk-benefit assessments; overall research plans for the next year; documentation relating to any variations to drug product or active pharmaceutical ingredients; and such other information in Cipla's possession or control as regulatory authorities may expressly require.  For clarity, but without limiting Xuanzhu's right of reference in Section 1.4, any obligations of Cipla under this section or this Agreement, except as expressly set forth herein, shall be limited to information acquired from Achaogen and existing at the time of execution of the Cipla APA.

(b)  Cipla shall notify Xuanzhu promptly (but in no event later than forty-eight (48) hours) following its determination that any event, incident or circumstance has occurred that will result in the need for a recall, market suspension, or market withdrawal of Plazomicin in any jurisdiction outside the China Territory and shall include in such notice the reasoning behind such determination and any supporting facts.  Cipla shall have the unilateral right to make a final determination whether to voluntarily implement any such recall, market suspension, or market withdrawal.  If a recall, market suspension, or market withdrawal of Plazomicin in any jurisdiction outside the China Territory is mandated by a regulatory authority, then Cipla shall initiate such a recall, market suspension, or market withdrawal in compliance with applicable law.  For all such recalls, market suspensions, or market withdrawals, Cipla shall be solely responsible for the execution thereof, and shall be responsible for all costs of any such recall, market suspension, or market withdrawal.

(c)  If Xuanzhu believes that Cipla or any of its affiliates or licensees is taking or intends to take any action (including any recall action) with respect to Plazomicin that could have a material adverse impact upon the regulatory status of Plazomicin in any jurisdiction of the China Territory, Xuanzhu may bring the matter to the attention of Cipla and the parties will discuss and endeavor to resolve such concern in good faith. Without limiting the foregoing, unless Cipla otherwise agrees in writing, none of Xuanzhu or its affiliates or its or their licensees will (i) communicate with any regulatory

authority having jurisdiction outside the China Territory unless so ordered by such regulatory authority, in which case Xuanzhu will immediately notify Cipla of such order, or (ii) submit any regulatory documentation or seek regulatory approvals for plazomicin outside the China Territory.

(d)     Cipla shall promptly notify Xuanzhu of any suspected or actual infringement of intellectual property rights relating to Plazomicin by any third party, or of any allegations that any intellectual property rights that it acquired pursuant to the Cipla APA infringes on the intellectual property rights of any third party, to the extent that any such actual or suspected infringement affects Xuanzhu or the China Territory in any material respect.

(e)     Information disclosed under provisions I(a)-(d) will be subject to the Confidentiality provisions of section 1.3 of this Agreement, including its survival provisions in 1.3(E).

II.    <u>Supply for Regulatory Purposes</u>.

(a)    Subject to the terms of Part II of this Exhibit B, Cipla shall supply the below quantities (or such lesser amounts, or none, as Xuanzhu may specify, or such greater amounts not to exceed in the aggregate 7,452 vials as Xuanzhu may specify)  of Plazomicin to Xuanzhu for the sole purpose of performance of preclinical and clinical studies and otherwise obtaining marketing approval in the China Territory of Plazomicin prior to marketing approval (the "Clinical Requirements") in any jurisdictions within the China Territory.  Xuanzhu will not be entitled to resell the Plazomicin sold by Cipla hereunder.

| Category | Tentatively 4Q 2020 | Tentatively 4Q 2021 |
| --- | --- | --- |
| cUTI Clinical trial supply # | 1,755 vials (Can be same or different batches) | 1,755 vials (Can be same or different batches) |
| NDA registration testing sample # | | 2,700 vials, provided that Cipla shall supply such amount in three tranches of 900 vials each, with each tranche being from a different batch (so that in all three different batches will be utilized for such 2,700 vials) |
| Total Vials – 6210 vials | | |

The parties acknowledge that notwithstanding the table above, the delivery dates for Xuanzhu's purchases shall be determined by Xuanzhu in its sole discretion provided the notice requirement in (b) below is met.

(b)    Xuanzhu will raise a non-cancelable purchase order on Cipla six (6) months in advance of any requirement of Clinical Requirements. Unless an order is given, there will be no obligation to provide or purchase Clinical Requirements. Unless otherwise expressly agreed by Cipla, orders shall be shipped EXW Cipla designated facility (Incoterms® 2019). Xuanzhu will be responsible for transportation, storage and customs clearance. Payment terms are Net 60 - payment due within 60 days of invoice.

