# **EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Achaogen, Inc., | Case No. 19-10844 (BLS) |
| Debtor. | |

---

## AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION JOINTLY PROPOSED BY ACHAOGEN, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ACHAOGEN, INC.

---

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Sally Veghte (DE Bar No. 3989)
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062

-and-

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Morton Branzburg (admitted *pro hac vice*)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Arik Preis (admitted *pro hac vice*)
Mitchell P. Hurley (admitted *pro hac vice*)
One Bryant Park, Bank of America Tower
New York, New York 10036-6745

Dated: May 26, 2020

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Derek C. Abbott (DE Bar No. 3376)
Andrew R. Remming (DE Bar No. 5120)
Matthew O. Talmo (DE Bar No. 6333)
Paige N. Topper (DE Bar No. 6471)
1201 Market Street, 16th Floor
Wilmington, Delaware 19899-1347

-and-

**HOGAN LOVELLS US LLP**
Richard L. Wynne (admitted *pro hac vice*)
Erin N. Brady (admitted *pro hac vice*)
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") RELATES TO THE FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION JOINTLY PROPOSED BY ACHAOGEN, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ACHAOGEN, INC. (THE "**PLAN**") AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(C) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF ACHAOGEN, INC. SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY,

STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASE OF THE DEBTOR, AND FINANCIAL INFORMATION. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR, IN PART, AND FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE, TO THE BEST OF THE PROPONENTS' KNOWLEDGE, INFORMATION AND BELIEF UNLESS OTHERWISE NOTED. ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH INFORMATION IS QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN, SUCH DOCUMENTS OR ANY STATUTORY PROVISIONS THAT MAY BE REFERENCED THEREIN. THE PROPONENTS BELIEVE THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, BUT MAKE NO REPRESENTATION WITH RESPECT TO ITS ACCURACY OR COMPLETENESS.

## 1.    INTRODUCTION

### 1.1    *Purpose of Disclosure Statement.*

Achaogen, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the **"Debtor"**) and the Official Committee of Unsecured Creditors (the "**Committee**" and together with the Debtor, the "**Plan Proponents**"), provide this Amended Disclosure Statement (the "**Disclosure Statement**") to the Office of the United States Trustee and to all of the Debtor's known Claimholders and Interestholders pursuant to section 1125(b) of Title 11 of the United States Code (the **"Bankruptcy Code"**) for the purpose of soliciting acceptances of the *First Amended Chapter 11 Plan of Liquidation Jointly Proposed by Achaogen, Inc. and the Official Committee of Unsecured Creditors of Achaogen, Inc.* (the **"Plan"**), which has been filed with the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**).

The Plan Proponents strongly urge you to read this Disclosure Statement because it contains a summary of the Plan and important information concerning the Debtor's history and operations. The Disclosure Statement also provides information as to alternatives to the Plan. A copy of the Plan accompanies this Disclosure Statement as a separate document.

**PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTOR'S BOOKS AND RECORDS AND FROM MOTIONS AND OTHER PAPERS FILED WITH THE BANKRUPTCY COURT BY THE DEBTOR AND OTHER PARTIES-IN-INTEREST. ALTHOUGH THE PROPONENTS HAVE ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THEY ARE UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR.**

Unless otherwise defined herein, capitalized terms contained in this Disclosure Statement shall have the same meanings as ascribed to them in the Plan. All capitalized terms used in this Disclosure Statement and not defined herein or in the Plan, but that are defined in the Bankruptcy Code, shall have the respective meanings ascribed to them in the Bankruptcy Code. All capitalized terms used in this Disclosure Statement and not defined herein, in the Plan or in the Bankruptcy Code, but that are defined in the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**" or "**Bankruptcy Rule**"), shall have the respective meanings ascribed to them in the Bankruptcy Rules. Holders of Claims or Interests receiving this Disclosure Statement should carefully review the Plan in conjunction with their review of this Disclosure Statement.

**PLEASE REVIEW THE PLAN IN ITS ENTIRETY IN DETAIL.**

**NO REPRESENTATION CONCERNING THE DEBTOR OR THE VALUE OF ITS ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTOR IS NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION**

**OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.**

The purpose of this Disclosure Statement is to provide Claimholders and Interestholders, to the extent they are entitled to vote, with information determined by the Bankruptcy Court to be adequate to enable them to make an informed decision to vote to accept or reject the Plan.

### 1.2    Brief Summary of the Plan

As described in more detail in this Disclosure Statement, during the course of the Debtor's bankruptcy case, the Debtor sold substantially all of the Estate Assets, which included among other things the Debtor's global plazomicin business, for cash and a royalty stream from those assets (the "**Royalty Stream**"). Certain Estate Assets, however, including the Debtor's interest in the C-Scape program assets, have yet to be sold or otherwise disposed of.

In order to maintain operations while it conducted a bankruptcy sales process, the Debtor required access to debtor-in-possession financing. Silicon Valley Bank ("**SVB**") was the only lender willing to fund a chapter 11 sale process. SVB agreed to provide a $25 million senior secured debtor-in-possession financing facility, $15 million of which would be a rollup of SVB's prepetition secured debt (the "**DIP Facility**"). Thus, the Debtor and SVB entered into that certain Debtor-in-Possession Loan and Security Agreement dated as of April 15, 2019 (as amended, restated or otherwise modified from time to time, the "**DIP Credit Agreement**"). The DIP Facility provided liquidity that the Debtor believed was necessary to conclude the sale processes on an expedited basis and wind down the Debtor's affairs.

The Committee informally objected to the DIP Facility. Over the course of several months, the Debtor, SVB and the Committee negotiated a resolution to the Committee's informal objections, which resolution was memorialized in the final order approving the DIP Facility entered on September 24, 2019 [Docket No. 478] (the "**DIP Order**"). Among other things, the DIP Order provided for a split of proceeds of Estate Assets between SVB and the Committee as more fully described in Section 2.3.2 herein.

The Royalty Stream, any remaining proceeds of the sales of the Estate Assets, any proceeds resulting from the collection and liquidation of the remaining Estate Assets and any proceeds of Third Party Claims will be used to make payments, to Holders of Allowed Claims in the order of priority under section 507 of the Bankruptcy Code, including Allowed Administrative Claims (including Professional Fee Claims), and Allowed Claims in Class 1, Class 2 and Class 3. The Plan Trustee shall make Distributions to Allowed Class 4 General Unsecured Claims from the GUC Cash; provided that such Distributions shall be subject to the satisfaction of the Distribution Reserve.

### 1.3    Confirmation of Plan.

1.3.1    **Requirements**. The requirements for Confirmation of the Plan are set forth in detail in section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

(a)  **Acceptance by Unimpaired Classes**.  Except to the extent that the cramdown provisions of section 1129(b) of the Bankruptcy Code may be invoked, each Class of Claims must either vote to accept the Plan or be presumed to accept the Plan because the Claims or Interests of such Class are Unimpaired.

(b)  **Feasibility**.  The Bankruptcy Court is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

(c)  **"Best Interest" Test**.  The Bankruptcy Court must find that the Plan is in the "best interest" of all Claimholders.  To satisfy this requirement, the Bankruptcy Court must determine that each Holder of a Claim against the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on such date.

(d)  "**Cramdown" Provisions**.  Under the circumstances which are set forth in detail in section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though a Class of Claims or Interests has not accepted the Plan, so long as one Impaired Class of Claims has accepted the Plan, excluding the votes of Insiders (as defined in the Bankruptcy Code), if the Plan is fair and equitable and does not discriminate unfairly against such non-accepting Classes.  The Debtor will invoke the "cramdown" provisions of section 1129(b) of the Bankruptcy Code as to holders of Interests since under the Plan, the Class in which Interests reside are deemed to have rejected the Plan.  Should any voting Class fail to accept the Plan, the Debtor will also invoke the "cramdown" provision as to such Class.

1.3.2  *Procedure.*  To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code (the "**Confirmation Hearing**").  The Bankruptcy Court has set **May 28, 2020 at 10:00 a.m. Eastern Time**, for the Confirmation Hearing.

1.3.3  *Objection to Confirmation*.    Any party-in-interest may object to Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection.  The Bankruptcy Court has set **May 21, 2020 at 4:00 p.m. Eastern Time**, as the deadline for filing and serving upon counsel for the Debtor, the United States Trustee's Office, and counsel to the Committee objections to Confirmation of the Plan.  Objections to Confirmation must be filed with the Bankruptcy Court at the following address:

> U.S. Bankruptcy Court for the District of Delaware
> 824 Market Street
> Wilmington, Delaware 19801

with a copy served upon counsel to the Debtor:

> Erin N. Brady, Esquire
> Hogan Lovells US LLP
> 1999 Avenue of the Stars, Suite 1400
> Los Angeles, CA 90067

Derek C. Abbott, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 Market Street, 16th Floor
Wilmington, DE  19899

and a copy served upon the Office of the United States Trustee:

United States Trustee
844 King Street, Room 2311
Lockbox 35
Wilmington, DE 19801

and a copy served upon counsel to the Committee:

Domenic E. Pacitti, Esquire
Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

Morton R. Branzburg, Esquire
Klehr Harrison Harvey Branzburg LLP
1835 Market Street
Philadelphia, PA  19103

Arik Preis, Esquire
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park, Bank of America Tower
New York, NY  10036

and a copy served upon counsel to SVB:

Todd M. Goren, Esquire
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019

Alexander Rheaume, Esquire
Morrison & Foerster LLP
200 Clarendon Street
Boston, MA 02116

1.3.4   ***Effect of Confirmation and Effective Date***.  Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, title to all Plan Trust Assets shall be transferred to the Plan Trust.  In accordance with Section 1.80 of the Plan, the Creditors' Committee and the DIP Lender will designate the Plan Trustee in the Plan Supplement.  The Plan Trust shall be established on the Effective Date for the purpose of liquidating the Plan Trust

Assets, winding down the remaining affairs of the Debtor, reconciling and objecting to Claims, prosecuting Third Party Claims and making Distributions to holders of Allowed Claims in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Plan Trustee may affect the dissolution of the Debtor and the Debtor's subsidiaries at any time after the Effective Date. Confirmation serves to make the Plan binding upon the Debtor, all creditors, Interest Holders and other parties-in-interest, regardless of whether they cast a ballot ("**Ballot**") to accept or reject the Plan.

### 1.4    *Voting on the Plan.*

1.4.1    *Impaired Claims or Interest*.  Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes "Impaired" by the Plan and receiving distributions or other treatment under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the holders of such Claims or Interests treated in such Class.  Claimholders not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  The Claimholders in any Class that will not receive any payment or distribution or retain any property pursuant to the Plan are deemed to reject the Plan and do not have the right to vote.

1.4.2    *Eligibility*.  In order to vote on the Plan, a Claimholders must have timely filed or been assigned a timely filed proof of Claim, unless its Claim is scheduled by the Debtor and is not identified as disputed, unliquidated or contingent on the Debtor's Schedules of Assets and Liabilities (the **"Schedules"**), and an objection or request for estimation of such Claim has not been filed on or before the Solicitation Date as set forth in the Disclosure Statement Approval Order.  Claimholders having a Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each Class.

1.4.3    *Binding Effect*.  Whether a Claimholder votes on the Plan or not, such Person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court.  Absent some affirmative act constituting a vote, a Claimholder will not be included in the vote: (i) for purposes of accepting or rejecting the Plan; or (ii) for purposes of determining the number of Persons voting on the Plan.