(c)    The price for all orders of Plazomicin for Xuanzhu's Clinical Requirements shall be US$250 per single dose (i.e., 10 milliliter) vial of Plazomicin net of all taxes and fees. Shelf-life will be 15 months at the point of delivery.

(d)     At all times during which Xuanzhu is using Plazomicin supplied by Cipla pursuant to this Part II, Xuanzhu shall have and maintain commercial general liability insurance policies, including product liability insurance, in those jurisdictions of the China Territory where such use is taking place.  The foregoing policies shall be customary in form for the relevant jurisdictions of the China Territory.  Xuanzhu shall provide proof of such coverage to Cipla upon request.

(e)     CIPLA WARRANTS THAT IT HAS TITLE TO, AND ALL NECESSARY RIGHT AND AUTHORITY TO SELL TO XUANZHU SOLELY FOR CLINICAL REQUIREMENTS, ALL PLAZOMICIN SOLD TO XUANZHU PURSUANT TO THIS PART II.  EXCEPT AS SO WARRANTED, CIPLA EXCLUDES ALL EXPRESS AND IMPLIED WARRANTIES RELATING TO PLAZOMICIN SOLD TO XUANZHU PURSUANT TO THIS  PART II, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.

(f)     CIPLA SHALL NOT BE LIABLE TO XUANZHU OR TO ANY THIRD PARTY FOR ANY CLAIMS, INCLUDING PRODUCT LIABILITY AND INTELLECTUAL PROPERTY INFRINGEMENT CLAIMS, ARISING IN CONNECTION WITH XUANZHU'S USE OF PLAZOMICIN SOLD TO XUANZHU PURSUANT TO THIS PART II.  XUANZHU SHALL INDEMNIFY CIPLA FOR ANY CLAIMS AGAINST CIPLA IN THE CHINA TERRITORY RELATING TO CIPLA'S SUPPLY OF PLAZOMICIN PURSUANT TO THIS AGREEMENT.

(g)     In no event shall Cipla be obligated to supply in excess of the Clinical Requirements to Xuanzhu without having entered into a written agreement with Xuanzhu, expressly authorizing such additional supply.

EXHIBIT C

TRADEMARK COVENANTS

The following is the image referred to in Section 2.9(A)(i) and 2.9(B)(i), which may be in any color or combination thereof, or in black and white coloration:



## Exhibit E

**Form of Sale Order**

**[Intentionally Omitted]**

# SCHEDULE 2.1(C)

# CHINA INTELLECTUAL PROPERTY

## I. PATENTS

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| China | 200880117193.1 11/21/2008 | 101868472A | ZL 200880117193.1 05/29/2013 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| Hong Kong | 11101563.2 11/21/2008 | 1147499 | HK1147499 01/26/2018 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered (via EP) |
| Taiwan | 097145246 11/21/2008 | 200927146 | I425947 02/11/2014 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| China | 201310142186.X 11/21/2008 | 103360440A | ZL 201310142186.X 08/31/2016 | ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc. | Registered |
| China | 201080031078.X 05/14/2010 | 102481307A | ZL 201080031078.X 08/24/2016 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Hong Kong | 12111406.1 05/14/2010 | 1170663 | 1170663 11/17/2017 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| Macau | J/002404 (132) 05/14/2010 | | J/002404 01/24/2017 | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Registered |
| China | 201610573991.1 05/14/2010 | 106188175A | | TREATMENT OF KLEBSIELLA PNEUMONIAE | Achaogen, Inc. | Pending |

| Country | Application No./Filing Date | Publication No. | Registration No./Issue Date | Title/Mark | Assignee | Case Status |
|---|---|---|---|---|---|---|
| | | | | INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | | |
| Hong Kong | 1710S427.3 05/14/2010 | 1231886A | | TREATMENT OF KLEBSIELLA PNEUMONIAE INFECTIONS WITH ANTIBACTERIAL AMINOGLYCOSIDE COMPOUNDS | Achaogen, Inc. | Pending |
| Taiwan | 107136676 10/18/2018 | 201922233 6/16/2019 | | SYNTHESIS OF ANTIBACTERIAL AMINOGLYCOSIDE ANALOGS | Achaogen, Inc | Pending |
| Taiwan | 106126088 8/2/2017 | 201815826 5/1/2018 | | PLAZOMICIN ANTIBODIES AND METHODS OF USE | | Filed |