1.4.4    *Procedure*.  Members of Classes 1 and 4 may vote to accept or reject the Plan.  Classes 2 and 3 are unimpaired and presumed to accept the Plan and, therefore, may not vote.  Class 5 is Impaired by the Plan and is deemed to have rejected the Plan because the Equity and Other Interests in Class 5 will receive no distributions under the Plan.  In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to:

> Kurtzman Carson Consultants LLC
> Achaogen Balloting
> 222 N. Pacific Coast Highway, Suite 300
> El Segundo, CA 90245

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery

by Kurtzman Carson Consultants LLC (the **"Balloting Agent"**) at the address set forth above on or before **4:00 p.m. Eastern Time on May 21, 2020**.  Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

The following types of Ballots <u>will not be</u> counted in determining whether the Plan has been accepted or rejected:

> (i) any Ballot received after the Voting Deadline;

> (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

> (iii) any Ballot cast by a person or entity that does not hold a Claim in a class that is entitled to vote to accept or reject the Plan;

> (iv) any Ballot cast for a Claim identified in the Schedules as unliquidated, contingent, or disputed for which no proof of claim was timely filed;

> (v) any Ballot cast for a Claim for which an objection or request for estimation has been filed on or before the Solicitation Date as set forth in the Disclosure Statement Approval Order;

> (vi) any unsigned Ballot or Ballot that does not contain an original signature;

> (vii) any Ballot transmitted to the Balloting Agent by facsimile or other means not specifically approved in the Disclosure Statement Approval Order;

> (viii) any Ballot that is otherwise properly completed, executed and timely returned, but does not indicate a vote to accept or reject the Plan or that indicates a vote to both accept and reject the Plan.

The following types of Ballots <u>will be</u> counted in determining whether the Plan has been accepted or rejected: whenever a creditor casts more than one Ballot voting the same claim(s) before the Voting Deadline, the last Ballot received before the Voting Deadline shall be deemed to reflect the voter's intent, and thus, to supersede any prior Ballots.

### 1.5    *Acceptance of the Plan.*

1.5.1    *Claimholder Acceptance*.  As a Claimholder, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan, or the Plan must qualify for "cramdown" of any non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code.  At least one impaired Class of creditors, excluding the votes of Insiders, must actually vote to accept the Plan.  You are urged to complete, date, sign and promptly mail the enclosed Ballot.  Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim and the name of the Claimholder.

1.5.2  ***Cramdown Election***.  If all Classes do not accept the Plan, but at least one Impaired Class votes to accept the Plan, excluding the votes of Insiders, the Debtor may attempt to invoke the "cramdown" provisions of the Bankruptcy Code.  Cramdown may be an available remedy, because the Debtor believes that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of section 1129(b)(2) of the Bankruptcy Code and does not discriminate unfairly.

### 1.6  *Sources of Information.*

The information contained in this Disclosure Statement has been obtained from the Debtor's books and records and from motions and other papers filed with the Bankruptcy Court by the Debtor and other parties-in-interest.  Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof.  Any value given as to the Estate Assets of the Debtor is based upon an estimation of such value.  You are strongly urged to consult with your financial and legal advisors to understand fully the Plan and Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified.  The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date.  This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits.  If any conflicts exist between the Plan and Disclosure Statement, the terms of the Plan shall control.

### 1.7  *Additional Information.*

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact:

> Erin N. Brady, Esquire
> Hogan Lovells US LLP
> 1999 Avenue of the Stars, Suite 1400
> Los Angeles, CA 90067
> Telephone:  (310) 785-4600
> or
> Domenic E. Pacitti, Esquire
> Klehr Harrison Harvey Branzburg LLP
> 919 Market Street, Suite 1000
> Wilmington, DE 19801
> Telephone: (302) 426-1189

## 2.  THE DEBTOR

### 2.1  *Description of the Debtor.*

On April 15, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Debtor is authorized to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtor was a biopharmaceutical company focused on the discovery, development and commercialization of innovative antibiotic treatments against multi-drug resistant gram-negative infections.  Incorporated in 2002, Achaogen's primary activities included discovering, developing and commercializing its product candidates, including conducting preclinical studies and clinical trials and providing general and administrative support for these operations.  Achaogen's focus was to fight "superbugs" or bacterial infections that have developed ways to resist treatment by even the most potent available antibiotics.  Achaogen designed its lead product ZEMDRI (Plazomicin) to treat patients who have limited or no alternative treatment options from infections from resistant bacteria.

ZEMDRI was the Debtor's first product and was developed to combat bacterial resistance to antibiotics.  Two Phase 3 clinical trials for ZEMDRI demonstrated clinically meaningful results compared to standard of care therapies in patients with complicated infections or life threatening bloodstream infections or pneumonia due to multi-drug resistant bacteria.  In June 2018, the Federal Drug Administration ("**FDA**") approved the Debtor's application for approval of ZEMDRI for the intravenous treatment of adult patients with complicated urinary tract infections.  Thereafter, ZEMDRI became commercially available in the United States.  As of the Petition Date, the Debtor held global commercialization rights and patent protection in the United States through 2031 and 2032 based on current estimations.

As of the Petition Date, the Debtor was also developing a pharmaceutical drug known as C-Scape, an orally administered antibiotic for treatment of patients suffering from infections caused by MDR bacteria.  The FDA awarded C-Scape Qualified Infectious Disease Product status and, in September 2017, the Biomedical Advanced Research and Development Authority ("**BARDA**") awarded Achaogen a development contract to support the development of C-Scape.  The contract with BARDA included committed funding of $12 million and potential funding through subsequent option periods that, if exercised, brought the total value of the contract to $18 million for Achaogen.  In January 2018, Achaogen announced positive Phase 1 top-line results, and at the time of its bankruptcy filing, Achaogen was continuing to develop C-Scape to improve the likelihood of clinical and commercial success.  C-Scape is investigational, has not been determined to be safe or efficacious, and has not been approved for commercialization.

### 2.2    *The Debtor's Operations and Financial Difficulties.*

#### 2.2.1    *Corporate Structure.*

As of the Petition Date the Debtor was a publicly traded company with its shares listed on The NASDAQ National Market.  Following the Debtor's chapter 11 filing, The NASDAQ Stock Market LLC ("**NASDAQ**"), upon concerns regarding (i) the residual equity interest of the existing listed securities holders and (ii) the Debtor's ability to comply with NASDAQ's requirements for continued listing on The NASDAQ Stock Market, determined that the Debtor's stock should be delisted from The NASDAQ National Market.  As a result, NASDAQ suspended

the Debtor's stock on April 26, 2019.  Thereafter, on May 1, 2019, NASDAQ delisted the Debtor's stock from The NASDAQ Stock Market.

The Debtor wholly owns two non-debtor entities, Achaogen UK Ltd. and Achaogen Ireland Limited.  These foreign subsidiaries never had any operations or assets and were established only to facilitate foreign regulatory approvals.

### 2.2.2    *The Debtor's Debt Structure.*

Prior to the Petition Date, the Debtor entered into a Loan and Security Agreement (the "**Prepetition Term Loan Agreement**" and the credit facility extended thereunder, the "**Prepetition Term Loan**") with Silicon Valley Bank ("**SVB**" or the "**Prepetition Lender**"), pursuant to which SVB agreed to extend term loans in the aggregate principal amount of up to $50,000,000 to the Debtor.  The Prepetition Term Loan was secured by valid, fully perfected and enforceable security interests in substantially all of the Debtor's assets, including proceeds of Intellectual Property (as such term is defined in the Prepetition Term Loan Agreement) but excluding Intellectual Property and stock owned by the Debtor in any Foreign Subsidiary in excess of 65%.

The Prepetition Term Loan was structured in two separate parts: first, a term loan made as a single advance in the principal amount of $25 million (the "**Term A Loan**"), all or a portion of which Achaogen was required to use to repay in full its outstanding obligations to Solar Capital, Ltd; and second, further advances to Achaogen in an amount not to exceed $25 million (the "**Term B Loan**").

In December 2018, SVB collateralized $25 million of the $50 million that was previously borrowed under the Prepetition Term Loan.  Collateralization of this $25 million meant that the funds were restricted and no longer available for use until the cash on deposit at SVB exceeded the "Minimum Account Threshold" for thirty consecutive days, which is the greater of (a) $48 million and (b) the "Monthly Cash Burn," which was defined as the difference of (1)(i) net loss plus (ii) unfinanced capital expenditures minus (2)(i) depreciation and amortization expenses, (ii) non-cash stock compensation expense and (iii) other non-cash expenses as approved by SVB.  In December 2018, Achaogen funded $25 million into the pledged cash collateral account in accordance with Section 6.6(b) of the Prepetition Loan Agreement.

On April 12, 2019, pursuant to the Waiver and First Amendment to the Loan and Security Agreement (the "**Prepetition Loan Amendment**"), the Debtor agreed, among other things, to permit SVB to debit $34,663,598.50 from its bank accounts held at SVB, including $25 million held in a restricted cash collateral account, and to apply the debited funds to the principal and interest due under the Prepetition Loan Agreement.

In addition, the Debtor agreed to extend SVB's first priority security interest to the Debtor's Intellectual Property, in exchange for SVB providing a commitment to provide debtor in possession financing in the amount of $25 million in the chapter 11 Case.  SVB also agreed to waive the Term A Final Payment and the Prepayment Premium.

As a result of the Prepetition Term Loan Agreement, as of the Petition Date, $15 million in principal, plus a de minimis amount of unpaid interest, was outstanding under the Prepetition

Term Loan.  SVB has since provided $25 million in debtor in possession financing in its capacity as the "DIP Lender" which includes $10 million of new money and a rollup of the $15 million principal balance outstanding under the Prepetition Term Loan Agreement.

### 2.2.3   *Events Leading to the Filings.*

Since 2007, Achaogen invested significant efforts and financial resources into the development of ZEMDRI, which was only made available for order in July 2018.  Due to the cost of ZEMDRI's clinical development and research – as well as the development of other product candidates, none of which have made it beyond phase 1 clinical trials – Achaogen experienced losses since its inception.  As of December 31, 2018, Achaogen had an accumulated deficit of $559.4 million. Achaogen believed its ability to successfully transition to profitability was dependent upon obtaining financial infusions both to drive the commercialization of ZEMDRI in the U.S. and beyond, as well as to develop additional products, such as C-Scape.  Thus, in the fall of 2018, Achaogen began a marketing process to explore potential sale, financing and restructuring transactions.

Achaogen retained Evercore Group LLP ("**Evercore**") as its investment banker to assist it with this process.  Achaogen and Evercore identified and then met with numerous potential parties for such a transaction.  A team of senior executives worked together on this process with Evercore on a daily basis reaching out to various potential parties and providing detailed management presentations.  A virtual data room was made available containing extensive information about Achaogen, including documents describing Achaogen's business and financial results in considerable detail, and potential purchasers and investors had the opportunity to conduct due diligence via the virtual data room, as well as through meetings with Achaogen management.

Achaogen and Evercore ran a marketing process that targeted strategic partners, merger-of-equal candidates and peripheral candidates (ex-U.S. buyers, parties without direct complementary assets, lagging parties, etc.).  In total, Evercore contacted 75 potential buyers, including financial buyers, privately-held specialty pharmaceutical companies, small publicly traded infectious disease companies and a number of publicly-traded pharmaceutical companies.  Approximately 21 of the parties Evercore contacted received process letters, and 19 executed NDAs.  Of the 19 parties that executed NDAs, all parties received management presentations and 15 received access to the virtual data room.

Recognizing that maintaining liquidity would be key to achieving a strategic transaction that would bridge the company to profitability, thereby maximizing value for all stakeholders, including equity holders, Achaogen engaged the restructuring professionals at Meru, LLC in December 2018.  This effort was made to complement the marketing and cost-cutting efforts already implemented by Achaogen and Evercore and to assist in refining its business strategy and examine the possibility of further cost reductions.

Throughout this period, Achaogen pursued various funding and financing options, including selling equity and pursuing licensing opportunities outside of the United States.  These efforts were all intended to bridge the company to the point of free positive cash flow or consummation of a strategic transaction.  Achaogen also pursued discussions with multiple

13

companies to exclusively license the rights to develop and commercialize plazomicin in China and Europe. Several small private companies and large pharmaceutical companies reviewed the opportunity to license plazomicin and five non-binding term sheets were received for Chinese or European rights.

Unfortunately, at just the time Achaogen began this process, there was a dramatic downturn and pull back in investment within the anti-infective field. This downturn was based in part on the withdrawal from the space of certain large pharmaceutical companies, which served to diminish the opportunities for the partnerships, joint R&D relationships and merger acquisition transactions Achaogen was seeking. Ultimately, likely due to these adverse market trends, the marketing process did not yield sufficient cash flow or an acceptable proposal for a strategic transaction. This, coupled with its dwindling liquidity, jeopardized its ability to continue to commercialize ZEMDRI, obtain regulatory approval for plazomicin in Europe, develop C-Scape and other new products and, ultimately, avoid defaulting under the Prepetition Term Loan.