## II. TRADEMARKS

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| WIPO Q1 wo 23 | Design Only  RN: 1441507 | International Registered Last Status Received: Registered April 15, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: China[1] |
| WIPO Q1 wo 24 | Design Only | International Registered Last Status Received: Registered March 26, 2019 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 300 South San Francisco CA 94080, United States of America Claimed Countries: |

---

[1] For the avoidance of doubt, this transfer only includes the transfer of trademark rights in China, Hong Kong, Taiwan, or Macau, as applicable.

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | RN: 1442826 | Registered: November 20, 2018 Expiration Date: November 20, 2028 | | Madrid Protocol: China[2] |
| WIPO QI wo 25 | ZEMDRI and Design ZEMDRI RN: 1442745 | International Registered Last Status Received: Registered November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 360 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: China |
| WIPO QI wo 26 | ZEMDRI and Design ZEMDRI RN: 1443260 | International Registered Last Status Received: Registered April 2, 2019 Registered: November 20, 2018 Expiration Date: November 20, 2028 | (Int'l Class: 05) Antibiotics. | Achaogen, Inc. 1 Tower Place, Suite 360 South San Francisco CA 94080, United States of America Claimed Countries: Madrid Protocol: China |
| China QI cn 55 | XEMDRO XEMDRO RN: 22301161 AN: 22301161 | China Registered Last Status Received: Registered Filed: December 19, 2016 Registered: January 28, 2018 Expiration Date: January 27, 2028 | (Translation) (Int'l Class: 05) antibiotics | 爱超根有限公司 加利福尼亚州 94080 南旧金山 7000 沿海大楼 371室 United States of America ACHAOGEN, INC. 7000 SHORELINE COURT, SUITE 371, SOUTH SAN FRANCISCO, CALIFORNIA 94080, UNITED STATES OF AMERICA, United States of America |

[2] For the avoidance of doubt, this transfer only includes the transfer of trademark rights in China, Hong Kong, Taiwan, or Macau, as applicable.
[3] For the avoidance of doubt, this transfer only includes the transfer of trademark rights in China, Hong Kong, Taiwan, or Macau, as applicable.
[4] For the avoidance of doubt, this transfer only includes the transfer of trademark rights in China, Hong Kong, Taiwan, or Macau, as applicable.

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| China<br>Q1<br>cn 56 | ZEMDRI<br><br>ZEMDRI<br><br>RN: 22301162<br>AN: 22301162 | China<br>Registered<br>Last Status Received: Registered<br>Filed: December 19, 2016<br>Registered: January 28, 2018<br>Expiration Date: January 27, 2028 | (Translation)<br>(Int'l Class: 05)<br>antibiotics | 爱超根有限公司 加利福尼亚州 94080 南旧金山 7000 沿海大楼 371 室, United States of America<br><br>ACHAOGEN, INC.<br>7000 SHORELINE COURT, SUITE 371, SOUTH SAN FRANCISCO, CALIFORNIA 94080, UNITED STATES OF AMERICA, United States of America |
| Hong Kong<br>Q1<br>hk 58 | ZEMDRI and Design<br><br>ZEMDRI<br><br>AN: 304338135 | Hong Kong<br>Published<br>Last Status Received: Published<br>December 8, 2017<br>Filed: November 16, 2017 | (Int'l Class: 05)<br>Antibiotics | Achaogen, Inc. 1 Tower Place, Suite 300, South San Francisco, California 94080, United States of America |
| Taiwan<br>Q1<br>tw 68 | Logo design (in black-and-white)<br><br><br><br>AN: 107075189 | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察裿有限公司<br>美國<br>United States of America |
| Taiwan<br>Q1<br>tw 69 | Logo design (in color) | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察裿有限公司<br>美國<br>United States of America |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | <br>AN: 107075187 | | | |
| Taiwan<br>Q1<br>tw 70 | ZEMDRI<br><br>**ZEMDRI**<br><br>AN: 106072193 | Taiwan<br>Other<br>Filed: November 16, 2017 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC. 1 Tower Place,<br>Suite 300, South San Francisco,<br>California 94080 U.S.A. United<br>States of America |
| Taiwan<br>Q1<br>tw 71 | ZEMDRI<br><br><br>**ZEMDRI**<br><br>AN: 107075184 | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察納有限公司<br>美國<br>United States of America |
| Taiwan<br>Q1<br>tw 72 | ZEMDRI | Taiwan<br>Other<br>Last Status Received: Unknown<br>Filed: November 21, 2018 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察納有限公司 |