Recognizing that its options were limited, and realizing that it was critical to obtain short-term capital to bridge to a sale process, Achaogen began discussions with SVB regarding, among other things, a restructuring of the debt or a potential auction sale process in the context of a chapter 11 proceeding. Ultimately, Achaogen and SVB mutually determined that, among the strategic alternatives to be considered, Achaogen should prepare for a potential sale process that could be implemented through the filing of a chapter 11 case to maximize the value of the company and its assets. Later, as described in more detail below, SVB agreed to provide the Debtor DIP Financing in the Chapter 11 Case on the condition that the Debtor agreed to enter into the Prepetition Loan Amendment described above. Achaogen ultimately filed this case in an effort to maximize the value of the company and its assets and then effectuate an orderly and efficient liquidation and wind down process.

### 2.3    The Debtor's Bankruptcy Proceedings.

2.3.1    **Employment of Professionals**.    The Debtor requested and obtained authority to employ the following professionals: (i) Hogan Lovells US LLP and Morris, Nichols, Arsht & Tunnell LLP as co-counsel; (ii) Nicholas K. Campbell of Meru, LLC as Chief Restructuring Officer; (iii) Cassel Salpeter & Co., LLC as investment banker; (iv) Kurtzman Carson Consultants LLC as claims/balloting agent; and (v) Alvarez & Marsal Holdings, LLC as a restructuring specialist.

2.3.2    **DIP Financing/Debtor's Use of Cash Collateral**.    In order to maintain operations while it conducted a bankruptcy sales process, the Debtor required access to debtor-in-possession financing. Thus, in the weeks leading up to the filing, Achaogen and Evercore worked diligently to identify lenders (other than SVB) willing to provide postpetition financing to the Debtor on an unsecured, junior secured or priming basis. None were forthcoming.

SVB was the only lender willing to fund a chapter 11 sale process. SVB agreed to provide a $25 million senior secured debtor-in-possession financing facility, $15 million of which would be a rollup of SVB's prepetition secured debt (the "**DIP Facility**"). Thus, the Debtor and SVB entered into that certain Debtor-in-Possession Loan and Security Agreement

dated as of April 15, 2019 (as amended, restated or otherwise modified from time to time, the "**DIP Credit Agreement**"). The DIP Facility provided liquidity that the Debtor believed was necessary to conclude the sale processes on an expedited basis and wind down the Debtor's affairs.

The Committee informally objected to the DIP Facility.  Over the course of several months, the Debtor, SVB and the Committee negotiated a resolution to the Committee's informal objections, which resolution was memorialized in the final order approving the DIP Facility entered on September 24, 2019 [Docket No. 478] (the "**DIP Order**").  Among other things, the DIP Order provided for a split of proceeds of Estate Assets between SVB and the Committee as follows:

      (a)      "Initial Distributions of DIP Collateral.  On or before September 30, 2019, the Debtor applied all cash held by the Debtor (including all Cash Collateral and all cash proceeds of DIP Collateral or any other property of the Debtor's estate, but excluding the LC Collateral) as of such date as follows:

            (i)      The Debtor applied $1,100,000 plus the amount in the Carve Out Account as of September 24, 2019 (together, the "**Wind Down Reserve Amount**") to fund a reserve to be created and maintained by the Debtor, on terms mutually agreeable to the Debtor and the Professionals (as may be further funded, the "**Wind Down Reserve**"), until the effective date of the Plan at which point the amounts in the Wind Down Reserve shall be transferred to the Plan Trust; and

            (ii)      The Debtor paid (A) $968,150 to the DIP Lender (the "**First DIP Loan Payment**"), which amount shall be applied by the DIP Lender towards the satisfaction of the DIP Obligations in accordance with the terms of the DIP Loan Documents (as defined in the DIP Order) and (B) $170,850 (the "**First GUC Payment**") into a reserve to be created and maintained by the Debtor (the "**GUC Reserve**") until the Effective Date of the Plan, at which point the amounts in the GUC Reserve shall be transferred to the Plan Trust provided that the foregoing distributions of the Initial Cash Balance shall only be made contemporaneously with each other and no such distributions in (a)(ii)(A) or (a)(ii)(B) shall occur before the other without the consent of the DIP Lender and the Creditors' Committee.

      (b)      Future Distributions of DIP Collateral.  Within five business days of receipt, and from time to time, the Debtor shall apply all cash obtained by the Debtor (including all Cash Collateral and all cash proceeds of DIP Collateral or any other property of the Debtor's estate, but excluding the LC Collateral) after the date of the DIP Order (the "**Future Cash**

**Proceeds**") in the following order of priority (to the extent of the Future Cash Proceeds):

(i)     First, the Debtor shall apply any additional amounts mutually agreed between the Debtor, the DIP Lender, and the Creditors' Committee to the Wind Down Reserve (or, if Future Cash Proceeds are received after the Effective Date of the Plan, any additional amount mutually agreed between the Plan Trust and the DIP Lender) (any such payments, collectively, the "**Supplemental Wind Down Reserve Payments**");

(ii)    Second, any portion of the Future Cash Proceeds that remains after the funding of the Wind Down Reserve in the Wind Down Reserve Amount, and the payment of any Supplemental Wind Down Reserve Payments, shall be paid by the Debtor (or, if Future Cash Proceeds are received after the Effective Date, by the Plan Trust) on a ratable basis, (*i.e.*, 85% to the DIP Lender and 15% to the GUC Reserve) (A) to the DIP Lender, $1,700,000 less the amount of the First DIP Loan Payment (the "**Second DIP Loan Payment**"), which amount shall be applied by the DIP Lender towards the satisfaction of the DIP Obligations in accordance with the terms of the DIP Loan Documents, and (B) to the GUC Reserve, $300,000 less the amount of the First GUC Payment (the "**Second GUC Payment**"); provided, that the foregoing distributions of the Future Cash Proceeds shall only be made contemporaneously with each other and no such distributions in (b)(ii)(A) or (b)(ii)(B) shall occur before the other without the consent of the DIP Lender and the Creditors' Committee;

(iii)   Third, any portion of the Future Cash Proceeds that remains after the funding of the Wind Down Reserve in the Wind Down Reserve Amount, the payment of any Supplemental Wind Down Reserve Payments, and the payment in full of the First DIP Loan Payment, the Second DIP Loan Payment, the First GUC Payment and the Second GUC Payment, shall be paid by the Debtor (or, if Future Cash Proceeds are received after the Effective Date, by the Plan Trust), on a ratable basis (*i.e.*, 80% to the DIP Lender and 20% to the GUC Reserve), as follows: (A) an additional $10,400,000 to the DIP Lender (the "**Third DIP Loan Payment**"), which amount shall be applied by the DIP Lender towards the satisfaction of the DIP Obligations in accordance with the terms of the DIP Loan Documents, and (B) an additional $2,600,000 (the "**Third GUC Payment**") into the GUC Reserve; provided, that the foregoing distributions of the Future Cash Proceeds shall only be made contemporaneously with each other and no such distributions in (b)(iii)(A) or (b)(iii)(B) shall occur before the other without the consent of the DIP Lender and the Committee; and

(iv)     Fourth, any portion of the Future Cash Proceeds that remains after the funding of the Wind Down Reserve in the Wind Down Reserve Amount, and the payment of any Supplemental Wind Down Reserve Payments, the First DIP Loan Payment, the Second DIP Loan Payment, the Third DIP Loan Payment, the First GUC Payment, the Second GUC Payment, and the Third GUC Payment shall be applied by the Debtor (or, the Plan Trust if after the Effective Date) as follows:  (A) 50% towards the payment of DIP Obligations and Prepetition Loan Obligations, which amount shall be applied by the DIP Lender towards the satisfaction of the DIP Obligations in accordance with the terms of the DIP Loan Documents, and (B) 50% into the GUC Reserve.

(c)     <u>Additional Terms Regarding Wind Down Reserve</u>.  Notwithstanding anything to the contrary contained herein, the amounts in the Wind Down Reserve shall be used to fund (x) the Carve-Out (including the Carve-Out Cap), which shall be held and applied by the Debtor in accordance with Paragraph 27 of the DIP Order, and (y) fees and expenses incurred in connection with the wind down of the Debtor's estate (including the confirmation of the Liquidating Plan and any fees, expenses and interest payments due to Silicon Valley Bank under the DIP Order; provided, that, subject to the effective date of a Liquidating Plan, no interest shall accrue under the DIP Facility on or after September 1, 2019); provided, further, that (i) no more than $250,000 of the Wind Down Reserve shall be used to fund costs associated with the Trust (such amount, the "**Trust Budget**"), and (ii) the Trust Budget shall be allocated as follows: (A) $100,000 to fund costs associated with the Plan Trust solely as it relates to activities or costs incurred in connection with, or related to, general unsecured claims, including administrative costs associated with administering general unsecured claims and making distributions to unsecured creditors in accordance with the terms of the Plan, and (B) $150,000 to fund all other costs associated with the Trust. Silicon Valley Bank shall have no obligation to provide any funding to the Plan Trust that is in excess of the Trust Budget. Unless otherwise agreed to by the Committee, the Plan (or such agreement governing the Plan Trust) shall set forth procedures, reasonably acceptable to the Debtors, the DIP Lender and the Committee, to ensure that the Liquidating Trustee (as defined herein) appropriately allocates and records its fees and expenses to ensure that such fees and expenses are properly allocated pursuant to (ii)(A) and (ii)(B) of the immediately prior sentence. Any amounts in the Wind Down Reserve that are in excess of the actual fees and expenses incurred in connection with the wind down of the Debtor's estate and payable from the Wind Down Reserve in accordance with this paragraph 46 shall be deemed to be Future Cash Proceeds and shall be distributed in accordance with paragraph 46(b) of the DIP Order.

(d)     <u>Additional Terms Regarding GUC Reserve</u>. Notwithstanding anything to the contrary contained herein, (i) all proceeds distributed into the GUC Escrow shall be free and clear of all liens, including the DIP Liens, the Prepetition Loan Liens and the Adequate Protection Liens, (ii) the terms and conditions of the agreement governing the GUC Reserve shall be acceptable to the Committee in all respects, and (iii) all funds in the GUC Reserve shall be used to fund (A) distributions to holders of allowed general unsecured claims under the Plan, (B) administrative costs associated with reconciling general unsecured claims and making distributions to general unsecured creditors under the Plan (solely to the extent the Trust Budget is exhausted), and (C) any other distributions to unsecured creditors that are otherwise ordered by the Court. For the avoidance of doubt, the Prepetition Lender and the DIP Lender shall not be to any recoveries or distributions from the GUC Reserve.

*See* DIP Order, ¶ 46.

The DIP Order also provided, among other things, that:

"<u>Milestones</u>.  As a condition to the DIP Facility and the use of Cash Collateral, the Debtor shall comply with the Milestones.  The term "Milestones" shall include the following:  (a) on or before October 18, 2019, the Debtor shall obtain conditional approval of a disclosure statement (the "<u>Disclosure Statement</u>") for the Liquidating Plan (as defined herein) and solicitation procedures with respect thereto; and (b) on or before November 26, 2019, the Debtor shall obtain final approval of the Disclosure Statement and confirmation of the Liquidating Plan. The Milestones can only be modified or waived by the DIP Lender in writing in accordance with the provisions of the DIP Credit Agreement; <u>provided</u>, that the Milestones that relate to the entry of the DIP Order and to the sale of the Debtor's assets are deemed waived by the DIP Lender."

*See* DIP Order, ¶ 22.

On March 23, 2020, the Debtor, DIP Lender and Committee filed a stipulation (the "**Proceeds Stipulation**") modifying the DIP Order and memorializing an agreement as to the allocation and distribution of the proceeds from the Xuanzhu Sale and the Qilu settlement (as discussed below).  This stipulation was approved by the Supplemental DIP Order.  The key terms are as follows[1]:

(a)     **Distribution Waterfall**.  The Parties agreed that the Additional Proceeds would be allocated and distributed in accordance with the distribution waterfall (the "<u>Distribution Waterfall</u>") attached as **Exhibit A** to the Proceeds Stipulation.  Specifically, and as set forth on **Exhibit A** thereto, the following payments were to be made within three (3) business days

---

[1] Capitalized terms used, but not defined, in this summary shall have the meanings ascribed to them in the Proceeds Stipulation.

after entry of the Supplemental DIP Order: (i) $3,325,000 to be paid to the DIP Lender, (ii) $777,000 to be placed in the GUC Reserve, (iii) $823,000 to be used to satisfy certain professional fees (the "Supplemental Carve-Out") and (iv) $300,000 to be used to fund operational costs.