| TM Record | TM/AN/RN/ Disclaimer | Status/Key Dates | Full Goods/Services | Owner/Designations |
|---|---|---|---|---|
| | ZEMDRI<br><br>AN: 107075186 | | | 美國<br>United States of America |
| Taiwan<br>Q1<br>tw 73 | ZEMDRI<br><br>ZEMDRI<br><br>RN: 01919327<br>AN: 106072193 | Taiwan<br>Registered<br>Last Status Received: Registered<br>Filed: November 16, 2017<br>Registered: June 16, 2018<br>Expiration Date: June 15, 2028 | (Translation)<br>(Int'l Class: 05)<br>antibiotics. | ACHAOGEN, INC.<br>美國<br>United States of America<br><br>爾察珍有限公司<br>美國<br>United States of America |

## III.  COPYRIGHTS

No registered copyrights.

## IV.  REGISTERED DOMAINS

| Domain Name |
|---|
| enrezovi.tw |
| zemdri.tw |
| enrezovi.cn |
| xemdro.cn |

| xemdro.tw | zemdri.cn |
|---|---|

## SCHEDULE 3.4

## TITLE TO ASSETS, LIENS

None.

# SCHEDULE 3.5

## CLAIMS, LITIGATION AND DISPUTES

1. We note that in June 2018, the FDA issued a complete response letter for the bloodstream infection (BSI) indication the Seller sought for plazomicin. In December 2018, the Seller filed a Formal Dispute Resolution Request (FDRR) with the FDA regarding the BSI indication for plazomicin. The Seller believes that the data submitted in the New Drug Application for plazomicin provides substantial evidence of efficacy in treating BSI and that plazomicin should be approved for the proposed BSI indication. The FDA denied the Seller's first-round FDRR. The Seller does not know whether Cipla has taken any action with respect to the foregoing.

**SCHEDULE 3.6**

**GOVERNMENTAL AUTHORIZATIONS**

None.

**SCHEDULE 3.9(A)**

**COMPANY OWNED CHINA INTELLECTUAL PROPERTY, COMPANY USED CHINA INTELLECTUAL PROPERTY AND CHINA IP AGREEMENTS**

**<u>Company Owned China Intellectual Property</u>**

Please see Schedule 2.1(c), which information set forth therein is incorporated herein by reference.

**<u>Company Used China Intellectual Property</u>**

None.

**<u>China IP Agreements</u>**

None.

**SCHEDULE 3.9(C)**

**INTELLECTUAL PROPERTY CLAIMS BROUGHT AGAINST THE SELLER**

Seller's ownership rights to Intellectual Property it developed under U.S. federally-funded research grants and contracts in connection with certain neglected diseases initiatives may be subject to certain rights that the government may have under applicable statute or the underlying contracts that govern such research grants. Provisions in the Seller's U.S. government contracts, including its contracts with BARDA, may affect the Seller's intellectual property rights.

# SCHEDULE 3.10

## TAXES

1. The Seller's 2019 property taxes related to its fixed assets were due in July 2019. The Seller has appealed the amount it owes and is waiting for a resolution of such appeal before making the necessary payment.

2. The Seller's 2019 Delaware Franchise Taxes are due in estimated quarterly installments throughout 2019. The Seller is waiting for an updated invoice since filing for bankruptcy in order to make the appropriate payment.

**SCHEDULE 5.2**

**OPERATION OF THE CHINA PLAZOMICIN BUSINESS**

None.