(b)  **Professional Fees: Catch-Up Payments.**  The Supplemental Carve-Out would be added to the existing Carve-Out (as defined in the DIP Order) account, such that a total of $2,034,000 would be available in the Carve-Out account upon distribution of Additional Proceeds as contemplated in paragraph 1 in the Proceeds Stipulation.  From this, the following payments, which were each previously authorized by the Bankruptcy Court, were to be made within three (3) business days of entry of the Supplemental DIP Order:

- Meru, LLC = $7,943.50
- Hogan Lovells US LLP = $295,963.37
- Morris, Nichols, Arsht & Tunnell LLP = $138,057.70
- Cassel Salpeter & Co LLC = $151,794.50
- Kurtzman Carson Consultants LLC ("KCC") = $303,584.67
- Morrison & Foerster LLP = $70,665.80
- Ashby & Geddes, P.A. = $2,276.90
- Akin Gump Strauss Hauer & Feld LLP = $52,681.20
- Klehr Harrison Harvey Branzburg LLP = $69,644.93
- Province, Inc. = $19,559.20

(c)  **Future Payments to Non-Deferral Professionals.**  Until such time that the Debtor exits this Chapter 11 Case, the Debtor is authorized to pay all newly invoiced fees and expenses of the Committee professionals and the DIP Lender professionals (the "Non-Deferral Professionals") in the ordinary course and in accordance with the Fee Orders (the "Go-Forward Payments"); provided, that, the aggregate Catch-Up Payments and Go-Forward Payments for each Non-Deferral Professional shall not exceed the budgeted "Remaining Fees" for such Non-Deferral Professionals, as set forth on **Exhibit A** thereto.

(d)  **Future Payments to Deferral Professionals**.  Until such time that the Debtor exits this Chapter 11 Case, the Debtor is authorized to pay, in the ordinary course and subject to the Fee Orders, each of MERU, LLC, Hogan Lovells US LLP, Morris, Nichols, Arsht & Tunnell LLP, Cassel Salpeter & Co., LLC and KCC (the "Deferral Professionals"): (1) one hundred percent (100%) of all remaining fees and expenses incurred between April 15, 2019 and October 31, 2019 (the "Pre-November 1 Payments") and (2) forty percent (40%) of fees and one hundred percent (100%) of expenses sought by each of the Deferral Professionals incurred between November 1, 2019 through the end of this Chapter 11 Case (the "Post-November 1 Payments"); provided, that, the Catch-Up Payments, Pre-November 1 Payments and Post-

November 1 Payments for each Deferral Professional shall not exceed the budgeted "Remaining Fees" for such Deferral Professional, as set forth on **Exhibit A** to the Proceeds Stipulation.  If funds remain in the Carve-Out after the Non-Deferral Professionals are paid in full, up to their respective budgeted amounts, the remaining funds shall be promptly distributed *pro rata* (or as otherwise agreed among the Deferral Professionals) among the Deferral Professionals up to their respective allowed amounts notwithstanding the above-referenced forty percent (40%) payment limitation.

(e) **Deferred Professional Fees.**  The Parties further recognize that the funds in the Carve-Out are unlikely to be sufficient to satisfy all allowed professional fees which have or will be incurred in this Chapter 11 Case.  The Deferral Professionals, therefore, have agreed to defer (but not waive) those fees (the "Deferred Fees") that cannot be satisfied by the existing Carve-Out (as supplemented) pending the receipt by the Debtor or its successor, including any post-confirmation trustee or similar entity (collectively, the "Estate") of additional future proceeds from any source, including, but not limited to, royalty payments, litigation recoveries and proceeds of future assets sales (the "Additional Future Proceeds").  Until all Deferred Fees are paid in full, up to their respective budgeted amounts, the Estate shall pay any and all Additional Future Proceeds it receives to the Deferral Professionals to satisfy Deferred Fees, up to their respective budgeted amounts.  Such payments shall be made within the later of five (5) business days of receipt of Additional Future Proceeds or five (5) business days after such fees are approved by the Court (to the extent Court approval is required).  If the Estate receives Additional Future Proceeds in an amount insufficient to pay all Deferred Fees in full, up to their respective budgeted amounts, such Additional Future Proceeds shall be paid to the Deferral Professionals on a *pro rata* basis, and all Additional Future Proceeds received thereafter will continue to be paid toward the Deferred Fees, on a *pro rata* basis, until the Deferred Fees are satisfied in full.  No distributions or payments shall be made from Additional Future Proceeds to any creditor or beneficiary other than the Deferral Professionals until such time that all Deferred Fees are paid in full.  Notwithstanding the foregoing, upon the agreement of the Committee, the DIP Lender and the Deferral Professionals, the Estate shall be permitted to pay the contingency fee and reasonable expenses of any counsel engaged to pursue litigation claims on its behalf before payment of the Deferred Fees.

(f) **Final DIP Order Controls After Deferred Fees Satisfied**.  Once all Deferred Fees have been paid in full, any Additional Future Proceeds shall be allocated between the DIP Lender and the GUC Reserve as set forth in the DIP Order.

*See* Proceeds Stipulation, ¶ 1-6.

2.3.3   ***The Creditors' Committee***.  On April 23, 2019, the Office of the United States Trustee appointed an official committee of the Debtor's unsecured creditors (the **"Creditors' Committee"**) pursuant to section 1102(a) of the Bankruptcy Code.  The Creditors' Committee consists of five of the Debtor's unsecured creditors: Hovione Limited; EsteveQuimica SA; Solar Capital Ltd.; Crystal BioScience; and World Courier.  The Creditors' Committee retained (i) Akin Gump Strauss Hauer & Feld LLP and Klehr Harrison Harvey Branzburg LLP, as lead and local co-counsel respectively, and (ii) Province, Inc. as financial advisor.

2.3.4   ***The Sale of Substantially All of the Estate Assets***.  By order entered on May 1, 2019, the Court approved the Bidding Procedures for the purpose of soliciting the highest and best offers to purchase all or substantially all of the Debtor's assets [Docket No. 123] (the "**Bidding Procedures Order**").  In accordance with the Bidding Procedures, the Debtor commenced an auction (the "**Auction**") for substantially all of its assets on June 3, 2019.  Cipla USA Inc. ("**Cipla**") was the successful bidder for the Debtor's global rights to ZEMDRI (Plazomicin) and related assets and liabilities other than the Greater China Assets with a bid of (i) cash consideration in the amount of $4.65 million and (ii) non-cash consideration comprised of (1) the assumption of certain contractual liabilities and (2) two forms of additional contingent consideration.  One form of such contingent consideration, which includes non-contingent guaranteed minimum payments equaling $2.7 million  over the next 10 years, consists of 10% of net sales of plazomicin greater than $40 million per year in all countries (other than Greater China) for the period beginning on Closing (as such term is defined in the Cipla Plazomicin Sale Agreement) and ending at such time that any Person (other than the Purchaser or its Affiliates) has received FDA approval for an Abbreviated New Drug Application or an FDA AP-rated 505(b)(2) NDA using ZEMDRI (Plazomicin).  A second form of contingent consideration relates to royalty payments of 12.5% which the Debtor will be entitled to receive from Cipla, calculated on cash actually received by Cipla, for certain stockpiling sales in 2019, 2020, and 2021 pursuant to a yet-to-be-awarded government contract (the application for which is due June 21, 2019), provided such contract is actually awarded.

Qilu Antibiotics Pharmaceutical Co., Ltd. was the successful bidder with a bid of $8.5 million for the Debtor's Greater China Assets; Unity Biotechnology, Inc. ("**Unity**") was the successful bidder with a bid of $125,000 for the Tie2 antibody program; and Heritage Global Partners, Inc. ("**Heritage**") was the successful bidder with a bid of $225,000 for certain of the Debtor's equipment.

Additionally, pursuant to the Bidding Procedures Order, the Debtor selected the following parties as Back-up Bidder: (i) Altamont Pharma Fund II, LLC's bid of $4.4 million (with the same non-cash consideration as Cipla's successful bid) for the Debtor's global rights to ZEMDRI (plazomicin) other than the Greater China Assets, (ii) Cipla's bid of $8.4 million for the Greater China Assets, and (iii) American Laboratory Trading Inc.'s bid of $60,000 for certain of the Debtor's equipment.

A separate auction was conducted by the Debtor for the C-Scape program assets on June 12, 2019.  Cipla was the successful bidder, agreeing to pay $1,050,000.  Vipragen Biosciences Private Ltd. ("**Vipragen**") was selected as the Backup Bidder based on its offer to purchase the C-Scape assets for $1,025,000.

The Debtor entered into four asset purchase agreements in the weeks following the auction. The four agreements were with (i) Cipla for the global rights to ZEMDRI (plazomicin) and related assets and liabilities (other than the Greater China Assets) dated June 20, 2019 (the "**Cipla Plazomicin Sale Agreement**"); (ii) Cipla for the C-Scape program assets dated June 20, 2019 (the "**Cipla C-Scape Sale Agreement**" and with the Cipla Plazomicin Sale Agreement, the "**Cipla Sale Agreements**"); (iii) Heritage for certain of the Debtor's equipment dated June 23, 2019 (the "**Heritage Sale Agreement**"); and (iv) Unity for the Tie2 program assets dated June 21, 2019 (the "**Unity Sale Agreement**", and together with the Cipla Sale Agreements and the Heritage Sale Agreement, the "**June 24 APAs**").

The Court was scheduled to hold a hearing to approve the June 24 APAs on June 24, 2019. Just before that hearing, the U.S. Government contacted the Debtor and the Court's chambers to request that the hearing be adjourned pending the government's review of certain national security concerns. The hearing was so adjourned. The government subsequently determined that it had no concerns regarding the proposed Heritage and Unity sales, which were approved by the Court by orders dated June 26, 2019 and July 1, 2019, respectively. The Debtor and the government ultimately resolved the government's concerns with the Debtor's proposed transactions with Cipla. On July 23, 2019, the Court approved the Cipla Plazomicin sale agreement.

Notwithstanding its execution of the C-Scape APA, Cipla determined on or about July 20, 2019 that it would not consummate the transaction. The Backup Bidder for C-Scape, Vipragen, made a similar decision on or about October 1, 2019. Similarly, Qilu determined on or about July 29, 2019 that it would not consummate a license transaction involving the Greater China Assets. Cipla, the Backup Bidder for that asset, also refused to consummate a transaction.

The Debtor has not identified an alternative buyer for the C-Scape assets. After months of additional marketing, the Debtor has, however, identified a new proposed buyer for the Greater China Assets, albeit at a greatly reduced price. On December 29, 2019, the Debtor entered into an asset purchase agreement with Xuanzhu (HK) Biopharmaceutical Limited ("**Xuanzhu**") for the China Assets (the "**Xuanzhu Sale**"). On January 9, 2020, the Court entered an order approving the Xuanzhu Sale which provided that, subject to the agreement of the Debtor, DIP Lender and Committee, any distribution may be made to the DIP Lender and/or the GUC Reserve without further order of the Court. The Xuanzhu Sale closed on or about January 10, 2020, resulting in the Debtor's receipt of $4.5 million in sale proceeds. The proceeds from the Xuanzhu Sale were placed in escrow until such time as the Debtor, DIP Lender and Committee agreed upon the allocation of such proceeds.

2.3.5    *Claims Against Cipla and Qilu*. As a result of Cipla's and Qilu's refusal to close their respective transactions, the Debtor believes it became a holder of claims against the two entities. On January 20, 2020, Qilu and the Debtor entered into a settlement and release agreement relating to Qilu's refusal to consummate its transaction for the China Assets which resulted in a net payment of $725,000 from Qilu to the Debtor in exchange for mutual releases. The proceeds from the Qilu settlement have been distributed in accordance with the Proceeds Stipulation. The Debtor continues to hold claims against Cipla and, notwithstanding anything to the contrary herein or in the Plan, neither Cipla nor any of its affiliates or subsidiaries shall be

Released Parties, and all claims the Debtor and its Estate may have against these entities are expressly preserved.

2.3.6 ***Statement By Cipla***.  Cipla denies that it has any liability to the Debtor or its Estate, of any nature whatsoever.  If any liability does exist, it should not exceed the possible forfeiture of the Good Faith Deposit of $350,000.

The terms of the Bidding Procedures state, among other things, that "Following entry by the Bankruptcy Court of an order authorizing the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale, and such failure is the result of a breach by the Successful Bidder of its obligations under its Qualified Bidder Purchase Agreement, the Successful Bidder's (other than the Stalking Horse Bidder, as applicable) Good Faith Deposit shall be forfeited to the Debtor as liquidated damages in accordance with the terms of such agreement, and if the Successful Bidder is the Stalking Horse Bidder, as applicable, the Debtor shall have the right to pursue all of its rights and remedies against the Stalking Horse Bidder in accordance with the terms of such Stalking Horse Bidder Purchase Agreement, as applicable.  If the Back-Up Bidder is later designated by the Debtor to be the Successful Bidder, the foregoing shall be read to apply to the Back-Up Bidder (and its guarantors, if any) in its capacity as the Successful Bidder."  As described in Cipla's Limited Objection, Achaogen holds a Good Faith Deposit from Cipla in the amount of $350,000.  Cipla believes that the Bidding Procedures make clear that Cipla has no liability to the Debtor or its Estate beyond the possible forfeiture of the remaining Good Faith Deposit.

THIS SECTION SUMMARIZES THE POSITION OF CIPLA. THE DEBTOR, THE COMMITTEE AND SVB DO NOT ADOPT OR SUPPORT CIPLA'S POSITIONS OR DESCRIPTION OF FACTS, AND RESERVES ALL RIGHTS WITH RESPECT THERETO. CERTAIN OF THE DEBTOR'S POSITIONS WITH RESPECT TO CIPLA'S STATEMENTS AND ALLEGATIONS MADE HEREIN CAN BE FOUND IN SECTIONS 2.3.4 and 2.3.5 HEREIN, AND IN THE DEBTOR'S PLEADINGS IN THIS CHAPTER 11 CASE.  THE PLAN PROPONENTS BELIEVE THE PLAN IS THE BEST ALTERNATIVE AVAILABLE TO CREDITORS, AND THAT ALL CREDITORS WILL RECEIVE A BETTER RECOVERY UNDER THE PLAN THAN ANY OTHER AVAILABLE ALTERNATIVE.

2.3.7 ***Schedules and Bar Date***.  On May 30, 2019, the Debtor filed its schedules of assets and liabilities and statements of financial affairs. On June 14, 2019, the Court established August 5, 2019 as the Bar Date for prepetition creditors.  The Administrative Claims Bar Date, including creditors with Claims arising under section 503(b)(9) of the Bankruptcy Code, was July 22, 2019.  October 14, 2019 was established as the Bar Date for governmental units to file proofs of claim.

### 2.4     Claims Against the Debtor.

2.4.1 ***Administrative Claims - 503(b)(9) Claims***.  The amount of Administrative Claims – 503(b)(9) Claims filed against the Debtor to date is approximately $458,678.99.  The Debtor estimates that a portion of that amount in Administrative 503(b)(9) Claims will be allowed and unpaid as of the Effective Date of the Plan.

2.4.2   ***DIP Facility Claim***.  The Debtor estimates that the DIP Claim exceeds $24 million.

2.4.3   ***Prepetition Term Loan Secured Claim***.  The amount of Secured Claims against the Debtor is undetermined to date.  The holder of the Prepetition Term Loan Secured Claim was indefeasibly paid $15,000,000 on account of the Prepetition Term Loan Secured Claim pursuant to the DIP Order form the proceeds of the DIP Facility.  To the extent not earlier paid, any outstanding amounts due and owing to the holder of the Prepetition Term Loan Secured Claim shall be paid in an amount equal to the amount of the DIP Lender Cash in accordance with the Committee Settlement and the Proceeds Stipulation.

2.4.4   ***Priority Tax Claims.***  The Debtor has scheduled $0.00 for Priority Tax Claims and the amount of Priority Tax Claims filed against the Debtor to date is approximately $16,145.19.  Many Priority Tax Claims filed against the Debtor appear to be duplicative, erroneously classified, unsupportable and/or for contingent/unliquidated amounts and will be the subject of claims objections filed by the Debtor or Plan Trustee. The Debtor estimates that $0.00 of Priority Tax Claims will be allowed and unpaid as of the Effective Date of the Plan.

2.4.5   ***Priority Non-Tax Claims.***   The Debtor has scheduled $0.00 for Priority Non-Tax Claims and the amount of Priority Non-Tax Claims filed against the Debtor to date is approximately $444,179.48.  Many Priority Non-Tax Claims filed against the Debtor appear to be duplicative, erroneously classified, unsupportable and/or for contingent/unliquidated amounts and will be the subject of claims objections filed by the Debtor or Plan Trustee.

2.4.6   ***General Unsecured Claims***.   The Debtor's Schedules reflect General Unsecured Claims against the Debtor in the approximate aggregate amount of $20,257,639.81. Many General Unsecured Claims filed against the Debtor appear to be duplicative, erroneously classified, unsupportable and/or for contingent/unliquidated amounts and will be the subject of claims objections filed by the Debtor or Plan Trustee.

## 3.   SUMMARY OF THE PLAN OF LIQUIDATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTING THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR

UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND OTHER PARTIES IN INTEREST.

### 3.1    In General.

The Plan is jointly proposed by the Debtor and the Creditors' Committee.  The Allowed Claims of Claimholders will be paid in accordance with priorities set forth in the Bankruptcy Code, a structure that the Debtor believes will produce a fundamentally equitable outcome for all creditors.

3.1.1    *Estate Assets*.  On the Effective Date, the Estate Assets not sold pursuant to the Asset Sales and other section 363 sale processes and not distributed pursuant to other provisions of the Plan or Orders of the Bankruptcy Court and the Plan Trust Assets shall be transferred to and vest in the Plan Trust and administered by the Plan Trustee pursuant to the Plan and Plan Trust Agreement.

3.1.2    *Plan Trustee*.  As set forth in Section 1.80 of the Plan, the Creditors' Committee and DIP Lender will designate the Plan Trustee in the Plan Supplement.  As of the Effective Date, the Plan Trustee shall be vested with full legal power, capacity and authority, and shall be directed to administer, collect and liquidate or abandon the remaining Estate Assets and to implement the Plan.

3.1.3    *Third Party Claims*.  Subject to the provisions of the Plan, the Plan Trustee may, but is not required to, pursue any Third Party Claim or Avoidance Action not otherwise released under the Plan, DIP Order or other Order of the Bankruptcy Court by informal demand and/or by commencing litigation.

### 3.2    Classification of Claims and Interests.

3.2.1    *Class 1.*  Class 1 consists of the DIP Facility Claim / Prepetition Term Loan Secured Claim, if any.  Class 1 is impaired by the Plan and is entitled to vote.

3.2.2    *Class 2.*  Class 2 consists of all Priority Tax Claims.  Class 2 is unimpaired by the Plan and is presumed to accept the Plan.

3.2.3    *Class 3.*  Class 3 consists of all Priority Non-Tax Claims.  Class 3 is unimpaired by the Plan and is presumed to accept the Plan.

3.2.4    *Class 4 .*  Class 4 consists of all General Unsecured Claims, including all Deficiency Claims, if any.  Class 4 is impaired by the Plan and is entitled to vote.

3.2.5    *Class 5.*  Class 5 consists of all Equity and Other Interest Claims. Class 5 is impaired by the Plan and is deemed to reject the Plan.

### 3.3    Treatment of Claims and Interests.

3.3.1   *Class 1 (DIP Facility Claim / Prepetition Term Loan Secured Claim)*. The holder of the Prepetition Term Loan Secured Claim was indefeasibly paid $15,000,000 on account of the Prepetition Term Loan Secured Claim pursuant to the DIP Order from the proceeds of the DIP Facility.   To the extent not earlier paid, any outstanding amounts due and owing to the holder of the Prepetition Term Loan Secured Claim shall be paid in an amount equal to the amount of the DIP Lender Cash in accordance with the Committee Settlement, the Supplemental DIP Order and Section 5.1 of the Plan; provided, notwithstanding anything to the contrary contained herein, the Plan Trustee shall pay all invoiced fees and expenses of the DIP Lender's professionals in accordance with (and to the extent provided for under) the Proceeds Stipulation.

3.3.2   **Class 2 (*Priority Tax Claims*)**. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of such Allowed Priority Tax Claim shall be paid in full in Cash from the Wind Down Reserve.  Allowed Priority Tax Claims shall be paid as soon as reasonably practicable after the Effective Date and after the reconciliation of all Disputed Priority Tax Claims, unless the Plan Trustee, in his, her or its sole discretion, determines that an earlier Distribution is practicable consistent with the Plan.

3.3.3   **Class 3 (*Priority Non-Tax Claims*)**. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash from the Wind Down Reserve. Allowed Priority Non-Tax Claims shall be paid as soon as reasonably practicable after the Effective Date and after the reconciliation of all Disputed Priority Non-Tax Claims, unless the Plan Trustee, in his, her or its sole discretion, determines that an earlier Distribution is practicable consistent with the Plan.

3.3.4   **Class 4 (*General Unsecured Claims*)**.  Except to the extent that a holder of an Allowed Class 4 General Unsecured Claim agrees to a less favorable treatment, on or as soon as practicable after, the Effective Date, each holder of an Allowed Class 4 General Unsecured Claim shall receive its Pro Rata share of the GUC Cash.

3.3.5   *Class 5 (Equity and Other Interest Claims)*.  The holders of Allowed Class 5 Equity and Other Interest Claims shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan, on account of such Equity or Other Interest Claims.

### 3.4   *Treatment of Administrative Claims.*

3.4.1   *Administrative Claims - Professional Claims.*

(a)   <u>**Final Professional Fee Applications**</u>.  All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 363, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on counsel to the Debtor, counsel to the DIP Lender, counsel to the Creditors' Committee, counsel to the Plan Trustee, and counsel to the U.S. Trustee no later than forty-five (45) calendar days after the Effective Date, unless otherwise ordered by the Bankruptcy Court (the "**Professional Fee Claim Bar Date**").  Objections to such applications must be filed and served on counsel to the Debtor, counsel to the DIP Lender, counsel to the Plan Trustee, counsel to the Creditors'

Committee, counsel to the U.S. Trustee, and the requesting Professional on or before the date that is fifteen (15) calendar days after the date on which the application was served (or such longer period as may be allowed by order of the Bankruptcy Court or by agreement with the requesting Professional).

(b) **Payment of Interim Amounts**.  The provisions of the Professional Fee Order shall remain in effect as to amounts owing to Professionals prior to the Effective Date.

(c) **Payment of Professional Fee Claims**.  All Allowed Professional Fee Claims shall be paid solely from the Professional Fee Claim Escrow to the extent (i) approved by order of the Bankruptcy Court within five (5) Business Days after entry of such order, and (ii) of the amount of the Professional Fee Claim Escrow.  On the Effective Date, or as soon thereafter as practicable, the Debtor or the Plan Trustee, as applicable, shall fund the Professional Fee Claim Escrow in an amount that is permitted under the terms of the Proceeds Stipulation; provided, notwithstanding anything to the contrary herein, and except as provided in the Proceeds Stipulation, the Professional Fee Claim Escrow shall not be funded from DIP Lender Cash without the consent of the DIP Lender or from the GUC Cash or the GUC Reserve.  All Allowed Professional Fee Claims that have not previously been paid, otherwise satisfied, or withdrawn shall be paid from the Professional Fee Claim Escrow.  Any excess funds in the Professional Fee Claim Escrow after the satisfaction of all Allowed Professional Fee Claims shall be distributed in accordance with the Committee Settlement, the Proceeds Stipulation and the Plan.

(d) **Post-Effective Date Services**.  After the Effective Date, any requirement that Professionals comply with the Professional Fee Order or sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  The Plan Trustee shall pay any Professionals from the Wind Down Reserve for Post-Effective Date services requested by the Plan Trustee.

3.4.2 *Administrative Claims - Substantial Contribution Compensation and Expenses Bar Date*.  Any person or entity who requests compensation or expense reimbursement for making a substantial contribution ("**Substantial Contribution Claim**") in the Chapter 11 Case pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code, for a claim that arose from the Petition Date through July 1, 2019, was required to file an application with the clerk of the Bankruptcy Court on or before July 22, 2019, or be forever barred from seeking such compensation or expense reimbursement.  Any person or entity who requests compensation or expense reimbursement for a Substantial Contribution Claim in the Chapter 11 Case pursuant to sections 503(b)(3), (4) or (5) of the Bankruptcy Code, for a claim that arose from July 1, 2019 through the Effective Date, must file an application with the clerk of the Bankruptcy Court on or before a date that is thirty (30) days subsequent to the Effective Date (the "**Section 503 Deadline**") and serve such application on counsel for the Debtor and on all other parties as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the Section 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.  All Allowed Substantial Contribution Claims shall be paid by the Plan Trustee from the Wind Down Reserve within thirty (30) days of allowance by the Bankruptcy Court.

3.4.3   ***Administrative Claims – Allowed Claims under section 503(b)(9) of the Bankruptcy Code.***  Allowed Section 503(b)(9) Claims shall be paid in full in Cash by the Plan Trustee from the Wind Down Reserve as soon as reasonably practicable after the Effective Date.

3.4.4   ***Administrative Claims – Allowed Administrative Tax Claims***.  Allowed Administrative Tax Claims shall be paid in full in Cash by the Plan Trustee from the Wind Down Reserve as soon as reasonably practicable after the Effective Date.

3.4.5   ***Other Administrative Claims Bar Date***.  All requests for payment of an Administrative Claim, other than Professional Fee Claims, DIP Facility Claims, and Administrative Tax Claims, incurred after July 1, 2019 must be filed with the Bankruptcy Court and served on counsel to the Debtor, counsel to the DIP Lender, counsel to the Committee and counsel to the Plan Trustee no later than thirty (30) days after the Effective Date.  Unless the Plan Trustee objects to an Administrative Claim on or prior to the Claims Objection Deadline (subject to extension by consent or court order) such Administrative Claim shall be deemed an Allowed Administrative Claim in the amount requested.  All such Allowed Administrative Claims shall be paid in full in Cash by the Plan Trustee from the Wind Down Reserve as soon as reasonably practicable after the Effective Date.

### 3.5   *Implementation of the Plan.*

3.5.1   ***In General***.  The Plan is a liquidating plan and provides for the liquidation of the Estate Assets and the payment of the proceeds generated therefrom to holders of Allowed Claims in accordance with the priorities set forth in the Bankruptcy Code.  The Plan Trustee may, but is not required to, pursue any Third Party Claims not otherwise released under the Plan, DIP Order or other Order of the Bankruptcy Court by informal demand and/or by the commencement of litigation in any court of competent jurisdiction, with the recoveries of such Third Party Claims to be distributed in accordance with the Plan.

3.5.2   ***Means of Implementing the Plan***.  The primary means by which the Debtor will implement the Plan is through the Plan Trust and Plan Trustee.  The Plan Trustee may effect the dissolution of the Debtor and the Debtor's subsidiaries at any time after the Effective Date, regardless of whether Final Distributions have been made.

3.5.3   ***Transfer Taxes***.  Any transfer of the Plan Trust Assets or any portion(s) of the Plan Trust Assets pursuant to the Plan shall constitute a "transfer under a plan" within the purview of section 1146(c) of the Bankruptcy Code and shall not be subject to transfer, stamp or similar Taxes.

3.5.4   ***Estimated Plan Distribution***.  The Allowed Professional Fee Claims will be paid from the Professional Fee Claims Escrow and the Allowed Administrative Claims, Allowed Substantial Contribution Claims, Allowed Priority Non Tax Claims, and Allowed Priority Tax Claims will be paid pursuant to priorities set forth in the Bankruptcy Code from the Plan Trust Assets and Third Party Claims.  The amount of the Plan distribution on account of Class 4 General Unsecured Claims cannot be determined with certainty.

3.5.5   ***Time of Distributions.***  Except as otherwise provided for herein, ordered by the Bankruptcy Court, or otherwise, Distributions under the Plan shall be made in accordance

with the Committee Settlement and the Proceeds Stipulation or otherwise as soon as is reasonably practicable on the later to occur of (a) the Effective Date, (b) the date a Claim becomes an Allowed Claim, or (c) the date that Cash becomes available for Distribution to a particular Class pursuant to the treatment of such Class under the Plan.  The Plan Trustee may make additional Distributions of Cash and property received after the initial Distributions.  Such additional Distributions must be made in accordance with the timing set forth in the Committee Settlement and the Proceeds Stipulation.

####     3.6     *Funding and No Disbursing Agent.*

3.6.1   *Plan Predicated Upon Liquidation of the Estate Assets and Recoveries from Third Party Claims*.  The funding and treatment of Claims as contemplated in the Plan is predicated upon entry of the Confirmation Order and such Confirmation Order becoming a Final Order.

3.6.2   *No Separate Disbursing Agent*.  The Plan Trustee or his/her designee shall serve as the Disbursing Agent under the Plan for all creditors. The Plan Trustee may select an alternative disbursing agent for Allowed Claim (other than Professional Fee Claims) under the Plan.

####     3.7     *Executory Contracts and Unexpired Leases.*

3.7.1   *Assumption/Rejection*.   On the Effective Date, all Pre-Petition Date executory contracts, employment agreements and unexpired leases other than those leases and contracts that were previously assumed or rejected, except as set forth in Section 7.2 of the Plan, shall be deemed automatically rejected as of that date or such earlier date as the Debtor may have unequivocally terminated such lease or contract.   The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code.

3.7.2   *Rejection Damages Bar Date.*  If the rejection by the Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtor, the Plan Trustee or the properties of any of them unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Plan Trustee within twenty-one (21) days after entry of an Order authorizing the Debtor to reject an executory contract or unexpired lease; provided, however, that notwithstanding the foregoing, in the case of an executory contract or unexpired lease "deemed rejected" pursuant to Section 7.1 of the Plan which results in a Claim, such Claim shall be forever barred and shall not be enforceable against the Debtor, the Plan Trustee or the properties of any of them unless a proof of claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Plan Trustee within thirty (30) days after the Effective Date.

3.7.3   **Objections to Rejection Damage Claims.**  Objections to proofs of Claim for damages resulting from rejected executory contracts or unexpired leases shall be filed by the Plan Trustee with the Bankruptcy Court any time on or prior to the Claim Objection Deadline. Said objections shall be served upon the holder of the Claim to which such objection is made (or

holder's counsel, when applicable) and any Rejection Claim that is Allowed shall be treated as an Allowed Class 4 General Unsecured Claim in accordance with this Plan.

### 3.8    *Modification of the Plan.*

3.8.1    ***Plan May Be Modified***.  Upon mutual agreement of the Debtor and the Creditors' Committee, the Plan and Exhibits may be altered, amended or modified, with the consent of the DIP Lender, under section 1127(a) of the Bankruptcy Code at any time prior to the Effective Date.  After the Effective Date, the Plan Trustee may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Claimholders or Interestholders under the Plan; *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.  From and after the Effective Date and prior to substantial consummation of the Plan (as defined in section 1101(2) of the Bankruptcy Code), the Plan Trustee may seek non-material modification or amendment of the Plan pursuant to Section 13.2 of the Plan.

### 3.9    *Plan Controls.*

3.9.1    ***Plan Provisions Control***.  In the event and to the extent that any provision of the Plan is inconsistent with the provisions of this Disclosure Statement or any other agreement or instrument required or contemplated to be executed by the Debtor or the Plan Trustee, the provisions of the Plan will control.

### 3.10    *Binding Effect.*

3.10.1    ***Provisions of Plan are Binding***.  The provisions of the Plan and the Confirmation Order are binding and will inure to the benefit of the holders of Claims against, and Interests in, the Debtor and its respective successors, assigns, heirs and personal representatives, whether or not such persons voted to accept or reject the Plan.

### 3.11    *Procedures for Resolving Disputed Claims and Interests.*

3.11.1    ***Objections to Claims***.  Subsequent to Confirmation, the Plan Trustee will have the right to object to the allowance of any Claim and will have the exclusive right to object to the allowance of any General Unsecured Claim.  Such Objections, if any, will be filed with the Bankruptcy Court no later than the first Business Day that is at least 180 calendar days after the Effective Date.  For the avoidance of doubt, the Claim Objection Deadline may be extended one or more times by the Bankruptcy Court.

3.11.2    ***No Distributions Pending Allowance***.  No payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.  All objections to Disputed Claims must be filed by the Plan Trustee on or before the Claim Objection Deadline, unless such time period is extended by the Bankruptcy Court.

      3.11.3 *Compromises and Settlements*.  In accordance with the Final DIP Order, all decisions made by the Debtor (or, after the Effective Date, the Plan Trustee), regarding the disposition and/or treatment of the Debtor's assets, including any litigation, settlements or otherwise related thereto, shall require the consent of the DIP Lender and the Committee.  The Debtor expressly reserves the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle, up to and including the Effective Date, Claims against it and claims that it may have against other Persons.  After the Effective Date, such right will pass exclusively to the Plan Trustee to which such Claims will be conveyed pursuant to the Plan.

      3.11.4 *Procedures for Treating and Resolving Disputed Claims.*  Except as set forth in Section 8.7 of the Plan, no payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.  All objections to Disputed Claims shall be filed by the Plan Trustee on or before the Claim Objection Deadline, unless such time period is extended by the Bankruptcy Court.

      3.11.5 *Distribution Reserve.*  The Plan Trustee will withhold the Distribution Reserve from the property to be distributed under the Plan to Claimholders.  The Plan Trustee may request estimation for any Disputed Claim that is contingent or unliquidated, and the Plan Trustee will withhold the Distribution Reserve based upon the estimated amount of each such Claim as determined by the Bankruptcy Court.  If the Plan Trustee elects not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Plan Trustee will withhold the Distribution Reserve based upon the appropriate Pro Rata percentage Distribution of the Face Amount of such Claim.  Notwithstanding anything to the contrary herein, the Plan Trustee may not withhold any distributions of DIP Lender Cash to the DIP Lender that are required to be made under the terms of the Committee Settlement and Proceeds Stipulation.

      3.11.6 *Distributions After Allowance.*  Payments and Distributions from the Distribution Reserve on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Plan that govern the Class in which such Claim is classified.  As soon as reasonably practicable after the date when the order or judgment of the Bankruptcy Court allowing all or part of such Claim becomes a Final Order, the Plan Trustee shall distribute to the holder of such Claim any Cash allocated to such Claim in the Distribution Reserve that would have been distributed on the dates Distributions were previously made on account of Allowed Claims had such Claim been an Allowed Claim on such dates.  All Distributions made under this Section of the Plan on account of an Allowed Claim shall be made as if such Claim had been an Allowed Claim on the dates Distributions were previously made to Allowed Claims.

    *3.12*     *Retention of Claims Belonging to the Debtor.*

      3.12.1 *Third Party Claims*.  Unless otherwise released under a prior Order of the Bankruptcy Court or under the Plan, all Causes of Action and Third Party Claims are hereby preserved for prosecution and enforcement by the Plan Trustee.  For the avoidance of doubt and

without limiting the breadth and generality of the foregoing, the Identified Causes of Action shall be preserved for prosecution by the Plan Trustee. For the avoidance of doubt, neither the Debtor nor the Plan Trustee shall commence, litigate, prosecute and/or settle any Causes of Action against the Exculpated Parties for the Exculpated Claims. The Plan Trustee shall have no obligation to perform an analysis of or pursue any Cause of Action or Third Party Claims.

### 3.13    *Tax Consequences.*

3.13.1 **In General**. The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. For all federal income tax purposes, all parties (including the Debtor, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets by the Debtor to the Liquidating Trust, as set forth in the Liquidating Trust Agreement, as a transfer of such assets by the Debtor to the Holders of Allowed Claims entitled to distributions from the Liquidating Trust Assets, followed by a transfer by such Holders to the Liquidating Trust. Thus, the Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

3.13.2 The Federal income tax consequences of the Plan to a creditor or Interest Holder will depend upon a number of factors and can be complex. In general, a creditor that receives cash in satisfaction of its Allowed Claim will generally receive a gain or loss with respect to the principal amount of the Allowed Claim equal to the difference between: (i) the creditor's basis in the Claim (other than any Claim in respect to accrued interest); and (ii) the balance of the cash received after any allocation to the accrued interest. The Debtor has not determined the character of any gain or loss to be recognized by an Interest Holder with respect to any distribution, if any, such Interest Holder may receive under the Plan. This discussion does not apply to a Holder of a Claim that is not a "United States person," as such term is defined in the Internal Revenue Code of 1986. **FOR THE FOREGOING REASONS, HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) OF THE PLAN. THE DEBTOR IS NOT MAKING ANY REPRESENTATION REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR OR INTEREST HOLDER, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES. CREDITORS AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TREATMENT OF DISTRIBUTIONS MADE UNDER THE PLAN**.

## 4.    POST-CONFIRMATION ISSUES

### 4.1    *Role of Creditors' Committee.*    From and after the Effective Date, the Creditors' Committee shall not exist, except in accordance with Article 13.3 of the Plan.

### 4.2    *Employment of Counsel and Fees.*

4.2.1    ***Employment of Professionals After Confirmation***.    All professionals employed by the Debtor and the Creditors' Committee during the pendency of the Chapter 11 Cases shall continue to be employed, and will be entitled to compensation as holders of Administrative Claims for their services prior to the Effective Date.  Upon the occurrence of the Effective Date, the Plan Trustee shall be deemed a judicial substitute for the Debtor and shall be empowered to retain and/or employ professionals.

### 4.3    Exculpation and Limitation of Liability; Releases; and Injunction

4.3.1    ***Compromise and Settlement of Claims, Interests and Controversies.***  With the consent of the DIP Lender, pursuant to Bankruptcy Rule 9019(a), the Debtor may compromise and settle various (a) Claims against it, and (b) claims that it has against other Persons.  The Debtor expressly reserves the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle up to and including the Effective Date, Claims against it and claims that it may have against other Persons, subject to the consent of the DIP Lender.  After the Effective Date, such right shall pass exclusively to the Plan Trustee to which such claims shall be conveyed pursuant to the Plan, including in accordance with Section 9.1 of the Plan.

4.3.2    ***Release of Liens.***    Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the relevant Estate and its successors and assigns.

4.3.3    ***Releases by the Debtor.***  **EFFECTIVE AS OF THE <u>EFFECTIVE DATE</u> OF THE PLAN, PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, ON AND AFTER THE EFFECTIVE DATE, EACH <u>RELEASED PARTY</u> IS DEEMED CONCLUSIVELY, ABSOLUTELY, EXPRESSLY, UNCONDITIONALLY, IRREVOCABLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY RELEASED AND ACQUITTED BY THE <u>DEBTOR</u> AND THE DEBTOR'S <u>ESTATE</u> FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE <u>DEBTOR</u> OR THE DEBTOR'S <u>ESTATE</u>, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE OR OTHERWISE, THAT THE <u>DEBTOR</u> OR THE DEBTOR'S <u>ESTATE</u> OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE DEBTOR'S LIQUIDATION, THE <u>CHAPTER 11 CASE</u>, THE SUBJECT MATTER OF,**

OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY <u>RELEASED PARTY</u>, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE <u>CHAPTER 11 CASES, INCLUDING</u> THE NEGOTIATION, FORMULATION, PREPARATION, OR PERFORMANCE OF THE DIP FACILITY, THE <u>ASSET SALES</u>, THE <u>PLAN</u>, THE <u>DISCLOSURE STATEMENT</u> OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE <u>EFFECTIVE DATE</u> OF THE PLAN RELATING TO THE <u>DEBTOR</u> OR THE DEBTOR'S <u>ESTATE</u>, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.

4.3.4   *Releases by Holders.* AS OF THE <u>EFFECTIVE DATE</u> OF THE <u>PLAN</u>, EACH AND ALL OF THE <u>RELEASING PARTIES</u> SHALL BE DEEMED TO CONCLUSIVELY, ABSOLUTELY, EXPRESSLY, UNCONDITIONALLY, IRREVOCABLY, GENERALLY AND INDIVIDUALLY AND COLLECTIVELY, RELEASE AND ACQUIT EACH AND ALL OF THE <u>RELEASED PARTIES</u> AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL ACTIONS, CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE AGAINST OR ON BEHALF OF ANY OR ALL OF THE RELEASED PARTIES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE OR OTHERWISE, THAT SUCH RELEASING PARTY (WHETHER INDIVIDUALLY OR COLLECTIVELY) EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE <u>DEBTOR</u>, THE DEBTOR'S ESTATE, THE DEBTOR'S LIQUIDATION, THE <u>CHAPTER 11 CASE</u>, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY <u>CLAIM</u> OR <u>INTEREST</u> THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE <u>DEBTOR</u> AND ANY <u>RELEASED PARTY</u>, THE RESTRUCTURING OF <u>CLAIMS</u> AND <u>INTERESTS</u> BEFORE OR DURING THE <u>CHAPTER 11 CASE</u>, INCLUDING THE NEGOTIATION, FORMULATION, PREPARATION OR PERFORMANCE OF THE <u>DIP FACILITY</u>, THE <u>ASSET SALES</u>, THE <u>PLAN</u>, THE <u>DISCLOSURE STATEMENT</u>, OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE <u>EFFECTIVE DATE</u> OF THE <u>PLAN</u> RELATING TO THE <u>DEBTOR</u> OR THE <u>DEBTOR'S ESTATE</u>, EXCEPT FOR ANY CLAIMS AND CAUSES OF ACTION FOR ACTUAL FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.

4.3.5   *Liabilities to, and Rights of, Governmental Units.*  Nothing in the Plan or Confirmation Order shall release, or preclude:  (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Effective Date; (3) any

liability to a Governmental Unit on the part of any Person or Entity other than the Debtor or Plan Trustee; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability.    Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.    The injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Effective Date, pursuing any police or regulatory action.

4.3.6 *Exculpation.*    EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE <u>PLAN</u>, NO <u>EXCULPATED PARTY</u> SHALL HAVE OR INCUR, AND EACH <u>EXCULPATED PARTY</u> IS HEREBY RELEASED AND EXCULPATED FROM ANY <u>EXCULPATED CLAIM</u>, OBLIGATION, CAUSE OF ACTION OR LIABILITY FOR ANY <u>EXCULPATED CLAIM</u>, EXCEPT FOR FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO RAISE ANY AFFIRMATIVE DEFENSES, INCLUDING REASONABLE RELIANCE UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE <u>PLAN</u>.    THE <u>DEBTOR AND THE COMMITTEE</u> (AND EACH OF ITS AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS AND ATTORNEYS) HAVE PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS AND PROVISIONS OF THE <u>BANKRUPTCY CODE</u> WITH REGARD TO THE SOLICITATION OF VOTES AND TRANSFER OF <u>ESTATE ASSETS</u> TO THE <u>PLAN TRUST</u> PURSUANT TO THE <u>PLAN</u> AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH TRANSFER SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE <u>PLAN</u> OR THE TRANSFER OF <u>ESTATE ASSETS</u> PURSUANT TO THE PLAN.

4.3.7 *Injunction.*    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE <u>PLAN</u> OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE <u>PLAN</u>, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD <u>CLAIMS</u> OR <u>INTERESTS</u> THAT ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 9.6 OF THE PLAN OR THAT HAVE BEEN RELEASED UNDER THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE <u>EFFECTIVE DATE</u>, FROM TAKING ANY OF THE FOLLOWING ACTIONS:    (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH <u>CLAIMS</u> OR <u>INTERESTS</u>; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH <u>CLAIMS</u> OR <u>INTERESTS</u>; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR <u>ESTATES</u> OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH <u>CLAIMS</u> OR <u>INTERESTS</u>; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES

35

ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH **CLAIMS** OR **INTERESTS** UNLESS SUCH **HOLDER** HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE EFFECTIVE DATE, AND NOTWITHSTANDING AN INDICATION OF A **CLAIMS** OR **INTERESTS** OR OTHERWISE THAT SUCH **HOLDER** ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH **CLAIMS** OR **INTERESTS** RELEASED OR SETTLED PURSUANT TO THE **PLAN**.

4.3.8    FROM AND AFTER THE **EFFECTIVE DATE**, TO THE EXTENT OF THE EXCULPATION GRANTED IN THIS ARTICLE, THE **DEBTOR** AND **HOLDERS** OF **CLAIMS** OR **INTERESTS** SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE **EXCULPATED PARTIES** AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY EXCULPATED CLAIM.

4.3.9    THE RIGHTS AFFORDED IN THE **PLAN** AND THE TREATMENT OF ALL **CLAIMS** OR **INTERESTS** HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF **CLAIMS** OR **INTERESTS** OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON **CLAIMS** FROM AND AFTER THE **PETITION DATE**, AGAINST THE **DEBTOR** OR ANY OF ITS ASSETS, OR **ESTATE ASSETS**.  ON THE **EFFECTIVE DATE**, ALL SUCH **CLAIMS** AGAINST THE **DEBTOR** SHALL BE FULLY RELEASED, AND THE **INTERESTS** SHALL BE CANCELLED.

4.3.10    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE **EFFECTIVE DATE**, ALL **CLAIMS** SHALL BE FULLY RELEASED, AND THE **INTERESTS** SHALL BE CANCELLED, AND THE **DEBTOR'S** LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE **BANKRUPTCY CODE**.

4.3.11    ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE **DEBTOR**, THE **DEBTOR'S** **ESTATE**, THE **CREDITORS' COMMITTEE** THE **PLAN TRUSTEE**, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER **CLAIMS** OR **INTERESTS** BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE **EFFECTIVE DATE**.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ON OR AFTER THE **EFFECTIVE DATE**, EXCEPT AS OTHERWISE PROVIDED HEREIN OR IN A PRIOR ORDER OF THE **BANKRUPTCY COURT**, A **CLAIM** MAY NOT BE FILED OR AMENDED WITHOUT THE PRIOR AUTHORIZATION OF THE **BANKRUPTCY**

**COURT OR THE CONSENT OF THE <u>PLAN TRUSTEE</u>.   ABSENT SUCH AUTHORIZATION OR CONSENT, ANY NEW OR AMENDED <u>CLAIM</u> FILED SHALL BE DEEMED <u>DISALLOWED</u> IN FULL AND EXPUNGED WITHOUT FURTHER ORDER OF THE <u>BANKRUPTCY COURT</u>.**

        4.3.12 *Term of Injunctions or Stays*.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

        4.3.13 *No Liability for Solicitation or Participation*.  As specified in section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale or purchase of securities.

## 5.  FEASIBILITY

### 5.1  *Financial Feasibility Analysis.*

        5.1.1 *Bankruptcy Code Standard*.  The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan.

        5.1.2 *No Need for Further Reorganization of Debtor*.  The Plan provides for the liquidation of all of the Debtor's Assets.  Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

## 6.  ALTERNATIVES TO THE PLAN

### 6.1  *Chapter 7 Liquidation.*

        6.1.1 *Bankruptcy Code Standard*.  Notwithstanding acceptance of the Plan by the requisite number of Creditors and Interest Holders of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims and Interests a recovery that has a value at least equal to the value of the distribution that each such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

        6.1.2 *Plan is in Best Interest of Creditors*.  The Debtor believes that the Plan satisfies this standard because the Plan provides for an orderly liquidation of the Assets. Furthermore, the Debtor believes that the Plan also provides creditors with a degree of certainty that would not exist if the Assets were subject to liquidation outside of the Plan and eliminates the

risks and expenses of the marketplace and continual administration of the Debtor. In this regard, in the event of a liquidation under Chapter 7, some administrative expenses may go unpaid, general unsecured creditors would likely receive no distribution, and the following is likely to occur:

1.    Additional administrative expenses, including trustee's commissions, fees for trustee's accountant, attorneys and other professionals likely to be retained, would be incurred with priority over general unsecured claims under section 507(a) of the Bankruptcy Code and would materially reduce creditor recovery.

2.    Distributions would likely be substantially delayed, while expenses of administration would continue to grow.

It is the Debtor's belief that in a Chapter 7 liquidation of the Debtor, the Unsecured Creditors would not receive a distribution. Accordingly, the Debtor believes that the Plan is in the best interests of creditors. *See* Chapter 7 Liquidation Analysis attached hereto as **Exhibit B**.

### 6.2    *Risk Factors.*

6.2.1    There can be no assurance by the Debtor that it or the Plan Trustee will be able to liquidate its remaining Assets. Even in the event of the liquidation of the Debtor's remaining Assets, there can be no assurance by the Debtor that such sale or sales will generate additional proceeds for distribution to the holders of Allowed General Unsecured Claims.

6.2.2    There can be no assurance at this time of the number or amount of Claims that will ultimately be Allowed, and thus the projected recoveries disclosed in this Disclosure Statement are highly speculative. A large amount of Allowed Claims may materially and adversely affect, among other things, the recoveries to holders of Allowed Claims under the Plan. Some holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Debtor's various assumptions, even those holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery. Therefore, there can be no assurance by the Debtor that there will be Plan Trust Assets available to make Distributions to holders of Allowed Claims or that there will be sufficient Plan Trust Assets to meet the projected recoveries provided for in this Disclosure Statement.

6.2.3    Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, and the value of such assets could potentially be zero. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtor's creditors, including holders of Claims in the voting classes.

6.2.4    Although the Debtor has made commercially reasonable efforts to disclose projected recoveries in this Disclosure Statement, it is possible that the amount of Allowed Claims will be materially higher than any range of possible Allowed Claims the Debtor has considered to date, and thus creditor recoveries could be materially reduced or eliminated. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by

many factors that cannot be predicted.  Therefore, the Debtor cannot guarantee the timing of any recovery on an Allowed Claim.

6.2.5    Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtor believes that the classification of the Claims and Interests under the Plan complies with this requirement.  There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

6.2.6    The Debtor may not be able to secure confirmation of the Plan.  The Debtor will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code; and (d) such plan provide for the payment in full of administrative claims. There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

6.2.7    The Bankruptcy Court may determine that the Plan cannot be confirmed under section 1129 of the Bankruptcy Code if the Plan Trust Assets are not sufficient to satisfy Allowed Administrative Claims in full.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

6.2.8    The Bankruptcy Court may determine that the Plan does not meet the requirements for confirmation under the Bankruptcy Code and applicable law, including, without limitation, as a result of the third party releases conferred upon the Debtor's insiders and other parties under the Plan.

6.2.9    Article X of the Plan sets forth certain conditions that must be fulfilled before the Effective Date of the Plan can occur.  As of the date of this Disclosure Statement, there can be no assurance that any or all of such conditions in the Plan will be met (or waived) or that other conditions to consummation (if any) will be satisfied.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

6.2.10  Any delays of either confirmation or effectiveness of the Plan could result in, among other things, increased administrative costs.   The negative effects of delays in confirmation or effectiveness of the Plan could affect the ultimate approval of the Plan by the Bankruptcy Court.

6.2.11  Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.  To the extent that the Plan Trust Interests are deemed to constitute securities issued in accordance with the Plan, the Debtor believes that the Plan Trust Interests should satisfy the requirements of section 1145(a)(1) and, therefore, should be exempt from registration under the Securities Act and applicable state securities laws.  Claimholders or Interest holders should consult their own advisors regarding any securities law consequences of the treatment of their Claims or Interests under the Plan.

6.2.12  As discussed in this Disclosure Statement, there are material income tax considerations, risks and uncertainties associated with consummation of the Plan.  Claimholders and Interest holders should read carefully the discussion set forth in Section 3.13 of this Disclosure Statement and consult with their own tax advisors to determine any tax implications of the Plan to such holders.

### 6.3     Recommendations.

6.3.1   It is the position of the Debtor and the Creditors' Committee that the Plan is preferable to a liquidation under Chapter 7 of the Bankruptcy Code.  Conversion of this Chapter 11 Case would result in: (i) substantial delays in the distribution of any proceeds (if any) available under such alternative; (ii) increased uncertainty as to whether payments would be made to Unsecured Creditors; and (iii) substantially increased administrative costs.

**THE DEBTOR AND THE CREDITORS' COMMITTEE RECOMMEND THAT YOU VOTE IN FAVOR OF THE PLAN.**

## 7.     CONCLUSION

It is important that you exercise your right to vote on the Plan.  It is the Debtor and the Creditors' Committee's belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against the Debtor and is substantially preferable to a liquidation under Chapter 7 of the Bankruptcy Code.

     IN WITNESS WHEREOF, the Plan Proponents have executed this Disclosure Statement this 26th day of May, 2020.

Respectfully submitted,

Achaogen, Inc.

By:    */s/ Nicholas K. Campbell*
        Nicholas K. Campbell
        Chief Restructuring Officer

Official Committee of Unsecured Creditors of Achaogen, Inc.

By:    */s/ Sally E. Veghte*

# <u>EXHIBIT A</u>

**Estimated Percent Distribution**

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Claim / Equity Interest | Status | Estimated Percent Recovery Under the Plan[1] |
|-------|------------------------|--------|---------------------------------------------|
| 1 | DIP Facility / Prepetition Term Loan Secured Claim[2] | Impaired | 22% - 44% |
| 2 | Priority Tax Claims | Unimpaired | 100% |
| 3 | Priority Non-Tax Claims | Unimpaired | 100% |
| 4 | General Unsecured Claims[3] | Impaired | 2% - 5% |
| 5 | Equity and Other Interest Claims | Impaired | 0% |

[1] Low and high recoveries assume the Debtor receives future proceeds from litigation settlements and royalty streams.

[2] Low recovery includes $5.3 million of payments already distributed ($4.3 million from various asset purchases and $954 thousand in interest payments). High recovery includes an additional $5.5 million of future proceeds (80% of proceeds net of deferred professional fees). Total amount of debt outstanding is $24.4 million.

[3] Low recovery includes $948 thousand of payments from various asset purchases and high recovery includes an additional $1.3 million of future proceeds (20% of proceeds net of deferred professional fees). Total amount of general unsecured claims is approximately $48.8 million.

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

**Achaogen, Inc**
Achaogen, Inc. - Liquidation Analysis
*Assumptions*

**Assumptions (Gross Liquidation Proceeds)**

| | | |
|---|---|---|
| 1 | **Cash and Cash Equivalents** | Cash is all unrestricted so assume full % recovery |
| 2 | **Accounts Receivable** | Consists of 3 customers who purchased ZEMDRI over a year ago - low recovery if have not been paid yet |
| 3 | **Other Current Assets** | Property tax refund from appeal process |
| 4 | **Other Non-Current Assets** | Consists of prepayment to C-scape equipment. Assuming a zero recovery as the C-scape program has little to no value remaining |
| 5 | **Estate Wind-Down Expenses** | Assume $350k - $400k cost to wind down the estate |
| 6 | **Chapter 7 Trustee Fees** | $250k reserved per UCC and DIP Lender agreement plus another $100k for legal and financial advisors |
| 7 | **Remaining Carve Out Professional Fees** | Remaining balance in carve out account |
| 8 | **Deferred Professional Fees** | Professional fee estimate above the carve out funding that will be paid upon future proceeds |

**Assumptions (Other)**

- There are $1.6 million worth of Chapter 11 Administrative Claims

- In addition to the unsecured debt there are other general unsecured claims totaling $48 million.  These consist of lease rejection claims and trade claims.

**Capital Structure**

    **Secured Debt**

| | |
|---|---|
| DIP Loan | $9.4 million |
| Secured Loan Prepetition | $15 million |

**Achaogen, Inc.**
Achaogen, Inc. - Liquidation Analysis
*Consolidated Liquidation Analysis*

| | | Net Book Value | Liquidation Analysis - Achaogen | | | | Comments/ Notes (if needed) |
|---|---|---|---|---|---|---|---|
| | | | Low | | High | | |
| | | 3/31/2020 | % | $ | % | $ | |
| | Notes | | | | | | |
| **Assets** | | | | | | | |
| Cash and Cash Equivalents | 1 | $ 1,511,628 | 100% | $ 1,511,628 | 100% | $ 1,511,628 | |
| Accounts Receivable | 2 | 180,337 | 32% | 57,960 | 47% | 84,759 | In communication with 360 Infusion customer regarding a $57,960 settlement to their $144,000 outstanding debt. Also reaching out to Emerald Coast customer regarding $26,775 outstanding balance but have not heard a response |
| Other Current Assets | 3 | 95,849 | 0% | - | 100% | 95,849 | 2019 San Mateo property tax refund after appeal |
| Other Non-Current Assets | 4 | 494,882 | 0% | - | 0% | - | Prepayment on C-scape equipment contract (do not own equipment). Not liquid and little value in the C-scape program |
| **Gross Liquidation Proceeds** | | $ 2,282,696 | 69% | $ 1,569,588 | 74% | $ 1,692,235 | |
| **Liquidation Costs** | | | | | | | |
| Estate Wind-Down Expenses | 5 | (400,000) | | (350,000) | | (400,000) | Includes US Trustee fees for distributions plus operating wind-down expenses |
| Chapter 7 Trustee Fees | 6 | (350,000) | | (350,000) | | (350,000) | |
| Remaining Carve Out Professional Fees | 7 | (805,996) | | (805,996) | | (805,996) | Remaining balance in carve out professional fee account |
| Deferred Professional Fees | 8 | (871,042) | | (871,042) | | (871,042) | |
| **Total Liquidation Expenses** | | $ (2,427,038) | | $ (2,377,038) | | $ (2,427,038) | |
| **Proceeds Available for Distribution** | | $ (144,342) | | $ (807,450) | | $ (734,803) | |
| **Secured Claims** | | | | | | | |
| DIP Loan | | 4,145,257 | 0% | 4,145,257 | 0% | 4,145,257 | DIP Loan balance of $9,392,098 less $5,246,841 of recover as of 3/31 ($968,150 Cipla sale, $953,691 interest and $3,325,000 China and Qilu sale) |
| SVB Prepetition Loan Balance | | 15,000,000 | 0% | 15,000,000 | 0% | 15,000,000 | |
| Total Secured Claims | | 19,145,257 | 0% | 19,145,257 | 0% | 19,145,257 | |
| **Remaining Amount Available for Distribution** | | | | (19,952,707) | | (19,880,060) | |
| **Administrative Claims / Priority Claims** | | Claim Amount | | | | | |
| Administrative Claims | | 1,139,647 | 0% | 169,647 | 0% | 1,139,647 | Low assumptions removed the following:<br>- $31,000 503b9 claims that were prepetition<br>- $399,431 equity claims<br>- $539,569 trade claims from assumed contracts by Cipla (Eversana, JMI and Microgenics |
| Priority Claims | | 453,324 | 0% | 22,795 | 0% | 453,324 | Low assumptions removed the following:<br>- $54,161 blank claims as they related to equity claims<br>- $61,382 equity claims<br>- $191,591 trade claims<br>- $123,395 employee claims as KERP employees that waived right (Rogers and Peterson) |
| Total Admin and Priority Claims | | 1,592,971 | 0% | 192,442 | 0% | 1,592,971 | |
| **Remaining Amount Available for Distribution** | | | | (20,145,149) | | (21,473,031) | |
| **Unsecured & Other Claims** | | | | | | | |
| General Unsecured Claims | | 47,873,880 | 0% | 47,873,880 | 0% | 47,873,880 | GUC less GUC reserve of $948,000 |
| Total General Unsecured Claims | | 47,873,880 | 0% | 47,873,880 | 0% | 47,873,880 | |
| **Remaining Amount Available for Distribution** | | | | $ (68,019,029) | | $ (69,346,911) | |